Daniel C. Girard (CA Bar No. 114826); dcg@girardgibbs.com
Elizabeth C. Pritzker (CA Bar No. 146267); ecp@girardgibbs.com
Aaron M. Sheanin (CA Bar No. 214472) ams@girardgibbs.com
Alex C. Turan (CA Bar No. 227273); act@girardgibbs.com
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, California 94104
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

RUBEN ROMERO and SARAH YAHN, on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

FIDELITY NATIONAL FINANCIAL, INC., FIDELITY NATIONAL TITLE INSURANCE COMPANY, TICOR TITLE INSURANCE COMPANY, TICOR TITLE INSURANCE COMPANY OF FLORIDA, CHICAGO TITLE INSURANCE COMPANY, NATIONAL TITLE INSURANCE COMPANY OF NEW YORK, INC., SECURITY UNION TITLE INSURANCE COMPANY, THE FIRST AMERICAN CORPORATION, FIRST AMERICAN TITLE INSURANCE COMPANY, UNITED GENERAL TITLE INSURANCE COMPANY, LANDAMERICA FINANCIAL GROUP, INC., COMMONWEALTH LAND TITLE INSURANCE COMPANY, LAWYERS TITLE INSURANCE CORPORATION, TRANSNATION TITLE INSURANCE COMPANY, STEWART TITLE GUARANTY COMPANY, STEWART TITLE INSURANCE COMPANY, OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY, and OLD REPUBLIC INTERNATIONAL CORPORATION,

Defendants.

Case No._____

CLASS ACTION COMPLAINT

DEMAND FOR JURY TRIAL

CLASS ACTION COMPLAINT

Plaintiffs Ruben Romero and Sarah Yahn, on behalf of themselves and all others similarly situated, allege as follows:

## INTRODUCTION

1.      Plaintiffs bring this antitrust action on behalf of all persons and entities who purchased title insurance in the State of California directly from the named defendants or any co-conspirator as identified in this Complaint.

2.      Title insurance is one of the most costly items associated with a real estate purchase, aside from the purchase price of the property. In 2005, the price of title insurance for residential properties ranged from approximately $1,010 (for a $250,000 property) to $1,490 (for a $500,000). Title insurance premiums for more expensive homes and commercial properties are significantly higher.

3.      Title insurance differs from other kinds of insurance in three respects. First, unlike automobile, life, homeowners or other forms of insurance, which protect consumers from loss resulting from an event that may occur in the future, title insurance offers protection from events that occurred in the past that may affect the title to the property. Second, unlike other forms of insurance, in which coverage may vary, most title insurance policies are based on a single set of form policies, published by the American Land Title Association, and provide substantially the same protection. Third, unlike other forms of insurance, title companies do not market their products directly to the consumers who pay for them. Instead, title insurers rely on "reverse competition" to market and sell their products. They pay commissions, kick-backs or referral fees, or provide other inducements to real estate agents, banks, lenders, builders and others involved in real estate transactions to use their insurance products as part of those transactions.

4.      In California, the title insurance market is dominated by five companies and their affiliates or subsidiaries: Fidelity National Financial, Inc., First American Corporation, LandAmerica Financial Group, Inc., Stewart Title Guaranty Title Company, and Old Republic National Title Insurance Company. Combined, these five affiliate groups sell about 92 percent of the title insurance policies sold in California – or roughly $2.85 billion of the $3.1 billion in title insurance premiums collected from California consumers in 2004.

1    5.    In some of the major markets in the United States, such as New York, these same title

2  insurers collectively meet, jointly set rates, and file these rates with the applicable state insurance

3  authority.  The rates are not subject to any meaningful review or regulation, however.  Moreover, the

4  companies agree to fix the price of title insurance at levels that include commissions, kick-backs and

5  other inducements paid to middlemen to steer business referrals to these companies.  These agreed-

6  upon rates far exceed the risk and loss experience associated with title insurance.  As a result of their

7  joint rate setting agreement, no company competes on price to the consumer.

8    6.    Having agreed to fix prices in states where joint rate setting occurs, the five groups of

9  affiliated companies agreed not to compete based on price to the consumer in other states, including

10  California, where regulation of filed rates is non-existent.  The result of this arrangement in California

11  is that these companies have agreed to compete by offering inducements to middlemen for business

12  referrals and thereby have fixed the rates of title insurance premiums at supra competitive levels.

13    7.    These agreements and activities by five affiliate groups of title insurers, combined with

14  their market dominance in the State, have enabled these companies to maintain the price of title

15  insurance in California at artificially high levels.  California regulators have acknowledged the harm

16  these agreements and this anti-competitive conduct have caused consumers during the Class Period.

17    8.    In 2005, for example, the California Office of the Insurance Commissioner found an

18  "astonishing number" of kickbacks and similar inducements by title insurers to middlemen in

19  violation of state law.  A report to the California Insurance Commissioner prepared that same year by

20  Birny Birnbaum, a consulting economist, also found "numerous examples in California of illegal

21  rebates and kickbacks where the title insurer or the underwritten title company provides money, free

22  services or other things of value to a real estate agent, a lender or homebuilder in exchange for

23  business referrals."  (*An Analysis of Competition in the California Title Insurance and Escrow*

24  *Industry*, December 2005, p.3)  Similar findings by California Insurance Commissioner, Steve

25  Poizner, led to a February 2007 statement in which the Commissioner declared that "reasonable price

26  competition does not exist for title and escrow services" in California.  (*Insurance Commissioner*

27  *Steve Poisner Issues Statement Following Decision by OAL in New Regulations, California*

28  *Department of Insurance*, February 22, 2007.)

1      9.     The California Insurance Commissioner does not actively oversee or regulate rates,

2  however, and does not have the power to do so.  The absence of regulation by the California Insurance

3  Commissioner has allowed collusive behavior among the five affiliate groups that dominate the

4  market, as described herein, resulting in excessive rates for title insurance premiums in California.

5      10.    As a result of defendants' unlawful conduct, plaintiffs and members of the Class paid

6  higher prices for title insurance than they would have paid in a competitive market.

### JURISDICTION AND VENUE

8      11.    Plaintiffs bring this action to obtain injunctive relief and to recover damages, including

9  treble damages, costs of suit, and reasonable attorneys' fees arising from defendants' violations of

10  Section 1 of the Sherman Act (15 U.S.C. § 1).  Plaintiffs also bring this action under the California

11  Cartwright Act (Business and Professions Code § 16720 *et seq.*), and the California Unfair

12  Competition Law (Business and Professions Code § 17200 *et seq.*).

13      12.    This Court has jurisdiction over this action pursuant to Sections 4 and 16 of the

14  Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331, 1332(d) and 1337(a).  This Court also

15  has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

16      13.    Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15

17  U.S.C. § 22) and 28 U.S.C. § 1391(b), (c) and (d), because a substantial part of the events giving rise

18  to the plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade

19  and commerce was carried out in this District, and one or more  defendants transact business, maintain

20  offices or are found in this District.

### PARTIES

22  **Plaintiffs**

23      14.    Plaintiffs Ruben Romero and Sarah Yahn, a married couple, are individuals residing in

24  California.  During the Class Period, plaintiffs Romero and Yahn purchased title insurance in

25  California directly from one or more of the defendants and have been injured by reason of the antitrust

26  violations alleged.

**Defendants**

**A.    Fidelity Family of Title Companies**

15.    Defendant Fidelity National Financial, Inc. ("Fidelity National") is a Delaware corporation headquartered at 601 Riverside Avenue, Jacksonville, Florida 32204. Fidelity National does business in California through one or more of its subsidiaries, including defendants Fidelity National Title Insurance Company, Ticor Title Insurance Company, Ticor Title Insurance Company of Florida, National Title Insurance of New York, Inc., Security Union Title Insurance Company, and Chicago Title insurance Company. Fidelity National is registered to do business in California.

16.    Defendant Fidelity National Title insurance Company ("Fidelity Title") is a California corporation with its principal place of business located at 601 Riverside Avenue, Jacksonville, Florida 32204. Fidelity Title does business in California, is a licensed title insurance company in California, and is registered to do business in California.

17.    Defendant Ticor Title Insurance Company ("Ticor") is a California corporation with its principal place of business located at 601 Riverside Avenue, Jacksonville, Florida 32204. Ticor does business in California, is a licensed title insurance company in California, and is registered to do business in California.

18.    Defendant Ticor Title Insurance Company of Florida ("Ticor Florida") is a Florida corporation with its principal place of business located at 601 Riverside Avenue, Jacksonville, Florida 32204. Ticor Florida does business in California, is a licensed title insurance company in California, and is registered to do business in California.

19.    Defendant Chicago Title insurance Company ("Chicago Title") is a Missouri corporation with its principal place of business located at 601 Riverside Avenue, Jacksonville, Florida 32204. Chicago Title does business in California, is a licensed title insurance company in California, and is registered to do business in California.

20.    Defendant National Title Insurance of New York, Inc. ("National Title") is a New York corporation with its principal place of business located at 601 Riverside Avenue, Jacksonville, Florida 32204. National Title does business in California, is a licensed title insurance company in California, and is registered to do business in California.

21.     Defendant Security Union Title Insurance Company ("Security Union") is a California corporation with its principal place of business located at 601 Riverside Avenue, Jacksonville, Florida 32204. Security Union does business in California, is a licensed title insurance company in California, and is registered to do business in California.

22.     The Fidelity family of title insurance companies (collectively "Fidelity") including Fidelity National, Fidelity Title, Ticor, Ticor Florida, Chicago Title, National Title, Security Union, and their affiliates, sells title insurance to purchasers of commercial and residential real estate throughout the United States, including California. Nationally, Fidelity accounts for approximately 27 percent of title premiums. These sales amounted to approximately $4.6 billion in 2006. Fidelity, Chicago Title, and Ticor also were founding members of the New York rate-setting organization known as TIRSA (discussed below), and have collectively fixed title insurance rates in the State of New York under that rate setting regime since TIRSA's inception in 1991.

23.     Fidelity and its affiliates are wholly-owned and controlled by Fidelity National. Through its subsidiaries, Fidelity National is a provider of title insurance, specialty insurance, and claims management services. During 2006, Fidelity National had revenues of approximately $9.4 billion. Fidelity engaged in the conduct challenged here with the approval of Fidelity National.

**B.     The First American Family of Title Companies**

24.     Defendant The First American Corporation ("First American Corp.") is a California corporation with its headquarters located at 1st American Way, Santa Ana, California 92707. First American does business in California through one or more of its subsidiaries, including First American Title Insurance Company.

25.     Defendant First American Title Insurance Company ("First American Title") is a California corporation with its headquarters at First American Way, Santa Ana, California 92707. First American Title does business in California, is a licensed title insurance company in California, and is registered to do business in California.

26.     Defendant United General Title Insurance Company ("United General") is a Colorado corporation located at 8310 S. Valley Highway, Suite 130, Englewood, Colorado 80112. United

1  General does business in California, is a licensed title insurance company in California, and is

2  registered to do business in California.

3        27.     The First American family of title insurance companies (collectively "First

4  American"), including defendants First American, First American Title, United General, and their

5  affiliates, sells title insurance to purchasers of commercial and residential real estate throughout the

6  United States, including California. Nationally, First American accounts for approximately 29 percent

7  of title premiums. These sales amounted to approximately $4.8 billion in 2006.

8        28.     The First American family of title insurance companies and their affiliates are wholly-

9  owned and controlled by First American Corp. Through its subsidiaries, First American is a provider

10 of title insurance, business information, and related products and services. During 2006, First

11 American had revenues of approximately $8.5 billion. The First American family of title insurance

12 companies and their affiliates engaged in the conduct challenged here with the approval of First

13 American Corp.

14 **C.    LandAmerica Family of Title Companies**

15       29.     Defendant LandAmerica Financial Group, Inc. ("LandAmerica") is a Virginia

16 corporation headquartered at 5600 Cox Road, Glen Allen, Virginia 23060. LandAmerica does

17 business in California through one or more of its subsidiaries, including Commonwealth Land Title

18 Insurance Company, Lawyers Title Insurance Corporation, and Transnation Title insurance Company.

19       30.     Defendant Commonwealth Land Title Insurance Company ("Commonwealth") is a

20 Pennsylvania corporation with its principal place of business located at 5600 Cox Road, Glen Allen,

21 Virginia 23060. Commonwealth does business in California, is a licensed title insurance company in

22 California, and is registered to do business in California.

23       31.     Defendant Lawyers Title Insurance Corporation ("Lawyers Title") is a Nebraska

24 corporation with its principal place of business located at 5600 Cox Road, Glen Allen, Virginia 23060.

25 Lawyers Title does business in California, is a licensed title insurance company in California, and is

26 registered to do business in California.

27       32.     Defendant Transnation Title Insurance Company ("Transnation") is a Nebraska

28 corporation with its principal place of business located at 5600 Cox Road, Glen Allen, Virginia 23060.

1  Transnation does business in California, is a licensed title insurance company in California, and is

2  registered to do business in California.

3      33.    The LandAmerica family of title insurance companies (collectively "LandAmerica"),

4  including defendants LandAmerica, Commonwealth, Lawyers Title, Transnation, and their affiliates,

5  is engaged in selling title insurance to purchasers of commercial and residential real estate throughout

6  the United States, including California. Nationally, LandAmerica accounts for approximately 19

7  percent of title premiums. These sales amounted to approximately $3.15 billion in 2006.

8      34.    The LandAmerica family of title insurance companies and their affiliates are wholly-

9  owned and controlled by defendant LandAmerica Financial Group, Inc. Through its subsidiaries,

10  LandAmerica is a provider of title insurance and other products and services that facilitate the

11  purchase, sale, transfer, and financing of residential and commercial real estate. During 2006,

12  LandAmerica had revenues of approximately $4 billion. The LandAmerica family of title insurance

13  companies and their affiliates engaged in the conduct challenged here with the approval of

14  LandAmerica.

15  **D.    Stewart Family of Title Companies**

16      35.    Defendant Stewart Title Guaranty Company ("Stewart Guaranty") is a Texas

17  corporation headquartered at 1980 Post Oak Blvd., Suite 800, Houston, Texas 77056. Stewart

18  Guaranty does business in California, is a licensed title insurance company in California, and is

19  registered to do business in California.

20      36.    Defendant Stewart Title insurance Company ("Stewart Title") is a New York

21  corporation with its principal place of business located at 300 E. 42nd Street, Floor 10, New York,

22  New York 10017. Stewart Title does business in California, is a licensed title insurance company in

23  California, and is registered to do business in California.

24      37.    The Stewart family of title insurance companies (collectively "Stewart"), including

25  defendants Stewart Guaranty, Stewart Title, and their affiliates, sells title insurance to purchasers of

26  commercial and residential real estate throughout the United States and California. Nationally,

27  Stewart accounts for approximately 12 percent of title premiums. These sales amount to

28  approximately $2 billion in 2006.

1  **E.    Old Republic Family of Title Companies**

2       38.    Old Republic National Title Insurance Company ("Old Republic") is a Delaware

3  corporation with its principle place of business located at 400 Second Avenue South, Minneapolis,

4  Minnesota 55401.  Old Republic sells title insurance to purchasers of commercial and residential real

5  estate throughout the United States, including California, and is a licensed title insurance company in

6  California and is registered to do business in California.  Nationally, Old Republic accounts for

7  approximately 6 percent of title premiums that, in 2006, amount to roughly $1 billion.

8       39.    Old Republic and its affiliates are wholly owned and/or controlled by defendant Old

9  Republic International Corporation ("Old Republic International"), a Delaware corporation

10  headquartered in Chicago, Illinois.  Through its subsidiaries, Old Republic International is a provider

11  of title insurance, general insurance, mortgage guaranty insurance, and life and health insurance.  Old

12  Republic international had 2006 revenues of approximately $3.8 billion.  Old Republic engaged in the

13  conduct alleged here with the approval of Old Republic International.

14       40.    Together, defendants account for more than 90 percent of the market for title insurance

15  premiums consumers pay in California.  Defendants account for more than 85 percent of the national

16  market for title insurance premiums.  In 2006, those sales amounted to approximately $14.5 billion.

17                          **AGENTS AND CO-CONSPIRATORS**

18       41.    The acts alleged against the defendants in this Complaint were authorized, ordered, or

19  done by their officers, agents, employees or representatives, while actively engaged in the

20  management or operation of defendants' business or affairs.

21       42.    Various other persons, firms or corporations not named as defendants may have

22  participated as co-conspirators with the named defendants in the violations alleged herein and may

23  have performed acts and made statements in furtherance thereof.

24       43.    Each defendant acted as the principal, agent or joint venturer of, or for, other

25  defendants with respect to the acts, violations and common course of conduct alleged by plaintiffs.

26                          **CLASS ACTION ALLEGATIONS**

27       44.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant to

28  Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of the following Class:

**All persons or entities who purchased title insurance in California directly from the defendants, their subsidiaries, agents and/or affiliates, or any co-conspirator, from the earliest date allowable by law through the present (the "Class Period").**

**Specifically excluded from this Class are the defendants; the officers, directors or employees of any defendant; any entity in which any defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any defendant. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.**

45.    This action has been brought and may properly be maintained on behalf of the Class proposed above under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

46.    **Numerosity.** Members of the Class are so numerous that their individual joinder is impracticable. It is estimated that the Class consists of thousands of members.

47.    **Existence and predominance of common questions.** Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members. These common questions include:

a.    Whether defendants engaged in a contract, combination or conspiracy among themselves and/or their co-conspirators to raise, fix, and maintain the prices of title insurance sold in California;

b.    The identities of the co-conspirators;

c.    The duration of the conspiracy and nature and character of the acts done in furtherance of the conspiracy;

d.    Whether the conspiracy violated Section 1 of the Sherman Act;

e.    Whether defendants actively concealed the contract, combination or conspiracy from plaintiff and other Class members;

f.    Whether the conduct of defendants and their co-conspirators caused prices of title insurance premiums to be artificially inflated to non-competitive levels; and

g.    Whether plaintiffs and other members of the Class were injured by the conduct of defendants and their co-conspirators and, if so, the appropriate class-wide measure of damages and appropriate injunctive relief.

48.   **Typicality.**  Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs bought title insurance from one of the defendants and, like all Class members, were damaged by the wrongful conduct of defendants and their co-conspirators, and seek relief common to the Class.

49.   **Adequacy.**  Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class they seek to represent.  Plaintiffs have retained counsel competent and experienced in complex class action litigation, and intend to prosecute this action vigorously.  The interests of the members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

50.   **Superiority.**  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this case as a class action.

51.   In the alternative, the Class may be certified because:

a.   The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class members and would establish incompatible standards of conduct for defendants;

b.   The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede the ability of other Class members to protect their interests; and

c.   Defendants have acted or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief with respect to the members of the Class as a whole an appropriate form of relief.

1    52.    Plaintiffs reserve the right to expand, modify, or alter the class definition in response to

2    information learned during discovery.

3    **TRADE AND COMMERCE**

4    53.    During the Class Period, defendants were the major sellers of title insurance in the

5    United States and California. Defendants controlled in excess of 85 percent of the market for title

6    insurance in the United States and approximately 92 percent of the statewide market in California.

7    54.    During the Class Period, defendants sold substantial quantities of title insurance in a

8    continuous and uninterrupted flow of interstate commerce, including through and into this judicial

9    district.

10    55.    During the Class Period, Class members located outside of and within California

11    purchased commercial or residential property and title insurance within California.

12    56.    The activities of defendants and their co-conspirators, as described here substantially

13    affected interstate trade and commerce in the United States, and in the State of California, and caused

14    antitrust injury in the United States and in California.

15    **FACTUAL ALLEGATIONS**

16    57.    Defendants are competitors in the sale of title insurance to consumers throughout the

17    United States, including California. They agreed and engaged in concerted efforts to (i) collectively

18    set and charge supra-competitive rates for title insurance; (ii) include agency commission costs in their

19    calculated rates; (iii) embed within these costs payoffs, kickbacks, and other charges that are unrelated

20    to the issuance of title insurance; and (iv) hide these supposed "costs" from regulatory scrutiny by

21    funneling them to and through title agents over which the government agencies have no ability or

22    authority to regulate.

23    **I.    The Nature of Title Insurance**

24    58.    Title insurance differs from other, more familiar kinds of insurance. Unlike automobile

25    and homeowner insurance policies that protect consumers from events that may occur in the future,

26    title insurance offers protection from events that might have occurred in the past and may affect the

27    title to the real estate that a consumer is buying.

28

59.    Title insurance, therefore, protects the purchaser of a property from unidentified defects in the title that would interfere with the full ownership and use of the property and the ultimate right to resell the property.  Possible title defects include errors or omissions in deeds, mistakes in examining records, forgery, undisclosed heirs, missing heirs, liens for unpaid taxes, and liens by contractors.

60.    There are two basic types of title insurance policies – the lender's policy and the owner's policy.  The lender's policy is issued to the lender and will pay the lender the remaining principal on the loan if there is a title problem that cannot be resolved.  The owner's policy is issued to the buyer of the property for the full purchase price of the property.  Consequently, the maximum liability on a title insurance policy is the purchase price of the property.

61.    In a typical home purchase, both a lender's policy and an owner's policy are issued. Lenders require a lender's policy whenever there is a loan associated with the real estate transaction. The lender's policy continues in force until the loan is extinguished, and the owner's policy continues until the property is sold.

62.    With a refinancing transaction, the existing lender's policy is terminated and a new lender's policy is issued.  The existing owner's policy remains in place.  The lender does not pay for the lender's policy in a purchase or refinancing transaction.  The premium may be paid by the buyer or seller in a purchase transaction, and by the owner in a refinancing transaction.

63.    Title insurers do not compete on the basis of the policies or coverage that they provide. In fact, almost all title policies are based on a single set of form policies published and maintained by the American Land Title Association, the title insurance industry's national trade association. Moreover, the end goal of an exhaustive title search by a title insurer is not to provide coverage for title defects that the search uncovers, but rather to exclude coverage for any such defects and, therefore, further reduce the real value of the title policy that is written to cover only unknown defects in the title at the time of issuance.  As a result, title insurance is a homogenous, commodity product. There is no substantive, if any, difference between a policy offered by one company in comparison to a policy offered by another company for the same property transaction.

64.    Title insurance is one of the most costly items associated with the closing of a real estate transaction, aside from the purchase price of the property.  In California, rates for title insurance

1 | are based on a percentage of the total value of the property being insured. For residential properties,

2 | this price ranged in 2005 from about $1,010 (for a $250,000 property) to about $1,490 (for a $500,000

3 | property). For more expensive homes and commercial properties, these prices are significantly

4 | higher. The amount consumers spent on title insurance in California rose dramatically from

5 | approximately $700 million in 1995 to about $3.1 billion in 2004.

6 |      65.    Title insurance companies recognize that consumers generally lack the means to make

7 | independent decisions regarding the scope, terms and price of title insurance. Title insurance referrals

8 | are typically made by lawyers, mortgage brokers, lenders, realtors or other professionals who take part

9 | in the transaction, and the cost of title insurance premium is presented to the consumer in the closing

10 | statement at the time of closing. Typically, consumers do not shop around or negotiate the price for

11 | title insurance. As a result of these dynamics, the supply and demand principles that would apply in a

12 | competitive market are not implicated, and the title insurance industry is not subject to any meaningful

13 | competitive constraints.

14 |      66.    The title insurance market in California is dominated by five groups of affiliated

15 | companies, that when combined, sell approximately 92 percent of the title insurance policies sold in

16 | California, and that own and control the "title plants" in many California counties that every title

17 | insurer must rely on to issue title policies. "Title plants" contain information regarding property

18 | transfers and liens reaching back many years.

19 |      67.    Title companies, in marked contrast to property, casualty, life, and other traditional

20 | insurance carriers, choose not to market their products directly to consumers who pay for them.

21 | Instead, the title insurance industry operates on what is termed a "reverse competition" model.

22 | Reverse competition means that title companies solicit business referrals from the other major players

23 | in the home purchase scenario – real estate agents and agencies, banks, lenders, builders, developers,

24 | and others such as middlemen or go-betweens. The title companies pay middlemen for these referrals

25 | in the form of direct payments, advertising expenses, junkets, parties, and other kickbacks and

26 | inducements. In addition, middlemen such as Windermere, John L. Scott, and Coldwell Banker-Bain,

27 | who themselves control a substantial portion of the real estate brokerage market, take significant

28 | ownership stakes in local title agencies and affiliates of the major title insurers. These middlemen

1  | then profit be receiving a direct monetary return from the referral of title business to the title agent in
2  | which they maintain an ownership interest.

3  |     68.    Reverse competition does not benefit consumers through market-driven forces.
4  | Instead, companies spend much of their marketing budgets entertaining real estate agents, banks,
5  | lenders, builders, developers, and others in an effort to convince these middlemen to steer the home-
6  | buying clients to their companies for the clients' title insurance needs.

7  |     69.    Rather than seek to capture business by offering lower prices, title insurers offer
8  | kickbacks in the form of finder's fees, gifts, meals, business services, and other financial enticements.
9  | As a result, title insurers compete and increase their business through higher pricing (that allows for
10 | generous inducements and kickbacks) not lower pricing to consumers.

11 |     70.    In some of the major markets in the United States, these same title insurers collectively
12 | meet, jointly set rates, and file these rates with the applicable state insurance authority. The rates are
13 | not subject to any meaningful review or regulation. The companies agree to fix the price of title
14 | insurance far in excess of the risk and loss experience associated with such insurance. As a result of
15 | the joint agreement as to rates, competition is relegated to the middleman, and therefore, no title
16 | company competes on price to the consumer.

17 |     71.    In addition to paying inducements and kickbacks, the title insurance companies and
18 | their agents divide the market of real-estate middlemen through the use of Affiliated Business
19 | Arrangements ("ABAs"), where the dominant real estate brokers purchase significant ownership
20 | stakes in favored title insurance affiliates. The real estate brokers then reward their associates for
21 | using the preferred title insurance providers and lock out independent title insurers.

22 |     72.    Having agreed to fix prices in states where joint rate-setting occurs, the companies
23 | agreed not to compete based on price to the consumer in other states, including California, where
24 | regulation of filed rates is lax or non-existent. Thus, title insurance companies agree to set prices at
25 | supra-competitive levels and to compete based on offering inducements to middlemen.

26 |     73.    One example of competing based on illegal kickbacks to middlemen came to light in
27 | July 2005, when nine major title companies reached an agreement with the California Department of
28 | Insurance to pay $37.8 million in refunds and penalties for illegal rebating where national

1    homebuilders, lenders, and realtors were encouraged to steer business to particular title insurers. The

2    nine companies were members of three insurance groups, all three of which are defendants here –

3    LandAmerica Financial Corporation, The First American Title Insurance Company, and Fidelity

4    National Financial, Inc.

5          74.    Under the arrangement, the homebuilder formed a reinsurance company affiliate – a

6    captive reinsurer. Then, under an agreement with the title insurer, the homebuilder would steer the

7    consumer to the title insurer and the title insurer would cede a portion of the premium – typically 50%

8    after the first $200 to $300 – to the captive reinsurer with no substantive risk of loss associated with

9    the reinsurance transaction. In effect, the arrangement allowed for the title insurer to rebate 50% of

10    the premium to the homebuilder.

11          75.    As a result of this scheme, the companies were accused of paying $25.4 million in

12    illegal kickbacks to various lenders, builders, and realtors in exchange for the referral of title insurance

13    business. Their actions involved more than 82,000 California households that purchased or refinanced

14    a home between 1997 and 2004.

15          76.    In March 2005, the U.S. Department of Housing and Urban Development ("HUD")

16    determined that 80% or more of the premium paid by a consumer for title insurance frequently goes to

17    the local title agent or lawyer who ordered the policy and may be running the closing.

18    **II.    Lack of Regulatory Supervision in California**

19          77.    In California, there is a lack of regulatory authority and oversight over title insurance

20    companies. The rates in California are not set as part of deliberate state intervention, and the state

21    does not meaningfully renew or approve these rates. The rates at issue in this case went into effect

22    without review.

23          78.    Although the California Office of the Insurance Commissioner ("OIC") found an

24    "astonishing number" of kickbacks and similar inducements in violation of state law, it does not

25    actively oversee or regulate rates, and, does not, by its own admission, have the power to do so. The

26    absence of regulation in California has allowed and continues to allow collusive behavior and

27    excessive rates to flourish at the expense of the consumers.

28

79.    In February 2007, Steve Poizner, the Insurance Commissioner of California, issued a statement concluding that "reasonable price competition does not exist for title and escrow services." (*Insurance Commissioner Steve Poizner Issues Statement Following Decision by OAL on New Regulations,* California Department of Insurance, February 22, 2007.)

80.    Poizner's press release goes on to state that the costs of the illegal inducements that title companies lavish on intermediaries to obtain the homeowner's business are passed on to the homeowner. Indeed, Poizner's press release states: "As a result, over the past 10 years, even though technology has lowered the costs of title searches and document production, title and escrow charges have not come down. In fact, title insurance on the average home in California costs roughly double what it cost 10 years ago, despite the fact that [title insurance] companies' production costs have plummeted."

81.    A report to the California Insurance Commissioner prepared during December 2005 by Birny Birnbaum, Consulting Economist, found abuses of the lack of regulatory supervision in this state. For instance, his report states: "We found numerous examples in California of illegal rebates and kickbacks where the title insurer or the underwritten title company provides money, free services or other things of value to a real estate agent, a lender or homebuilder in exchange for business referrals." (*An Analysis of Competition in the California Title Insurance and Escrow Industry,* December 2005, p.3.)

82.    The excess money paid to title agents not only works to steer business to defendants, but also serves to boost defendants' profits through the inflated revenues they obtain to cover the agency payments, and through their ownership or management stake in many of these agencies.

**III.    Indicators of a Lack of Competition and Conditions Conducive to Collusive Rate Setting**

**A.    Low or Declining Title Search Costs**

83.    The bulk of the title insurance premium goes to expenses as opposed to claim payments. Title insurers paid an average of 4.6 percent of premiums for claims and claim settlement expenses from 1995 to 2004, compared to around 80 percent of the total premium collected for property and casualty insurance. Title searches have become less labor intensive, especially in large urban counties and cities, as more of the pertinent information regarding claim of title is available

1  online.  As a result, the costs of production and the risk of loss have decreased.  None of these factors
2  resulted in price competition at the consumer level, however.

3       84.    Despite declining costs of production, increased number of transactions and increased
4  revenue per transaction, there have been few rate changes by title insurers over the past five years.
5  During a period when costs per unit of production declined, underwritten title companies and title
6  insurers maintained excessive rates.  That prices charged by title insurers and underwritten title
7  companies were not and are not responsive to the changing costs of production or increasing revenue
8  per transaction at a given set of rates is evidence of an agreement not to compete based on price.

9  **B.**    **Title Premiums Include Improper Payments, Commissions and Inducements**

10       85.    The defendant title companies provide illegal rebates and kickbacks where the title
11  insurer or the underwritten title company provides money, free services, or other things of value to a
12  real estate agent, a lender, or homebuilder in exchange for business referrals.  These illegal rebates and
13  kickbacks – a consequence of reverse competition – show that title insurance rates are supra-
14  competitive.

15  **C.**    **Market Dominance and Lack of Competition Based on Price to Consumer**

16       86.    The volume of the California title insurance transactions is substantial.  The number of
17  residential title transactions exceeded 3 million during 2004 alone.  Commercial property transactions
18  are in addition to this volume.

19       87.    The title insurance market is highly concentrated – few title insurers account for the
20  vast majority of title insurance sales – at both the statewide level and at the county level in California.
21  For example, the five defendant families controlled approximately 92 percent of the California title
22  insurance market in 2005.

23       88.    Defendants have maintained their market dominance and ability to control prices for
24  title insurance in part because of the substantial barriers to entry in the market.  Between 1995 and
25  2005, the number of title insurer groups declined as title insurers acquired other title insurers.  Few
26  companies entered the title insurance business during the period from 2000 through 2005.

27       89.    Access to title plants is a barrier to entry.  Established relationships between entities
28  that steer consumers to title insurance sellers is an additional barrier to entry.

90.     As a result of their market dominance and anti-competitive practices, defendants enjoy excessive profits at the expense of the consumers.  For example, title insurance underwriters earned after-tax profits of 49.0 percent in 2003 and 32.3 percent in 2004.

**IV.    Price Fixing in Other Large Markets that Affect California**

91.     New York is one of several states in which the leading title insurers collectively fix their prices through a rate-setting organization known as the Title Insurance Rate Service Association, Inc., or TIRSA.  TIRSA collects from defendants and TIRSA's other members revenue and cost information and annually submits it in aggregate form along with collectively set title rates to the New York Insurance Department.  Under this rate setting regime, defendants have charged identical and collectively fixed rates to consumers since TIRSA's inception in 1991.

92.     The New York Insurance Department is charged with reviewing the title rates that defendants (through TIRSA) collectively fix.  Defendants have made this impossible, however, by manipulating the rates so that they are principally based on costs over which the Insurance Department has neither the authority nor the ability to assess.

93.     Under TIRSA's collective rate setting regime, roughly 85 percent of the total title insurance premiums are based on the so-called "costs" associated with the payment of agency commissions.  These costs are referred to as so-called "agency commissions."  As in California, these commissions chiefly include kickbacks and other costs unrelated to the issuance of title insurance.  Instead, as in California, these supposed costs are funned to and through title agents to increase defendants' overall business and get them more business.

94.     New York Insurance Law does not authorize TIRSA to include kickbacks and other agency commission payments that are unrelated to the issuance of title insurance in its collectively fixed rates.  The New York Insurance Department has acknowledged, however, that it lacks the authority to review any agency commission payments and, therefore, cannot properly evaluate TIRSA's calculated rates.

## VIOLATIONS ALLEGED

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

95.    Plaintiffs incorporate and reallege each and every allegation in the preceding paragraphs of this complaint.

96.    Beginning at a time presently unknown to Plaintiffs, but at least as early as May 2004, defendants and their co-conspirators engaged in a combination and conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

97.    The combination and conspiracy consisted of a continuing agreement, understanding and concert of action among defendants and their co-conspirators, the substantial terms of which were:

   a.    To fix, raise, maintain and stabilize the price of title insurance throughout California;

   b.    To fix, raise, maintain and stabilize the terms and conditions of sale of title insurance in California; and

   c.    To allocate and divide the market for title insurance in California.

98.    In the absence of proper regulatory authority and oversight, defendants' conduct constitutes a horizontal agreement to fix the form, structure, and prices of title insurance and to allocate and divide the title insurance market in California which is a *per se* violation of Section 1 of the Sherman Act.

99.    Defendants' price fixing, market allocation, and division activity has been continuous throughout the relevant damages period and has been renewed and reinforced annually through submissions to the OIC of supposed cost and revenue information and its periodic submissions of rate changes.

100.    Through their collective price-fixing, market allocation and division, as well as manipulation of the regulatory process, defendants harmed competition by charging consumers supra-competitive prices for title insurance in California, evidenced by the uniformly higher prices as compared to the cost of providing the title insurance.

101.    The combination and conspiracy alleged here had, among other things, the following effects:

   a.    Price competition in the sale of title insurance has been restrained, suppressed, and/or eliminated;

   b.    Prices for title insurance sold by defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels; and

   c.    Purchasers of title insurance have been deprived of the benefits of free and open competition.

102.    During the period of the antitrust violations by defendants and their co-conspirators, Plaintiffs and each member of the Class they represent purchased title insurance and, by reason of the antitrust violations alleged here, paid more for such than they would have paid in the absence of the antitrust violations.  As a result, Plaintiffs and members of the Class have been injured in an amount presently undetermined.

## Second Claim for Relief

## (Violation of the California Cartwright Act)

103.    Plaintiffs incorporate and reallege each and every allegation in the preceding paragraphs of this complaint.

104.    Defendants' contract, combination, trust or conspiracy was centered in, carried out, effectuated and perfected mainly within California, and defendants' conduct within California injured all members of the Class throughout the United States.  Therefore, this claim for relief under California law is brought on behalf of all members of the Class, whether or not they are California residents.

105.    Beginning at a time presently unknown to Plaintiffs, but at least as early as May 2004, defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Sections 16720, *et seq.* of the California Business and Professional Code.  Defendants acted in violation of Sections 16720, *et seq.* to fix, raise, stabilize and maintain prices of, and allocate markets for title insurance at supra-competitive levels.

106.    The violations of Sections 16720, *et seq.* of the California Business and Professions Code consisted of a continuing unlawful trust and concert of action among the defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for title insurance in the state of California.

107.    For the purpose of forming and effectuating the unlawful agreement, defendants and their co-conspirators did those things which they combined and conspired to do, including the acts, practices and course of conduct alleged above and the following:

a.    To fix, raise, maintain and stabilize the price of title insurance;

b.    To allocate markets for title insurance amongst themselves; and

c.    To allocate and divide the market for title insurance in California.

108.    The combination and conspiracy alleged here had the following effects:

a.    Price competition in the sale of title insurance has been restrained, suppressed and/or eliminated in California and throughout the United States;

b.    Price for title insurance sold by defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in California and throughout the United States; and

c.    Those who purchased title insurance from defendants and their co-conspirators have been deprived of the benefit of free and open competition.

109.    Plaintiffs and the other members of the Class paid supra-competitive, artificially inflated prices for title insurance.

110.    As a direct and proximate result of defendants' unlawful conduct, Plaintiff and the members of the Class have been injured in their business and property because they paid more for title insurance than they otherwise would have paid in the absence of defendants' unlawful conduct.

111.    As a result of defendants' violation of Sections 16720, *et seq.* of the California Business and Professions Code, Plaintiffs seek treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief

### (Violation of the California Unfair Competition Law)

112.    Plaintiffs incorporate and reallege each and every allegation in the preceding paragraphs of this complaint.

113.    Defendants' business acts and practices were centered in, carried out, effectuated and perfected mainly within California, and defendant's conduct within California injured all members of the Class throughout the United States.  Therefore, this claim for relief under California law is brought on behalf of all members of the Class, whether or not they are California residents.

114.    During the Class Period, and continuing to the present, defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

115.    This Claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from defendants for acts that violated Sections 17200, *et seq.* of the California Business and Professions Code, commonly known as the Unfair Competition Law.

116.    Defendants' conduct violated Section 17200.  The acts, omissions, misrepresentations, practices and non-disclosures by defendants constituted a common continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Sections 17200, *et seq.*, including the following:

> a.    Defendants' acts and practices violate Section 1 of the Sherman
>       Act and Section 16720, *et seq.*, of the California Business and
>       Professions Code, set forth above;
>
> b.    Defendants' acts and practices are unfair to consumers of title
>       insurance in California and throughout the United States within the

1     meaning of Section 17200 of the California Business and

2     Professions Code; and

3     c.    Defendants' acts and practices are fraudulent or deceptive within

4     the meaning of Section 17200 of the California Business and

5     Professions Code.

6     117.    Plaintiffs and each of the Class members are entitled to full restitution and/or

7     disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained

8     by defendants as a result of their illegal business acts or practices as alleged here.

9     118.    The illegal conduct alleged here is continuing and there is no indication that defendants

10    will not continue such activity into the future.

11    119.    The unlawful and unfair business practices of defendants, as described above, caused

12    Plaintiffs and the members of the Class to pay supra-competitive and artificially-inflated prices for title

13    insurance.  Plaintiffs and the members of the Class suffered injury in fact and lost money or property as

14    a result.

15    120.    Plaintiffs request that this Court enter such order or judgment as may be necessary to

16    enjoin defendants from continuing their unfair, unlawful, and/or deceptive practices, to restore to them

17    and the Class members any money that may have been unjustly acquired by defendants by means of

18    defendants' unfair competition.

19

20                                    **PRAYER FOR RELIEF**

21    WHEREFORE, Plaintiffs and the members of the Class pray for relief as follows:

22    A.    That this action be certified and maintained as a class action under Rule 23(a) and

23    (b)(3) of the Federal Rules of Civil Procedure;

24    B.    That the unlawful conduct, contract, conspiracy or combination alleged here be

25    adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of

26    the Sherman Act;

27

28

C.    That Plaintiffs and the Class recover damages, including treble damages, and restitution, as provided by federal and state antitrust and unfair competition laws, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against the defendants;

D.    That defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, employees, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner: (1) continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged here; (2) entering into any other conspiracy similar to the ones alleged here; (3) entering into any other contract, conspiracy or combination having similar purpose or effect; and (4) adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.    That Plaintiffs and the Class be awarded pre-and post-judgment interest, and that the interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.    That Plaintiffs and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.    That Plaintiffs and the Class have such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

//
//
//
//
//
//
//
//
//
//
//

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims so triable.

DATED:  July 14, 2008

Respectfully submitted,

**GIRARD GIBBS LLP**

By: _____
Daniel C. Girard
Elizabeth C. Pritzker
Aaron M. Sheanin
Alex C. Turan
601 California Street, 14th Floor
San Francisco, California  94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

*Attorneys for Plaintiffs Ruben Romero and Sarah Yahn*