1  Daniel C. Girard (CA Bar No. 114826)
2  Elizabeth C. Pritzker (CA Bar No. 146267)
   Aaron M. Sheanin (CA Bar No. 214472)
3  Alex C. Turan (CA Bar No. 227273)
   **GIRARD GIBBS LLP**
4  601 California Street, 14th Floor
   San Francisco, California 94104
5  Telephone: (415) 981-4800
6  Facsimile: (415) 981-4846

7  Attorneys for Plaintiffs

8              **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

10

11 LYNN BARTON, on behalf of herself and all others
   similarly situated,                                    Case No. 08-CV-01341 JSW

12
                    Plaintiff,
13                                                         **DECLARATION OF ALEX C. TURAN
                                                           IN SUPPORT OF ADMINISTRATIVE**
14     vs.                                                 **MOTION TO CONSIDER WHETHER
                                                           CASES SHOULD BE RELATED**
15 FIDELITY NATIONAL FINANCIAL, INC., et al.

16                  Defendants.

17 ────────────────────────────

18 THIS DOCUMENT RELATES TO:
                                                           Case No. 08-CV-03391 EMC
19 RUBEN ROMERO and SARAH YAHN, on behalf of
   themselves and all others similarly situated,
20
21                  Plaintiffs,
       vs.
22
23 FIDELITY NATIONAL FINANCIAL, INC., et al.,

24                  Defendants.

25
26
27
28

────────────────────────────
                              1
DECL. OF ALEX C. TURAN IN SUPPORT OF ADMIN. MOTION TO CONSIDER WHETHER
                    CASES SHOULD BE RELATED

I, Alex C. Turan, declare as follows:

1.     I am a member in good standing of the California State Bar and an attorney at the law firm of Girard Gibbs LLP, counsel of record for Plaintiffs in *Ruben Romero, et al. v. Fidelity National Financial, Inc., et al.*, Case No. C 08-03391 EMC. I make this declaration based on my personal knowledge, and if called to testify to the contents, I cold and would competently do so.

2.     Attached as <u>Exhibit A</u> is a true and correct copy of the class action complaint filed on March 10, 2008 in *Barton v. Fidelity National Financial, Inc., et al.*, Case No. 08-CV-01341 JSW, and assigned to the Honorable Jeffrey S. White.

3.     Attached as <u>Exhibit B</u> is a true and correct copy of the class action complaint filed on July 14, 2008 in *Romero, et al. v. Fidelity National Financial, Inc., et al.*, Case No. 08-CV-03391 EMC.

4.     Defendants that have been sued in *Romero* have yet to appear in the action. Local Rule 3-12 requires an Administrative Motion to Consider Whether Cases Should Be Related to be filed promptly. Therefore, a stipulation could not be entered prior to the filing of Plaintiffs' Administrative Motion.

I declare under penalty of perjury that the foregoing facts are true and correct and that this declaration was executed this 16th day of July, 2008, in San Francisco, California.

By: ___/s/ Alex C. Turan_____
        Alex C. Turan

---

2

DECL. OF ALEX C. TURAN IN SUPPORT OF ADMIN. MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED

1

**CERTIFICATE OF SERVICE**

2

I, Alex C. Turan, hereby certify that on July 16, 2008, I filed the following document(s):

3

4

1. **DECLARATION OF ALEX C. TURAN IN SUPPORT OF ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED**

5

6

By ECF (Electronic Case Filing):  I e-filed the above-detailed document utilizing the United States

7

District Court, Northern District of California's mandated ECF service on July 16, 2008.  Counsel of

8

record are required by the Court to be registered e-filers, and as such are automatically e-served with a

copy of the document(s) upon confirmation of e-filing.

9

10

I declare under penalty of perjury that the foregoing is true and correct. Executed at San

11

Francisco, CA on July 16, 2008

12

13

_____ /S/ *Alex C. Turan*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT A

1  Reed R. Kathrein (139304)
   Jeff D. Friedman (173886)
2  HAGENS BERMAN SOBOL SHAPIRO LLP
   715 Hearst Avenue, Suite 202
3  Berkeley, CA 94710                    E-filing
   Telephone: (510) 725-3000
4  Facsimile: (510) 725-3001
   reed@hbsslaw.com
5  jefff@hbsslaw.com
6
   Attorneys for Plaintiff
7
                  UNITED STATES DISTRICT COURT
8
                  NORTHERN DISTRICT OF CALIFORNIA
9
10  LYNN BARTON, on behalf of herself and all      )  NO.              1341
    others similarly situated,                      )
11                                                   )  CLASS ACTION COMPLAINT        EDL
                              Plaintiff,             )
12                                                   )  JURY TRIAL DEMANDED
         v.                                          )
13                                                   )
    FIDELITY NATIONAL FINANCIAL, INC.,               )
14  FIDELITY NATIONAL TITLE INSURANCE                )
    COMPANY, TICOR TITLE INSURANCE                   )
15  COMPANY, TICOR TITLE INSURANCE                   )
    COMPANY OF FLORIDA, CHICAGO TITLE                )
16  INSURANCE COMPANY, NATIONAL TITLE                )
    INSURANCE OF NEW YORK, INC.,                     )
17  SECURITY UNION TITLE INSURANCE                   )
    COMPANY, THE FIRST AMERICAN                      )
18  CORPORATION, FIRST AMERICAN TITLE                )
    INSURANCE COMPANY, UNITED                        )
19  GENERAL TITLE INSURANCE COMPANY,                 )
    LANDAMERICA FINANCIAL GROUP, INC.,               )
20  COMMONWEALTH LAND TITLE                          )
    INSURANCE COMPANY, LAWYERS TITLE                 )
21  INSURANCE CORPORATION,                           )
    TRANSNATION TITLE INSURANCE                      )
22  COMPANY, STEWART TITLE GUARANTY                  )
    COMPANY and STEWART TITLE                        )
23  INSURANCE COMPANY                                )
                                                     )
24                              Defendants.          )
25
26
27
28

CLASS ACTION COMPLAINT

010031-11 226460 V1

1

## TABLE OF CONTENTS

2                                                                    **PAGE**

3    I.    INTRODUCTION..................................................................................... 1

4    II.   JURISDICTION AND VENUE ........................................................... 3

5    III.  PARTIES............................................................................................... 4

6          A.    Plaintiff.................................................................................. 4

7          B.    Defendants............................................................................ 4

8    IV.   OTHER ENTITIES .............................................................................. 8

9    V.    CLASS ACTION ALLEGATIONS .................................................... 9

10   VI.   TRADE AND COMMERCE ................................................................ 11

11   VII.  FACTUAL ALLEGATIONS ................................................................ 11

12         A.    The Nature of Title Insurance ............................................ 11

13         B.    Price-Fixing in the Large Markets ..................................... 13

14         C.    TIRSA's Formation.............................................................. 14

15         D.    Lack of Regulatory Supervision and Authority in New York and
                 Other States Including California......................................... 15
16
           E.    Competition Based on Kickbacks and Inducements But Not Rates ........... 19
17
           F.    Other Indicators of a Lack of Competition and Conditions Conducive
18               to Collusive Rate Setting...................................................... 19

19   VIII. CLAIMS FOR RELIEF ......................................................................... 22

20         COUNT I  Violation of the Sherman Act ...................................... 22

21         COUNT II  Violation of Cal. Bus. and Prof. Code §§ 16720, *et seq.*...................... 23

22         COUNT III  (California's Business & Professions Code §§ 17200, *et seq.*)................. 23

23         COUNT IV  Unjust Enrichment .................................................... 24

24   PRAYER FOR RELIEF ................................................................................... 25

25   JURY TRIAL DEMANDED .............................................................................. 25

26

27

28

CLASS ACTION COMPLAINT                    - i -

010031-11  226460 V1

1       Plaintiff, Lynn Barton, by her attorneys, on behalf of herself and all others similarly

2   situated, brings this action for treble damages and injunctive relief under the antitrust laws of the

3   United States and based on statutes of the State of California against the above named defendants,

4   demand a trial by jury, and complaining and alleging as follows:

## I.      INTRODUCTION

6      1.    From the consumer's point of view, title insurance differs greatly from other, more

7   familiar kinds of insurance.  For one thing, while automobile and homeowner insurance policies

8   protect consumer from an event that may occur in the future, title insurance offers protection from

9   events that might have occurred in the past.

10      2.    Most simply, title insurance is protection purchased against a loss arising from

11   problems that occurred in the past and may affect the title to the real estate that a consumer is

12   buying.  Title insurers do not compete on the basis of the policies or coverage that they provide.  In

13   fact, almost all title policies are based on a single set of form policies published and maintained by

14   the national trade association, the American Land Title Association.  Furthermore, the end goal of

15   an exhaustive title search by a title insurer is not to provide coverage for title defects that the search

16   uncovers, but rather to exclude coverage for any such defects and therefore, further reduce the real

17   value of the title policy which is written to cover only unknown defects in title at the time of

18   issuance.  As a result, title insurance is a commodity product.

19      3.    Even for the savviest of insurance consumers, the purchase of a title insurance

20   policy is just one more expensive step in the dizzying, convoluted and often confusing flurry of

21   paperwork and signings that culminate in the closing of a home purchase.  Consumers who

22   normally shop around for their insurance and carefully compare prices, typically emerge from the

23   closing on their new home holding an insurance policy that they know virtually nothing about and

24   that in all likelihood, they will never need.

25      4.    The title insurance market in California consists of a dozen carriers, ranging in size

26   from regional companies to national affiliates.  However, the market is dominated by four groups

27   of affiliated companies which, combined, sell over 90 percent of the title insurance policies sold in

28

- 1 -

1    California and which own and control the title plants in many California counties that every title

2    insurer must rely on in order issue title policies.

3        5.    Title companies, in marked contrast to property, casualty, life and other traditional

4    insurance carriers, choose not to market their products directly to the consumers who pay for them.

5    Instead, the title insurance industry operates on what is termed a "reverse competition" model.

6    Reverse competition means that title companies solicit business referrals from the other major

7    players in the home purchase scenario – real estate agents and agencies, banks, lenders, builders,

8    developers and others:  middlemen or go-betweens.  The title companies pay middlemen for these

9    referrals in the form of direct payments, advertising expenses, junkets, parties and other kick-backs

10    and inducements.  In addition, middlemen such as Windermere, John L. Scott and Caldwell

11    Banker-Bain, who themselves control a significant portion of the real estate brokerage market, take

12    significant ownership stakes in local title agents and affiliates of the major title insurers and

13    thereby get a direct return in profit from the referral of title business to the title agent whom they

14    partly or wholly own.

15        6.    Reverse competition, as the term suggests, isn't a model that benefits consumers

16    through market-driven forces.  In fact, consumers are bypassed completely as title companies

17    spend nearly all of their marketing budgets "wining and dining" real estate agents, banks, lenders,

18    builders, developers and others in an effort to convince these middlemen to steer their home-

19    buying clients to their companies for their title insurance needs.

20        7.    In some of the major markets in the United States, these same title insurers

21    collectively meet, and jointly set rates and file these rates with the applicable state insurance

22    authority.  The rates are not subject to any meaningful review or regulation.  The companies agree

23    to fix the price of title insurance far in excess of the risk and loss experience associated with such

24    insurance.  As a result of the joint agreement as to rates, competition is relegated to the middleman.

25    As a result of their joint rate setting and agreement, no company competes on price to the

26    consumer.

27        8.    Having agreed to fix prices in states where joint rate setting occurs, the companies

28    agreed to not compete based on price to the consumer in other states, including California, where

CLASS ACTION COMPLAINT                                        - 2 -

010031-11  226460 V1

1 regulation of filed rates is lax or non-existent. Thus, they agreed to set rates at supra competitive

2 prices and to compete based on offering inducements to middlemen. In California, in three

3 successive reports, the Office of the Insurance Commissioner ("OIC") has found an "astonishing

4 number" of such inducements that are in violation of state law. However, the OIC does not

5 actively oversee or regulate rates, and, in fact, does not by its own admission have the power to do

6 so. The absence of regulation has allowed collusive behavior and excessive rates.

7   9.  In addition to paying inducements and kick-backs, the title companies and their

8 agents divide the market of real-estate middlemen through the use of Affiliated Business

9 Arrangements ("ABAs"), wherein the dominant real estate brokers purchase significant ownership

10 stakes in favored title insurance affiliates. The real estate brokers then reward their associates for

11 using the preferred title insurance providers and lock-out independent title insurers.

12   10.  In this action, plaintiff, on behalf of a Class of those purchasing title insurance in

13 California, seek damages arising from defendants' violations of the Sherman Act as well as

14 California statutory law.

15      **II.  JURISDICTION AND VENUE**

16   11.  This Complaint is filed and these proceedings are instituted under Sections 4 and 16

17 of the Act of Congress of October 15, 1914, C. 323, Stats. 731, 737 (15 U.S.C. §§ 15, 26) to obtain

18 injunctive relief and to recover treble damages and the costs of suit, including a reasonable

19 attorneys' fee, against defendants for the injuries sustained by plaintiff and the members of the

20 Class which she represents by reason of defendants' and their co-conspirators' violations, as

21 hereinafter alleged, of Section I of the Sherman Act (15 U.S.C. § 1).

22   12.  Defendants transact business, maintain offices or are found within the Northern

23 District of California. The interstate commerce described hereinafter is carried on, in part, within

24 the Northern District of California and the conspiratorial acts herein alleged were carried on, in

25 part, in the Northern District of California.

26   13.  Intradistrict Assignment: Assignment to the San Francisco or Oakland division of

27 this Court is appropriate because a substantial part of the events or omissions which give rise to the

28

1   claim occurred in the county of San Francisco.  Pursuant to Northern District of California, Local

2   Rule 3-2(d), assignment to either the San Francisco Division or the Oakland Division is proper.

3                                   **III.     PARTIES**

4   **A.      Plaintiff**

5          14.     Plaintiff, Lynn Barton, is an individual residing in San Francisco County,

6   California.  During the Class Period, plaintiff purchased title insurance directly from one or more

7   of the defendants herein and has been injured by reason of the antitrust violations alleged.

8   **B.      Defendants**

9          15.     Defendant Fidelity National Financial, Inc. ("Fidelity National") is a Delaware

10  corporation headquartered at 601 Riverside Avenue, Jacksonville, Florida 32204.  Fidelity National

11  does business in California through one or more of its subsidiaries, including but not limited to,

12  defendants Fidelity National Title Insurance Company, Ticor Title Insurance Company, Ticor Title

13  Insurance Company of Florida,  National Title Insurance of New York, Inc., Security Union Title

14  Insurance Company, and Chicago Title Insurance Company.  Fidelity National is registered to do

15  business in California.

16         16.     Defendant Fidelity National Title Insurance Company ("FNTIC") is a California

17  Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.

18  FNTIC does business in California, is a licensed title insurance company in California and is

19  registered to do business in California.

20         17.     Defendant Ticor Title Insurance Company ("Ticor") is a California Corporation

21  with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.  Ticor does

22  business in California, is a licensed title insurance company in California and is registered to do

23  business in California.

24         18.     Defendant Ticor Title Insurance Company of Florida ("TTICF") is a Florida

25  corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.

26  TTICF does business in California, is a licensed title insurance company in California and is

27  registered to do business in California.

28
                                                   - 4 -

CLASS ACTION COMPLAINT
010031-11  226460 V1

19.     Defendant Chicago Title Insurance Company ("Chicago Title") is a Missouri Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204. Chicago Title does business in California, is a licensed title insurance company in California and is registered to do business in California.

20.     Defendant National Title Insurance of New York, Inc. ("NTINY") is a New York corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204. NTINY does business in California, is a licensed title insurance company in California and is registered to do business in California.

21.     Defendant Security Union Title Insurance Company ("SUTIC") is a California corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204. SUTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

22.     The Fidelity family of title insurance companies (collectively, "Fidelity") – which includes defendants Fidelity National, FNTIC, Ticor, TTICF, Chicago Title, NTINY and SUTIC, and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including California. Nationally, Fidelity accounts for approximately 27 percent of title premiums, which in 2006 amounted to roughly $4.6 billion. Fidelity, Chicago Title and Ticor were founding members of TIRSA (defined below) and since TIRSA's inception have charged title insurance rates in New York that TIRSA collectively sets.

23.     The Fidelity family of title insurance companies and their affiliates are wholly-owned and controlled by defendant Fidelity National Financial, Inc. Through its subsidiaries, Fidelity National is a provider of title insurance, specialty insurance, and claims management services. Fidelity National had 2006 revenues of roughly $9.4 billion. The Fidelity family of title insurance companies engaged in the conduct challenged herein with the approval and assent of defendant Fidelity National.

24.     Defendant The First American Corporation ("First American") is a California corporation with its headquarters at 1st American Way, Santa Ana, California 92707. First American does business in California through one or more of its subsidiaries, including but not limited to, defendants First American Title Insurance Company and United General Title Insurance Company.

25.     Defendant First American Title Insurance Company ("FATIC") is a California corporation with its headquarters at 1st American Way, Santa Ana, California 92707. FATIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

26.     Defendant United General Title Insurance Company ("UGTIC") is a Colorado corporation located at 8310 S. Valley Highway, Suite 130, Englewood, CO 80112. UGTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

27.     The First American family of title insurance companies (collectively, "First American") – which includes defendants First American, FATIC and UGTIC, and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including California. Nationally, First American accounts for approximately 29 percent of title premiums, which in 2006 amounted to roughly $4.8 billion. First American Title was a founding member of TIRSA and since TIRSA's inception has charged title insurance rates in New York that TIRSA collectively sets.

28.     The First American family of title insurance companies and their affiliates are wholly-owned and controlled by defendant The First American Corporation. Through its subsidiaries, First American is a provider of title insurance, business information, and related products and services. First American had 2006 revenues of roughly $8.5 billion. The First

CLASS ACTION COMPLAINT
010031-11  226460 V1

1    American family of title insurance companies and their affiliates engaged in the conduct

2    challenged herein with the approval and assent of defendant First American.

3        29.    Defendant LandAmerica Financial Group, Inc. ("LandAmerica") is a Virginia

4    corporation headquartered at 5600 Cox Road, Glen Allen, Virginia 23060. LandAmerica does

5    business in California through one or more of its subsidiaries, including but not limited to,

6    defendants Commonwealth Land Title Insurance Company, Lawyers Title Insurance Corporation

7    and Transnation Title Insurance Company.

8        30.    Defendant Commonwealth Land Title Insurance Company ("CLTIC") is a

9    Pennsylvania corporation with is principle place of business at 5600 Cox Road, Glen Allen,

10   Virginia 23060. CLTIC does business in California, is a licensed title insurance company in

11   California and is registered to do business in California.

12       31.    Defendant Lawyers Title Insurance Corporation ("LTIC") is a Nebraska corporation

13   with is principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060. LTIC does

14   business in California, is a licensed title insurance company in California and is registered to do

15   business in California.

16       32.    Defendant Transnation Title Insurance Company ("TNTIC") is a Nebraska

17   corporation with is principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060.

18   TNTIC does business in California, is a licensed title insurance company in California and is

19   registered to do business in California.

20       33.    The LandAmerica family of title insurance companies (collectively,

21   "LandAmerica") – which includes defendants LandAmerica, CLTIC, LTIC and TNTIC, and their

22   affiliates – is engaged in selling title insurance to purchasers of commercial and residential real

23   estate throughout the United States, including California. Nationally, LandAmerica accounts for

24   approximately 19 percent of title premiums, which in 2006 amounted to roughly $3.15 billion.

25   Commonwealth and Lawyers Title were founding members of TIRSA and since TIRSA's

26   inception have charged title insurance rates in New York that TIRSA collectively sets.

27       34.    The LandAmerica family of title insurance companies and their affiliates are

28   wholly-owed and controlled by defendant Land America Financial Group, Inc. Through its

CLASS ACTION COMPLAINT                              - 7 -

010031-11 226460 V1

1    subsidiaries, LandAmerica is a provider of title insurance and other products and services that

2    facilitate the purchase, sale, transfer, and financing of residential and commercial real estate.

3    LandAmerica had 2006 revenues of roughly $4 billion.  The LandAmerica family of title insurance

4    companies and their affiliates engaged in the conduct challenged herein with the approval of

5    defendant LandAmerica.

6         35.    Defendant Stewart Title Guaranty Company ("STGC") is a Texas corporation

7    headquartered at 1980 Post Oak Blvd., Suite 800, Houston, Texas 77056.  STGC does business in

8    California, is a licensed title insurance company in California and is registered to do business in

9    California.

10        36.    Defendant Stewart Title Insurance Company ("STIC") is a New York corporation

11   with its principle place of business at 300 E. 42nd St., Floor 10, New York, NY 10017.  STIC does

12   business in California, is a licensed title insurance company in California and is registered to do

13   business in California.

14        37.    The Stewart family of title insurance companies (collectively, "Stewart") – which

15   includes defendants STGC and STIC, and its affiliates – is engaged in selling title insurance to

16   purchasers of commercial and residential real estate throughout the United States and California.

17   Nationally, Stewart accounts for approximately 12 percent of title premiums, which in 2006

18   amounted to roughly $2 billion.  Stewart was a founding member of TIRSA and since TIRSA's

19   inception has charged title insurance rates in New York that TIRSA collectively sets.

20        38.    Together, defendants account for more than 85 percent of the title premiums

21   consumers pay in California.  Nationally, they account for more than 85 percent of title premiums,

22   which in 2006 amounted to roughly $14.5 billion.  Throughout the relevant damages period,

23   defendants charged California consumers in California virtually identical title insurance rates.

24                         IV.    OTHER ENTITIES

25        39.    TIRSA is a voluntary association of title insurers licensed as a rate service

26   organization pursuant to Article 23 of the State of New York Insurance Law.  TIRSA maintains its

27   offices in New York City, which until recently were located at the same New York address of

28   Fidelity Title.

CLASS ACTION COMPLAINT                          - 8 -

010031-11 226460 V1

40.    TIRSA annually compiles from its members statistical data relating to their title insurance premiums, losses and expenses and submits this information in aggregate form to the New York Insurance Department. TIRSA also prepares and submits the New York Title Insurance Rate Manual which sets forth title rates to be charged and rules to be followed by TIRSA's members. The Insurance Department has never objected to any of the rates TIRSA has collectively set. Similarly, the California OIC has not actually held a public hearing or conducted any other review or regulation of the title insurance rates in California for thirty years.

41.    TIRSA's membership is comprised of defendant insurers and all other title insurers that are licensed to issue policies in New York. Currently, Fidelity, First American, LandAmerica, and Stewart collectively represent 14 of TIRSA's 22 members. As such, they comprise a majority voting block which, according to TIRSA's by-laws, allows them to control the operations of TIRSA and, in particular, TIRSA's collective rate setting activity.

42.    Various other persons, firms and corporations not made defendants herein have participated as co-conspirators with the defendants in the violations alleged herein and have performed acts and made statements in furtherance thereof.

## V.    CLASS ACTION ALLEGATIONS

43.    Plaintiff brings this action under Rule 23, and particularly subsection (b)(3), of the Federal Rules of Civil Procedure, on behalf of herself and a Class consisting of all persons excluding governmental entities, defendants, subsidiaries and affiliates of defendants, who purchased directly, from one or more of the defendants and/or their co-conspirators title insurance for residential and commercial property in California during the four year period preceding this lawsuit and who have sustained damages as a result of the conspiracy herein alleged. The number of potential Class members is so numerous that joinder is impracticable.

44.    Plaintiff, as representative of the Class, will fairly and adequately protect the interest of the Class members. The interests of plaintiff are coincident with, and not antagonistic to, those of the Class members.

45.    Except as to the amount of damages each member of the Class has by itself sustained, all other questions of fact and law are common to the Class, including but not limited to,

CLASS ACTION COMPLAINT

010031-11 226460 V1

1   the combination and conspiracy hereinafter alleged, the violation of Section 1 of the Sherman Act

2   (15 U.S.C. § 1) and the effects of such violation.

3          46.     Plaintiff, along with all other members of the Rule (b)(3) Class, were injured as a

4   result of paying supracompetitive prices for title insurance in California.  These supracompetitive

5   prices were achieved as a result of defendants' illegal price-fixing activities and market allocation

6   and division.

7          47.     Members of the Class include hundreds of thousands, if not millions, of consumers.

8   They are so numerous that their joinder would be impracticable.

9          48.     Plaintiff also brings this action as a class action under Rule 23(b)(2) of the Federal

10  Rules of Civil Procedure, for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  The Rule

11  (b)(2) Class includes all members of the (b)(3) Class, and all consumers who are threatened with

12  injury by the anticompetitive conduct detailed herein.

13         49.     Defendants have acted, continued to act, refused to act and continued to refuse to act

14  on grounds generally applicable to the Rule (b)(2) Class, thereby making appropriate final

15  injunctive relief with respect to the Rule (b)(2) Class as a whole.

16         50.     Members of the Rule (b)(2) Class include hundreds of thousands, if not millions, of

17  consumers.  They are so numerous that their joinder would be impracticable.

18         51.     Common questions of law and fact exist with respect to all Class members and

19  predominate over any questions solely affecting individual Class members.  Among the questions

20  of law or fact common to the class are the following:

21         •   Whether defendants have engaged in the alleged illegal price-fixing activity
               and market allocation and division.
22
           •   The duration and scope of defendants' alleged illegal price-fixing and market
23             allocation and division activity.

24         •   Whether defendants' alleged illegal price-fixing and market allocation and
               division has caused higher prices to plaintiffs and other purchasers of title
25             insurance in California.

26         •   Whether the Insurance Commissioner has actively supervised defendants'
               price fixing and market allocation and division.
27

28
                                                    - 10 -

CLASS ACTION COMPLAINT
010031-11  226460 V1

52.     Plaintiff does not have any conflict of interest with other Class members. Plaintiff's claims are typical of the claims of the Class and they will fairly and adequately reflect the interests of the Class. Counsel competent and experienced in federal class action and federal antitrust litigation has been retained to represent the Class.

53.     This action is superior to any other method for the fair and efficient adjudication of this legal dispute since joinder of all members is not only impracticable, but impossible. The damages suffered by certain members of the Class are small in relation to the expense and burden of individual litigation and therefore it is highly impractical for such Class members to seek redress for damages resulting from defendants' anticompetitive conduct.

54.     There will be no extraordinary difficulty in the management of the Class action.

## VI.     TRADE AND COMMERCE

55.     During all or part of the period in suit, defendants and their co-conspirators were sellers of title insurance in California.

56.     During the period in suit, the defendants sold substantial quantities of title insurance in a continuous and uninterrupted flow in interstate commerce. In 2005, consumers in the United States paid $17 billion for residential title insurance policies.

57.     During the period in suit, Class members from locations outside California purchased commercial or residential property and title insurance within California.

58.     During the period in suit, the defendants were the major sellers of title insurance in the United States and California. Defendants controlled in excess of 85 percent of the market for title insurance in the United States and California.

59.     The activities of the defendants and their co-conspirators, as described herein, were within the flow of interstate commerce and substantially affected interstate commerce.

## VII.     FACTUAL ALLEGATIONS

A.     **The Nature of Title Insurance**

60.     Title insurance is one of most costly items associated with the closing of a real estate transaction. In California, rates for title insurance are based on a percentage of the total value of the property being insured. For residential properties, this price ranged in 2005 from

1    about $1,010 (for a $250,000.00) property to $1,490 (for a $500,000 property).  For more

2    expensive homes and commercial properties, these prices are significantly higher.  This amount

3    spent on title insurance has risen dramatically over the past decade.

4       61. Title insurance serves an important purpose.  It protects the purchaser of a property

5    from any unidentified defects in the title that would in any way interfere with the full and complete

6    ownership and use of the property with the ultimate right to resell the property.  Title insurance is

7    required by lenders in most residential and commercial real estate transactions.

8       62. Consumers exercise little discretion in choosing the title insurer from which they

9    purchase the insurance.  That decision is typically made for them by their lawyer, mortgage broker,

10   lender, or realtor.  Consequently, for most purchasers, the cost of title insurance is not challenged.

11   Most consumers do not even become aware of the price they will pay and to which insurer they

12   will pay it until the actual closing of the real estate transaction.  By then it's too late, consumers

13   can't attempt to negotiate a better title insurance price or alternate provider for fear of delaying or

14   derailing the entire transaction.  There is no shopping around.  There is no negotiation of price.

15      63. This dynamic basically removes the sale of title insurance from the normal

16   competitive process.  Unlike the regular forces of supply and demand that keep most industries and

17   their pricing in check, the title insurance industry is not subject to any real competitive constraints.

18   The purchasers of the insurance, in most instances, are not the ones making the purchasing

19   decisions.  And, they are certainly in no position to question the price.

20      64. The most effective but illegal way for a particular title insurer to get business is to

21   encourage those making the purchasing decisions – the real-estate middlemen – to steer business to

22   that insurer.  The best way to so motivate the middlemen is not through lower prices (that they are

23   not even paying).  Rather, it is through kickbacks in the form of finder's fees, gifts, meals, business

24   services and other financial enticements.  Therefore, it is through higher pricing (which allows for

25   generous inducements and kick-backs), not lower pricing, that provides the best way for title

26   insurers to compete and increase their business.

27

28

   - 12 -

CLASS ACTION COMPLAINT
010031-11 226460 V1

**B.    Price-Fixing in the Large Markets**

65.    New York is one of several states in which the leading title insurers collectively fix their prices through a rate-setting organization like TIRSA. There are two principal cost components that go into TIRSA's calculation. One comprises the risk associated with issuing the title policy. The other comprises the "agency commissions" paid to title agents.

66.    The risk component covers the risk the title insurer bears for any undiscovered defects in the title. Unlike property insurance, title insurance carries with it a very limited risk of loss to the insurer. That is because title insurance protects against unknown *prior* events that cause defects in title. With a proper search and examination of prior ownership records, any such defects can and almost always are readily identified and excluded from the policy's coverage. Consequently, the average claim payout on a title insurance policy in the United States amounts to only about 5 percent of the total premium collected. This is very different from property coverage (such as auto and home insurance) – which protects against *future* occurrences over which the insurer has little to no control – where the average claim payout amounts to about 80 percent of the total premium.

67.    The "agency commissions" component of the title insurance rate covers payments made to title agents. Defendants have an ownership or management stake in many of the title agencies to which these payments are made. A small portion of these payments is for the search and exam of prior ownership records of the property being purchased to identify any liens, encumbrances, burdens, exclusions, or other defects in the title. The search and exam function does not involve the spreading or underwriting of risk, and title insurers typically outsource this task to title agents.

68.    The remainder, and by far the bulk, of the agency commissions are comprised of costs unrelated to the issuance of title insurance. These costs include kickbacks and other financial inducements title insurers provide to title agents and indirectly (through title agents) to the lawyers, brokers, and lenders who, in reality, are the ones deciding which title insurer to use. These payments have nothing to do with the issuance of title insurance and are made by title insurers merely to inflate their revenues and steer business their way.

- 13 -

1    69.    Under TIRSA's collective rate setting regime, roughly 85 percent of the total title

2    insurance premium is based on the so-called "costs" associated with the payment of agency

3    commissions. Only 15 percent is based on costs associated with the risk of loss.

4    70.    TIRSA publishes its final calculated title rates in the New York Title Insurance Rate

5    Manual. These rates are tied to the value of the property being insured. This is so despite the fact

6    that the costs associated with agency commissions are entirely unrelated to the value of the

7    property. Indeed, agency kickbacks and enticements have little to do with producing a particular

8    title policy and provide no value – proportional to property value or otherwise – to the consumer.

9    Even search and exam costs are unrelated to property value. They instead depend on the age of the

10   property, the complexity of the ownership history, and the accessibility of prior ownership records.

11   71.    There are other states in which the defendants overly meet and agree to fix the rates

12   for title insurance as part of a formal collective rate setting process.

13   **C.    TIRSA's Formation**

14   72.    Prior to TIRSA, the New York Board of Title Underwriters ("NYBTU") served as

15   the title insurance rate-setting body in New York. NYBTU, along with the title insurance rate

16   setting bureaus in many other states, was disbanded in the mid-1980s in the wake of a Federal

17   Trade Commission("FTC") challenge to the collective rate setting activity of many of these

18   associations. The FTC's challenge culminated in *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621 (1992),

19   where the Supreme Court held that to avoid *per se* illegal price fixing liability, the rate setting

20   activity of these rating bureaus must be actively supervised by the state.

21   73.    In *Ticor*, the FTC focused its challenge on agency commissions. The FTC

22   contended that the respective state insurance departments merely rubber-stamped this portion of the

23   collectively fixed rates without any independent review or analysis of their reasonableness or cost

24   justification. The Supreme Court agreed with the FTC that this kind of limited state oversight was

25   not sufficient. Rather, to avoid illegal price-fixing liability, the state insurance department has to

26   "exercise[]sufficient independent judgment and control so that the details of the rates or prices have

27   been established as a product of deliberate state intervention, not simply by agreement among

28   private parties." *Ticor*, 504 U.S. at 634-35.

- 14 -

CLASS ACTION COMPLAINT
010031-11 226460 VI

1    74.    Following the Supreme Court's instruction in *Ticor*, the Third Circuit on remand in

2    *Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129 (3d Cir. 1992), upheld the FTC's finding that the

3    collective rate-setting of certain state rating bureaus was improper because it was not actively

4    supervised by the state.  According to the circuit court, "[t]he Supreme Court plainly instructed us

5    that a state's rubber stamp is not enough.  Active supervision requires the state regulatory

6    authorities' independent review and approval."  *Id.* at 1139.

7    75.    Defendants formulated TIRSA's first rate manual and procedure soon after the

8    Supreme Court's *Ticor* decision.  Through TIRSA, defendants have set up a rate-setting scheme to

9    get around the rigors of state oversight required by *Ticor*.  They have done so by calculating a

10    single rate that comprises both risk and agency commission costs and by outsourcing to title agents

11    the agency commission costs.  In this way, defendants avoid providing the Insurance Department

12    with any detailed breakout or backup for the bulk of the costs that make up their collectively fixed

13    rates.

14    76.    TIRSA merely submits an aggregated figure that is supposed to represent the total

15    agency commission costs.  Embedded within this figure is the vast quantity of dollars that are

16    funneled to and through the title agencies as kickbacks, financial inducements and other costs

17    unrelated to the issuance of title insurance.  Defendants' design in all of this has been to effective

18    "hide" the cost basis for their artificially high and collectively fixed title insurance premiums from

19    the regulatory scrutiny that *Ticor* demands.

20    **D.    Lack of Regulatory Supervision and Authority in New York and Other States**
      **Including California**

21

22    77.    There is no provision under the New York Insurance Law for TIRSA to include in

23    its collectively fixed rates kickbacks and other agency commission payments unrelated to the

24    issuance of title insurance.  Indeed, the New York Insurance Department has openly acknowledged

25    that it lacks the authority to review any agency commission payments.  It has likewise recognized

26    that defendants' outsourcing of agency commission costs has prevented it from performing a

27    meaningful review of TIRSA's calculated rates.  This was made clear at a November 2006 public

28    hearing the New York Insurance Department held – the first in 15 years – where it questioned

- 15 -

1   TIRSA and its members on TIRSA's failure to provide the Insurance Department with any backup

2   or detail for agency commissions.

3        78.    At the hearing, the Insurance Department conceded that it could not properly

4   evaluate TIRSA's calculated rates, and that it could only do so if it obtained the detailed cost

5   information on agency commissions that TIRSA does not provide.

6        79.    The Insurance Department's recognition that it is not properly supervising TIRSA's

7   rate-setting activity is consistent with the April 2007 findings of the U.S. Government

8   Accountability Office ("GAO") that the title insurance industry is in need of greater state

9   regulation.  The GAO studied the industry conditions of several states, including New York, and

10  concluded that "state regulators have not collected the type of data, *primarily on title agents' costs*

11  *and operations,* needed to analyze premium prices and underlying costs." (Emphasis added.)

12       80.    Unchecked by regulatory review and insulated from competition, defendants have

13  thus been able to collectively fix title insurance rates at supra competitive levels and earn profits

14  that vastly exceed those contemplated by the Insurance Department or that would have resulted in a

15  free and open competitive market.

16       81.    At the time of TIRSA's formation, the Insurance Department established 5 percent

17  (of the total premium) as the level of profit to which title insurers are entitled.  The Insurance

18  Department is supposed to carefully analyze TIRSA's rate calculations, and, in particular, its

19  revenue and cost information, to ensure that this 5 percent profit level is maintained and based on a

20  reasonable premium.  However, without the authority or ability to scrutinize agency commission

21  costs, the Insurance Department has been unable to perform this function.  As a result, defendants

22  (through TIRSA) have been able to set artificially high title premiums and secure title profits far in

23  excess of the 5 percent threshold.

24       82.    Through an independent investigation conducted over the past several years, the

25  New York State Attorney General found that for every dollar of insurance premium defendants

26  collected, of the roughly 15 cents that supposedly accounts for the risk of loss, only 3 cents is paid

27  out in claims.  And, of the roughly 85 cents that supposedly covers agency commissions, only

28  between 8 and 11 cents goes to costs actually incurred by title agents in producing the title policy.

- 16 -

1    These numbers show that title insurers' collectively fixed rates have resulted in profits that

2    untethered to and vastly exceed the costs of producing such policies.

3        83.    The New York Attorney General's investigation further revealed that what was

4    largely driving these numbers were the kickbacks and other financial inducements defendants were

5    funneling to and through title agents to secure more business. As reported at the New York

6    Insurance Department's 2006 hearing, one title agency's financial statements revealed that it spent

7    more than $1 million of these so-called "agency commissions" on items identified as "Christmas",

8    "automobile expenses", "political contributions", "promotional expenses", and "travel and

9    entertainment". These expenses are not even remotely related to the issuance of title insurance.

10       84.    The Washington State Insurance Commissioner's October 2006 report found

11    strikingly similarly abuses in Washington. Violations were pervasive and the Commissioner

12    concluded that consumers were paying too much as a result.

13       85.    All of this "excess money" paid to title agents not only works to steer business to

14    defendants. It also serves to boost defendants' own profits through the inflated revenues they

15    obtain to cover these agency payments and through their ownership or management stake in many

16    of these agencies.

17       86.    Defendants are competitors in the sale of title insurance to consumers throughout

18    the United States. These title insurers have agreed and engaged in concerted efforts to

19    (i) collectively set and charge uniform and supracompetitive rates for title insurance, (ii) include in

20    their calculated rates agency commission costs, (iii) embed within these costs payoffs, kickbacks,

21    and other charges that are unrelated to the issuance of title insurance, and (iv) hide these supposed

22    "costs" from regulatory scrutiny by funneling them to and through title agents over which the

23    government agencies have no ability or authority to regulate.

24       87.    The GAO in its 2007 report entitled "Actions Needed to Improve Oversight of the

25    Title Insurance Industry and Better Protect Consumers" found several indicia of a lack of

26    competition and questions about the reasonableness of prices including:

27

28

CLASS ACTION COMPLAINT
010031-11 226460 V1

- Consumers find it difficult to shop for title insurance, therefore, they put little pressure on insurers and agents to compete based on price;

- Title agents do not market to consumers, who pay for title insurance, but to those in the position to refer consumers to particular title agents, thus creating potential conflicts of interest;

- A number of recent investigations by HUD and state regulatory officials have identified instances of alleged illegal activities with the title industry that appear to reduce price competition and could indicate excessive prices;

- As property values or loan amounts increase, prices paid for title insurance by consumers appear to increase faster than insurers' and agents' costs; and

- In states where agents' search and examination services are not included in the premium paid by consumers, it is not clear that additional amounts paid to title agents are fully supported by underlying costs.

88.    The GAO visited several states, including California, and found a lack of regulatory oversight:

> In the states we visited, we found that regulators did not assess title agents' costs to determine whether they were in line with premium rates; had made only limited efforts to oversee title agents (including ABAs involving insurers and agents); and, until recently, had taken few actions against alleged violations of antikickback laws. In part, this situation has resulted from a lack of resources and limited coordination among different regulators within states. On the federal level, authority for alleged violations of section 8 of RESPA, including those involving increasingly complex ABAs, is limited to seeking injunctive relief. Some state regulators expressed frustration with HUD's level of responsiveness to their requests for help with enforcement, and some industry officials said that RESPA rules regarding ABAs and referral fees need to be clarified. Industry and government stakeholders have proposed several regulatory changes, including RESPA reform, strengthened regulation of agents, a competitor right of action with no monetary penalty, and alternative title insurance models. [*Id.* at 41, footnotes omitted.]

CLASS ACTION COMPLAINT
010031-11 226460 V1

- 18 -

1    **E.    Competition Based on Kickbacks and Inducements But Not Rates**

2          89.    Having agreed to fix or stabilize prices in New York and other states where they

3    overtly meet to promulgate rates, these same defendants then set out to do the same in other states.

4          90.    In other words, as a direct result of these meetings where rates were agreed to, these

5    same defendants agreed, either expressly or tacitly, to not compete on rates in other states as well.

6    To compete on rates in other states could and would imperil their ability to maintain the agreed rate

7    in states like New York.

8          91.    As is the case in New York, a lack of regulatory authority over rates created an

9    environment in which a conspiracy can and did succeed.  No agency was examining why all the

10    rates were virtually identical, and no agency was examining whether the costs associated with these

11    premiums were reasonable.  This is an environment which is conducive to price fixing.

12          92.    In California, there is a lack of regulatory authority and oversight over title

13    insurance companies.  The rates in California are not set as part of a deliberate state intervention

14    and the state does not and cannot meaningfully renew or approve these rates.  The rates at issue in

15    this case went into effect without review.

16    **F.    Other Indicators of a Lack of Competition and Conditions Conducive to Collusive
   Rate Setting**

17

18          93.    In addition to the uniformity of rates, other facts suggest that it is more plausible

19    than not that rates have been set based on an agreement to fix prices.

20          94.    In theory, the chain of title should be documented back to its historic grant of

21    ownership centuries in the past.  Fear about a possible title defect in the distant past is widely used

22    as a justification by title agencies when convincing property buyers to purchase an owner policy in

23    addition to the lender policy, which is mandatory to secure a mortgage.  The title agency, however,

24    saves much time and money when the search is limited to one or two transactions.  They rely on

25    the insurance policy to cover the remote chance of missing an earlier but still-valid claim.  If such a

26    claim is asserted and survives the scrutiny of the title insurance company's legal department, the

27    expected cost of compensation is likely to be less than the sum of added overhead costs of

28    routinely tracing back every chain of title to the earliest registered owner in the distant past.

- 19 -

CLASS ACTION COMPLAINT

010031-11  226460 V1

95.    Title insurance industry officials tend to justify the large proportion of the premium retained by the title abstract and settlement agency (from 60 to more than 90 percent) by the alleged high cost of title searching back into the distant past. In fact, a high proportion of noncommercial properties are searched only through the most recent transaction. No information is available as to what proportion of claims originate in the distant past. The industry has never published pertinent statistics. It would have a marketing incentive to publish these statistics if the risk were significant; that it has not published these statistics indicates that the risk probably is only slightly greater than zero.

96.    Many U.S. homes are being resold three or four times in twenty-five years. At each of these occasions, an abstract of title will be prepared on the basis of a more or less thorough review of the available title records, inheritance records, family records and records of past or current liens against a property. It is reasonable, therefore, to suspect that the risk of a title defect will decrease every time a property is sold.

97.    Title searches have become less labor intensive, especially in large urban counties and cities. More and more of the information is available online. The statistical likelihood that a title default would be overlooked is a closely held industry secret, but it appears to be so small that many transactions are now insured on the basis of a search of the last owner's title history or a search into transactions that occurred during the last twenty-five to thirty-five years. The evidence is strong that the title insurance industry has achieved a remarkably high level of loss minimization.

98.    Thus the costs of production have decreased as has the risk of loss yet none of these factors has resulted in price competition at the consumer level.

99.    There is a remarkable absence of rate changes by title insurers over the past five years, despite declining costs of production, increased number of transactions and increased revenue per transaction. During a period when costs per unit of production declined significantly, underwritten title companies and title insurers maintained excessive rates. The prices charged by title insurers and underwritten title companies were not and are not responsive to the changing costs of production or increasing revenue per transaction at a given set of rates. Again, this is indicia of an agreement not to compete based on price.

CLASS ACTION COMPLAINT

010031-11  226460 V1

100.     As noted, the title companies engage in illegal rebates and kickbacks where the title insurer or the underwritten title company provides money, free services or other things of value to a real estate agent, a lender or homebuilder in exchange for business referrals. These illegal rebates and kickbacks – a consequence of reverse competition – show that title insurance rates are supra competitive and that some portion of the overcharge is passed from the underwritten title company or title insurer to the referrer of business.

101.     A lack of competition and the ability to control prices is enhanced by the fact that there were few title insurer entrants over the period from 1995 through 2005 and the number of title insurer groups declined as title insurers acquired other title insurers. There were few underwritten title company entrants over the 2000 to 2005 period and new entrants were controlled business arrangements whose addition to the market did not result in greater price competition.

102.     Access to title plants can be a barrier to entry, but a large barrier to entry exists due to the established relationships between the entities that can steer the consumer's title and escrow business and the entities who sell title insurance and escrow services.

103.     The title insurance market is highly concentrated – a few title insurers account for the vast majority of title insurance sales – at both the statewide level and at the county level in California. For example, three title insurer groups account for 77.4% of the market at a statewide level. At the county level, each individual market was highly concentrated. The GAO found that First American and Fidelity had a market share of 66 percent. Such a concentration enhances the ability of companies to fix prices

104.     The agreement not to compete based on price is also evidenced by the fact that no company has marketed its services to consumers, the ultimate purchasers of the product. This is in marked contrast to real insurance, for example, car insurance, where the companies compete vigorously with well recognized slogans such as State Farm's "Like a Good Neighbor," or Allstate's "good hands," or the cute (to some) GEICO gecko promising low prices.

CLASS ACTION COMPLAINT
010031-11 226460 V1

VIII.  CLAIMS FOR RELIEF

COUNT I

**Violation of the Sherman Act**

105.   Plaintiff incorporates by reference the preceding allegations.

106.   Beginning at least as early as February 2004, and continuing thereafter to the present, the exact dates being unknown to plaintiff, defendants and their co-conspirators engaged in a combination and conspiracy in unreasonable restraint of the aforesaid interstate trade and commerce in violation of Section 1 of the Sherman Act.

107.   The aforesaid combination and conspiracy has consisted of a continuing agreement, understanding and concert of action among the defendants and their co-conspirators, the substantial terms of which have been:

        (a)    to fix, raise, maintain and stabilize the price of title insurance throughout California;

        (b)    to fix, raise, maintain and stabilize the terms and conditions of sale of title insurance in Californi; and

        (c)    to allocate and divide the market for title insurance in California.

108.   In the absence of proper regulatory authority and oversight, defendants' conduct constitutes a horizontal agreement to fix the form, structure, and prices of title insurance and to allocate and divide the title insurance market in California and is a *per se* violation of Section I of the Sherman Act.

109.   Defendants' price-fixing, market allocation and division activity has been continuous throughout the relevant damages period and has been renewed and reinforced annually through submissions to the OIC of supposed cost and revenue information and its periodic submissions of rate changes.

110.   Through their collective price-fixing, market allocation and division and manipulation of the regulatory process, defendants have harmed competition by charging consumers supra competitive prices for title insurance in California, evidenced in part by the fact that the prices are uniformly higher than compared with the cost of providing the insurance.

- 22 -

1        111.    The aforesaid combination and conspiracy has had the following effects among

2    others:

3               (a)      price competition in the sale of title insurance has been suppressed,

4    restrained and eliminated;

5               (b)      prices for title insurance have been raised, fixed, maintained and stabilized at

6    artificially high and non-competitive levels; and

7               (c)      purchasers of title insurance have been deprived of the benefit of free and

8    open competition.

9        112.    During the period of the antitrust violations by defendants and their co-conspirators,

10   plaintiff and each member of the Class she represents, has purchased title insurance and, by reason

11   of the antitrust violations herein alleged, paid more for such that it would have paid in the absence

12   of said antitrust violations.  As a result, plaintiff and each member of the Class she represents, has

13   been injured and damaged in an amount presently undetermined.

**COUNT II**

15   **Violation of Cal. Bus. and Prof. Code §§ 16720, *et seq.***

16       113.    Plaintiff incorporates by reference the preceding allegations.

17       114.    Defendants conduct as set forth above is in violation of the Cartwright Act of

18   California (Cal. Bus. & Prof. Code §§ 16720, *et seq.*).

19       115.    As a direct result of defendants' unlawful acts plaintiffs have paid artificially

20   inflated prices for title insurance and have suffered injury to their business and property.

**COUNT III**

22   **(California's Business & Professions Code §§ 17200, *et seq.*)**

23       116.    The preceding paragraphs of this Complaint are realleged and incorporated by

24   reference.   Plaintiff asserts this claim for violations of California's UCL, Bus. & Prof. Code

25   §§ 17200, *et seq.*, on behalf of herself and the members of the Class.

26       117.    Defendants' statements and representations constitute unfair, unlawful and

27   deceptive trade practices in violation of the UCL.

28

- 23 -

CLASS ACTION COMPLAINT

010031-11 226460 V1

118.    All of the wrongful conduct alleged herein occurs and continues to occur in the conduct of defendants' business.  Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is repeated in the State of California on hundreds, if not thousands, of occasions daily.

119.    Plaintiff has suffered injury in fact and has lost money or property as a result of defendants' unfair, unlawful and/or deceptive practices by paying a higher price for title insurance then she would or should have absent the conduct complained of.

120.    Plaintiff requests that this Court enter such orders or judgment as may be necessary to enjoin the defendants from continuing its unfair, unlawful, and/or deceptive practices, to restore to any person in interest any money which may have been acquired by means of such unfair competition and to disgorge any profits realized by defendants as a result of its unfair, unlawful and/or deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code § 3345, and for such other relief as set forth in the Prayer for Relief.

## COUNT IV

### UNJUST ENRICHMENT

121.    Plaintiff incorporates by reference the preceding allegations.

122.    This Cause of Action is pled in the alternative to all claims and/or causes of action at law.

123.    Defendant has received a benefit from plaintiff and the Class members in the form of the prices plaintiff and the Class members paid for defendants' title insurance.

124.    Defendants are aware of their receipt of the above-described benefit.

125.    Defendants received the above-described benefit to the detriment of plaintiff and each of the other members of the Class.

126.    Defendants continue to retain the above-described benefit to the detriment of plaintiff and the Class members.

127.    As a result of defendants' unjust enrichment, plaintiff and the Class members have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution

CLASS ACTION COMPLAINT
010031-11 226460 V1

1  of defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or

2  wrongful conduct alleged above.

### PRAYER FOR RELIEF

4       WHEREFORE, plaintiff demands:

5       A.    That the alleged combination and conspiracy among the defendants and their

6  co-conspirators be adjudged and decreed to be an unreasonable restraint of trade in violation of

7  Section 1 of the Sherman Act;

8       B.    That the Court declare that the premiums charged are excessive under state law and

9  order damages;

10       C.    That judgment be entered against defendants, jointly and severally, and in favor of

11  plaintiff, and each member of the Class it represents, for threefold the damages determined to have

12  been sustained by plaintiff, and each member of the Class it represents, together with the cost of

13  suit, including a reasonable attorneys' fee;

14       D.    Each of the defendants, successors, assignees, subsidiaries and transferees, and their

15  respective officers, directors, agents and employees, and all other persons acting or claiming to act

16  on behalf thereof or in concert therewith, be perpetually enjoined and restrained from, in any

17  manner, directly or indirectly, continuing, maintaining or renewing the aforesaid combination,

18  conspiracy, agreement, understanding or concert of action, adopting or following any practice,

19  plan, program, or design having a similar purpose or effect in restraining competition; and

20       E.    Such other and further relief as may appear necessary and appropriate.

### JURY TRIAL DEMANDED

22       Pursuant to Rule 38, F.R.C.P., plaintiff demands a trial by jury of the claims alleged herein.

23       DATED: March 10, 2008.

24                 HAGENS BERMAN SOBOL SHAPIRO LLP

26       By _____

27                   JEFF D. FRIEDMAN (173886)

1

Reed R. Kathrein (139304)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com
reed@hbsslaw.com

Steve W. Berman
Anthony D. Shapiro
Thomas E. Loeser (202724)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, California 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
tony@hbsslaw.com
toml@hbsslaw.com

Attorneys for Plaintiff

EXHIBIT B

1    Daniel C. Girard (CA Bar No. 114826); dcg@girardgibbs.com
     Elizabeth C. Pritzker (CA Bar No. 146267); ecp@girardgibbs.com
2    Aaron M. Sheanin (CA Bar No. 214472) ams@girardgibbs.com
     Alex C. Turan (CA Bar No. 227273); act@girardgibbs.com
3    **GIRARD GIBBS LLP**
4    601 California Street, 14th Floor
     San Francisco, California 94104
5    Telephone: (415) 981-4800
6    Facsimile: (415) 981-4846

7    Attorneys for Plaintiffs

8                   UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11   RUBEN ROMERO and SARAH YAHN, on behalf of       Case No. _____
     themselves and all others similarly situated,
12                                                    CLASS ACTION COMPLAINT
             Plaintiffs,
13
        vs.                                           DEMAND FOR JURY TRIAL
14
     FIDELITY NATIONAL FINANCIAL, INC.,
15   FIDELITY NATIONAL TITLE INSURANCE
     COMPANY, TICOR TITLE INSURANCE
16   COMPANY, TICOR TITLE INSURANCE
     COMPANY OF FLORIDA, CHICAGO TITLE
17   INSURANCE COMPANY, NATIONAL TITLE
     INSURANCE COMPANY OF NEW YORK, INC.,
18   SECURITY UNION TITLE INSURANCE
     COMPANY, THE FIRST AMERICAN
19   CORPORATION, FIRST AMERICAN TITLE
     INSURANCE COMPANY, UNITED GENERAL
20   TITLE INSURANCE COMPANY, LANDAMERICA
     FINANCIAL GROUP, INC., COMMONWEALTH
21   LAND TITLE INSURANCE COMPANY,
     LAWYERS TITLE INSURANCE CORPORATION,
22   TRANSNATION TITLE INSURANCE COMPANY,
     STEWART TITLE GUARANTY COMPANY,
23   STEWART TITLE INSURANCE COMPANY, OLD
     REPUBLIC NATIONAL TITLE INSURANCE
24   COMPANY, and OLD REPUBLIC
     INTERNATIONAL CORPORATION,
25
             Defendants.
26

27

28

CV 08    3391

ORIGINAL FILED
'08 JUL 14 PM 4: 13
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

EMC

1    Plaintiffs Ruben Romero and Sarah Yahn, on behalf of themselves and all others similarly

2    situated, allege as follows:

3                                    **INTRODUCTION**

4    1.    Plaintiffs bring this antitrust action on behalf of all persons and entities who purchased

5    title insurance in the State of California directly from the named defendants or any co-conspirator as

6    identified in this Complaint.

7    2.    Title insurance is one of the most costly items associated with a real estate purchase,

8    aside from the purchase price of the property.  In 2005, the price of title insurance for residential

9    properties ranged from approximately $1,010 (for a $250,000 property) to $1,490 (for a $500,000).

10   Title insurance premiums for more expensive homes and commercial properties are significantly

11   higher.

12   3.    Title insurance differs from other kinds of insurance in three respects.  First, unlike

13   automobile, life, homeowners or other forms of insurance, which protect consumers from loss

14   resulting from an event that may occur in the future, title insurance offers protection from events that

15   occurred in the past that may affect the title to the property.  Second, unlike other forms of insurance,

16   in which coverage may vary, most title insurance policies are based on a single set of form policies,

17   published by the American Land Title Association, and provide substantially the same protection.

18   Third, unlike other forms of insurance, title companies do not market their products directly to the

19   consumers who pay for them.  Instead, title insurers rely on "reverse competition" to market and sell

20   their products.  They pay commissions, kick-backs or referral fees, or provide other inducements to

21   real estate agents, banks, lenders, builders and others involved in real estate transactions to use their

22   insurance products as part of those transactions.

23   4.    In California, the title insurance market is dominated by five companies and their

24   affiliates or subsidiaries:  Fidelity National Financial, Inc., First American Corporation, LandAmerica

25   Financial Group, Inc., Stewart Title Guaranty Title Company, and Old Republic National Title

26   Insurance Company.  Combined, these five affiliate groups sell about 92 percent of the title insurance

27   policies sold in California – or roughly $2.85 billion of the $3.1 billion in title insurance premiums

28   collected from California consumers in 2004.

                                CLASS ACTION COMPLAINT

5.      In some of the major markets in the United States, such as New York, these same title insurers collectively meet, jointly set rates, and file these rates with the applicable state insurance authority.  The rates are not subject to any meaningful review or regulation, however.  Moreover, the companies agree to fix the price of title insurance at levels that include commissions, kick-backs and other inducements paid to middlemen to steer business referrals to these companies.  These agreed-upon rates far exceed the risk and loss experience associated with title insurance.  As a result of their joint rate setting agreement, no company competes on price to the consumer.

6.      Having agreed to fix prices in states where joint rate setting occurs, the five groups of affiliated companies agreed not to compete based on price to the consumer in other states, including California, where regulation of filed rates is non-existent.  The result of this arrangement in California is that these companies have agreed to compete by offering inducements to middlemen for business referrals and thereby have fixed the rates of title insurance premiums at supra competitive levels.

7.      These agreements and activities by five affiliate groups of title insurers, combined with their market dominance in the State, have enabled these companies to maintain the price of title insurance in California at artificially high levels.  California regulators have acknowledged the harm these agreements and this anti-competitive conduct have caused consumers during the Class Period.

8.      In 2005, for example, the California Office of the Insurance Commissioner found an "astonishing number" of kickbacks and similar inducements by title insurers to middlemen in violation of state law.  A report to the California Insurance Commissioner prepared that same year by Birny Birnbaum, a consulting economist, also found "numerous examples in California of illegal rebates and kickbacks where the title insurer or the underwritten title company provides money, free services or other things of value to a real estate agent, a lender or homebuilder in exchange for business referrals." (*An Analysis of Competition in the California Title Insurance and Escrow Industry*, December 2005, p.3)  Similar findings by California Insurance Commissioner, Steve Poizner, led to a February 2007 statement in which the Commissioner declared that "reasonable price competition does not exist for title and escrow services" in California. (*Insurance Commissioner Steve Poisner Issues Statement Following Decision by OAL in New Regulations, California Department of Insurance*, February 22, 2007.)

9.     The California Insurance Commissioner does not actively oversee or regulate rates, however, and does not have the power to do so.  The absence of regulation by the California Insurance Commissioner has allowed collusive behavior among the five affiliate groups that dominate the market, as described herein, resulting in excessive rates for title insurance premiums in California.

10.     As a result of defendants' unlawful conduct, plaintiffs and members of the Class paid higher prices for title insurance than they would have paid in a competitive market.

## JURISDICTION AND VENUE

11.     Plaintiffs bring this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).  Plaintiffs also bring this action under the California Cartwright Act (Business and Professions Code § 16720 *et seq.*), and the California Unfair Competition Law (Business and Professions Code § 17200 *et seq.*).

12.     This Court has jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331, 1332(d) and 1337(a).  This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

13.     Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c) and (d), because a substantial part of the events giving rise to the plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more  defendants transact business, maintain offices or are found in this District.

## PARTIES

**Plaintiffs**

14.     Plaintiffs Ruben Romero and Sarah Yahn, a married couple, are individuals residing in California.  During the Class Period, plaintiffs Romero and Yahn purchased title insurance in California directly from one or more of the defendants and have been injured by reason of the antitrust violations alleged.

3
CLASS ACTION COMPLAINT

1 **Defendants**

2 **A.     Fidelity Family of Title Companies**

3        15.     Defendant Fidelity National Financial, Inc. ("Fidelity National") is a Delaware

4 corporation headquartered at 601 Riverside Avenue, Jacksonville, Florida 32204.  Fidelity National

5 does business in California through one or more of its subsidiaries, including defendants Fidelity

6 National Title Insurance Company, Ticor Title Insurance Company, Ticor Title Insurance Company of

7 Florida, National Title Insurance of New York, Inc., Security Union Title Insurance Company, and

8 Chicago Title insurance Company.  Fidelity National is registered to do business in California.

9        16.     Defendant Fidelity National Title insurance Company ("Fidelity Title") is a California

10 corporation with its principal place of business located at 601 Riverside Avenue, Jacksonville, Florida

11 32204.  Fidelity Title does business in California, is a licensed title insurance company in California,

12 and is registered to do business in California.

13        17.     Defendant Ticor Title Insurance Company ("Ticor") is a California corporation with its

14 principal place of business located at 601 Riverside Avenue, Jacksonville, Florida 32204.  Ticor does

15 business in California, is a licensed title insurance company in California, and is registered to do

16 business in California.

17        18.     Defendant Ticor Title Insurance Company of Florida ("Ticor Florida") is a Florida

18 corporation with its principal place of business located at 601 Riverside Avenue, Jacksonville, Florida

19 32204.  Ticor Florida does business in California, is a licensed title insurance company in California,

20 and is registered to do business in California.

21        19.     Defendant Chicago Title insurance Company ("Chicago Title") is a Missouri

22 corporation with its principal place of business located at 601 Riverside Avenue, Jacksonville, Florida

23 32204.  Chicago Title does business in California, is a licensed title insurance company in California,

24 and is registered to do business in California.

25        20.     Defendant National Title Insurance of New York, Inc. ("National Title") is a New

26 York corporation with its principal place of business located at 601 Riverside Avenue, Jacksonville,

27 Florida 32204.  National Title does business in California, is a licensed title insurance company in

28 California, and is registered to do business in California.

CLASS ACTION COMPLAINT

21.    Defendant Security Union Title Insurance Company ("Security Union") is a California corporation with its principal place of business located at 601 Riverside Avenue, Jacksonville, Florida 32204. Security Union does business in California, is a licensed title insurance company in California, and is registered to do business in California.

22.    The Fidelity family of title insurance companies (collectively "Fidelity") including Fidelity National, Fidelity Title, Ticor, Ticor Florida, Chicago Title, National Title, Security Union, and their affiliates, sells title insurance to purchasers of commercial and residential real estate throughout the United States, including California. Nationally, Fidelity accounts for approximately 27 percent of title premiums. These sales amounted to approximately $4.6 billion in 2006. Fidelity, Chicago Title, and Ticor also were founding members of the New York rate-setting organization known as TIRSA (discussed below), and have collectively fixed title insurance rates in the State of New York under that rate setting regime since TIRSA's inception in 1991.

23.    Fidelity and its affiliates are wholly-owned and controlled by Fidelity National. Through its subsidiaries, Fidelity National is a provider of title insurance, specialty insurance, and claims management services. During 2006, Fidelity National had revenues of approximately $9.4 billion. Fidelity engaged in the conduct challenged here with the approval of Fidelity National.

**B.    The First American Family of Title Companies**

24.    Defendant The First American Corporation ("First American Corp.") is a California corporation with its headquarters located at 1st American Way, Santa Ana, California 92707. First American does business in California through one or more of its subsidiaries, including First American Title Insurance Company.

25.    Defendant First American Title Insurance Company ("First American Title") is a California corporation with its headquarters at First American Way, Santa Ana, California 92707. First American Title does business in California, is a licensed title insurance company in California, and is registered to do business in California.

26.    Defendant United General Title Insurance Company ("United General") is a Colorado corporation located at 8310 S. Valley Highway, Suite 130, Englewood, Colorado 80112. United

1    General does business in California, is a licensed title insurance company in California, and is

2    registered to do business in California.

3        27.    The First American family of title insurance companies (collectively "First

4    American"), including defendants First American, First American Title, United General, and their

5    affiliates, sells title insurance to purchasers of commercial and residential real estate throughout the

6    United States, including California. Nationally, First American accounts for approximately 29 percent

7    of title premiums. These sales amounted to approximately $4.8 billion in 2006.

8        28.    The First American family of title insurance companies and their affiliates are wholly-

9    owned and controlled by First American Corp. Through its subsidiaries, First American is a provider

10   of title insurance, business information, and related products and services. During 2006, First

11   American had revenues of approximately $8.5 billion. The First American family of title insurance

12   companies and their affiliates engaged in the conduct challenged here with the approval of First

13   American Corp.

14   **C.    LandAmerica Family of Title Companies**

15       29.    Defendant LandAmerica Financial Group, Inc. ("LandAmerica") is a Virginia

16   corporation headquartered at 5600 Cox Road, Glen Allen, Virginia 23060. LandAmerica does

17   business in California through one or more of its subsidiaries, including Commonwealth Land Title

18   Insurance Company, Lawyers Title Insurance Corporation, and Transnation Title insurance Company.

19       30.    Defendant Commonwealth Land Title Insurance Company ("Commonwealth") is a

20   Pennsylvania corporation with its principal place of business located at 5600 Cox Road, Glen Allen,

21   Virginia 23060. Commonwealth does business in California, is a licensed title insurance company in

22   California, and is registered to do business in California.

23       31.    Defendant Lawyers Title Insurance Corporation ("Lawyers Title") is a Nebraska

24   corporation with its principal place of business located at 5600 Cox Road, Glen Allen, Virginia 23060.

25   Lawyers Title does business in California, is a licensed title insurance company in California, and is

26   registered to do business in California.

27       32.    Defendant Transnation Title Insurance Company ("Transnation") is a Nebraska

28   corporation with its principal place of business located at 5600 Cox Road, Glen Allen, Virginia 23060.

CLASS ACTION COMPLAINT

1  Transnation does business in California, is a licensed title insurance company in California, and is

2  registered to do business in California.

3          33.     The LandAmerica family of title insurance companies (collectively "LandAmerica"),

4  including defendants LandAmerica, Commonwealth, Lawyers Title, Transnation, and their affiliates,

5  is engaged in selling title insurance to purchasers of commercial and residential real estate throughout

6  the United States, including California.  Nationally, LandAmerica accounts for approximately 19

7  percent of title premiums.  These sales amounted to approximately $3.15 billion in 2006.

8          34.     The LandAmerica family of title insurance companies and their affiliates are wholly-

9  owned and controlled by defendant LandAmerica Financial Group, Inc.  Through its subsidiaries,

10  LandAmerica is a provider of title insurance and other products and services that facilitate the

11  purchase, sale, transfer, and financing of residential and commercial real estate.  During 2006,

12  LandAmerica had revenues of approximately $4 billion.  The LandAmerica family of title insurance

13  companies and their affiliates engaged in the conduct challenged here with the approval of

14  LandAmerica.

15  **D.      Stewart Family of Title Companies**

16          35.     Defendant Stewart Title Guaranty Company ("Stewart Guaranty") is a Texas

17  corporation headquartered at 1980 Post Oak Blvd., Suite 800, Houston, Texas 77056.  Stewart

18  Guaranty does business in California, is a licensed title insurance company in California, and is

19  registered to do business in California.

20          36.     Defendant Stewart Title insurance Company ("Stewart Title") is a New York

21  corporation with its principal place of business located at 300 E. 42nd Street, Floor 10, New York,

22  New York 10017.  Stewart Title does business in California, is a licensed title insurance company in

23  California, and is registered to do business in California.

24          37.     The Stewart family of title insurance companies (collectively "Stewart"), including

25  defendants Stewart Guaranty, Stewart Title, and their affiliates, sells title insurance to purchasers of

26  commercial and residential real estate throughout the United States and California.  Nationally,

27  Stewart accounts for approximately 12 percent of title premiums.  These sales amount to

28  approximately $2 billion in 2006.

7

CLASS ACTION COMPLAINT

E.   **Old Republic Family of Title Companies**

38.   Old Republic National Title Insurance Company ("Old Republic") is a Delaware corporation with its principle place of business located at 400 Second Avenue South, Minneapolis, Minnesota 55401. Old Republic sells title insurance to purchasers of commercial and residential real estate throughout the United States, including California, and is a licensed title insurance company in California and is registered to do business in California. Nationally, Old Republic accounts for approximately 6 percent of title premiums that, in 2006, amount to roughly $1 billion.

39.   Old Republic and its affiliates are wholly owned and/or controlled by defendant Old Republic International Corporation ("Old Republic International"), a Delaware corporation headquartered in Chicago, Illinois. Through its subsidiaries, Old Republic International is a provider of title insurance, general insurance, mortgage guaranty insurance, and life and health insurance. Old Republic international had 2006 revenues of approximately $3.8 billion. Old Republic engaged in the conduct alleged here with the approval of Old Republic International.

40.   Together, defendants account for more than 90 percent of the market for title insurance premiums consumers pay in California. Defendants account for more than 85 percent of the national market for title insurance premiums. In 2006, those sales amounted to approximately $14.5 billion.

## AGENTS AND CO-CONSPIRATORS

41.   The acts alleged against the defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees or representatives, while actively engaged in the management or operation of defendants' business or affairs.

42.   Various other persons, firms or corporations not named as defendants may have participated as co-conspirators with the named defendants in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

43.   Each defendant acted as the principal, agent or joint venturer of, or for, other defendants with respect to the acts, violations and common course of conduct alleged by plaintiffs.

## CLASS ACTION ALLEGATIONS

44.   Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of the following Class:

CLASS ACTION COMPLAINT

**All persons or entities who purchased title insurance in California directly from the defendants, their subsidiaries, agents and/or affiliates, or any co-conspirator, from the earliest date allowable by law through the present (the "Class Period").**

**Specifically excluded from this Class are the defendants; the officers, directors or employees of any defendant; any entity in which any defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any defendant. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.**

45.    This action has been brought and may properly be maintained on behalf of the Class proposed above under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

46.    **Numerosity.**  Members of the Class are so numerous that their individual joinder is impracticable.  It is estimated that the Class consists of thousands of members.

47.    **Existence and predominance of common questions.**  Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members.  These common questions include:

a.    Whether defendants engaged in a contract, combination or conspiracy among themselves and/or their co-conspirators to raise, fix, and maintain the prices of title insurance sold in California;

b.    The identities of the co-conspirators;

c.    The duration of the conspiracy and nature and character of the acts done in furtherance of the conspiracy;

d.    Whether the conspiracy violated Section 1 of the Sherman Act;

e.    Whether defendants actively concealed the contract, combination or conspiracy from plaintiff and other Class members;

f.    Whether the conduct of defendants and their co-conspirators caused prices of title insurance premiums to be artificially inflated to non-competitive levels; and

g.    Whether plaintiffs and other members of the Class were injured by the conduct of defendants and their co-conspirators and, if so, the appropriate class-wide measure of damages and appropriate injunctive relief.

CLASS ACTION COMPLAINT

48.   **Typicality.**   Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs bought title insurance from one of the defendants and, like all Class members, were damaged by the wrongful conduct of defendants and their co-conspirators, and seek relief common to the Class.

49.   **Adequacy.**   Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class they seek to represent.  Plaintiffs have retained counsel competent and experienced in complex class action litigation, and intend to prosecute this action vigorously.  The interests of the members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

50.   **Superiority.**   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this case as a class action.

51.   In the alternative, the Class may be certified because:

a.   The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class members and would establish incompatible standards of conduct for defendants;

b.   The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede the ability of other Class members to protect their interests; and

c.   Defendants have acted or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief with respect to the members of the Class as a whole an appropriate form of relief.

CLASS ACTION COMPLAINT

52.     Plaintiffs reserve the right to expand, modify, or alter the class definition in response to information learned during discovery.

## TRADE AND COMMERCE

53.     During the Class Period, defendants were the major sellers of title insurance in the United States and California.  Defendants controlled in excess of 85 percent of the market for title insurance in the United States and approximately 92 percent of the statewide market in California.

54.     During the Class Period, defendants sold substantial quantities of title insurance in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district.

55.     During the Class Period, Class members located outside of and within California purchased commercial or residential property and title insurance within California.

56.     The activities of defendants and their co-conspirators, as described here substantially affected interstate trade and commerce in the United States, and in the State of California, and caused antitrust injury in the United States and in California.

## FACTUAL ALLEGATIONS

57.     Defendants are competitors in the sale of title insurance to consumers throughout the United States, including California.  They agreed and engaged in concerted efforts to (i) collectively set and charge supra-competitive rates for title insurance; (ii) include agency commission costs in their calculated rates; (iii) embed within these costs payoffs, kickbacks, and other charges that are unrelated to the issuance of title insurance; and (iv) hide these supposed "costs" from regulatory scrutiny by funneling them to and through title agents over which the government agencies have no ability or authority to regulate.

## I.     The Nature of Title Insurance

58.     Title insurance differs from other, more familiar kinds of insurance.  Unlike automobile and homeowner insurance policies that protect consumers from events that may occur in the future, title insurance offers protection from events that might have occurred in the past and may affect the title to the real estate that a consumer is buying.

59.     Title insurance, therefore, protects the purchaser of a property from unidentified defects in the title that would interfere with the full ownership and use of the property and the ultimate right to resell the property. Possible title defects include errors or omissions in deeds, mistakes in examining records, forgery, undisclosed heirs, missing heirs, liens for unpaid taxes, and liens by contractors.

60.     There are two basic types of title insurance policies – the lender's policy and the owner's policy. The lender's policy is issued to the lender and will pay the lender the remaining principal on the loan if there is a title problem that cannot be resolved. The owner's policy is issued to the buyer of the property for the full purchase price of the property. Consequently, the maximum liability on a title insurance policy is the purchase price of the property.

61.     In a typical home purchase, both a lender's policy and an owner's policy are issued. Lenders require a lender's policy whenever there is a loan associated with the real estate transaction. The lender's policy continues in force until the loan is extinguished, and the owner's policy continues until the property is sold.

62.     With a refinancing transaction, the existing lender's policy is terminated and a new lender's policy is issued. The existing owner's policy remains in place. The lender does not pay for the lender's policy in a purchase or refinancing transaction. The premium may be paid by the buyer or seller in a purchase transaction, and by the owner in a refinancing transaction.

63.     Title insurers do not compete on the basis of the policies or coverage that they provide. In fact, almost all title policies are based on a single set of form policies published and maintained by the American Land Title Association, the title insurance industry's national trade association. Moreover, the end goal of an exhaustive title search by a title insurer is not to provide coverage for title defects that the search uncovers, but rather to exclude coverage for any such defects and, therefore, further reduce the real value of the title policy that is written to cover only unknown defects in the title at the time of issuance. As a result, title insurance is a homogenous, commodity product. There is no substantive, if any, difference between a policy offered by one company in comparison to a policy offered by another company for the same property transaction.

64.     Title insurance is one of the most costly items associated with the closing of a real estate transaction, aside from the purchase price of the property. In California, rates for title insurance

1   are based on a percentage of the total value of the property being insured.  For residential properties,

2   this price ranged in 2005 from about $1,010 (for a $250,000 property) to about $1,490 (for a $500,000

3   property).  For more expensive homes and commercial properties, these prices are significantly

4   higher.  The amount consumers spent on title insurance in California rose dramatically from

5   approximately $700 million in 1995 to about $3.1 billion in 2004.

6        65.     Title insurance companies recognize that consumers generally lack the means to make

7   independent decisions regarding the scope, terms and price of title insurance.  Title insurance referrals

8   are typically made by lawyers, mortgage brokers, lenders, realtors or other professionals who take part

9   in the transaction, and the cost of title insurance premium is presented to the consumer in the closing

10  statement at the time of closing.  Typically, consumers do not shop around or negotiate the price for

11  title insurance.  As a result of these dynamics, the supply and demand principles that would apply in a

12  competitive market are not implicated, and the title insurance industry is not subject to any meaningful

13  competitive constraints.

14       66.     The title insurance market in California is dominated by five groups of affiliated

15  companies, that when combined, sell approximately 92 percent of the title insurance policies sold in

16  California, and that own and control the "title plants" in many California counties that every title

17  insurer must rely on to issue title policies.  "Title plants" contain information regarding property

18  transfers and liens reaching back many years.

19       67.     Title companies, in marked contrast to property, casualty, life, and other traditional

20  insurance carriers, choose not to market their products directly to consumers who pay for them.

21  Instead, the title insurance industry operates on what is termed a "reverse competition" model.

22  Reverse competition means that title companies solicit business referrals from the other major players

23  in the home purchase scenario – real estate agents and agencies, banks, lenders, builders, developers,

24  and others such as middlemen or go-betweens.  The title companies pay middlemen for these referrals

25  in the form of direct payments, advertising expenses, junkets, parties, and other kickbacks and

26  inducements.  In addition, middlemen such as Windermere, John L. Scott, and Coldwell Banker-Bain,

27  who themselves control a substantial portion of the real estate brokerage market, take significant

28  ownership stakes in local title agencies and affiliates of the major title insurers.  These middlemen

1 | then profit be receiving a direct monetary return from the referral of title business to the title agent in

2 | which they maintain an ownership interest.

3 |      68.    Reverse competition does not benefit consumers through market-driven forces.

4 | Instead, companies spend much of their marketing budgets entertaining real estate agents, banks,

5 | lenders, builders, developers, and others in an effort to convince these middlemen to steer the home-

6 | buying clients to their companies for the clients' title insurance needs.

7 |      69.    Rather than seek to capture business by offering lower prices, title insurers offer

8 | kickbacks in the form of finder's fees, gifts, meals, business services, and other financial enticements.

9 | As a result, title insurers compete and increase their business through higher pricing (that allows for

10 | generous inducements and kickbacks) not lower pricing to consumers.

11 |      70.    In some of the major markets in the United States, these same title insurers collectively

12 | meet, jointly set rates, and file these rates with the applicable state insurance authority. The rates are

13 | not subject to any meaningful review or regulation. The companies agree to fix the price of title

14 | insurance far in excess of the risk and loss experience associated with such insurance. As a result of

15 | the joint agreement as to rates, competition is relegated to the middleman, and therefore, no title

16 | company competes on price to the consumer.

17 |      71.    In addition to paying inducements and kickbacks, the title insurance companies and

18 | their agents divide the market of real-estate middlemen through the use of Affiliated Business

19 | Arrangements ("ABAs"), where the dominant real estate brokers purchase significant ownership

20 | stakes in favored title insurance affiliates. The real estate brokers then reward their associates for

21 | using the preferred title insurance providers and lock out independent title insurers.

22 |      72.    Having agreed to fix prices in states where joint rate-setting occurs, the companies

23 | agreed not to compete based on price to the consumer in other states, including California, where

24 | regulation of filed rates is lax or non-existent. Thus, title insurance companies agree to set prices at

25 | supra-competitive levels and to compete based on offering inducements to middlemen.

26 |      73.    One example of competing based on illegal kickbacks to middlemen came to light in

27 | July 2005, when nine major title companies reached an agreement with the California Department of

28 | Insurance to pay $37.8 million in refunds and penalties for illegal rebating where national

1  homebuilders, lenders, and realtors were encouraged to steer business to particular title insurers. The

2  nine companies were members of three insurance groups, all three of which are defendants here –

3  LandAmerica Financial Corporation, The First American Title Insurance Company, and Fidelity

4  National Financial, Inc.

5        74.    Under the arrangement, the homebuilder formed a reinsurance company affiliate – a

6  captive reinsurer. Then, under an agreement with the title insurer, the homebuilder would steer the

7  consumer to the title insurer and the title insurer would cede a portion of the premium – typically 50%

8  after the first $200 to $300 – to the captive reinsurer with no substantive risk of loss associated with

9  the reinsurance transaction. In effect, the arrangement allowed for the title insurer to rebate 50% of

10  the premium to the homebuilder.

11        75.    As a result of this scheme, the companies were accused of paying $25.4 million in

12  illegal kickbacks to various lenders, builders, and realtors in exchange for the referral of title insurance

13  business. Their actions involved more than 82,000 California households that purchased or refinanced

14  a home between 1997 and 2004.

15        76.    In March 2005, the U.S. Department of Housing and Urban Development ("HUD")

16  determined that 80% or more of the premium paid by a consumer for title insurance frequently goes to

17  the local title agent or lawyer who ordered the policy and may be running the closing.

18  **II.    Lack of Regulatory Supervision in California**

19        77.    In California, there is a lack of regulatory authority and oversight over title insurance

20  companies. The rates in California are not set as part of deliberate state intervention, and the state

21  does not meaningfully renew or approve these rates. The rates at issue in this case went into effect

22  without review.

23        78.    Although the California Office of the Insurance Commissioner ("OIC") found an

24  "astonishing number" of kickbacks and similar inducements in violation of state law, it does not

25  actively oversee or regulate rates, and, does not, by its own admission, have the power to do so. The

26  absence of regulation in California has allowed and continues to allow collusive behavior and

27  excessive rates to flourish at the expense of the consumers.

28

79.     In February 2007, Steve Poizner, the Insurance Commissioner of California, issued a statement concluding that "reasonable price competition does not exist for title and escrow services." (*Insurance Commissioner Steve Poizner Issues Statement Following Decision by OAL on New Regulations,* California Department of Insurance, February 22, 2007.)

80.     Poizner's press release goes on to state that the costs of the illegal inducements that title companies lavish on intermediaries to obtain the homeowner's business are passed on to the homeowner.  Indeed, Poizner's press release states: "As a result, over the past 10 years, even though technology has lowered the costs of title searches and document production, title and escrow charges have not come down.  In fact, title insurance on the average home in California costs roughly double what it cost 10 years ago, despite the fact that [title insurance] companies' production costs have plummeted."

81.     A report to the California Insurance Commissioner prepared during December 2005 by Birny Birnbaum, Consulting Economist, found abuses of the lack of regulatory supervision in this state.  For instance, his report states: "We found numerous examples in California of illegal rebates and kickbacks where the title insurer or the underwritten title company provides money, free services or other things of value to a real estate agent, a lender or homebuilder in exchange for business referrals."  (*An Analysis of Competition in the California Title Insurance and Escrow Industry,* December 2005, p.3.)

82.     The excess money paid to title agents not only works to steer business to defendants, but also serves to boost defendants' profits through the inflated revenues they obtain to cover the agency payments, and through their ownership or management stake in many of these agencies.

**III.     Indicators of a Lack of Competition and Conditions Conducive to Collusive Rate Setting**

**A.     Low or Declining Title Search Costs**

83.     The bulk of the title insurance premium goes to expenses as opposed to claim payments.  Title insurers paid an average of 4.6 percent of premiums for claims and claim settlement expenses from 1995 to 2004, compared to around 80 percent of the total premium collected for property and casualty insurance.  Title searches have become less labor intensive, especially in large urban counties and cities, as more of the pertinent information regarding claim of title is available

1 online. As a result, the costs of production and the risk of loss have decreased. None of these factors

2 resulted in price competition at the consumer level, however.

3      84.    Despite declining costs of production, increased number of transactions and increased

4 revenue per transaction, there have been few rate changes by title insurers over the past five years.

5 During a period when costs per unit of production declined, underwritten title companies and title

6 insurers maintained excessive rates. That prices charged by title insurers and underwritten title

7 companies were not and are not responsive to the changing costs of production or increasing revenue

8 per transaction at a given set of rates is evidence of an agreement not to compete based on price.

9 **B.    Title Premiums Include Improper Payments, Commissions and Inducements**

10      85.    The defendant title companies provide illegal rebates and kickbacks where the title

11 insurer or the underwritten title company provides money, free services, or other things of value to a

12 real estate agent, a lender, or homebuilder in exchange for business referrals. These illegal rebates and

13 kickbacks – a consequence of reverse competition – show that title insurance rates are supra-

14 competitive.

15 **C.    Market Dominance and Lack of Competition Based on Price to Consumer**

16      86.    The volume of the California title insurance transactions is substantial. The number of

17 residential title transactions exceeded 3 million during 2004 alone. Commercial property transactions

18 are in addition to this volume.

19      87.    The title insurance market is highly concentrated – few title insurers account for the

20 vast majority of title insurance sales – at both the statewide level and at the county level in California.

21 For example, the five defendant families controlled approximately 92 percent of the California title

22 insurance market in 2005.

23      88.    Defendants have maintained their market dominance and ability to control prices for

24 title insurance in part because of the substantial barriers to entry in the market. Between 1995 and

25 2005, the number of title insurer groups declined as title insurers acquired other title insurers. Few

26 companies entered the title insurance business during the period from 2000 through 2005.

27      89.    Access to title plants is a barrier to entry. Established relationships between entities

28 that steer consumers to title insurance sellers is an additional barrier to entry.

CLASS ACTION COMPLAINT

90.    As a result of their market dominance and anti-competitive practices, defendants enjoy excessive profits at the expense of the consumers. For example, title insurance underwriters earned after-tax profits of 49.0 percent in 2003 and 32.3 percent in 2004.

**IV.    Price Fixing in Other Large Markets that Affect California**

91.    New York is one of several states in which the leading title insurers collectively fix their prices through a rate-setting organization known as the Title Insurance Rate Service Association, Inc., or TIRSA. TIRSA collects from defendants and TIRSA's other members revenue and cost information and annually submits it in aggregate form along with collectively set title rates to the New York Insurance Department. Under this rate setting regime, defendants have charged identical and collectively fixed rates to consumers since TIRSA's inception in 1991.

92.    The New York Insurance Department is charged with reviewing the title rates that defendants (through TIRSA) collectively fix. Defendants have made this impossible, however, by manipulating the rates so that they are principally based on costs over which the Insurance Department has neither the authority nor the ability to assess.

93.    Under TIRSA's collective rate setting regime, roughly 85 percent of the total title insurance premiums are based on the so-called "costs" associated with the payment of agency commissions. These costs are referred to as so-called "agency commissions." As in California, these commissions chiefly include kickbacks and other costs unrelated to the issuance of title insurance. Instead, as in California, these supposed costs are funned to and through title agents to increase defendants' overall business and get them more business.

94.    New York Insurance Law does not authorize TIRSA to include kickbacks and other agency commission payments that are unrelated to the issuance of title insurance in its collectively fixed rates. The New York Insurance Department has acknowledged, however, that it lacks the authority to review any agency commission payments and, therefore, cannot properly evaluate TIRSA's calculated rates.

### VIOLATIONS ALLEGED

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

95.     Plaintiffs incorporate and reallege each and every allegation in the preceding paragraphs of this complaint.

96.     Beginning at a time presently unknown to Plaintiffs, but at least as early as May 2004, defendants and their co-conspirators engaged in a combination and conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

97.     The combination and conspiracy consisted of a continuing agreement, understanding and concert of action among defendants and their co-conspirators, the substantial terms of which were:

      a.    To fix, raise, maintain and stabilize the price of title insurance throughout California;

      b.    To fix, raise, maintain and stabilize the terms and conditions of sale of title insurance in California; and

      c.    To allocate and divide the market for title insurance in California.

98.     In the absence of proper regulatory authority and oversight, defendants' conduct constitutes a horizontal agreement to fix the form, structure, and prices of title insurance and to allocate and divide the title insurance market in California which is a *per se* violation of Section 1 of the Sherman Act.

99.     Defendants' price fixing, market allocation, and division activity has been continuous throughout the relevant damages period and has been renewed and reinforced annually through submissions to the OIC of supposed cost and revenue information and its periodic submissions of rate changes.

100.    Through their collective price-fixing, market allocation and division, as well as manipulation of the regulatory process, defendants harmed competition by charging consumers supra-competitive prices for title insurance in California, evidenced by the uniformly higher prices as compared to the cost of providing the title insurance.

101.   The combination and conspiracy alleged here had, among other things, the following effects:

    a.   Price competition in the sale of title insurance has been restrained, suppressed, and/or eliminated;

    b.   Prices for title insurance sold by defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels; and

    c.   Purchasers of title insurance have been deprived of the benefits of free and open competition.

102.   During the period of the antitrust violations by defendants and their co-conspirators, Plaintiffs and each member of the Class they represent purchased title insurance and, by reason of the antitrust violations alleged here, paid more for such than they would have paid in the absence of the antitrust violations.  As a result, Plaintiffs and members of the Class have been injured in an amount presently undetermined.

### Second Claim for Relief

### (Violation of the California Cartwright Act)

103.   Plaintiffs incorporate and reallege each and every allegation in the preceding paragraphs of this complaint.

104.   Defendants' contract, combination, trust or conspiracy was centered in, carried out, effectuated and perfected mainly within California, and defendants' conduct within California injured all members of the Class throughout the United States.  Therefore, this claim for relief under California law is brought on behalf of all members of the Class, whether or not they are California residents.

105.   Beginning at a time presently unknown to Plaintiffs, but at least as early as May 2004, defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Sections 16720, *et seq.* of the California Business and Professional Code.  Defendants acted in violation of Sections 16720, *et seq.* to fix, raise, stabilize and maintain prices of, and allocate markets for title insurance at supra-competitive levels.

106.    The violations of Sections 16720, *et seq.* of the California Business and Professions Code consisted of a continuing unlawful trust and concert of action among the defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for title insurance in the state of California.

107.    For the purpose of forming and effectuating the unlawful agreement, defendants and their co-conspirators did those things which they combined and conspired to do, including the acts, practices and course of conduct alleged above and the following:

      a.    To fix, raise, maintain and stabilize the price of title insurance;

      b.    To allocate markets for title insurance amongst themselves; and

      c.    To allocate and divide the market for title insurance in California.

108.    The combination and conspiracy alleged here had the following effects:

      a.    Price competition in the sale of title insurance has been restrained, suppressed and/or eliminated in California and throughout the United States;

      b.    Price for title insurance sold by defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in California and throughout the United States; and

      c.    Those who purchased title insurance from defendants and their co-conspirators have been deprived of the benefit of free and open competition.

109.    Plaintiffs and the other members of the Class paid supra-competitive, artificially inflated prices for title insurance.

110.    As a direct and proximate result of defendants' unlawful conduct, Plaintiff and the members of the Class have been injured in their business and property because they paid more for title insurance than they otherwise would have paid in the absence of defendants' unlawful conduct.

111.   As a result of defendants' violation of Sections 16720, *et seq*. of the California Business and Professions Code, Plaintiffs seek treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief

### (Violation of the California Unfair Competition Law)

112.   Plaintiffs incorporate and reallege each and every allegation in the preceding paragraphs of this complaint.

113.   Defendants' business acts and practices were centered in, carried out, effectuated and perfected mainly within California, and defendant's conduct within California injured all members of the Class throughout the United States.  Therefore, this claim for relief under California law is brought on behalf of all members of the Class, whether or not they are California residents.

114.   During the Class Period, and continuing to the present, defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices specified above.

115.   This Claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from defendants for acts that violated Sections 17200, *et seq*. of the California Business and Professions Code, commonly known as the Unfair Competition Law.

116.   Defendants' conduct violated Section 17200.  The acts, omissions, misrepresentations, practices and non-disclosures by defendants constituted a common continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Sections 17200, *et seq.*, including the following:

      a.   Defendants' acts and practices violate Section 1 of the Sherman Act and Section 16720, *et seq.*, of the California Business and Professions Code, set forth above;

      b.   Defendants' acts and practices are unfair to consumers of title insurance in California and throughout the United States within the

meaning of Section 17200 of the California Business and

Professions Code; and

c.    Defendants' acts and practices are fraudulent or deceptive within

the meaning of Section 17200 of the California Business and

Professions Code.

117.    Plaintiffs and each of the Class members are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of their illegal business acts or practices as alleged here.

118.    The illegal conduct alleged here is continuing and there is no indication that defendants will not continue such activity into the future.

119.    The unlawful and unfair business practices of defendants, as described above, caused Plaintiffs and the members of the Class to pay supra-competitive and artificially-inflated prices for title insurance.  Plaintiffs and the members of the Class suffered injury in fact and lost money or property as a result.

120.    Plaintiffs request that this Court enter such order or judgment as may be necessary to enjoin defendants from continuing their unfair, unlawful, and/or deceptive practices, to restore to them and the Class members any money that may have been unjustly acquired by defendants by means of defendants' unfair competition.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the members of the Class pray for relief as follows:

A.    That this action be certified and maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.    That the unlawful conduct, contract, conspiracy or combination alleged here be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

1           C.      That Plaintiffs and the Class recover damages, including treble damages, and

2   restitution, as provided by federal and state antitrust and unfair competition laws, and that a joint and

3   several judgment in favor of Plaintiffs and the Class be entered against the defendants;

4           D.      That defendants, their affiliates, successors, transferees, assignees, and the officers,

5   directors, partners, agents, employees, and all other persons acting or claiming to act on their behalf,

6   be permanently enjoined and restrained from in any manner: (1) continuing, maintaining, or renewing

7   the conduct, contract, conspiracy or combination alleged here; (2) entering into any other conspiracy

8   similar to the ones alleged here; (3) entering into any other contract, conspiracy or combination having

9   similar purpose or effect; and (4) adopting or following any practice, plan, program, or device having

10  a similar purpose or effect;

11          E.      That Plaintiffs and the Class be awarded pre-and post-judgment interest, and that the

12  interest be awarded at the highest legal rate from and after the date of service of the initial complaint

13  in this action;

14          F.      That Plaintiffs and the Class recover their costs of this suit, including reasonable

15  attorneys' fees as provided by law; and

16          G.      That Plaintiffs and the Class have such other, further and different relief as the case

17  may require and the Court may deem just and proper under the circumstances.

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

1

## JURY DEMAND

2    Plaintiffs demand a trial by jury on all claims so triable.

3

4    DATED:  July 14, 2008                    Respectfully submitted,

5                                             **GIRARD GIBBS LLP**

6

7                                    By:  _____

8                                             Daniel C. Girard
                                             Elizabeth C. Pritzker
9                                             Aaron M. Sheanin
                                             Alex C. Turan
10                                            601 California Street, 14th Floor
                                             San Francisco, California  94108
11                                            Telephone: (415) 981-4800
                                             Facsimile: (415) 981-4846
12

13                                           *Attorneys for Plaintiffs Ruben Romero and*
                                             *Sarah Yahn*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28