Reed R. Kathrein (139304)
Jeff D. Friedman (173886)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
jefff@hbsslaw.com

Attorneys for Plaintiffs Barton and Gentilcore

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| LYNN BARTON, On Behalf of Herself and all Others Similarly Situated,<br><br>         Plaintiff,<br><br>  v.<br><br>FIDELITY NATIONAL FINANCIAL, INC., FIDELITY NATIONAL TITLE INSURANCE COMPANY, TICOR TITLE INSURANCE COMPANY, TICOR TITLE INSURANCE COMPANY OF FLORIDA, CHICAGO TITLE INSURANCE COMPANY, NATIONAL TITLE INSURANCE OF NEW YORK, INC., SECURITY UNION TITLE INSURANCE COMPANY, THE FIRST AMERICAN CORPORATION, FIRST AMERICAN TITLE INSURANCE COMPANY, UNITED GENERAL TITLE INSURANCE COMPANY, LANDAMERICA FINANCIAL GROUP, INC., COMMONWEALTH LAND TITLE INSURANCE COMPANY, LAWYERS TITLE INSURANCE CORPORATION, TRANSNATION TITLE INSURANCE COMPANY, STEWART TITLE GUARANTY COMPANY and STEWART TITLE INSURANCE COMPANY,<br><br>        Defendants. | No. 08-cv-1341 JSW<br>No. 08-cv-1374 JSW<br>No. 08-cv-1928 MEJ<br>No. 08-cv-3391 JSW<br><br>**DECLARATION OF REED R. KATHREIN IN SUPPORT OF JOINT MOTION TO CONSOLIDATE RELATED ACTIONS FOR ALL PURPOSES**<br><br>DATE:  September 5, 2008<br>TIME:  9:00 a.m.<br>DEPT:  Courtroom 2, 17th Floor<br><br>ACTION FILED: March 10, 2008 |

1        I, Reed R. Kathrein, declare:

2        1.      I am an attorney at the law firm of Hagens Berman Sobol Shapiro LLP, one of the

3 counsel of record for Plaintiffs in the above action.  I make this declaration in support of the Joint

4 Motion to Consolidate Related Cases for All Purposes.  I am familiar with the facts set forth herein

5 and will testify to them if necessary.

6        2.      Attached as Exhibits 1-9 are true and correct copies of the complaints filed in the

7 following actions:

| EX. NO. | ABBREVIATED CASE NAME | CASE NO. |
|---------|----------------------|----------|
| 1 | *Barton v. Fidelity National Financial, Inc. et al.* | 08-1341-JSW (N.D. Cal.) |
| 2 | *Gentilcore v. Fidelity National Financial, Inc. et al.* | 08-1374-JSW (N.D. Cal.) |
| 3 | *Blackwell v. Fidelity National Financial, Inc. et al.* | 08-1928-MEJ (N.D. Cal.) |
| 4 | *Romero v. Fidelity National Financial, Inc. et al.* | 08-3391-JSW (N.D. Cal.) |
| 5 | *Martinez v. Fidelity National Financial, Inc. et al.* | 08-0499-MJL (S.D. Cal.) |
| 6 | *Davis v. Fidelity National Financial, Inc. et al.* | 08-1897-DSF (C.D. Cal.) |
| 7 | *Kothari v. Fidelity National Financial, Inc. et al.* | 08-0440-DSF (C.D. Cal.) |
| 8 | *Magana v. Fidelity National Financial, Inc. et al.* | 08-0591-DSF (C.D. Cal.) |
| 9 | *Moynahan v. Fidelity National Financial, Inc. et al.* | 08-0620-AHS (C.D. Cal.) |

        I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct.  Executed this 23rd day of July, 2008, at Berkeley, California.

                               /s/ Reed R. Kathrein
                               REED R. KATHREIN

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on July 23, 2008, I electronically filed the foregoing with the Clerk of

3 the Court using the CM/ECF system which will send notification of such filing to the e-mail

4 addresses registered, as denoted on the attached Electronic Mail Notice List, and I hereby certify

5 that I have mailed the foregoing document or paper via the United States Postal Service to the non-

6 CM/ECF participants indicated on the attached Manual Notice List.

7

8

9

10                                        /s/ Reed R. Kathrein
                                        REED R. KATHREIN
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CAND-ECF                     file:///C:/Documents%20and%20Settings/sftemp/Desktop/07-23-08%20...

Case 3:08-cv-03391-JSW     Document 8     Filed 07/23/2008     Page 4 of 7

CM/ECF ?

- [Civil](#)
- [Criminal](#)
- [Query](#)
- [Reports](#)
- [Utilities](#)
- [Search](#)
- [Logout](#)

# Mailing Information for a Case 3:08-cv-01341-JSW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Steve W. Berman**
  steve@hbsslaw.com,robert@hbsslaw.com,heatherw@hbsslaw.com

- **Jeff D Friedman**
  jefff@hbsslaw.com,nancyq@hbsslaw.com,sf_filings@hbsslaw.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com,sf_filings@hbsslaw.com

- **Margaret Anne Keane**
  mkeane@dl.com

- **Thomas Eric Loeser**
  toml@hbsslaw.com

- **Kris Hue Chau Man**
  kman@dl.com,sholstrom@dl.com

- **Frank E. Merideth , Jr**
  meridethf@gtlaw.com,beattyc@gtlaw.com

- **Anthony D. Shapiro**
  tony@hbsslaw.com,george@hbsslaw.com,ronnie@hbsslaw.com

- **Alex C. Turan**
  act@girardgibbs.com,ace@girardgibbs.com

## Manual Notice List

The following is the list of attorneys who are **not**
on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for this recipients.

- (No manual recipients)

# Mailing Information for a Case 3:08-cv-01374-JSW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jeff D Friedman**
  jefff@hbsslaw.com,nancyq@hbsslaw.com,sf_filings@hbsslaw.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com,sf_filings@hbsslaw.com

- **Margaret Anne Keane**
  mkeane@dl.com

- **Kris Hue Chau Man**
  kman@dl.com,sholstrom@dl.com

- **Frank E. Merideth , Jr**
  meridethf@gtlaw.com,beattyc@gtlaw.com

## Manual Notice List

The following is the list of attorneys who are **not**
on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your
mouse to select and copy this list into your word processing program in order to create notices or labels for these
recipients.

- (No manual recipients)

# Mailing Information for a Case 3:08-cv-01928-MEJ

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Donald Chidi Amamgbo , Esq**
  donald@amamgbolaw.com,ndudi@amamgbolaw.com

- **Frank E. Merideth , Jr**
  meridethf@gtlaw.com,beattyc@gtlaw.com

- **Reginald Von Terrell**
  reggiet2@aol.com

## Manual Notice List

The following is the list of attorneys who are **not**
on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

# Mailing Information for a Case 3:08-cv-03391-JSW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Daniel C. Girard**
  dcg@girardgibbs.com,cma@girardgibbs.com

- **Elizabeth Cheryl Pritzker**
  ecp@girardgibbs.com,act@girardgibbs.com,smq@girardgibbs.com,amv@girardgibbs.com,ale@girardgibbs.com,cme@girardgibbs.com

- **Aaron M. Sheanin**
  ams@girardgibbs.com,amv@girardgibbs.com,ace@girardgibbs.com

- **Alex C. Turan**
  act@girardgibbs.com,ace@girardgibbs.com

## Manual Notice List

The following is the list of attorneys who are **not**
on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

# EXHIBIT 1

Reed R. Kathrein (139304)
Jeff D. Friedman (173886)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710

*E-filing*

Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
jefff@hbsslaw.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| LYNN BARTON, on behalf of herself and all others similarly situated, | ) ) ) | NO. 1341 |
| Plaintiff, | ) ) ) | CLASS ACTION COMPLAINT    EDL |
| v. | ) ) | JURY TRIAL DEMANDED |
| FIDELITY NATIONAL FINANCIAL, INC., FIDELITY NATIONAL TITLE INSURANCE COMPANY, TICOR TITLE INSURANCE COMPANY, TICOR TITLE INSURANCE COMPANY OF FLORIDA, CHICAGO TITLE INSURANCE COMPANY, NATIONAL TITLE INSURANCE OF NEW YORK, INC., SECURITY UNION TITLE INSURANCE COMPANY, THE FIRST AMERICAN CORPORATION, FIRST AMERICAN TITLE INSURANCE COMPANY, UNITED GENERAL TITLE INSURANCE COMPANY, LANDAMERICA FINANCIAL GROUP, INC., COMMONWEALTH LAND TITLE INSURANCE COMPANY, LAWYERS TITLE INSURANCE CORPORATION, TRANSNATION TITLE INSURANCE COMPANY, STEWART TITLE GUARANTY COMPANY and STEWART TITLE INSURANCE COMPANY | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

CLASS ACTION COMPLAINT

1

**TABLE OF CONTENTS**

2

**PAGE**

3   I.      INTRODUCTION........................................................................................................ 1

4   II.     JURISDICTION AND VENUE ................................................................................ 3

5   III.    PARTIES..................................................................................................................... 4

6           A.      Plaintiff.......................................................................................................... 4

7           B.      Defendants...................................................................................................... 4

8   IV.     OTHER ENTITIES .................................................................................................... 8

9   V.      CLASS ACTION ALLEGATIONS .......................................................................... 9

10  VI.     TRADE AND COMMERCE ................................................................................... 11

11  VII.    FACTUAL ALLEGATIONS................................................................................... 11

12          A.      The Nature of Title Insurance ..................................................................... 11

13          B.      Price-Fixing in the Large Markets .............................................................. 13

14          C.      TIRSA's Formation..................................................................................... 14

15          D.      Lack of Regulatory Supervision and Authority in New York and
                    Other States Including California.................................................................. 15
16
            E.      Competition Based on Kickbacks and Inducements But Not Rates ............ 19
17
            F.      Other Indicators of a Lack of Competition and Conditions Conducive
18                  to Collusive Rate Setting............................................................................. 19

19  VIII.   CLAIMS FOR RELIEF ........................................................................................... 22

20          COUNT I  Violation of the Sherman Act ............................................................... 22

21          COUNT II  Violation of Cal. Bus. and Prof. Code §§ 16720, *et seq.*..................... 23

22          COUNT III  (California's Business & Professions Code §§ 17200, *et seq.*)........... 23

23          COUNT IV  Unjust Enrichment ............................................................................... 24

24  PRAYER FOR RELIEF..................................................................................................... 25

25  JURY TRIAL DEMANDED .............................................................................................. 25

26

27

28

CLASS ACTION COMPLAINT                           - i -

010031-11  226460 V1

1    Plaintiff, Lynn Barton, by her attorneys, on behalf of herself and all others similarly

2    situated, brings this action for treble damages and injunctive relief under the antitrust laws of the

3    United States and based on statutes of the State of California against the above named defendants,

4    demand a trial by jury, and complaining and alleging as follows:

## I.    INTRODUCTION

6    1.    From the consumer's point of view, title insurance differs greatly from other, more

7    familiar kinds of insurance. For one thing, while automobile and homeowner insurance policies

8    protect consumer from an event that may occur in the future, title insurance offers protection from

9    events that might have occurred in the past.

10    2.    Most simply, title insurance is protection purchased against a loss arising from

11    problems that occurred in the past and may affect the title to the real estate that a consumer is

12    buying. Title insurers do not compete on the basis of the policies or coverage that they provide. In

13    fact, almost all title policies are based on a single set of form policies published and maintained by

14    the national trade association, the American Land Title Association. Furthermore, the end goal of

15    an exhaustive title search by a title insurer is not to provide coverage for title defects that the search

16    uncovers, but rather to exclude coverage for any such defects and therefore, further reduce the real

17    value of the title policy which is written to cover only unknown defects in title at the time of

18    issuance. As a result, title insurance is a commodity product.

19    3.    Even for the savviest of insurance consumers, the purchase of a title insurance

20    policy is just one more expensive step in the dizzying, convoluted and often confusing flurry of

21    paperwork and signings that culminate in the closing of a home purchase. Consumers who

22    normally shop around for their insurance and carefully compare prices, typically emerge from the

23    closing on their new home holding an insurance policy that they know virtually nothing about and

24    that in all likelihood, they will never need.

25    4.    The title insurance market in California consists of a dozen carriers, ranging in size

26    from regional companies to national affiliates. However, the market is dominated by four groups

27    of affiliated companies which, combined, sell over 90 percent of the title insurance policies sold in

28

CLASS ACTION COMPLAINT                                          - 1 -
010031-11 226460 V1

1    California and which own and control the title plants in many California counties that every title

2    insurer must rely on in order issue title policies.

3         5.    Title companies, in marked contrast to property, casualty, life and other traditional

4    insurance carriers, choose not to market their products directly to the consumers who pay for them.

5    Instead, the title insurance industry operates on what is termed a "reverse competition" model.

6    Reverse competition means that title companies solicit business referrals from the other major

7    players in the home purchase scenario – real estate agents and agencies, banks, lenders, builders,

8    developers and others: middlemen or go-betweens. The title companies pay middlemen for these

9    referrals in the form of direct payments, advertising expenses, junkets, parties and other kick-backs

10   and inducements. In addition, middlemen such as Windermere, John L. Scott and Caldwell

11   Banker-Bain, who themselves control a significant portion of the real estate brokerage market, take

12   significant ownership stakes in local title agents and affiliates of the major title insurers and

13   thereby get a direct return in profit from the referral of title business to the title agent whom they

14   partly or wholly own.

15        6.    Reverse competition, as the term suggests, isn't a model that benefits consumers

16   through market-driven forces. In fact, consumers are bypassed completely as title companies

17   spend nearly all of their marketing budgets "wining and dining" real estate agents, banks, lenders,

18   builders, developers and others in an effort to convince these middlemen to steer their home-

19   buying clients to their companies for their title insurance needs.

20        7.    In some of the major markets in the United States, these same title insurers

21   collectively meet, and jointly set rates and file these rates with the applicable state insurance

22   authority. The rates are not subject to any meaningful review or regulation. The companies agree

23   to fix the price of title insurance far in excess of the risk and loss experience associated with such

24   insurance. As a result of the joint agreement as to rates, competition is relegated to the middleman.

25   As a result of their joint rate setting and agreement, no company competes on price to the

26   consumer.

27        8.    Having agreed to fix prices in states where joint rate setting occurs, the companies

28   agreed to not compete based on price to the consumer in other states, including California, where

CLASS ACTION COMPLAINT                                    - 2 -
010031-11 226460 V1

1   regulation of filed rates is lax or non-existent. Thus, they agreed to set rates at supra competitive

2   prices and to compete based on offering inducements to middlemen. In California, in three

3   successive reports, the Office of the Insurance Commissioner ("OIC") has found an "astonishing

4   number" of such inducements that are in violation of state law. However, the OIC does not

5   actively oversee or regulate rates, and, in fact, does not by its own admission have the power to do

6   so. The absence of regulation has allowed collusive behavior and excessive rates.

7        9.        In addition to paying inducements and kick-backs, the title companies and their

8   agents divide the market of real-estate middlemen through the use of Affiliated Business

9   Arrangements ("ABAs"), wherein the dominant real estate brokers purchase significant ownership

10   stakes in favored title insurance affiliates. The real estate brokers then reward their associates for

11   using the preferred title insurance providers and lock-out independent title insurers.

12       10.       In this action, plaintiff, on behalf of a Class of those purchasing title insurance in

13   California, seek damages arising from defendants' violations of the Sherman Act as well as

14   California statutory law.

15                        **II.        JURISDICTION AND VENUE**

16       11.       This Complaint is filed and these proceedings are instituted under Sections 4 and 16

17   of the Act of Congress of October 15, 1914, C. 323, Stats. 731, 737 (15 U.S.C. §§ 15, 26) to obtain

18   injunctive relief and to recover treble damages and the costs of suit, including a reasonable

19   attorneys' fee, against defendants for the injuries sustained by plaintiff and the members of the

20   Class which she represents by reason of defendants' and their co-conspirators' violations, as

21   hereinafter alleged, of Section I of the Sherman Act (15 U.S.C. § 1).

22       12.       Defendants transact business, maintain offices or are found within the Northern

23   District of California. The interstate commerce described hereinafter is carried on, in part, within

24   the Northern District of California and the conspiratorial acts herein alleged were carried on, in

25   part, in the Northern District of California.

26       13.       Intradistrict Assignment: Assignment to the San Francisco or Oakland division of

27   this Court is appropriate because a substantial part of the events or omissions which give rise to the

28

CLASS ACTION COMPLAINT                          - 3 -
010031-11 226460 V1

1    claim occurred in the county of San Francisco. Pursuant to Northern District of California, Local

2    Rule 3-2(d), assignment to either the San Francisco Division or the Oakland Division is proper.

### III. PARTIES

**A. Plaintiff**

5       14.    Plaintiff, Lynn Barton, is an individual residing in San Francisco County,

6    California. During the Class Period, plaintiff purchased title insurance directly from one or more

7    of the defendants herein and has been injured by reason of the antitrust violations alleged.

**B. Defendants**

9       15.    Defendant Fidelity National Financial, Inc. ("Fidelity National") is a Delaware

10    corporation headquartered at 601 Riverside Avenue, Jacksonville, Florida 32204. Fidelity National

11    does business in California through one or more of its subsidiaries, including but not limited to,

12    defendants Fidelity National Title Insurance Company, Ticor Title Insurance Company, Ticor Title

13    Insurance Company of Florida, National Title Insurance of New York, Inc., Security Union Title

14    Insurance Company, and Chicago Title Insurance Company. Fidelity National is registered to do

15    business in California.

16       16.    Defendant Fidelity National Title Insurance Company ("FNTIC") is a California

17    Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.

18    FNTIC does business in California, is a licensed title insurance company in California and is

19    registered to do business in California.

20       17.    Defendant Ticor Title Insurance Company ("Ticor") is a California Corporation

21    with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204. Ticor does

22    business in California, is a licensed title insurance company in California and is registered to do

23    business in California.

24       18.    Defendant Ticor Title Insurance Company of Florida ("TTICF") is a Florida

25    corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.

26    TTICF does business in California, is a licensed title insurance company in California and is

27    registered to do business in California.

28

- 4 -

1         19.    Defendant Chicago Title Insurance Company ("Chicago Title") is a Missouri

2    Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.

3    Chicago Title does business in California, is a licensed title insurance company in California and is

4    registered to do business in California.

5         20.    Defendant National Title Insurance of New York, Inc. ("NTINY") is a New York

6    corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.

7    NTINY does business in California, is a licensed title insurance company in California and is

8    registered to do business in California.

9         21.    Defendant Security Union Title Insurance Company ("SUTIC") is a California

10   corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.

11   SUTIC does business in California, is a licensed title insurance company in California and is

12   registered to do business in California.

13        22.    The Fidelity family of title insurance companies (collectively, "Fidelity") – which

14   includes defendants Fidelity National, FNTIC, Ticor, TTICF, Chicago Title, NTINY and SUTIC,

15   and their affiliates – is engaged in selling title insurance to purchasers of commercial and

16   residential real estate throughout the United States, including California. Nationally, Fidelity

17   accounts for approximately 27 percent of title premiums, which in 2006 amounted to roughly

18   $4.6 billion. Fidelity, Chicago Title and Ticor were founding members of TIRSA (defined below)

19   and since TIRSA's inception have charged title insurance rates in New York that TIRSA

20   collectively sets.

21        23.    The Fidelity family of title insurance companies and their affiliates are wholly-

22   owned and controlled by defendant Fidelity National Financial, Inc. Through its subsidiaries,

23   Fidelity National is a provider of title insurance, specialty insurance, and claims management

24   services. Fidelity National had 2006 revenues of roughly $9.4 billion. The Fidelity family of title

25   insurance companies engaged in the conduct challenged herein with the approval and assent of

26   defendant Fidelity National.

27

28

CLASS ACTION COMPLAINT
010031-11  226460 VI

24. Defendant The First American Corporation ("First American") is a California corporation with its headquarters at 1st American Way, Santa Ana, California 92707. First American does business in California through one or more of its subsidiaries, including but not limited to, defendants First American Title Insurance Company and United General Title Insurance Company.

25. Defendant First American Title Insurance Company ("FATIC") is a California corporation with its headquarters at 1st American Way, Santa Ana, California 92707. FATIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

26. Defendant United General Title Insurance Company ("UGTIC") is a Colorado corporation located at 8310 S. Valley Highway, Suite 130, Englewood, CO 80112. UGTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

27. The First American family of title insurance companies (collectively, "First American") – which includes defendants First American, FATIC and UGTIC, and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including California. Nationally, First American accounts for approximately 29 percent of title premiums, which in 2006 amounted to roughly $4.8 billion. First American Title was a founding member of TIRSA and since TIRSA's inception has charged title insurance rates in New York that TIRSA collectively sets.

28. The First American family of title insurance companies and their affiliates are wholly-owned and controlled by defendant The First American Corporation. Through its subsidiaries, First American is a provider of title insurance, business information, and related products and services. First American had 2006 revenues of roughly $8.5 billion. The First

CLASS ACTION COMPLAINT
010031-11 226460 V1

- 6 -

1    American family of title insurance companies and their affiliates engaged in the conduct

2    challenged herein with the approval and assent of defendant First American.

3        29.    Defendant LandAmerica Financial Group, Inc. ("LandAmerica") is a Virginia

4    corporation headquartered at 5600 Cox Road, Glen Allen, Virginia 23060. LandAmerica does

5    business in California through one or more of its subsidiaries, including but not limited to,

6    defendants Commonwealth Land Title Insurance Company, Lawyers Title Insurance Corporation

7    and Transnation Title Insurance Company.

8        30.    Defendant Commonwealth Land Title Insurance Company ("CLTIC") is a

9    Pennsylvania corporation with is principle place of business at 5600 Cox Road, Glen Allen,

10   Virginia 23060. CLTIC does business in California, is a licensed title insurance company in

11   California and is registered to do business in California.

12       31.    Defendant Lawyers Title Insurance Corporation ("LTIC") is a Nebraska corporation

13   with is principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060. LTIC does

14   business in California, is a licensed title insurance company in California and is registered to do

15   business in California.

16       32.    Defendant Transnation Title Insurance Company ("TNTIC") is a Nebraska

17   corporation with is principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060.

18   TNTIC does business in California, is a licensed title insurance company in California and is

19   registered to do business in California.

20       33.    The LandAmerica family of title insurance companies (collectively,

21   "LandAmerica") – which includes defendants LandAmerica, CLTIC, LTIC and TNTIC, and their

22   affiliates – is engaged in selling title insurance to purchasers of commercial and residential real

23   estate throughout the United States, including California. Nationally, LandAmerica accounts for

24   approximately 19 percent of title premiums, which in 2006 amounted to roughly $3.15 billion.

25   Commonwealth and Lawyers Title were founding members of TIRSA and since TIRSA's

26   inception have charged title insurance rates in New York that TIRSA collectively sets.

27       34.    The LandAmerica family of title insurance companies and their affiliates are

28   wholly-owed and controlled by defendant Land America Financial Group, Inc. Through its

- 7 -

CLASS ACTION COMPLAINT

010031-11  226460 V1

1  subsidiaries, LandAmerica is a provider of title insurance and other products and services that

2  facilitate the purchase, sale, transfer, and financing of residential and commercial real estate.

3  LandAmerica had 2006 revenues of roughly \$4 billion. The LandAmerica family of title insurance

4  companies and their affiliates engaged in the conduct challenged herein with the approval of

5  defendant LandAmerica.

6      35.    Defendant Stewart Title Guaranty Company ("STGC") is a Texas corporation

7  headquartered at 1980 Post Oak Blvd., Suite 800, Houston, Texas 77056. STGC does business in

8  California, is a licensed title insurance company in California and is registered to do business in

9  California.

10      36.    Defendant Stewart Title Insurance Company ("STIC") is a New York corporation

11  with its principle place of business at 300 E. 42nd St., Floor 10, New York, NY 10017. STIC does

12  business in California, is a licensed title insurance company in California and is registered to do

13  business in California.

14      37.    The Stewart family of title insurance companies (collectively, "Stewart") – which

15  includes defendants STGC and STIC, and its affiliates – is engaged in selling title insurance to

16  purchasers of commercial and residential real estate throughout the United States and California.

17  Nationally, Stewart accounts for approximately 12 percent of title premiums, which in 2006

18  amounted to roughly \$2 billion. Stewart was a founding member of TIRSA and since TIRSA's

19  inception has charged title insurance rates in New York that TIRSA collectively sets.

20      38.    Together, defendants account for more than 85 percent of the title premiums

21  consumers pay in California. Nationally, they account for more than 85 percent of title premiums,

22  which in 2006 amounted to roughly \$14.5 billion. Throughout the relevant damages period,

23  defendants charged California consumers in California virtually identical title insurance rates.

## IV. OTHER ENTITIES

25      39.    TIRSA is a voluntary association of title insurers licensed as a rate service

26  organization pursuant to Article 23 of the State of New York Insurance Law. TIRSA maintains its

27  offices in New York City, which until recently were located at the same New York address of

28  Fidelity Title.

CLASS ACTION COMPLAINT
010031-11 226460 V1

- 8 -

40. TIRSA annually compiles from its members statistical data relating to their title insurance premiums, losses and expenses and submits this information in aggregate form to the New York Insurance Department. TIRSA also prepares and submits the New York Title Insurance Rate Manual which sets forth title rates to be charged and rules to be followed by TIRSA's members. The Insurance Department has never objected to any of the rates TIRSA has collectively set. Similarly, the California OIC has not actually held a public hearing or conducted any other review or regulation of the title insurance rates in California for thirty years.

41. TIRSA's membership is comprised of defendant insurers and all other title insurers that are licensed to issue policies in New York. Currently, Fidelity, First American, LandAmerica, and Stewart collectively represent 14 of TIRSA's 22 members. As such, they comprise a majority voting block which, according to TIRSA's by-laws, allows them to control the operations of TIRSA and, in particular, TIRSA's collective rate setting activity.

42. Various other persons, firms and corporations not made defendants herein have participated as co-conspirators with the defendants in the violations alleged herein and have performed acts and made statements in furtherance thereof.

## V. CLASS ACTION ALLEGATIONS

43. Plaintiff brings this action under Rule 23, and particularly subsection (b)(3), of the Federal Rules of Civil Procedure, on behalf of herself and a Class consisting of all persons excluding governmental entities, defendants, subsidiaries and affiliates of defendants, who purchased directly, from one or more of the defendants and/or their co-conspirators title insurance for residential and commercial property in California during the four year period preceding this lawsuit and who have sustained damages as a result of the conspiracy herein alleged. The number of potential Class members is so numerous that joinder is impracticable.

44. Plaintiff, as representative of the Class, will fairly and adequately protect the interest of the Class members. The interests of plaintiff are coincident with, and not antagonistic to, those of the Class members.

45. Except as to the amount of damages each member of the Class has by itself sustained, all other questions of fact and law are common to the Class, including but not limited to,

- 9 -

CLASS ACTION COMPLAINT
010031-11 226460 V1

1  the combination and conspiracy hereinafter alleged, the violation of Section 1 of the Sherman Act

2  (15 U.S.C. § 1) and the effects of such violation.

3      46.    Plaintiff, along with all other members of the Rule (b)(3) Class, were injured as a

4  result of paying supracompetitive prices for title insurance in California. These supracompetitive

5  prices were achieved as a result of defendants' illegal price-fixing activities and market allocation

6  and division.

7      47.    Members of the Class include hundreds of thousands, if not millions, of consumers.

8  They are so numerous that their joinder would be impracticable.

9      48.    Plaintiff also brings this action as a class action under Rule 23(b)(2) of the Federal

10  Rules of Civil Procedure, for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Rule

11  (b)(2) Class includes all members of the (b)(3) Class, and all consumers who are threatened with

12  injury by the anticompetitive conduct detailed herein.

13      49.    Defendants have acted, continued to act, refused to act and continued to refuse to act

14  on grounds generally applicable to the Rule (b)(2) Class, thereby making appropriate final

15  injunctive relief with respect to the Rule (b)(2) Class as a whole.

16      50.    Members of the Rule (b)(2) Class include hundreds of thousands, if not millions, of

17  consumers. They are so numerous that their joinder would be impracticable.

18      51.    Common questions of law and fact exist with respect to all Class members and

19  predominate over any questions solely affecting individual Class members. Among the questions

20  of law or fact common to the class are the following:

21          •  Whether defendants have engaged in the alleged illegal price-fixing activity
              and market allocation and division.
22
23          •  The duration and scope of defendants' alleged illegal price-fixing and market
              allocation and division activity.

24          •  Whether defendants' alleged illegal price-fixing and market allocation and
              division has caused higher prices to plaintiffs and other purchasers of title
25             insurance in California.

26          •  Whether the Insurance Commissioner has actively supervised defendants'
              price fixing and market allocation and division.
27

28

CLASS ACTION COMPLAINT                          - 10 -
010031-11  226460 V1

52.     Plaintiff does not have any conflict of interest with other Class members. Plaintiff's claims are typical of the claims of the Class and they will fairly and adequately reflect the interests of the Class. Counsel competent and experienced in federal class action and federal antitrust litigation has been retained to represent the Class.

53.     This action is superior to any other method for the fair and efficient adjudication of this legal dispute since joinder of all members is not only impracticable, but impossible. The damages suffered by certain members of the Class are small in relation to the expense and burden of individual litigation and therefore it is highly impractical for such Class members to seek redress for damages resulting from defendants' anticompetitive conduct.

54.     There will be no extraordinary difficulty in the management of the Class action.

## VI.     TRADE AND COMMERCE

55.     During all or part of the period in suit, defendants and their co-conspirators were sellers of title insurance in California.

56.     During the period in suit, the defendants sold substantial quantities of title insurance in a continuous and uninterrupted flow in interstate commerce. In 2005, consumers in the United States paid $17 billion for residential title insurance policies.

57.     During the period in suit, Class members from locations outside California purchased commercial or residential property and title insurance within California.

58.     During the period in suit, the defendants were the major sellers of title insurance in the United States and California. Defendants controlled in excess of 85 percent of the market for title insurance in the United States and California.

59.     The activities of the defendants and their co-conspirators, as described herein, were within the flow of interstate commerce and substantially affected interstate commerce.

## VII.     FACTUAL ALLEGATIONS

### A.     The Nature of Title Insurance

60.     Title insurance is one of most costly items associated with the closing of a real estate transaction. In California, rates for title insurance are based on a percentage of the total value of the property being insured. For residential properties, this price ranged in 2005 from

CLASS ACTION COMPLAINT

- 11 -

010031-11 226460 VI

about $1,010 (for a $250,000.00) property to $1,490 (for a $500,000 property). For more expensive homes and commercial properties, these prices are significantly higher. This amount spent on title insurance has risen dramatically over the past decade.

61.     Title insurance serves an important purpose. It protects the purchaser of a property from any unidentified defects in the title that would in any way interfere with the full and complete ownership and use of the property with the ultimate right to resell the property. Title insurance is required by lenders in most residential and commercial real estate transactions.

62.     Consumers exercise little discretion in choosing the title insurer from which they purchase the insurance. That decision is typically made for them by their lawyer, mortgage broker, lender, or realtor. Consequently, for most purchasers, the cost of title insurance is not challenged. Most consumers do not even become aware of the price they will pay and to which insurer they will pay it until the actual closing of the real estate transaction. By then it's too late, consumers can't attempt to negotiate a better title insurance price or alternate provider for fear of delaying or derailing the entire transaction. There is no shopping around. There is no negotiation of price.

63.     This dynamic basically removes the sale of title insurance from the normal competitive process. Unlike the regular forces of supply and demand that keep most industries and their pricing in check, the title insurance industry is not subject to any real competitive constraints. The purchasers of the insurance, in most instances, are not the ones making the purchasing decisions. And, they are certainly in no position to question the price.

64.     The most effective but illegal way for a particular title insurer to get business is to encourage those making the purchasing decisions – the real-estate middlemen – to steer business to that insurer. The best way to so motivate the middlemen is not through lower prices (that they are not even paying). Rather, it is through kickbacks in the form of finder's fees, gifts, meals, business services and other financial enticements. Therefore, it is through higher pricing (which allows for generous inducements and kick-backs), not lower pricing, that provides the best way for title insurers to compete and increase their business.

CLASS ACTION COMPLAINT

010031-11 226460 V1

- 12 -

B. **Price-Fixing in the Large Markets**

65. New York is one of several states in which the leading title insurers collectively fix their prices through a rate-setting organization like TIRSA. There are two principal cost components that go into TIRSA's calculation. One comprises the risk associated with issuing the title policy. The other comprises the "agency commissions" paid to title agents.

66. The risk component covers the risk the title insurer bears for any undiscovered defects in the title. Unlike property insurance, title insurance carries with it a very limited risk of loss to the insurer. That is because title insurance protects against unknown *prior* events that cause defects in title. With a proper search and examination of prior ownership records, any such defects can and almost always are readily identified and excluded from the policy's coverage. Consequently, the average claim payout on a title insurance policy in the United States amounts to only about 5 percent of the total premium collected. This is very different from property coverage (such as auto and home insurance) – which protects against *future* occurrences over which the insurer has little to no control – where the average claim payout amounts to about 80 percent of the total premium.

67. The "agency commissions" component of the title insurance rate covers payments made to title agents. Defendants have an ownership or management stake in many of the title agencies to which these payments are made. A small portion of these payments is for the search and exam of prior ownership records of the property being purchased to identify any liens, encumbrances, burdens, exclusions, or other defects in the title. The search and exam function does not involve the spreading or underwriting of risk, and title insurers typically outsource this task to title agents.

68. The remainder, and by far the bulk, of the agency commissions are comprised of costs unrelated to the issuance of title insurance. These costs include kickbacks and other financial inducements title insurers provide to title agents and indirectly (through title agents) to the lawyers, brokers, and lenders who, in reality, are the ones deciding which title insurer to use. These payments have nothing to do with the issuance of title insurance and are made by title insurers merely to inflate their revenues and steer business their way.

1   69.     Under TIRSA's collective rate setting regime, roughly 85 percent of the total title

2   insurance premium is based on the so-called "costs" associated with the payment of agency

3   commissions. Only 15 percent is based on costs associated with the risk of loss.

4   70.     TIRSA publishes its final calculated title rates in the New York Title Insurance Rate

5   Manual. These rates are tied to the value of the property being insured. This is so despite the fact

6   that the costs associated with agency commissions are entirely unrelated to the value of the

7   property. Indeed, agency kickbacks and enticements have little to do with producing a particular

8   title policy and provide no value – proportional to property value or otherwise – to the consumer.

9   Even search and exam costs are unrelated to property value. They instead depend on the age of the

10  property, the complexity of the ownership history, and the accessibility of prior ownership records.

11  71.     There are other states in which the defendants overly meet and agree to fix the rates

12  for title insurance as part of a formal collective rate setting process.

13  **C.   TIRSA's Formation**

14  72.     Prior to TIRSA, the New York Board of Title Underwriters ("NYBTU") served as

15  the title insurance rate-setting body in New York. NYBTU, along with the title insurance rate

16  setting bureaus in many other states, was disbanded in the mid-1980s in the wake of a Federal

17  Trade Commission("FTC") challenge to the collective rate setting activity of many of these

18  associations. The FTC's challenge culminated in *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621 (1992),

19  where the Supreme Court held that to avoid *per se* illegal price fixing liability, the rate setting

20  activity of these rating bureaus must be actively supervised by the state.

21  73.     In *Ticor*, the FTC focused its challenge on agency commissions. The FTC

22  contended that the respective state insurance departments merely rubber-stamped this portion of the

23  collectively fixed rates without any independent review or analysis of their reasonableness or cost

24  justification. The Supreme Court agreed with the FTC that this kind of limited state oversight was

25  not sufficient. Rather, to avoid illegal price-fixing liability, the state insurance department has to

26  "exercise[]sufficient independent judgment and control so that the details of the rates or prices have

27  been established as a product of deliberate state intervention, not simply by agreement among

28  private parties." *Ticor*, 504 U.S. at 634-35.

- 14 -

CLASS ACTION COMPLAINT
010031-11 226460 V1

1    74.    Following the Supreme Court's instruction in *Ticor*, the Third Circuit on remand in

2   *Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129 (3d Cir. 1992), upheld the FTC's finding that the

3   collective rate-setting of certain state rating bureaus was improper because it was not actively

4   supervised by the state. According to the circuit court, "[t]he Supreme Court plainly instructed us

5   that a state's rubber stamp is not enough. Active supervision requires the state regulatory

6   authorities' independent review and approval." *Id.* at 1139.

7    75.    Defendants formulated TIRSA's first rate manual and procedure soon after the

8   Supreme Court's *Ticor* decision. Through TIRSA, defendants have set up a rate-setting scheme to

9   get around the rigors of state oversight required by *Ticor*. They have done so by calculating a

10   single rate that comprises both risk and agency commission costs and by outsourcing to title agents

11   the agency commission costs. In this way, defendants avoid providing the Insurance Department

12   with any detailed breakout or backup for the bulk of the costs that make up their collectively fixed

13   rates.

14    76.    TIRSA merely submits an aggregated figure that is supposed to represent the total

15   agency commission costs. Embedded within this figure is the vast quantity of dollars that are

16   funneled to and through the title agencies as kickbacks, financial inducements and other costs

17   unrelated to the issuance of title insurance. Defendants' design in all of this has been to effective

18   "hide" the cost basis for their artificially high and collectively fixed title insurance premiums from

19   the regulatory scrutiny that *Ticor* demands.

20   **D.    Lack of Regulatory Supervision and Authority in New York and Other States
         Including California**

21

22    77.    There is no provision under the New York Insurance Law for TIRSA to include in

23   its collectively fixed rates kickbacks and other agency commission payments unrelated to the

24   issuance of title insurance. Indeed, the New York Insurance Department has openly acknowledged

25   that it lacks the authority to review any agency commission payments. It has likewise recognized

26   that defendants' outsourcing of agency commission costs has prevented it from performing a

27   meaningful review of TIRSA's calculated rates. This was made clear at a November 2006 public

28   hearing the New York Insurance Department held – the first in 15 years – where it questioned

CLASS ACTION COMPLAINT                          - 15 -
010031-11 226460 V1

1  TIRSA and its members on TIRSA's failure to provide the Insurance Department with any backup
2  or detail for agency commissions.

3  78.    At the hearing, the Insurance Department conceded that it could not properly
4  evaluate TIRSA's calculated rates, and that it could only do so if it obtained the detailed cost
5  information on agency commissions that TIRSA does not provide.

6  79.    The Insurance Department's recognition that it is not properly supervising TIRSA's
7  rate-setting activity is consistent with the April 2007 findings of the U.S. Government
8  Accountability Office ("GAO") that the title insurance industry is in need of greater state
9  regulation. The GAO studied the industry conditions of several states, including New York, and
10 concluded that "state regulators have not collected the type of data, *primarily on title agents' costs
11 and operations,* needed to analyze premium prices and underlying costs." (Emphasis added.)

12 80.    Unchecked by regulatory review and insulated from competition, defendants have
13 thus been able to collectively fix title insurance rates at supra competitive levels and earn profits
14 that vastly exceed those contemplated by the Insurance Department or that would have resulted in a
15 free and open competitive market.

16 81.    At the time of TIRSA's formation, the Insurance Department established 5 percent
17 (of the total premium) as the level of profit to which title insurers are entitled. The Insurance
18 Department is supposed to carefully analyze TIRSA's rate calculations, and, in particular, its
19 revenue and cost information, to ensure that this 5 percent profit level is maintained and based on a
20 reasonable premium. However, without the authority or ability to scrutinize agency commission
21 costs, the Insurance Department has been unable to perform this function. As a result, defendants
22 (through TIRSA) have been able to set artificially high title premiums and secure title profits far in
23 excess of the 5 percent threshold.

24 82.    Through an independent investigation conducted over the past several years, the
25 New York State Attorney General found that for every dollar of insurance premium defendants
26 collected, of the roughly 15 cents that supposedly accounts for the risk of loss, only 3 cents is paid
27 out in claims. And, of the roughly 85 cents that supposedly covers agency commissions, only
28 between 8 and 11 cents goes to costs actually incurred by title agents in producing the title policy.

- 16 -

CLASS ACTION COMPLAINT
010031-11 226460 V1

1    These numbers show that title insurers' collectively fixed rates have resulted in profits that
2    untethered to and vastly exceed the costs of producing such policies.

3    83.    The New York Attorney General's investigation further revealed that what was
4    largely driving these numbers were the kickbacks and other financial inducements defendants were
5    funneling to and through title agents to secure more business. As reported at the New York
6    Insurance Department's 2006 hearing, one title agency's financial statements revealed that it spent
7    more than $1 million of these so-called "agency commissions" on items identified as "Christmas",
8    "automobile expenses", "political contributions", "promotional expenses", and "travel and
9    entertainment". These expenses are not even remotely related to the issuance of title insurance.

10   84.    The Washington State Insurance Commissioner's October 2006 report found
11   strikingly similarly abuses in Washington. Violations were pervasive and the Commissioner
12   concluded that consumers were paying too much as a result.

13   85.    All of this "excess money" paid to title agents not only works to steer business to
14   defendants. It also serves to boost defendants' own profits through the inflated revenues they
15   obtain to cover these agency payments and through their ownership or management stake in many
16   of these agencies.

17   86.    Defendants are competitors in the sale of title insurance to consumers throughout
18   the United States. These title insurers have agreed and engaged in concerted efforts to
19   (i) collectively set and charge uniform and supracompetitive rates for title insurance, (ii) include in
20   their calculated rates agency commission costs, (iii) embed within these costs payoffs, kickbacks,
21   and other charges that are unrelated to the issuance of title insurance, and (iv) hide these supposed
22   "costs" from regulatory scrutiny by funneling them to and through title agents over which the
23   government agencies have no ability or authority to regulate.

24   87.    The GAO in its 2007 report entitled "Actions Needed to Improve Oversight of the
25   Title Insurance Industry and Better Protect Consumers" found several indicia of a lack of
26   competition and questions about the reasonableness of prices including:

27

28

CLASS ACTION COMPLAINT
010031-11 226460 V1

- 17 -

1         •   Consumers find it difficult to shop for title insurance,
            therefore, they put little pressure on insurers and agents to
2             compete based on price;

3         •   Title agents do not market to consumers, who pay for title
4             insurance, but to those in the position to refer consumers to
            particular title agents, thus creating potential conflicts of
5             interest;

6         •   A number of recent investigations by HUD and state
            regulatory officials have identified instances of alleged illegal
7             activities with the title industry that appear to reduce price
8             competition and could indicate excessive prices;

9         •   As property values or loan amounts increase, prices paid for
            title insurance by consumers appear to increase faster than
10            insurers' and agents' costs; and

11         •   In states where agents' search and examination services are
12             not included in the premium paid by consumers, it is not clear
            that additional amounts paid to title agents are fully supported
13            by underlying costs.

14     88.     The GAO visited several states, including California, and found a lack of regulatory

15 oversight:

16         In the states we visited, we found that regulators did not assess title
        agents' costs to determine whether they were in line with premium
17         rates; had made only limited efforts to oversee title agents (including
18         ABAs involving insurers and agents); and, until recently, had taken
        few actions against alleged violations of antikickback laws. In part,
19         this situation has resulted from a lack of resources and limited
        coordination among different regulators within states. On the federal
20         level, authority for alleged violations of section 8 of RESPA,
        including those involving increasingly complex ABAs, is limited to
21         seeking injunctive relief. Some state regulators expressed frustration
22         with HUD's level of responsiveness to their requests for help with
        enforcement, and some industry officials said that RESPA rules
23         regarding ABAs and referral fees need to be clarified. Industry and
        government stakeholders have proposed several regulatory changes,
24         including RESPA reform, strengthened regulation of agents, a
        competitor right of action with no monetary penalty, and alternative
25         title insurance models. [*Id.* at 41, footnotes omitted.]

26

27

28

1

**E. Competition Based on Kickbacks and Inducements But Not Rates**

2      89.     Having agreed to fix or stabilize prices in New York and other states where they

3    overtly meet to promulgate rates, these same defendants then set out to do the same in other states.

4      90.     In other words, as a direct result of these meetings where rates were agreed to, these

5    same defendants agreed, either expressly or tacitly, to not compete on rates in other states as well.

6    To compete on rates in other states could and would imperil their ability to maintain the agreed rate

7    in states like New York.

8      91.     As is the case in New York, a lack of regulatory authority over rates created an

9    environment in which a conspiracy can and did succeed. No agency was examining why all the

10   rates were virtually identical, and no agency was examining whether the costs associated with these

11   premiums were reasonable. This is an environment which is conducive to price fixing.

12     92.     In California, there is a lack of regulatory authority and oversight over title

13   insurance companies. The rates in California are not set as part of a deliberate state intervention

14   and the state does not and cannot meaningfully renew or approve these rates. The rates at issue in

15   this case went into effect without review.

16   **F. Other Indicators of a Lack of Competition and Conditions Conducive to Collusive
     Rate Setting**

17

18     93.     In addition to the uniformity of rates, other facts suggest that it is more plausible

     than not that rates have been set based on an agreement to fix prices.

19

20     94.     In theory, the chain of title should be documented back to its historic grant of

     ownership centuries in the past. Fear about a possible title defect in the distant past is widely used

21

     as a justification by title agencies when convincing property buyers to purchase an owner policy in

22

     addition to the lender policy, which is mandatory to secure a mortgage. The title agency, however,

23

     saves much time and money when the search is limited to one or two transactions. They rely on

24

     the insurance policy to cover the remote chance of missing an earlier but still-valid claim. If such a

25

     claim is asserted and survives the scrutiny of the title insurance company's legal department, the

26

     expected cost of compensation is likely to be less than the sum of added overhead costs of

27

     routinely tracing back every chain of title to the earliest registered owner in the distant past.

28

CLASS ACTION COMPLAINT                              - 19 -
010031-11 226460 V1

1    95.    Title insurance industry officials tend to justify the large proportion of the premium

2    retained by the title abstract and settlement agency (from 60 to more than 90 percent) by the

3    alleged high cost of title searching back into the distant past. In fact, a high proportion of

4    noncommercial properties are searched only through the most recent transaction. No information

5    is available as to what proportion of claims originate in the distant past. The industry has never

6    published pertinent statistics. It would have a marketing incentive to publish these statistics if the

7    risk were significant; that it has not published these statistics indicates that the risk probably is only

8    slightly greater than zero.

9    96.    Many U.S. homes are being resold three or four times in twenty-five years. At each

10   of these occasions, an abstract of title will be prepared on the basis of a more or less thorough

11   review of the available title records, inheritance records, family records and records of past or

12   current liens against a property. It is reasonable, therefore, to suspect that the risk of a title defect

13   will decrease every time a property is sold.

14   97.    Title searches have become less labor intensive, especially in large urban counties

15   and cities. More and more of the information is available online. The statistical likelihood that a

16   title default would be overlooked is a closely held industry secret, but it appears to be so small that

17   many transactions are now insured on the basis of a search of the last owner's title history or a

18   search into transactions that occurred during the last twenty-five to thirty-five years. The evidence

19   is strong that the title insurance industry has achieved a remarkably high level of loss minimization.

20   98.    Thus the costs of production have decreased as has the risk of loss yet none of these

21   factors has resulted in price competition at the consumer level.

22   99.    There is a remarkable absence of rate changes by title insurers over the past five

23   years, despite declining costs of production, increased number of transactions and increased

24   revenue per transaction. During a period when costs per unit of production declined significantly,

25   underwritten title companies and title insurers maintained excessive rates. The prices charged by

26   title insurers and underwritten title companies were not and are not responsive to the changing

27   costs of production or increasing revenue per transaction at a given set of rates. Again, this is

28   indicia of an agreement not to compete based on price.

CLASS ACTION COMPLAINT                                    - 20 -
010031-11 226460 V1

1    100. As noted, the title companies engage in illegal rebates and kickbacks where the title

2    insurer or the underwritten title company provides money, free services or other things of value to

3    a real estate agent, a lender or homebuilder in exchange for business referrals. These illegal rebates

4    and kickbacks – a consequence of reverse competition – show that title insurance rates are supra

5    competitive and that some portion of the overcharge is passed from the underwritten title company

6    or title insurer to the referrer of business.

7    101. A lack of competition and the ability to control prices is enhanced by the fact that

8    there were few title insurer entrants over the period from 1995 through 2005 and the number of

9    title insurer groups declined as title insurers acquired other title insurers. There were few

10   underwritten title company entrants over the 2000 to 2005 period and new entrants were controlled

11   business arrangements whose addition to the market did not result in greater price competition.

12   102. Access to title plants can be a barrier to entry, but a large barrier to entry exists due

13   to the established relationships between the entities that can steer the consumer's title and escrow

14   business and the entities who sell title insurance and escrow services.

15   103. The title insurance market is highly concentrated – a few title insurers account for

16   the vast majority of title insurance sales – at both the statewide level and at the county level in

17   California. For example, three title insurer groups account for 77.4% of the market at a statewide

18   level. At the county level, each individual market was highly concentrated. The GAO found that

19   First American and Fidelity had a market share of 66 percent. Such a concentration enhances the

20   ability of companies to fix prices

21   104. The agreement not to compete based on price is also evidenced by the fact that no

22   company has marketed its services to consumers, the ultimate purchasers of the product. This is in

23   marked contrast to real insurance, for example, car insurance, where the companies compete

24   vigorously with well recognized slogans such as State Farm's "Like a Good Neighbor," or

25   Allstate's "good hands," or the cute (to some) GEICO gecko promising low prices.

26

27

28

CLASS ACTION COMPLAINT                                                    - 21 -
010031-11 226460 VI

## VIII.   CLAIMS FOR RELIEF

## COUNT I

### Violation of the Sherman Act

105.   Plaintiff incorporates by reference the preceding allegations.

106.   Beginning at least as early as February 2004, and continuing thereafter to the present, the exact dates being unknown to plaintiff, defendants and their co-conspirators engaged in a combination and conspiracy in unreasonable restraint of the aforesaid interstate trade and commerce in violation of Section 1 of the Sherman Act.

107.   The aforesaid combination and conspiracy has consisted of a continuing agreement, understanding and concert of action among the defendants and their co-conspirators, the substantial terms of which have been:

    (a)   to fix, raise, maintain and stabilize the price of title insurance throughout California;

    (b)   to fix, raise, maintain and stabilize the terms and conditions of sale of title insurance in Californi; and

    (c)   to allocate and divide the market for title insurance in California.

108.   In the absence of proper regulatory authority and oversight, defendants' conduct constitutes a horizontal agreement to fix the form, structure, and prices of title insurance and to allocate and divide the title insurance market in California and is a *per se* violation of Section I of the Sherman Act.

109.   Defendants' price-fixing, market allocation and division activity has been continuous throughout the relevant damages period and has been renewed and reinforced annually through submissions to the OIC of supposed cost and revenue information and its periodic submissions of rate changes.

110.   Through their collective price-fixing, market allocation and division and manipulation of the regulatory process, defendants have harmed competition by charging consumers supra competitive prices for title insurance in California, evidenced in part by the fact that the prices are uniformly higher than compared with the cost of providing the insurance.

- 22 -

CLASS ACTION COMPLAINT
010031-11 226460 V1

111.    The aforesaid combination and conspiracy has had the following effects among others:

(a)    price competition in the sale of title insurance has been suppressed, restrained and eliminated;

(b)    prices for title insurance have been raised, fixed, maintained and stabilized at artificially high and non-competitive levels; and

(c)    purchasers of title insurance have been deprived of the benefit of free and open competition.

112.    During the period of the antitrust violations by defendants and their co-conspirators, plaintiff and each member of the Class she represents, has purchased title insurance and, by reason of the antitrust violations herein alleged, paid more for such that it would have paid in the absence of said antitrust violations.  As a result, plaintiff and each member of the Class she represents, has been injured and damaged in an amount presently undetermined.

## COUNT II

### Violation of Cal. Bus. and Prof. Code §§ 16720, *et seq.*

113.    Plaintiff incorporates by reference the preceding allegations.

114.    Defendants conduct as set forth above is in violation of the Cartwright Act of California (Cal. Bus. & Prof. Code §§ 16720, *et seq.*).

115.    As a direct result of defendants' unlawful acts plaintiffs have paid artificially inflated prices for title insurance and have suffered injury to their business and property.

## COUNT III

### (California's Business & Professions Code §§ 17200, *et seq.*)

116.    The preceding paragraphs of this Complaint are realleged and incorporated by reference.  Plaintiff asserts this claim for violations of California's UCL, Bus. & Prof. Code §§ 17200, *et seq.*, on behalf of herself and the members of the Class.

117.    Defendants' statements and representations constitute unfair, unlawful and deceptive trade practices in violation of the UCL.

1  |  118. All of the wrongful conduct alleged herein occurs and continues to occur in the

2  |  conduct of defendants' business. Defendants' wrongful conduct is part of a pattern or generalized

3  |  course of conduct that is repeated in the State of California on hundreds, if not thousands, of

4  |  occasions daily.

5  |  119. Plaintiff has suffered injury in fact and has lost money or property as a result of

6  |  defendants' unfair, unlawful and/or deceptive practices by paying a higher price for title insurance

7  |  then she would or should have absent the conduct complained of.

8  |  120. Plaintiff requests that this Court enter such orders or judgment as may be necessary

9  |  to enjoin the defendants from continuing its unfair, unlawful, and/or deceptive practices, to restore

10  |  to any person in interest any money which may have been acquired by means of such unfair

11  |  competition and to disgorge any profits realized by defendants as a result of its unfair, unlawful

12  |  and/or deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code

13  |  § 3345, and for such other relief as set forth in the Prayer for Relief.

## COUNT IV

## UNJUST ENRICHMENT

16  |  121. Plaintiff incorporates by reference the preceding allegations.

17  |  122. This Cause of Action is pled in the alternative to all claims and/or causes of action

18  |  at law.

19  |  123. Defendant has received a benefit from plaintiff and the Class members in the form

20  |  of the prices plaintiff and the Class members paid for defendants' title insurance.

21  |  124. Defendants are aware of their receipt of the above-described benefit.

22  |  125. Defendants received the above-described benefit to the detriment of plaintiff and

23  |  each of the other members of the Class.

24  |  126. Defendants continue to retain the above-described benefit to the detriment of

25  |  plaintiff and the Class members.

26  |  127. As a result of defendants' unjust enrichment, plaintiff and the Class members have

27  |  sustained damages in an amount to be determined at trial and seek full disgorgement and restitution

28  |

CLASS ACTION COMPLAINT  
010031-11 226460 V1

- 24 -

1    of defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or

2    wrongful conduct alleged above.

3                                    **PRAYER FOR RELIEF**

4            WHEREFORE, plaintiff demands:

5            A.      That the alleged combination and conspiracy among the defendants and their

6    co-conspirators be adjudged and decreed to be an unreasonable restraint of trade in violation of

7    Section 1 of the Sherman Act;

8            B.      That the Court declare that the premiums charged are excessive under state law and

9    order damages;

10           C.      That judgment be entered against defendants, jointly and severally, and in favor of

11   plaintiff, and each member of the Class it represents, for threefold the damages determined to have

12   been sustained by plaintiff, and each member of the Class it represents, together with the cost of

13   suit, including a reasonable attorneys' fee;

14           D.      Each of the defendants, successors, assignees, subsidiaries and transferees, and their

15   respective officers, directors, agents and employees, and all other persons acting or claiming to act

16   on behalf thereof or in concert therewith, be perpetually enjoined and restrained from, in any

17   manner, directly or indirectly, continuing, maintaining or renewing the aforesaid combination,

18   conspiracy, agreement, understanding or concert of action, adopting or following any practice,

19   plan, program, or design having a similar purpose or effect in restraining competition; and

20           E.      Such other and further relief as may appear necessary and appropriate.

21                                   **JURY TRIAL DEMANDED**

22           Pursuant to Rule 38, F.R.C.P., plaintiff demands a trial by jury of the claims alleged herein.

23   DATED: March 10, 2008.

24                                                   HAGENS BERMAN SOBOL SHAPIRO LLP

25

26                                                   By _____
                                                          JEFF D. FRIEDMAN (173886)
27

28

CLASS ACTION COMPLAINT                          - 25 -
010031-11 226460 V1

Reed R. Kathrein (139304)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com
reed@hbsslaw.com

Steve W. Berman
Anthony D. Shapiro
Thomas E. Loeser (202724)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, California  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
tony@hbsslaw.com
toml@hbsslaw.com

Attorneys for Plaintiff

CLASS ACTION COMPLAINT
010031-11 226460 V1

# EXHIBIT 2

E-filing

1

Reed R. Kathrein (139304)
Jeff D. Friedman (173886)

2

HAGENS BERMAN SOBOL SHAPIRO LLP

3

715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000

4

Facsimile: (510) 725-3001

5

reed@hbsslaw.com
jefff@hbsslaw.com

6

7

Attorneys for Plaintiff

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

LISA GENTILCORE, on behalf of herself and )   No.
all others similarly situated,                )

11

                                              )   CLASS ACTION COMPLAINT
                        Plaintiff,            )

12

                                              )   JURY TRIAL DEMANDED
      v.                                      )

13

                                              )
FIDELITY NATIONAL FINANCIAL, INC.,           )
FIDELITY NATIONAL TITLE INSURANCE            )

14

COMPANY, TICOR TITLE INSURANCE               )
COMPANY, TICOR TITLE INSURANCE               )

15

COMPANY OF FLORIDA, CHICAGO TITLE            )
INSURANCE COMPANY, NATIONAL TITLE            )

16

INSURANCE OF NEW YORK, INC.,                 )
SECURITY UNION TITLE INSURANCE               )

17

COMPANY, THE FIRST AMERICAN                  )
CORPORATION, FIRST AMERICAN TITLE            )

18

INSURANCE COMPANY, UNITED                    )
GENERAL TITLE INSURANCE COMPANY,             )

19

LANDAMERICA FINANCIAL GROUP, INC.,           )
COMMONWEALTH LAND TITLE                      )

20

INSURANCE COMPANY, LAWYERS TITLE             )
INSURANCE CORPORATION,                       )

21

TRANSNATION TITLE INSURANCE                  )
COMPANY, STEWART TITLE GUARANTY              )

22

COMPANY and STEWART TITLE                    )
INSURANCE COMPANY                            )

23

                                              )
                        Defendants.          )

24

25

26

27

28

CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION.................................................................................................. 1

II. JURISDICTION AND VENUE ......................................................................... 3

III. PARTIES.............................................................................................................. 4

    A.    Plaintiff................................................................................................... 4

    B.    Defendants............................................................................................. 4

IV. OTHER ENTITIES ............................................................................................. 8

V. CLASS ACTION ALLEGATIONS .................................................................. 9

VI. TRADE AND COMMERCE ............................................................................ 11

VII. FACTUAL ALLEGATIONS............................................................................ 11

    A.    The Nature of Title Insurance ............................................................ 11

    B.    Price-Fixing in the Large Markets ..................................................... 13

    C.    TIRSA's Formation............................................................................. 14

    D.    Lack of Regulatory Supervision and Authority in New York and Other States Including California............................................................... 15

    E.    Competition Based on Kickbacks and Inducements But Not Rates ............ 19

    F.    Other Indicators of a Lack of Competition and Conditions Conducive to Collusive Rate Setting............................................................... 19

VIII. CLAIMS FOR RELIEF ................................................................................... 22

    COUNT I  Violation of the Sherman Act ............................................... 22

    COUNT II  Violation of Cal. Bus. and Prof. Code §§ 16720, *et seq.*...................... 23

    COUNT III  (California's Business & Professions Code §§ 17200, *et seq.*).......... 23

    COUNT IV  Unjust Enrichment ............................................................... 24

PRAYER FOR RELIEF...................................................................................... 25

JURY TRIAL DEMANDED .............................................................................. 25

1    Plaintiff, Lisa Gentilcore, by her attorneys, on behalf of herself and all others similarly

2    situated, brings this action for treble damages and injunctive relief under the antitrust laws of the

3    United States and based on statutes of the State of California against the above named defendants,

4    demand a trial by jury, and complaining and alleging as follows:

## I.    INTRODUCTION

6    1.    From the consumer's point of view, title insurance differs greatly from other, more

7    familiar kinds of insurance. For one thing, while automobile and homeowner insurance policies

8    protect consumer from an event that may occur in the future, title insurance offers protection from

9    events that might have occurred in the past.

10    2.    Most simply, title insurance is protection purchased against a loss arising from

11    problems that occurred in the past and may affect the title to the real estate that a consumer is

12    buying. Title insurers do not compete on the basis of the policies or coverage that they provide. In

13    fact, almost all title policies are based on a single set of form policies published and maintained by

14    the national trade association, the American Land Title Association. Furthermore, the end goal of

15    an exhaustive title search by a title insurer is not to provide coverage for title defects that the search

16    uncovers, but rather to exclude coverage for any such defects and therefore, further reduce the real

17    value of the title policy which is written to cover only unknown defects in title at the time of

18    issuance. As a result, title insurance is a commodity product.

19    3.    Even for the savviest of insurance consumers, the purchase of a title insurance

20    policy is just one more expensive step in the dizzying, convoluted and often confusing flurry of

21    paperwork and signings that culminate in the closing of a home purchase. Consumers who

22    normally shop around for their insurance and carefully compare prices, typically emerge from the

23    closing on their new home holding an insurance policy that they know virtually nothing about and

24    that in all likelihood, they will never need.

25    4.    The title insurance market in California consists of a dozen carriers, ranging in size

26    from regional companies to national affiliates. However, the market is dominated by four groups

27    of affiliated companies which, combined, sell over 90 percent of the title insurance policies sold in

28

- 1 -

1  California and which own and control the title plants in many California counties that every title

2  insurer must rely on in order issue title policies.

3      5.    Title companies, in marked contrast to property, casualty, life and other traditional

4  insurance carriers, choose not to market their products directly to the consumers who pay for them.

5  Instead, the title insurance industry operates on what is termed a "reverse competition" model.

6  Reverse competition means that title companies solicit business referrals from the other major

7  players in the home purchase scenario – real estate agents and agencies, banks, lenders, builders,

8  developers and others:  middlemen or go-betweens.  The title companies pay middlemen for these

9  referrals in the form of direct payments, advertising expenses, junkets, parties and other kick-backs

10  and inducements.  In addition, middlemen such as Windermere, John L. Scott and Caldwell

11  Banker-Bain, who themselves control a significant portion of the real estate brokerage market, take

12  significant ownership stakes in local title agents and affiliates of the major title insurers and

13  thereby get a direct return in profit from the referral of title business to the title agent whom they

14  partly or wholly own.

15      6.    Reverse competition, as the term suggests, isn't a model that benefits consumers

16  through market-driven forces.  In fact, consumers are bypassed completely as title companies

17  spend nearly all of their marketing budgets "wining and dining" real estate agents, banks, lenders,

18  builders, developers and others in an effort to convince these middlemen to steer their home-

19  buying clients to their companies for their title insurance needs.

20      7.    In some of the major markets in the United States, these same title insurers

21  collectively meet, and jointly set rates and file these rates with the applicable state insurance

22  authority.  The rates are not subject to any meaningful review or regulation.  The companies agree

23  to fix the price of title insurance far in excess of the risk and loss experience associated with such

24  insurance.  As a result of the joint agreement as to rates, competition is relegated to the middleman.

25  As a result of their joint rate setting and agreement, no company competes on price to the

26  consumer.

27      8.    Having agreed to fix prices in states where joint rate setting occurs, the companies

28  agreed to not compete based on price to the consumer in other states, including California, where

regulation of filed rates is lax or non-existent. Thus, they agreed to set rates at supra competitive prices and to compete based on offering inducements to middlemen. In California, in three successive reports, the Office of the Insurance Commissioner ("OIC") has found an "astonishing number" of such inducements that are in violation of state law. However, the OIC does not actively oversee or regulate rates, and, in fact, does not by its own admission have the power to do so. The absence of regulation has allowed collusive behavior and excessive rates.

9.    In addition to paying inducements and kick-backs, the title companies and their agents divide the market of real-estate middlemen through the use of Affiliated Business Arrangements ("ABAs"), wherein the dominant real estate brokers purchase significant ownership stakes in favored title insurance affiliates. The real estate brokers then reward their associates for using the preferred title insurance providers and lock-out independent title insurers.

10.    In this action, plaintiff, on behalf of a Class of those purchasing title insurance in California, seek damages arising from defendants' violations of the Sherman Act as well as California statutory law.

## II.    JURISDICTION AND VENUE

11.    This Complaint is filed and these proceedings are instituted under Sections 4 and 16 of the Act of Congress of October 15, 1914, C. 323, Stats. 731, 737 (15 U.S.C. §§ 15, 26) to obtain injunctive relief and to recover treble damages and the costs of suit, including a reasonable attorneys' fee, against defendants for the injuries sustained by plaintiff and the members of the Class which she represents by reason of defendants' and their co-conspirators' violations, as hereinafter alleged, of Section I of the Sherman Act (15 U.S.C. § 1).

12.    Defendants transact business, maintain offices or are found within the Northern District of California. The interstate commerce described hereinafter is carried on, in part, within the Northern District of California and the conspiratorial acts herein alleged were carried on, in part, in the Northern District of California.

13.    Intradistrict Assignment: Assignment to the San Francisco or Oakland division of this Court is appropriate because a substantial part of the events or omissions which give rise to the

1    claim occurred in the county of Alameda.  Pursuant to Northern District of California, Local Rule

2    3-2(d), assignment to either the San Francisco Division or the Oakland Division is proper.

3    **III.    PARTIES**

4    **A.    Plaintiff**

5    14.    Plaintiff, Lisa Gentilcore, is an individual residing in Alameda County, California.

6    During the Class Period, plaintiff purchased title insurance directly from one or more of the

7    defendants herein and has been injured by reason of the antitrust violations alleged.

8    **B.    Defendants**

9    15.    Defendant Fidelity National Financial, Inc. ("Fidelity National") is a Delaware

10    corporation headquartered at 601 Riverside Avenue, Jacksonville, Florida 32204.  Fidelity National

11    does business in California through one or more of its subsidiaries, including but not limited to,

12    defendants Fidelity National Title Insurance Company, Ticor Title Insurance Company, Ticor Title

13    Insurance Company of Florida,  National Title Insurance of New York, Inc., Security Union Title

14    Insurance Company, and Chicago Title Insurance Company.  Fidelity National is registered to do

15    business in California.

16    16.    Defendant Fidelity National Title Insurance Company ("FNTIC") is a California

17    Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.

18    FNTIC does business in California, is a licensed title insurance company in California and is

19    registered to do business in California.

20    17.    Defendant Ticor Title Insurance Company ("Ticor") is a California Corporation

21    with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.  Ticor does

22    business in California, is a licensed title insurance company in California and is registered to do

23    business in California.

24    18.    Defendant Ticor Title Insurance Company of Florida ("TTICF") is a Florida

25    corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.

26    TTICF does business in California, is a licensed title insurance company in California and is

27    registered to do business in California.

28

- 4 -

1        19.     Defendant Chicago Title Insurance Company ("Chicago Title") is a Missouri

2    Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.

3    Chicago Title does business in California, is a licensed title insurance company in California and is

4    registered to do business in California.

5        20.     Defendant National Title Insurance of New York, Inc. ("NTINY") is a New York

6    corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.

7    NTINY does business in California, is a licensed title insurance company in California and is

8    registered to do business in California.

9        21.     Defendant Security Union Title Insurance Company ("SUTIC") is a California

10   corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.

11   SUTIC does business in California, is a licensed title insurance company in California and is

12   registered to do business in California.

13       22.    The Fidelity family of title insurance companies (collectively, "Fidelity") – which

14   includes defendants Fidelity National, FNTIC, Ticor, TTICF, Chicago Title, NTINY and SUTIC,

15   and their affiliates – is engaged in selling title insurance to purchasers of commercial and

16   residential real estate throughout the United States, including California.  Nationally, Fidelity

17   accounts for approximately 27 percent of title premiums, which in 2006 amounted to roughly

18   $4.6 billion.  Fidelity, Chicago Title and Ticor were founding members of TIRSA (defined below)

19   and since TIRSA's inception have charged title insurance rates in New York that TIRSA

20   collectively sets.

21       23.    The Fidelity family of title insurance companies and their affiliates are wholly-

22   owned and controlled by defendant Fidelity National Financial, Inc.  Through its subsidiaries,

23   Fidelity National is a provider of title insurance, specialty insurance, and claims management

24   services.  Fidelity National had 2006 revenues of roughly $9.4 billion.  The Fidelity family of title

25   insurance companies engaged in the conduct challenged herein with the approval and assent of

26   defendant Fidelity National.

27

28

CLASS ACTION COMPLAINT
010031-11 227968 V1

24.     Defendant The First American Corporation ("First American") is a California corporation with its headquarters at 1st American Way, Santa Ana, California 92707. First American does business in California through one or more of its subsidiaries, including but not limited to, defendants First American Title Insurance Company and United General Title Insurance Company.

25.     Defendant First American Title Insurance Company ("FATIC") is a California corporation with its headquarters at 1st American Way, Santa Ana, California 92707. FATIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

26.     Defendant United General Title Insurance Company ("UGTIC") is a Colorado corporation located at 8310 S. Valley Highway, Suite 130, Englewood, CO 80112. UGTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

27.     The First American family of title insurance companies (collectively, "First American") – which includes defendants First American, FATIC and UGTIC, and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including California. Nationally, First American accounts for approximately 29 percent of title premiums, which in 2006 amounted to roughly $4.8 billion. First American Title was a founding member of TIRSA and since TIRSA's inception has charged title insurance rates in New York that TIRSA collectively sets.

28.     The First American family of title insurance companies and their affiliates are wholly-owned and controlled by defendant The First American Corporation. Through its subsidiaries, First American is a provider of title insurance, business information, and related products and services. First American had 2006 revenues of roughly $8.5 billion. The First

1    American family of title insurance companies and their affiliates engaged in the conduct

2    challenged herein with the approval and assent of defendant First American.

3        29.    Defendant LandAmerica Financial Group, Inc. ("LandAmerica") is a Virginia

4    corporation headquartered at 5600 Cox Road, Glen Allen, Virginia 23060. LandAmerica does

5    business in California through one or more of its subsidiaries, including but not limited to,

6    defendants Commonwealth Land Title Insurance Company, Lawyers Title Insurance Corporation

7    and Transnation Title Insurance Company.

8        30.    Defendant Commonwealth Land Title Insurance Company ("CLTIC") is a

9    Pennsylvania corporation with is principle place of business at 5600 Cox Road, Glen Allen,

10   Virginia 23060. CLTIC does business in California, is a licensed title insurance company in

11   California and is registered to do business in California.

12       31.    Defendant Lawyers Title Insurance Corporation ("LTIC") is a Nebraska corporation

13   with is principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060. LTIC does

14   business in California, is a licensed title insurance company in California and is registered to do

15   business in California.

16       32.    Defendant Transnation Title Insurance Company ("TNTIC") is a Nebraska

17   corporation with is principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060.

18   TNTIC does business in California, is a licensed title insurance company in California and is

19   registered to do business in California.

20       33.    The LandAmerica family of title insurance companies (collectively,

21   "LandAmerica") – which includes defendants LandAmerica, CLTIC, LTIC and TNTIC, and their

22   affiliates – is engaged in selling title insurance to purchasers of commercial and residential real

23   estate throughout the United States, including California. Nationally, LandAmerica accounts for

24   approximately 19 percent of title premiums, which in 2006 amounted to roughly $3.15 billion.

25   Commonwealth and Lawyers Title were founding members of TIRSA and since TIRSA's

26   inception have charged title insurance rates in New York that TIRSA collectively sets.

27       34.    The LandAmerica family of title insurance companies and their affiliates are

28   wholly-owed and controlled by defendant Land America Financial Group, Inc. Through its

CLASS ACTION COMPLAINT                           - 7 -
010031-11 227968 V1

1    subsidiaries, LandAmerica is a provider of title insurance and other products and services that

2    facilitate the purchase, sale, transfer, and financing of residential and commercial real estate.

3    LandAmerica had 2006 revenues of roughly $4 billion.  The LandAmerica family of title insurance

4    companies and their affiliates engaged in the conduct challenged herein with the approval of

5    defendant LandAmerica.

6        35.    Defendant Stewart Title Guaranty Company ("STGC") is a Texas corporation

7    headquartered at 1980 Post Oak Blvd., Suite 800, Houston, Texas 77056.  STGC does business in

8    California, is a licensed title insurance company in California and is registered to do business in

9    California.

10       36.    Defendant Stewart Title Insurance Company ("STIC") is a New York corporation

11   with its principle place of business at 300 E. 42nd St., Floor 10, New York, NY 10017.  STIC does

12   business in California, is a licensed title insurance company in California and is registered to do

13   business in California.

14       37.    The Stewart family of title insurance companies (collectively, "Stewart") – which

15   includes defendants STGC and STIC, and its affiliates – is engaged in selling title insurance to

16   purchasers of commercial and residential real estate throughout the United States and California.

17   Nationally, Stewart accounts for approximately 12 percent of title premiums, which in 2006

18   amounted to roughly $2 billion.  Stewart was a founding member of TIRSA and since TIRSA's

19   inception has charged title insurance rates in New York that TIRSA collectively sets.

20       38.    Together, defendants account for more than 85 percent of the title premiums

21   consumers pay in California.  Nationally, they account for more than 85 percent of title premiums,

22   which in 2006 amounted to roughly $14.5 billion.  Throughout the relevant damages period,

23   defendants charged California consumers in California virtually identical title insurance rates.

## IV.    OTHER ENTITIES

25       39.    TIRSA is a voluntary association of title insurers licensed as a rate service

26   organization pursuant to Article 23 of the State of New York Insurance Law.  TIRSA maintains its

27   offices in New York City, which until recently were located at the same New York address of

28   Fidelity Title.

1    40.    TIRSA annually compiles from its members statistical data relating to their title

2    insurance premiums, losses and expenses and submits this information in aggregate form to the

3    New York Insurance Department. TIRSA also prepares and submits the New York Title Insurance

4    Rate Manual which sets forth title rates to be charged and rules to be followed by TIRSA's

5    members. The Insurance Department has never objected to any of the rates TIRSA has collectively

6    set. Similarly, the California OIC has not actually held a public hearing or conducted any other

7    review or regulation of the title insurance rates in California for thirty years.

8    41.    TIRSA's membership is comprised of defendant insurers and all other title insurers

9    that are licensed to issue policies in New York. Currently, Fidelity, First American, LandAmerica,

10   and Stewart collectively represent 14 of TIRSA's 22 members. As such, they comprise a majority

11   voting block which, according to TIRSA's by-laws, allows them to control the operations of

12   TIRSA and, in particular, TIRSA's collective rate setting activity.

13   42.    Various other persons, firms and corporations not made defendants herein have

14   participated as co-conspirators with the defendants in the violations alleged herein and have

15   performed acts and made statements in furtherance thereof.

16                    V.    CLASS ACTION ALLEGATIONS

17   43.    Plaintiff brings this action under Rule 23, and particularly subsection (b)(3), of the

18   Federal Rules of Civil Procedure, on behalf of herself and a Class consisting of all persons

19   excluding governmental entities, defendants, subsidiaries and affiliates of defendants, who

20   purchased directly, from one or more of the defendants and/or their co-conspirators title insurance

21   for residential and commercial property in California during the four year period preceding this

22   lawsuit and who have sustained damages as a result of the conspiracy herein alleged. The number

23   of potential Class members is so numerous that joinder is impracticable.

24   44.    Plaintiff, as representative of the Class, will fairly and adequately protect the interest

25   of the Class members. The interests of plaintiff are coincident with, and not antagonistic to, those

26   of the Class members.

27   45.    Except as to the amount of damages each member of the Class has by itself

28   sustained, all other questions of fact and law are common to the Class, including but not limited to,

1    the combination and conspiracy hereinafter alleged, the violation of Section 1 of the Sherman Act

2    (15 U.S.C. § 1) and the effects of such violation.

3         46.    Plaintiff, along with all other members of the Rule (b)(3) Class, were injured as a

4    result of paying supracompetitive prices for title insurance in California.  These supracompetitive

5    prices were achieved as a result of defendants' illegal price-fixing activities and market allocation

6    and division.

7         47.    Members of the Class include hundreds of thousands, if not millions, of consumers.

8    They are so numerous that their joinder would be impracticable.

9         48.    Plaintiff also brings this action as a class action under Rule 23(b)(2) of the Federal

10   Rules of Civil Procedure, for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  The Rule

11   (b)(2) Class includes all members of the (b)(3) Class, and all consumers who are threatened with

12   injury by the anticompetitive conduct detailed herein.

13        49.    Defendants have acted, continued to act, refused to act and continued to refuse to act

14   on grounds generally applicable to the Rule (b)(2) Class, thereby making appropriate final

15   injunctive relief with respect to the Rule (b)(2) Class as a whole.

16        50.    Members of the Rule (b)(2) Class include hundreds of thousands, if not millions, of

17   consumers.  They are so numerous that their joinder would be impracticable.

18        51.    Common questions of law and fact exist with respect to all Class members and

19   predominate over any questions solely affecting individual Class members.  Among the questions

20   of law or fact common to the class are the following:

21            •    Whether defendants have engaged in the alleged illegal price-fixing activity
                  and market allocation and division.
22
23            •    The duration and scope of defendants' alleged illegal price-fixing and market
                  allocation and division activity.
24            •    Whether defendants' alleged illegal price-fixing and market allocation and
                  division has caused higher prices to plaintiffs and other purchasers of title
25                insurance in California.
26            •    Whether the Insurance Commissioner has actively supervised defendants'
                  price fixing and market allocation and division.
27

28

CLASS ACTION COMPLAINT                          - 10 -
010031-11 227968 V1

1    52.    Plaintiff does not have any conflict of interest with other Class members. Plaintiff's

2    claims are typical of the claims of the Class and they will fairly and adequately reflect the interests

3    of the Class. Counsel competent and experienced in federal class action and federal antitrust

4    litigation has been retained to represent the Class.

5    53.    This action is superior to any other method for the fair and efficient adjudication of

6    this legal dispute since joinder of all members is not only impracticable, but impossible. The

7    damages suffered by certain members of the Class are small in relation to the expense and burden

8    of individual litigation and therefore it is highly impractical for such Class members to seek redress

9    for damages resulting from defendants' anticompetitive conduct.

10    54.    There will be no extraordinary difficulty in the management of the Class action.

11    **VI.    TRADE AND COMMERCE**

12    55.    During all or part of the period in suit, defendants and their co-conspirators were

13    sellers of title insurance in California.

14    56.    During the period in suit, the defendants sold substantial quantities of title insurance

15    in a continuous and uninterrupted flow in interstate commerce. In 2005, consumers in the United

16    States paid $17 billion for residential title insurance policies.

17    57.    During the period in suit, Class members from locations outside California

18    purchased commercial or residential property and title insurance within California.

19    58.    During the period in suit, the defendants were the major sellers of title insurance in

20    the United States and California. Defendants controlled in excess of 85 percent of the market for

21    title insurance in the United States and California.

22    59.    The activities of the defendants and their co-conspirators, as described herein, were

23    within the flow of interstate commerce and substantially affected interstate commerce.

24    **VII.    FACTUAL ALLEGATIONS**

25    **A.    The Nature of Title Insurance**

26    60.    Title insurance is one of most costly items associated with the closing of a real

27    estate transaction. In California, rates for title insurance are based on a percentage of the total

28    value of the property being insured. For residential properties, this price ranged in 2005 from

CLASS ACTION COMPLAINT

010031-11 227968 V1

- 11 -

1    about $1,010 (for a $250,000.00) property to $1,490 (for a $500,000 property).  For more

2    expensive homes and commercial properties, these prices are significantly higher.  This amount

3    spent on title insurance has risen dramatically over the past decade.

4         61.    Title insurance serves an important purpose.  It protects the purchaser of a property

5    from any unidentified defects in the title that would in any way interfere with the full and complete

6    ownership and use of the property with the ultimate right to resell the property.  Title insurance is

7    required by lenders in most residential and commercial real estate transactions.

8         62.    Consumers exercise little discretion in choosing the title insurer from which they

9    purchase the insurance.  That decision is typically made for them by their lawyer, mortgage broker,

10   lender, or realtor.  Consequently, for most purchasers, the cost of title insurance is not challenged.

11   Most consumers do not even become aware of the price they will pay and to which insurer they

12   will pay it until the actual closing of the real estate transaction.  By then it's too late, consumers

13   can't attempt to negotiate a better title insurance price or alternate provider for fear of delaying or

14   derailing the entire transaction.  There is no shopping around.  There is no negotiation of price.

15        63.    This dynamic basically removes the sale of title insurance from the normal

16   competitive process.  Unlike the regular forces of supply and demand that keep most industries and

17   their pricing in check, the title insurance industry is not subject to any real competitive constraints.

18   The purchasers of the insurance, in most instances, are not the ones making the purchasing

19   decisions.  And, they are certainly in no position to question the price.

20        64.    The most effective but illegal way for a particular title insurer to get business is to

21   encourage those making the purchasing decisions – the real-estate middlemen – to steer business to

22   that insurer.  The best way to so motivate the middlemen is not through lower prices (that they are

23   not even paying).  Rather, it is through kickbacks in the form of finder's fees, gifts, meals, business

24   services and other financial enticements.  Therefore, it is through higher pricing (which allows for

25   generous inducements and kick-backs), not lower pricing, that provides the best way for title

26   insurers to compete and increase their business.

27

28

1

**B.    Price-Fixing in the Large Markets**

2      65.    New York is one of several states in which the leading title insurers collectively fix

3    their prices through a rate-setting organization like TIRSA.  There are two principal cost

4    components that go into TIRSA's calculation.  One comprises the risk associated with issuing the

5    title policy.  The other comprises the "agency commissions" paid to title agents.

6      66.    The risk component covers the risk the title insurer bears for any undiscovered

7    defects in the title.  Unlike property insurance, title insurance carries with it a very limited risk of

8    loss to the insurer.  That is because title insurance protects against unknown *prior* events that cause

9    defects in title.  With a proper search and examination of prior ownership records, any such defects

10    can and almost always are readily identified and excluded from the policy's coverage.

11    Consequently, the average claim payout on a title insurance policy in the United States amounts to

12    only about 5 percent of the total premium collected.  This is very different from property coverage

13    (such as auto and home insurance) – which protects against *future* occurrences over which the

14    insurer has little to no control – where the average claim payout amounts to about 80 percent of the

15    total premium.

16      67.    The "agency commissions" component of the title insurance rate covers payments

17    made to title agents.  Defendants have an ownership or management stake in many of the title

18    agencies to which these payments are made.  A small portion of these payments is for the search

19    and exam of prior ownership records of the property being purchased to identify any liens,

20    encumbrances, burdens, exclusions, or other defects in the title.  The search and exam function

21    does not involve the spreading or underwriting of risk, and title insurers typically outsource this

22    task to title agents.

23      68.    The remainder, and by far the bulk, of the agency commissions are comprised of

24    costs unrelated to the issuance of title insurance.  These costs include kickbacks and other financial

25    inducements title insurers provide to title agents and indirectly (through title agents) to the lawyers,

26    brokers, and lenders who, in reality, are the ones deciding which title insurer to use.  These

27    payments have nothing to do with the issuance of title insurance and are made by title insurers

28    merely to inflate their revenues and steer business their way.

1    69.    Under TIRSA's collective rate setting regime, roughly 85 percent of the total title

2    insurance premium is based on the so-called "costs" associated with the payment of agency

3    commissions. Only 15 percent is based on costs associated with the risk of loss.

4    70.    TIRSA publishes its final calculated title rates in the New York Title Insurance Rate

5    Manual. These rates are tied to the value of the property being insured. This is so despite the fact

6    that the costs associated with agency commissions are entirely unrelated to the value of the

7    property. Indeed, agency kickbacks and enticements have little to do with producing a particular

8    title policy and provide no value – proportional to property value or otherwise – to the consumer.

9    Even search and exam costs are unrelated to property value. They instead depend on the age of the

10    property, the complexity of the ownership history, and the accessibility of prior ownership records.

11    71.    There are other states in which the defendants overly meet and agree to fix the rates

12    for title insurance as part of a formal collective rate setting process.

13    **C.    TIRSA's Formation**

14    72.    Prior to TIRSA, the New York Board of Title Underwriters ("NYBTU") served as

15    the title insurance rate-setting body in New York. NYBTU, along with the title insurance rate

16    setting bureaus in many other states, was disbanded in the mid-1980s in the wake of a Federal

17    Trade Commission("FTC") challenge to the collective rate setting activity of many of these

18    associations. The FTC's challenge culminated in *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621 (1992),

19    where the Supreme Court held that to avoid *per se* illegal price fixing liability, the rate setting

20    activity of these rating bureaus must be actively supervised by the state.

21    73.    In *Ticor*, the FTC focused its challenge on agency commissions. The FTC

22    contended that the respective state insurance departments merely rubber-stamped this portion of the

23    collectively fixed rates without any independent review or analysis of their reasonableness or cost

24    justification. The Supreme Court agreed with the FTC that this kind of limited state oversight was

25    not sufficient. Rather, to avoid illegal price-fixing liability, the state insurance department has to

26    "exercise[]sufficient independent judgment and control so that the details of the rates or prices have

27    been established as a product of deliberate state intervention, not simply by agreement among

28    private parties." *Ticor*, 504 U.S. at 634-35.

CLASS ACTION COMPLAINT
010031-11  227968 V1

1    74.    Following the Supreme Court's instruction in *Ticor*, the Third Circuit on remand in

2    *Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129 (3d Cir. 1992), upheld the FTC's finding that the

3    collective rate-setting of certain state rating bureaus was improper because it was not actively

4    supervised by the state. According to the circuit court, "[t]he Supreme Court plainly instructed us

5    that a state's rubber stamp is not enough. Active supervision requires the state regulatory

6    authorities' independent review and approval." *Id.* at 1139.

7    75.    Defendants formulated TIRSA's first rate manual and procedure soon after the

8    Supreme Court's *Ticor* decision. Through TIRSA, defendants have set up a rate-setting scheme to

9    get around the rigors of state oversight required by *Ticor*. They have done so by calculating a

10    single rate that comprises both risk and agency commission costs and by outsourcing to title agents

11    the agency commission costs. In this way, defendants avoid providing the Insurance Department

12    with any detailed breakout or backup for the bulk of the costs that make up their collectively fixed

13    rates.

14    76.    TIRSA merely submits an aggregated figure that is supposed to represent the total

15    agency commission costs. Embedded within this figure is the vast quantity of dollars that are

16    funneled to and through the title agencies as kickbacks, financial inducements and other costs

17    unrelated to the issuance of title insurance. Defendants' design in all of this has been to effective

18    "hide" the cost basis for their artificially high and collectively fixed title insurance premiums from

19    the regulatory scrutiny that *Ticor* demands.

20    **D.    Lack of Regulatory Supervision and Authority in New York and Other States**
      **Including California**

21

22    77.    There is no provision under the New York Insurance Law for TIRSA to include in

23    its collectively fixed rates kickbacks and other agency commission payments unrelated to the

24    issuance of title insurance. Indeed, the New York Insurance Department has openly acknowledged

25    that it lacks the authority to review any agency commission payments. It has likewise recognized

26    that defendants' outsourcing of agency commission costs has prevented it from performing a

27    meaningful review of TIRSA's calculated rates. This was made clear at a November 2006 public

28    hearing the New York Insurance Department held – the first in 15 years – where it questioned

1   TIRSA and its members on TIRSA's failure to provide the Insurance Department with any backup

2   or detail for agency commissions.

3       78.    At the hearing, the Insurance Department conceded that it could not properly

4   evaluate TIRSA's calculated rates, and that it could only do so if it obtained the detailed cost

5   information on agency commissions that TIRSA does not provide.

6       79.    The Insurance Department's recognition that it is not properly supervising TIRSA's

7   rate-setting activity is consistent with the April 2007 findings of the U.S. Government

8   Accountability Office ("GAO") that the title insurance industry is in need of greater state

9   regulation. The GAO studied the industry conditions of several states, including New York, and

10  concluded that "state regulators have not collected the type of data, *primarily on title agents' costs*

11  *and operations,* needed to analyze premium prices and underlying costs." (Emphasis added.)

12      80.    Unchecked by regulatory review and insulated from competition, defendants have

13  thus been able to collectively fix title insurance rates at supra competitive levels and earn profits

14  that vastly exceed those contemplated by the Insurance Department or that would have resulted in a

15  free and open competitive market.

16      81.    At the time of TIRSA's formation, the Insurance Department established 5 percent

17  (of the total premium) as the level of profit to which title insurers are entitled. The Insurance

18  Department is supposed to carefully analyze TIRSA's rate calculations, and, in particular, its

19  revenue and cost information, to ensure that this 5 percent profit level is maintained and based on a

20  reasonable premium. However, without the authority or ability to scrutinize agency commission

21  costs, the Insurance Department has been unable to perform this function. As a result, defendants

22  (through TIRSA) have been able to set artificially high title premiums and secure title profits far in

23  excess of the 5 percent threshold.

24      82.    Through an independent investigation conducted over the past several years, the

25  New York State Attorney General found that for every dollar of insurance premium defendants

26  collected, of the roughly 15 cents that supposedly accounts for the risk of loss, only 3 cents is paid

27  out in claims. And, of the roughly 85 cents that supposedly covers agency commissions, only

28  between 8 and 11 cents goes to costs actually incurred by title agents in producing the title policy.

CLASS ACTION COMPLAINT                                    - 16 -
010031-11 227968 V1

1    These numbers show that title insurers' collectively fixed rates have resulted in profits that

2    untethered to and vastly exceed the costs of producing such policies.

3        83.    The New York Attorney General's investigation further revealed that what was

4    largely driving these numbers were the kickbacks and other financial inducements defendants were

5    funneling to and through title agents to secure more business.  As reported at the New York

6    Insurance Department's 2006 hearing, one title agency's financial statements revealed that it spent

7    more than $1 million of these so-called "agency commissions" on items identified as "Christmas",

8    "automobile expenses", "political contributions", "promotional expenses", and "travel and

9    entertainment".  These expenses are not even remotely related to the issuance of title insurance.

10       84.    The Washington State Insurance Commissioner's October 2006 report found

11   strikingly similarly abuses in Washington.  Violations were pervasive and the Commissioner

12   concluded that consumers were paying too much as a result.

13       85.    All of this "excess money" paid to title agents not only works to steer business to

14   defendants.  It also serves to boost defendants' own profits through the inflated revenues they

15   obtain to cover these agency payments and through their ownership or management stake in many

16   of these agencies.

17       86.    Defendants are competitors in the sale of title insurance to consumers throughout

18   the United States.  These title insurers have agreed and engaged in concerted efforts to

19   (i) collectively set and charge uniform and supracompetitive rates for title insurance, (ii) include in

20   their calculated rates agency commission costs, (iii) embed within these costs payoffs, kickbacks,

21   and other charges that are unrelated to the issuance of title insurance, and (iv) hide these supposed

22   "costs" from regulatory scrutiny by funneling them to and through title agents over which the

23   government agencies have no ability or authority to regulate.

24       87.    The GAO in its 2007 report entitled "Actions Needed to Improve Oversight of the

25   Title Insurance Industry and Better Protect Consumers" found several indicia of a lack of

26   competition and questions about the reasonableness of prices including:

27

28

CLASS ACTION COMPLAINT
010031-11 227968 V1

- Consumers find it difficult to shop for title insurance, therefore, they put little pressure on insurers and agents to compete based on price;

- Title agents do not market to consumers, who pay for title insurance, but to those in the position to refer consumers to particular title agents, thus creating potential conflicts of interest;

- A number of recent investigations by HUD and state regulatory officials have identified instances of alleged illegal activities with the title industry that appear to reduce price competition and could indicate excessive prices;

- As property values or loan amounts increase, prices paid for title insurance by consumers appear to increase faster than insurers' and agents' costs; and

- In states where agents' search and examination services are not included in the premium paid by consumers, it is not clear that additional amounts paid to title agents are fully supported by underlying costs.

88.     The GAO visited several states, including California, and found a lack of regulatory oversight:

> In the states we visited, we found that regulators did not assess title agents' costs to determine whether they were in line with premium rates; had made only limited efforts to oversee title agents (including ABAs involving insurers and agents); and, until recently, had taken few actions against alleged violations of antikickback laws. In part, this situation has resulted from a lack of resources and limited coordination among different regulators within states. On the federal level, authority for alleged violations of section 8 of RESPA, including those involving increasingly complex ABAs, is limited to seeking injunctive relief. Some state regulators expressed frustration with HUD's level of responsiveness to their requests for help with enforcement, and some industry officials said that RESPA rules regarding ABAs and referral fees need to be clarified. Industry and government stakeholders have proposed several regulatory changes, including RESPA reform, strengthened regulation of agents, a competitor right of action with no monetary penalty, and alternative title insurance models. [*Id.* at 41, footnotes omitted.]

- 18 -

**E.    Competition Based on Kickbacks and Inducements But Not Rates**

89.    Having agreed to fix or stabilize prices in New York and other states where they overtly meet to promulgate rates, these same defendants then set out to do the same in other states.

90.    In other words, as a direct result of these meetings where rates were agreed to, these same defendants agreed, either expressly or tacitly, to not compete on rates in other states as well. To compete on rates in other states could and would imperil their ability to maintain the agreed rate in states like New York.

91.    As is the case in New York, a lack of regulatory authority over rates created an environment in which a conspiracy can and did succeed. No agency was examining why all the rates were virtually identical, and no agency was examining whether the costs associated with these premiums were reasonable. This is an environment which is conducive to price fixing.

92.    In California, there is a lack of regulatory authority and oversight over title insurance companies. The rates in California are not set as part of a deliberate state intervention and the state does not and cannot meaningfully renew or approve these rates. The rates at issue in this case went into effect without review.

**F.    Other Indicators of a Lack of Competition and Conditions Conducive to Collusive Rate Setting**

93.    In addition to the uniformity of rates, other facts suggest that it is more plausible than not that rates have been set based on an agreement to fix prices.

94.    In theory, the chain of title should be documented back to its historic grant of ownership centuries in the past. Fear about a possible title defect in the distant past is widely used as a justification by title agencies when convincing property buyers to purchase an owner policy in addition to the lender policy, which is mandatory to secure a mortgage. The title agency, however, saves much time and money when the search is limited to one or two transactions. They rely on the insurance policy to cover the remote chance of missing an earlier but still-valid claim. If such a claim is asserted and survives the scrutiny of the title insurance company's legal department, the expected cost of compensation is likely to be less than the sum of added overhead costs of routinely tracing back every chain of title to the earliest registered owner in the distant past.

95.     Title insurance industry officials tend to justify the large proportion of the premium retained by the title abstract and settlement agency (from 60 to more than 90 percent) by the alleged high cost of title searching back into the distant past.  In fact, a high proportion of noncommercial properties are searched only through the most recent transaction.  No information is available as to what proportion of claims originate in the distant past.  The industry has never published pertinent statistics.  It would have a marketing incentive to publish these statistics if the risk were significant; that it has not published these statistics indicates that the risk probably is only slightly greater than zero.

96.     Many U.S. homes are being resold three or four times in twenty-five years.  At each of these occasions, an abstract of title will be prepared on the basis of a more or less thorough review of the available title records, inheritance records, family records and records of past or current liens against a property.  It is reasonable, therefore, to suspect that the risk of a title defect will decrease every time a property is sold.

97.     Title searches have become less labor intensive, especially in large urban counties and cities.  More and more of the information is available online.  The statistical likelihood that a title default would be overlooked is a closely held industry secret, but it appears to be so small that many transactions are now insured on the basis of a search of the last owner's title history or a search into transactions that occurred during the last twenty-five to thirty-five years.  The evidence is strong that the title insurance industry has achieved a remarkably high level of loss minimization.

98.     Thus the costs of production have decreased as has the risk of loss yet none of these factors has resulted in price competition at the consumer level.

99.     There is a remarkable absence of rate changes by title insurers over the past five years, despite declining costs of production, increased number of transactions and increased revenue per transaction.  During a period when costs per unit of production declined significantly, underwritten title companies and title insurers maintained excessive rates.  The prices charged by title insurers and underwritten title companies were not and are not responsive to the changing costs of production or increasing revenue per transaction at a given set of rates.  Again, this is indicia of an agreement not to compete based on price.

1      100.     As noted, the title companies engage in illegal rebates and kickbacks where the title

2 insurer or the underwritten title company provides money, free services or other things of value to

3 a real estate agent, a lender or homebuilder in exchange for business referrals. These illegal rebates

4 and kickbacks – a consequence of reverse competition – show that title insurance rates are supra

5 competitive and that some portion of the overcharge is passed from the underwritten title company

6 or title insurer to the referrer of business.

7      101.     A lack of competition and the ability to control prices is enhanced by the fact that

8 there were few title insurer entrants over the period from 1995 through 2005 and the number of

9 title insurer groups declined as title insurers acquired other title insurers. There were few

10 underwritten title company entrants over the 2000 to 2005 period and new entrants were controlled

11 business arrangements whose addition to the market did not result in greater price competition.

12      102.     Access to title plants can be a barrier to entry, but a large barrier to entry exists due

13 to the established relationships between the entities that can steer the consumer's title and escrow

14 business and the entities who sell title insurance and escrow services.

15      103.     The title insurance market is highly concentrated – a few title insurers account for

16 the vast majority of title insurance sales – at both the statewide level and at the county level in

17 California. For example, three title insurer groups account for 77.4% of the market at a statewide

18 level. At the county level, each individual market was highly concentrated. The GAO found that

19 First American and Fidelity had a market share of 66 percent. Such a concentration enhances the

20 ability of companies to fix prices

21      104.     The agreement not to compete based on price is also evidenced by the fact that no

22 company has marketed its services to consumers, the ultimate purchasers of the product. This is in

23 marked contrast to real insurance, for example, car insurance, where the companies compete

24 vigorously with well recognized slogans such as State Farm's "Like a Good Neighbor," or

25 Allstate's "good hands," or the cute (to some) GEICO gecko promising low prices.

26

27

28

CLASS ACTION COMPLAINT
010031-11 227968 V1

# VIII.  CLAIMS FOR RELIEF

## COUNT I

### Violation of the Sherman Act

105.    Plaintiff incorporates by reference the preceding allegations.

106.    Beginning at least as early as February 2004, and continuing thereafter to the present, the exact dates being unknown to plaintiff, defendants and their co-conspirators engaged in a combination and conspiracy in unreasonable restraint of the aforesaid interstate trade and commerce in violation of Section 1 of the Sherman Act.

107.    The aforesaid combination and conspiracy has consisted of a continuing agreement, understanding and concert of action among the defendants and their co-conspirators, the substantial terms of which have been:

    (a)    to fix, raise, maintain and stabilize the price of title insurance throughout California;

    (b)    to fix, raise, maintain and stabilize the terms and conditions of sale of title insurance in Californi; and

    (c)    to allocate and divide the market for title insurance in California.

108.    In the absence of proper regulatory authority and oversight, defendants' conduct constitutes a horizontal agreement to fix the form, structure, and prices of title insurance and to allocate and divide the title insurance market in California and is a *per se* violation of Section I of the Sherman Act.

109.    Defendants' price-fixing, market allocation and division activity has been continuous throughout the relevant damages period and has been renewed and reinforced annually through submissions to the OIC of supposed cost and revenue information and its periodic submissions of rate changes.

110.    Through their collective price-fixing, market allocation and division and manipulation of the regulatory process, defendants have harmed competition by charging consumers supra competitive prices for title insurance in California, evidenced in part by the fact that the prices are uniformly higher than compared with the cost of providing the insurance.

CLASS ACTION COMPLAINT
010031-11  227968 V1

111.    The aforesaid combination and conspiracy has had the following effects among others:

(a)    price competition in the sale of title insurance has been suppressed, restrained and eliminated;

(b)    prices for title insurance have been raised, fixed, maintained and stabilized at artificially high and non-competitive levels; and

(c)    purchasers of title insurance have been deprived of the benefit of free and open competition.

112.    During the period of the antitrust violations by defendants and their co-conspirators, plaintiff and each member of the Class she represents, has purchased title insurance and, by reason of the antitrust violations herein alleged, paid more for such that it would have paid in the absence of said antitrust violations.  As a result, plaintiff and each member of the Class she represents, has been injured and damaged in an amount presently undetermined.

<h2 style="text-align:center">COUNT II</h2>

<h3 style="text-align:center">Violation of Cal. Bus. and Prof. Code §§ 16720, <em>et seq.</em></h3>

113.    Plaintiff incorporates by reference the preceding allegations.

114.    Defendants conduct as set forth above is in violation of the Cartwright Act of California (Cal. Bus. & Prof. Code §§ 16720, *et seq.*).

115.    As a direct result of defendants' unlawful acts plaintiffs have paid artificially inflated prices for title insurance and have suffered injury to their business and property.

<h2 style="text-align:center">COUNT III</h2>

<h3 style="text-align:center">(California's Business & Professions Code §§ 17200, <em>et seq.</em>)</h3>

116.    The preceding paragraphs of this Complaint are realleged and incorporated by reference.  Plaintiff asserts this claim for violations of California's UCL, Bus. & Prof. Code §§ 17200, *et seq.*, on behalf of herself and the members of the Class.

117.    Defendants' statements and representations constitute unfair, unlawful and deceptive trade practices in violation of the UCL.

1     118.   All of the wrongful conduct alleged herein occurs and continues to occur in the

2     conduct of defendants' business.  Defendants' wrongful conduct is part of a pattern or generalized

3     course of conduct that is repeated in the State of California on hundreds, if not thousands, of

4     occasions daily.

5     119.   Plaintiff has suffered injury in fact and has lost money or property as a result of

6     defendants' unfair, unlawful and/or deceptive practices by paying a higher price for title insurance

7     then she would or should have absent the conduct complained of.

8     120.   Plaintiff requests that this Court enter such orders or judgment as may be necessary

9     to enjoin the defendants from continuing its unfair, unlawful, and/or deceptive practices, to restore

10    to any person in interest any money which may have been acquired by means of such unfair

11    competition and to disgorge any profits realized by defendants as a result of its unfair, unlawful

12    and/or deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code

13    § 3345, and for such other relief as set forth in the Prayer for Relief.

## COUNT IV

## UNJUST ENRICHMENT

16    121.   Plaintiff incorporates by reference the preceding allegations.

17    122.   This Cause of Action is pled in the alternative to all claims and/or causes of action

18    at law.

19    123.   Defendant has received a benefit from plaintiff and the Class members in the form

20    of the prices plaintiff and the Class members paid for defendants' title insurance.

21    124.   Defendants are aware of their receipt of the above-described benefit.

22    125.   Defendants received the above-described benefit to the detriment of plaintiff and

23    each of the other members of the Class.

24    126.   Defendants continue to retain the above-described benefit to the detriment of

25    plaintiff and the Class members.

26    127.   As a result of defendants' unjust enrichment, plaintiff and the Class members have

27    sustained damages in an amount to be determined at trial and seek full disgorgement and restitution

28

- 24 -

1    of defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or

2    wrongful conduct alleged above.

3                                    **PRAYER FOR RELIEF**

4          WHEREFORE, plaintiff demands:

5          A.    That the alleged combination and conspiracy among the defendants and their

6    co-conspirators be adjudged and decreed to be an unreasonable restraint of trade in violation of

7    Section 1 of the Sherman Act;

8          B.    That the Court declare that the premiums charged are excessive under state law and

9    order damages;

10         C.    That judgment be entered against defendants, jointly and severally, and in favor of

11   plaintiff, and each member of the Class it represents, for threefold the damages determined to have

12   been sustained by plaintiff, and each member of the Class it represents, together with the cost of

13   suit, including a reasonable attorneys' fee;

14         D.    Each of the defendants, successors, assignees, subsidiaries and transferees, and their

15   respective officers, directors, agents and employees, and all other persons acting or claiming to act

16   on behalf thereof or in concert therewith, be perpetually enjoined and restrained from, in any

17   manner, directly or indirectly, continuing, maintaining or renewing the aforesaid combination,

18   conspiracy, agreement, understanding or concert of action, adopting or following any practice,

19   plan, program, or design having a similar purpose or effect in restraining competition; and

20         E.    Such other and further relief as may appear necessary and appropriate.

21                                  **JURY TRIAL DEMANDED**

22         Pursuant to Rule 38, F.R.C.P., plaintiff demands a trial by jury of the claims alleged herein.

23         DATED:  March 11, 2008.

24                                        HAGENS BERMAN SOBOL SHAPIRO LLP

25

26                                        By _____

27                                             JEFF D. FRIEDMAN (173886)

28

Reed R. Kathrein (139304)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com
reed@hbsslaw.com

Steve W. Berman
Anthony D. Shapiro
Thomas E. Loeser (202724)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
tony@hbsslaw.com
toml@hbsslaw.com

Steven J. Greenfogel
MEREDITH COHEN GREENFOGEL &
    SKIRNICK, P.C.
1521 Locust Street, 8th Floor
Philadelphia, PA  19102
Telephone:  (215) 564-5182
Facsimile:  (215) 569-0958

Douglas A. Millen
William London
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL  60015
Telephone:  (224) 632-4500
Facsimile:  (224) 632-4521

Vincent J. Esades
Heins Mills & Olson P.L.C.
310 Clifton Avenue
Minneapolis, MN  55403
Telephone:  (612) 338-4605
Facsimile:  (612) 338-4692

Attorneys for Plaintiff

CLASS ACTION COMPLAINT

010031-11 227968 V1

# EXHIBIT 3

1    **DONALD AMAMGBO**
     **123 OAKPORT, SUITE 4900**
2    **OAKLAND, CA 94621**
     **TELEPHONE: 510 615 6000**
3    **FACSIMILE: : 10 615 6025**

4
     **REGINALD TERRELL**
5    **THE TERRELL LAW GROUP**
     **223 25TH STREET**
6    **RICHMOND 94804**
     **TELEPHONE: 510 237 9700**
7    **FACSIMILE: 510 237 4616**

8    **Attorneys for Plaintiff**

9

10            UNITED STATES DISTRICT COURT

11         NORTHERN DISTRICT OF CALIFORNIA

12   LISA BLACKWELL, on Behalf of herself     No. **C08-01928**
     and All Others Similarly Situated,
13                                            CIVIL - CLASS ACTION
              Plaintiff,
14                                            JURY TRIAL DEMANDED
        vs.
15
     FIDELITY NATIONAL FINANCIAL,
16   INC., FIDELITY NATIONAL TITLE
     INSURANCE COMPANY, TICOR TITLE
17   INSURANCE COMPANY, TICOR TITLE
     INSURANCE COMPANY OF FLORIDA,
18   CHICAGO TITLE INSURANCE
     COMPANY, NATIONAL TITLE
19   INSURANCE OF NEW YORK, INC.,
     SECURITY UNION TITLE INSURANCE
20   COMPANY, THE FIRST AMERICAN
     CORPORATION, FIRST AMERICAN
21   TITLE INSURANCE COMPANY,
     UNITED GENERAL TITLE INSURANCE
22   COMPANY, LANDAMERICA
     FINANCIAL GROUP, INC.,
23   COMMONWEALTH LAND TITLE
     INSURANCE COMPANY, LAWYERS
24   TITLE INSURANCE CORPORATION,
     TRANSNATION TITLE INSURANCE
25   COMPANY, STEWART TITLE
     GUARANTY COMPANY and STEWART
26   TITLE INSURANCE COMPANY
27

28

                                                          -1-

                         COMPLAINT



1     Defendants

2     Plaintiff Lisa Blackwell, by her attorneys, on behalf of herself and all others similarly

3 situated brings this action for treble damages and injunctive relief under the antitrust laws of the

4 United States and based on statutes of the State of California against the above-named

5 defendants, demand a trial by jury, and complaining and alleging as follows:

## I.    INTRODUCTION

7     1.    From the consumer's point of view, title insurance differs greatly from other, more

8 familiar kinds of insurance.  For one thing, while automobile and homeowner insurance policies

9 protect consumers from an event that may occur in the future, title insurance offers protection

10 from events that might have occurred in the past.

11     2.    Most simply, title insurance is protection purchased against a loss arising from

12 problems that occurred in the past and may affect the title to the real estate that a consumer is

13 buying.  Title insurers do not compete on the basis of the policies or coverage that they provide.

14 In fact, almost all title policies are based on a single set of form policies published and

15 maintained by the national trade association, the American Land Title Association.  Furthermore,

16 the end goal of an exhaustive title search by a title insurer is not to provide coverage for title

17 defects that the search uncovers, but rather to exclude coverage for any such defects and

18 therefore, further reduce the real value of the title policy which is written to cover only unknown

19 defects in title at the time of issuance.  As a result, title insurance is a commodity product.

20     3.    Even for the savviest of insurance consumers, the purchase of a title insurance

21 policy is just one more expensive step in the dizzying, convoluted and often confusing flurry of

22 paperwork and signings that culminate in the closing of a home purchase.  Consumers, who

23 normally show around for their insurance and carefully compare prices, typically emerge from

24 the closing on their new home holding an insurance policy that they know virtually nothing about

25 and that in all likelihood, they will never need.

26     4.    The title insurance market in California consists of a dozen carriers, ranging in

27 size from regional companies to national affiliates.  However, the market is dominated by four

28 groups of affiliated companies which, combined, sell over 90 percent of the title insurance

-2-

1  policies sold in California and which own and control the title plants in many California counties

2  that every title insurer must rely on in order to issue title policies.

3       5.    Title companies, in marked contrast to property, casualty, life and other traditional

4  insurance carriers, choose not to market their products directly to the consumers who pay for

5  them.  Instead, the title insurance industry operates on what is termed a "reverse competition"

6  model.  Reverse competition means that title companies solicit business referrals from the other

7  major players in the home purchase scenario - real estate agents and agencies, banks, lenders,

8  builders, developers an others: middlemen or go-betweens.  The title companies pay middlemen

9  for these referrals in the form of direct payments, advertising expenses, junkets, parties and other

10  kick-backs and inducements.  In addition, middlemen such as Windermere, John L. Scott and

11  Caldwell Bank-Bain, who themselves control a significant portion of the real estate brokerage

12  market, take significant ownership stakes in local title agents and affiliates of the major title

13  insurers and thereby get a direct return in profit from the referral of title business to the title agent

14  whom the partly or wholly own.

15       6.    Reverse competition, as the term suggests, isn't a model that benefits consumers

16  through market-driven forces.  In fact, consumers are bypassed completely as title companies

17  spend nearly all of their marketing budgets "wining and dining" real estate agents, banks, lenders,

18  builders, developers and others in an effort to convince these middlemen to steer their home-

19  buying clients to their companies for their title insurance needs.

20       7.    In some of the major markets in the United States, these same title insurers

21  collectively meet, and jointly set rates and file these rates with the applicable state insurance

22  authority.  The rates are not subject to any meaningful review of regulation.  The companies

23  agree to fix the price of title insurance far in excess of the risk and loss experience associated

24  with such insurance.  As a result of the joint agreement as to rates, competition is relegated to the

25  middleman.  As a result of their joint rate setting and agreement, no company competes on price

26  to the consumer.

27       8.    Having agreed to fix prices in states where joint rate setting occurs, the companies

28  agreed to not compete based on price to the consumer in other states, including California, where

-3-

1    regulation of filed rates is lax or non-existent. Thus, they agreed to set rates at supra competitive

2    prices and to compete based on offering inducements to middlemen. In California, in three

3    successive reports, the Office of the Insurance Commissioner ("OIC") has found an "astonishing

4    number" of such inducements that are in violation of state law. However, the OIC does not

5    actively oversee or regulate rates, and, in fact, does not buy its own admission have the power to

6    do so. The absence of regulation has allowed collusive behavior and excessive rates.

7        9.    In addition to paying inducements and kick-backs, the title companies and their

8    agents divide the market of real-estate middlemen through the use of Affiliated Business

9    Arrangements ("ABAs"), wherein the dominant real estate brokers purchase significant

10    ownership in favored title insurance affiliates. The real estate brokers then reward their

11    associates for using the preferred title insurance providers and lock-out independent title insurers.

12        10.    In this action, plaintiff, on behalf of a class of those purchasing title insurance in

13    California seek damages arising from defendants' violations of the Sherman Act as well as

14    California statutory law.

16          **II.    JURISDICTION AND VENUE**

17        11.    This Complaint is filed and these proceedings are instituted under Section 4 and

18    16 of the Act of Congress of October 15, 1914 C. 323, Stats. 731, 737 (15 U.S.C. §§ 15, 26) to

19    obtain injunctive relief and to recover treble damages and the costs of suit, including a reasonable

20    attorneys' fee, against defendants for the injuries sustained by plaintiff and the members of the

21    Class which she represents by reason of defendants' and their co-conspirators' violations, as

22    hereinafter alleged, of Section 1 of the Sherman Act (15 U.S.C. § 1).

23        12.    Defendants transact business, maintain offices or are found within the Northern

24    District of California. The interstate commerce described hereinafter is carried on, in part, within

25    the Northern District of California and the conspiratorial acts herein alleged were carried on, in

26    part, in the Northern District of California.

27        13.    Intra-district Assignment: Assignment to the San Francisco or Oakland division

28    of this court is appropriate because a substantial part of the events or omission which give rise to

-4-

1 │ the claim occurred in the county of San Francisco.  Pursuant to Northern District of California,

2 │ Local Rule 3-2(d), assignment to either the San Francisco Division or the Oakland Division is

3 │ proper.

4 │ ### III.   PARTIES

5 │      14.    Plaintiff Lisa Blackwell, is an individual residing in San Francisco County,

6 │ California.  During the class period, plaintiff purchased title insurance directly from one or more

7 │ of the defendants herein and has been injured by reason of the antitrust violations alleged.

8 │      15.    Defendant Fidelity National Financial, Inc. ("Fidelity National") is a Delaware

9 │ corporation headquartered at 601 Riverside Avenue, Jacksonville, Florida 32204.  Fidelity

10 │ National does business in California through one or more of its subsidiaries, including but not

11 │ limited to defendants Fidelity National Title Insurance Company, Ticor Title Insurance

12 │ Company, Ticor Title Insurance Company of Florida, National Title Insurance of New York,

13 │ Inc., Security Union Title Insurance Company, and Chicago Title Insurance Company.  Fidelity

14 │ National is registered to do business in California.

15 │      16.    Defendant Fidelity National Title Insurance Company ("FNTIC") is a California

16 │ Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida

17 │ 32204.  FNTIC does business in California, is a licensed title insurance company in California

18 │ and is registered to do business in California.

19 │      17.    Defendant Ticor Title Insurance Company ("Ticor") is a California Corporation

20 │ with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.  Ticor

21 │ does business in California, is a licensed title insurance company in California and is registered to

22 │ do business in California.

23 │      18.    Defendant Ticor Title Insurance Company of Florida ("TTICF") is a Florida

24 │ corporation with its principle place of business 601 Riverside Ave., Jacksonville, Florida 32204.

25 │ TTICF does business in California, is a licensed title insurance company in California and is

26 │ registered to do business in California.

27 │      19.    Defendant Chicago Title Insurance Company ("Chicago Title") is a Missouri

28 │ Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida

-5-

1  32204. Chicago Title does business in California, is a licensed title insurance company in

2  California and is registered to do business in California.

3        20.    Defendant National Title Insurance of New York, Inc. ("NYINY") is a New York

4  Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida

5  32204. NYINY does business in California, is a licensed title insurance company in California

6  and is registered o do business in California.

7        21.    Defendant Security Union Title Insurance Company Chicago Title Insurance

8  Company ("Chicago Title") is a Missouri Corporation with its principle place of business at 601

9  Riverside Ave., Jacksonville, Florida 32204. Chicago Title does business in California, is a

10  licensed title insurance company in California and is registered to do business in California.

11        22.    The Fidelity family of title insurance companies (collectively, "Fidelity") - which

12  includes defendants Fidelity National, FNTIC, Ticor, TTICF, Chicago Title, NYINY and SUTIC,

13  and their affiliates - in engaged in selling title insurance to purchases of commercial and

14  residential real estate throughout the United States, including California. Nationally, Fidelity

15  accounts for approximately 27 percent of title premiums, which in 2006 amounted to roughly

16  $4.6 billion. Fidelity, Chicago Title and Ticor were founding members of TIRSA (defined

17  below) and since TIRSA's inception have charged title insurance rates in New York that TIRSA

18  collectively sets.

19        23.    The Fidelity family of title insurance companies and their affiliates are wholly-

20  owned and controlled by defendant Fidelity National Financial, Inc. Through its subsidiaries,

21  Fidelity National is a provider of title insurance, specialty insurance, and claims management

22  services. Fidelity National had 2006 revenues of roughly $9.4 billion. The Fidelity family of

23  title insurance companies engaged in the conduct challenged herein with the approval and assent

24  of defendant Fidelity National.

25        24.    Defendant The First American Corporation ("First American") is a California

26  corporation with its headquarters at 1st American Way, Santa Ana, California 92707. First

27  American does business in California through one or more its subsidiaries, including but not

28  limited to, defendant First American Title Insurance Company and United General Title

-6-

1   Insurance Company.

2   25.   Defendant First American Title Insurance Company ("FATIC") is a California

3   corporation with its headquarters at 1st American Way, Santa Ana, California 92707.  FATIC

4   does business in California is a licensed title insurance company in California and is registered to

5   do business in California.

6   26.   Defendant United General Title Insurance Company ("UGTIC") is a Colorado

7   corporation located at 8310 S. Valley Highway, Suite 130, Englewood, CO 80112.  UGTIC does

8   business in California, is a licensed title insurance company in California and is registered to do

9   business in California.

10   27.   The First American family of title insurance companies (collectively, "First

11   American") - which includes defendants First American, FATIC and UGTIC, and their affiliates

12   - is engaged in selling title insurance to purchasers of commercial and residential real estate

13   throughout the United States, including California.  Nationally, First American accounts for

14   approximately 29 percent of title premiums, which in 2006 amounted to roughly $4.8 billion.

15   First American Title was a founding member if TIRSA and since TIRSA's inception has charged

16   title insurance rates in New York that TIRSA collectively sets.

17   28.   The First American family of title insurance companies and their affiliates are

18   wholly-owned and controlled by defendant The First American Corporation.  Through its

19   subsidiaries, First American is a provider of title insurance, business information, and related

20   products and services.  First American had 2006 revenues of roughly $8.5 billion.  The First

21   American family of title insurance companies and their affiliates engaged in the conduct

22   challenged herein with the approval and assent of defendant First American.

23   29.   Defendant LandAmerica Financial Group, Inc. ("LandAmerica") is a Virginia

24   corporation headquartered at 5600 Cox Road, Glen Allen, Virginia 23060.  LandAmerica does

25   business in California through one or more of its subsidiaries, including but not limited to,

26   defendants Commonwealth Land Title Insurance Company, Lawyers Title Insurance Corporation

27   and Trans-nation Title Insurance Company.

28   30.   Defendant Commonwealth Land Title Insurance Company ("CLTIC") is a

-7-

1   Pennsylvania corporation with its principle place of business at 5600 Cox Road, Glen Allen,

2   Virginia 23060.  CLTIC does business in California, is a licensed title insurance company in

3   California and registered to do business in California.

4       31.    Defendants Lawyers Title Insurance Corporation ("LTIC") is a Nebraska

5   corporation with its principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060.

6   LTIC does business in California, is a licensed title insurance company in California and is

7   registered to do business in California.

8       32.    Defendants Trans-nation Title Insurance Corporation ("TNTIC") is a Nebraska

9   corporation with its principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060.

10  TNTIC does business in California, is a licensed title insurance company in California and is

11  registered to do business in California.

12      33.    The LandAmerica family of title insurance companies (collectively,

13  "LandAmerica") - which includes defendants LandAmerica, CLTIC, LTIC and TNTIC, and their

14  affiliates - is engaged in selling title insurance to purchasers of commercial and residential real

15  estate throughout the United States, including California.  Nationally, LandAmerica accounts for

16  approximately 19 percent of title premiums, which in 2006 amount to roughly $3.15 billion.

17  Commonwealth and Lawyers Title were founding members of TIRSA and since TIRSA's

18  inception have charged title insurance rates in New York that TIRSA collectively sets.

19      34.    The LandAmerica family of title insurance companies and their affiliates are

20  wholly-owned and controlled by defendant Land America Financial Group, Inc.  Through its

21  subsidiaries, LandAmerica is a provider of title insurance and other products and services that

22  facilitate the purchase, sale, transfer, and financing of residential and commercial real estate.

23  LandAmerica had 2006 revenues of roughly $4 billion.  The LandAmerica family of title

24  insurance companies and their affiliates engaged in the conduct challenged herein with the

25  approval of defendant LandAmerica.

26      35.    Defendant Stewart Title Guaranty Company ("STGC") is a Texas corporation

27  headquartered at 1980 Post Oak Blvd., Suite 800, Houston, Texas 77056.  STGC does business in

28  California, is a licensed title insurance company in California and is registered to do business in

-8-

1  California.

2       36,    Defendant Stewart Title Insurance Company ("STIC") is a New York corporation

3  with its principle place of business at 300 E. 42nd St., Floor 10, New York, NY 10017.  STIC

4  does business in California, is a licensed title insurance company in California and is registered to

5  do business in California.

6       37.    The Stewart family of title insurance companies (collectively, "Steward") - which

7  includes defendants STGC and STIC, and its affiliates - is engaged in selling title insurance to

8  purchasers of commercial and residential real estate throughout the United States and California.

9  Nationally, Stewart accounts for approximately 12 percent of title premiums, which in 2006

10  amounted to roughly $2 billion.  Stewart was a founding member of TIRSA and since TIRSA's

11  inception has charged title insurance rates in New York that TIRSA collectively sets.

12       38.    Together, defendants account for more than 85 percent of title premiums

13  consumers pay in California.  Nationally, they account for more than 85 percent of title

14  premiums, which in 2006 amounted to roughly $14.5 billion.  Throughout the relevant damages

15  period, defendants charged California consumers in California virtually identical title insurance

16  rates.

17  **IV.**    **OTHER ENTITIES**

18       39.    TIRSA is a voluntary association of title insurers licensed as a rate service

19  organization pursuant to Article 23 of the State of New York Insurance Law.  TIRSA maintains

20  its offices in New York City, which until recently were located at the same New York address of

21  Fidelity Title.

22       40.    TIRSA annually compiles from its members statistical data relating to their title

23  insurance premiums, losses and expenses and submits this information in aggregate form to the

24  New York Insurance Department.  TIRSA also prepares and submits the New York Title

25  Insurance Rate Manual which sets forth title rates to be charged and rules to be followed by

26  TIRSA's members.  The Insurance Department has never objected to any of the rates TIRSA has

27  collectively set.  Similarly, the California OIC has not actually held a public hearing or conducted

28  any other review or regulation of the title insurance rates in California for thirty years.

-9-

41. TIRSA's membership is comprised of defendant insurers and all other title insurers that are licensed to issue policies in New York. Currently, Fidelity, First American, LandAmerica and Stewart collectively represent 14 of TIRSA's 22 members. As such, they comprise a majority voting block which, according to TIRSA's by-laws, allows them to control the operations of TIRSA and, in particular, TIRSA's collective rate setting activity.

42. Various other persons, firms and corporations not made defendants herein have participated as co-conspirators with the defendants in the violations alleged herein and have performed acts and made statements in furtherance thereof.

## V. CLASS ACTION ALLEGATIONS

43. Plaintiff brings this action under Rule 23, and particularly subsection (b)(3), of the Federal Rules of Civil Procedure, on behalf of herself and a class consisting of all persons excluding governmental entities, defendants, subsidiaries and affiliates of defendants, who purchased directly, from one or more of the defendants and/or their co-conspirators title insurance for residential and commercial property in California during the four year period preceding this lawsuit and who have sustained damages as a result of the conspiracy herein alleged. The number of potential class members is so numerous that joinder is impracticable.

44. Plaintiff, as representative of the class, will fairly and adequately protect the interest of the class members. The interests of plaintiff are coincident with, and not antagonistic to, those of the class members.

45. Except as to the amount of damages each member of the class has by itself sustained, all other questions of fact and law are common to the class, including but not limited to, the combination and conspiracy hereinafter alleged, the violation of Section 1 of the Sherman Act (15 U.S.C. §1) and the effects of such violation.

46. Plaintiff, along with all other members of the Rule (b) (3) class, were injured as a result of paying supra-competitive prices for title insurance in California. The supra-competitive prices were achieved as a result of defendants' illegal price-fixing activities and market allocation and division.

47. Members of the class include hundreds of thousands, if not millions, of

-10-

1  consumers.  They are so numerous that their joinder would be impracticable.

2      48.    Plaintiff also brings this action as a class action under Rule 23(b)(2) of the Federal

3  Rules of Civil Procedure, for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Rule

4  (b) (2) class includes all members of the (b) (3) class, and all consumers who are threatened with

5  injury by the anticompetitive conduct detailed herein.

6      49.    Defendants have acted, continued to act, refused to act and continued to refuse to

7  act on grounds generally applicable to Rule (b) (2) class, thereby making appropriate final

8  injunctive relief with respect to the Rule (b) (2) class as a whole.

9      50.    Members of the Rule (b) (2) class include hundreds of thousands, if not millions,

10  of consumers.  They are so numerous that their joinder would be impracticable.

11      51.    Common questions of law and fact exist with respect to all class members and

12  predominate over any questions solely affecting individual class members.  Among the questions

13  of law of fact common to the class are the following:

14      • Whether defendants have engaged in the alleged illegal price-fixing activity and

15         market allocation and division.

16      • The duration and scope of defendants' alleged illegal price-fixing and market

17         allocation and division activity.

18      • Whether defendants' alleged illegal price-fixing and market allocation and

19         division has caused higher prices to plaintiffs and other purchasers of title

20         insurance in California.

21      • Whether the Insurance Commissioner has actively supervised defendants' price

22         fixing and market allocation and division.

23      52.    Plaintiff does not have any conflict of interest with other class members.

24  Plaintiff's claims are typical of the claims of the class and they will fairly and adequately reflect

25  the interests of the class.  Counsel competent and experienced in federal class action and federal

26  antitrust litigation has been retained to represent the class.

27

28      53.    This action is superior to any other method for the fair and efficient adjudication

-11-

of this legal dispute since joinder of all members is not only impracticable, but impossible. The damages suffered by certain members of the class are small in relation to the expense and burden of individual litigation and therefore it is highly impractical for such class members to seek redress for damages resulting from defendants' anticompetitive conduct.

54. There will be no extraordinary difficulty in the management of the class action.

## VI.    TRADE AND COMMERCE

55. During all or part of the period in suit, defendants and their co-conspirators were sellers of title insurance in California.

56. During the period in suit, the defendants sold substantial quantities of title insurance in a continuous and uninterrupted flow in interstate commerce. In 2005, consumers in the United States paid $17 billion for residential title insurance policies.

57. During the period in suit, class members from locations outside California purchased commercial or residential property and title insurance within California.

58. During the period in suit, the defendants were the major sellers of title insurance in the United States and California. Defendants controlled in excess of 85 percent of the market for title insurance in the United States and California.

59. The activities of the defendants and their co-conspirators, as described herein, were within the flow of interstate commerce and substantially affected interstate commerce.

## VII.    FACTUAL ALLEGATIONS

### A.    The Nature of Title Insurance

60. Title insurance is one of most costly items associated with the closing of real estate transaction. In California, rates for title insurance are based on a percentage of the total value of the property being insurance. For residential properties, this price ranged in 2005 from about $1,010 (for a $250,000.00) property to $1,490 (for a $500,000.00 property). For more expensive homes and commercial properties, these prices are significantly higher. This amount spent on title insurance has risen dramatically over the past decade.

-12-

61.     Title insurance serves an important purpose.  It protects the purchaser of a property from any unidentified defects in the title that would in any way interfere with the full and complete ownership and use of the property with the ultimate right to resell the property. Title insurance is required by lenders in most residential and commercial real estate transactions.

62.     Consumers exercise little discretion in choosing the title insurer from which they purchase the insurance.  That decision is typically made for them by their lawyer, mortgage broker, lender, or realtor.  Consequently, for most purchasers, the cost of title insurance is not challenged.  Most consumers do not even become aware of the price they will pay and to which insurer they will pay it until the actual closing of the real estate transaction.  By then its too late, consumers can't attempt to negotiate a better title insurance price or alternate provider for fear of delaying or derailing the entire transaction.  There is no shopping around.  There is no negotiation of price.

63.     This dynamic basically removes the sale of title insurance from the normal competitive process.  Unlike the regular forces of supply and demand that keep most industries and their pricing in check, the title insurance industry is not subject to any real competitive constraints.  The purchasers of the insurance, in most instances, are not the ones making the purchasing decisions.  And, they are certainly in no position to question the price.

64.     The most effective but illegal way for a particular title insurer to get business is to encourage those making the purchasing decisions - the real-estate middlemen - to steer business to that insurer.  The best way to so motivate the middlemen is not through lower prices (that they are not even paying).  Rather, it is through kickbacks in the form of finder's fees, gifts, meals, business services and other financial enticements.  Therefore, it is through higher pricing (which allows for generous inducements and kick-backs), not lower pricing, which provides the best way for title insurers to compete and increase their business.

**B.     Price-Fixing in the Large Markets**

65.     New York is one of several states in which the leading title insurers collectively fix their prices through a rate-setting organization like TIRSA.  There are two principal cost components that go into TIRSA's calculation.  One comprises the risk associated with issuing the

-13-

1     title policy. The other comprises the "agency commissions" paid to title agents.

2         66.    The risk components cover the risk the title insurer bears for any undiscovered

3 defects in the title. Unlike property insurance, title insurance carriers with it a very limited risk

4 of loss to the insurer. That is because title insurance protects against unknown prior events that

5 cause defects in title. With a proper search and examination of prior ownership records, any such

6 defects can and almost always are readily identified and excluded from the policy's coverage.

7 Consequently, the average claim on a title insurance policy in the United States amounts to only

8 about 5 percent of the total premium collected. This is very different from property coverage

9 (such as auto and home insurance) - which protects against future occurrences over the insurer

10 has little or no control - where the average claim payout amounts to about 80 percent of the total

11 premium.

12         67.    The "agency commissions" component of the title insurance rate covers payments

13 made to title agents. Defendants have an ownership or management stake in many of the title

14 agencies to which these payments are made. A small portion of these payments is for the search

15 and exam of prior ownership records of the property being purchased to identify any liens,

16 encumbrances, burdens, exclusions, or other defects in the title. The search and exam function

17 does not involve the spreading or underwriting of risk, and title insurers typically outsource this

18 task to title agents.

19         68.    The remainder, and by far the bulk, of the agency commission are comprised of

20 costs unrelated to the issuance of title insurance. These costs include kickbacks and other

21 financial inducements title insurers provide to title agents and indirectly (through title agents) to

22 the lawyers, brokers, and lenders who, in realty, are the ones deciding which title insurer to use.

23 These payments have nothing to do with the issuance of title insurance and are made by title

24 insurers merely to inflate their revenues and steer business their way.

25         69.    Under TIRSA's collective rate setting regime, roughly 85 percent of the total tile

26 insurance premium is based on the so-called "costs" associated with the payment of agency

27 commissions. Only 15 percent is based on costs associated with the risk of loss.

28         70.    TIRSA publishes its final calculated title rates in the New York Title Insurance

-14-

1    Rate Manual. These rates are tied to the value of the property being insured. This is so despite

2    the fact that the costs associated with agency commissions are entirely unrelated to the value of

3    the property. Indeed, agency kickbacks and enticements have little to do with producing a

4    particular title policy and provide no value - proportional to property value. The instead depend

5    on the age of the property, the complexity of the ownership history, and the accessibility of prior

6    ownership records.

7         71.     There are other states in which the defendants overly meet and agree to fix the

8    rates for title insurance as part of a formal collective rate setting process.

9         **C.**    **TIRSA's Formation**

10        72.     Prior to TIRSA, the New York Board of Underwriters ("NYBTU") served as the

11    title insurance rate-setting body in New York. NYBTU, along with the title insurance rate setting

12    bureaus in many other states, was disbanded in the mid-1980s in the wake of a Federal Trade

13    Commission ("FTC") challenge to the collective rate setting activity of many of these

14    associations. The FTC's challenge culminated in *FTC v. Ticor Title Inc. Co.*, 504 U.S. 621

15    (1992), where the Supreme Court held that to avoid *per se* illegal price fixing, the rate setting

16    activity of these rating bureaus must be actively supervised by the state.

17        73.     In *Ticor*, the FTC focused its challenge on agency commissions. The FTC

18    contended that the respective state insurance departments merely rubber-stamped this portion of

19    the collectively fixed rates without any independent review or analysis of their reasonableness or

20    costs justification. The Supreme Court agreed with the FTC that this kind of limited state

21    oversight was not sufficient. Rather, to avoid illegal price-fixing liability, the state insurance

22    department has to "exercise sufficient independent judgment and control so that the details of the

23    rates or prices have been established as a product of deliberate state intervention, not simply by

24    agreement among private parties." *Ticor*, 504 U.S. at 634-35.

25        74.     Following the Supreme Court's instruction in *Ticor*, the Third Circuit on remand

26    in *Ticor Title Ins. Co. v. FTC*, 998 F.2D 1129 (3d Cir. 1992), upheld the FTC's finding that the

27    collective rate-setting of certain state rating bureaus was improper because it was not actively

28    supervised by the state. According to the circuit court, "[t]he Supreme Court plainly instructed

-15-

1    us that a state's rubber stamp is not enough. Active supervision requires the state regulatory

2    authorities' independent review and approval". *Id.* at 1139.

3          75.    Defendants formulated TIRSA's first rate manual and procedure soon after the

4    Supreme Court's *Ticor* decision. Through TIRSA, defendants have set up a rate-setting scheme

5    to get around the rigors of state oversight required by *Ticor*. They have done so by calculating a

6    single rate that comprises both risk and agency commission costs and by outsourcing to title

7    agents the agency commission costs. In this way, defendants avoid providing the Insurance

8    Department with any detailed breakout or backup for the bulk of the costs that make up their

9    collectively fixed rates.

10         76.    TIRSA merely submits an aggregated figure that is supposed to represent the total

11   agency commission costs. Embedded within this figure is the vast quantity of dollars that are

12   funneled to and through the title agencies as kickbacks, financial inducements and other costs

13   unrelated to the issuance of title insurance. Defendants' design in all of this has been to effective

14   "hide" the costs basis for their artificially high and collectively fixed title insurance premiums

15   form the regulatory scrutiny that *Ticor* demands.

16   **D.    Lack of Regulatory Supervision and Authority in New York and Other States
         Including California**

17         77.    There is no provision under the New York Insurance Law for TIRSA to include in

18   its collectively fixed rates kickbacks and other agency commission payments unrelated to the

19   issuance of title insurance. Indeed, the New York Insurance Department has openly

20   acknowledged that it lacks the authority to review any agency commission payments. It has

21   likewise recognized that defendants' outsourcing of agency commission costs has prevented it

22   from performing a meaningful review of TIRSA's calculated rates. This was made clear at a

23   November 2006 public hearing at New York Insurance Department held - the first in 15 years -

24   where it questioned TIRSA and its members on TIRSA's failure to provide the Insurance

25   Department with any backup or detail for agency commissions.

26         78.    At the hearing, the Insurance Department conceded that is could not properly

27   evaluate TIRSA's calculated rates, and that it could only do so if it obtained the detailed costs

28

-16-

information on agency commissions that TIRSA does not provide.

79.     The Insurance Department's recognition that it is not properly supervising TIRSA's rate-setting activity is consistent with the April 2007 findings of the U.S. Government Accountability Office ("GAO") that the title insurance industry is in need of greater state regulation. The GAO studied the industry conditions of several states, including New York, and concluded that "state regulators have not collected the type of data, *primarily on title agents' costs and operations*, needed to analyze premium prices and underlying costs." (Emphasis added.)

80.     Unchecked by regulatory review and insulated from competition, defendants have thus been unable to collectively fix title insurance rates at supra competitive levels and ear profits that vastly exceed those contemplated by the Insurance Department or that would have resulted in a free and open competitive market.

81.     At the time of TIRSA's formation, the Insurance Department established 5 percent (of the total premium) as the level of profit to which title insurers are entitled.  The Insurance Department is supposed to carefully analyze TIRSA's rate calculations, and, in particular, its revenue and cost formation, to ensure that this 5 percent profit level is maintained and based on a reasonable premium.  However, without the authority or ability to scrutinize agency commission costs, the Insurance Department has been unable to perform this function.  As a result, defendants (through TIRSA) have been able to set artificially high title premiums and secure title profits far in excess of the 5 percent threshold.

82.     Through an independent investigation conducted over the past several years, the New York State Attorney General found that for every dollar of insurance premium defendants collected, of the roughly 15 cents that supposedly accounts for the risk of loss, only 3 cents is paid out of claims.  And, of the roughly 85 cents that supposedly covers agency commissions, only between 8 and 11 cents goes to costs actually incurred by title agents in producing the title policy.  These numbers show that title insurers' collectively fixed rates have resulted in profits that vastly exceed the costs of producing such policies.

83.     The New York Attorney General's investigation further revealed that what were

-17-

1   largely driving these numbers were the kickbacks and other financial inducements defendants

2   were funneling to and through title agents to secure more business. As reported at the New York

3   Insurance Department's 2006 hearing, one title agency's financial statements revealed that it

4   spent more than $1 million of these so-called "agency commissions" on items identified at

5   "Christmas", "automobile expenses", "political contributions", "promotional expenses", and

6   "travel and entertainment". These expenses are not even remotely related to the issuance of title

7   insurance.

8       84.    The Washington State Insurance Commissioner's October 2006 report found

9   strikingly similarly abuses in Washington. Violations were pervasive and the Commissioner

10  concluded that consumers were paying too much as a result.

11      85.    All of this "excess money" paid to title agents not only works to steer business to

12  defendants. It also served to boost defendants' own profits through the inflated revenues they

13  obtain to cover these agency payments and through their ownership or management stake in

14  many of these agencies.

15      86.    Defendants are competitors in the sale of title insurance to consumers throughout

16  the United States. These title insurers have agreed and engaged in concerted efforts to (i)

17  collectively set and charge uniform and supra competitive rates for title insurance, (ii) include in

18  their calculated rates agency commission costs, (iii) embed within these costs payoffs, kickbacks,

19  and other charges that are unrelated to the issuance of title insurance, and (iv) hide these

20  supposed "costs" from regulatory scrutiny by funneling them to and through title agents over

21  which the government agencies have no ability or authority to regulate.

22      87.    The GAO in its 2007 report entitled "actions Needed to Improve Oversight of the

23  Title Insurance Industry and Better Protect Consumers" found several indicia of a lack of

24  competitions and questions about the reasonableness of prices including:

25      ● Consumers find it difficult to shop for title insurance, therefore, they put little

26         pressure on insurers and agents to compete based on price;

27      ● Title agents do not market to consumers, who pay for title insurance, but to those

28         in the position to refer consumers to particular title agents, thus creating potential

-18-

conflicts of interest;

- A number of recent investigations by HUD and state regulatory officials have identified instances of alleged illegal activities with the title industry that appear to reduce price competition and could indicate excessive prices;

- As property values or loan amounts increase, prices paid for title insurance by consumers appear to increase faster than insurers' and agents' costs; and

- In states where agents' search and examination services are not included in the premium paid by consumers, it is not clear that additional amounts paid to title agents are fully supported by underlying costs.

88. The GAO visited several states including California, and found a lack of regulatory oversight:

> In the states we visited, we found that regulators did not assess title agents' costs to determine whether they were in line with premium rates; had made only limited efforts to oversee title agents (including ABAs involving insurers and agents); and, until recently, had taken few actions against alleged violations of anti-kickback laws. In part, this situation has resulted from a lack of resources and limited coordination among different regulators within states. On the federal level, authority for alleged violations of section 8 of RESPA, including those involving increasingly complex ABAs, is limited to seeking injunctive relief. Some state regulators expressed frustration with HUD's level of responsiveness to their requests for help with enforcement, and some industry officials said that RESPA rules regarding ABAs and referral fees need to be clarified. Industry and government stakeholders have proposed several regulatory changes, including RESPA reform, strengthened regulation of agents, a competitor right of action with no monetary penalty, and alternative title insurance models. [*Id.* at 41, footnotes omitted.]

**E.    Competition Based on Kickbacks and Inducements But Not Rates**

89. Having agreed to fix or stabilize prices in New York and other states where thy overtly meet to promulgate rates, these same defendants then set out to do the same in other states.

90. In other words, as a direct result of these meetings where rates were agreed to, these same defendants agreed, either expressly or tacitly, to no compete on rates in other states as well. To compete on rates in other states could and would imperil their ability to maintain the

-19-

agreed rate in states like New York.

91.     As is the case in New York, a lack of regulatory authority over rates created an environment in which a conspiracy can and did succeed.  No agency was examining why all the rates were virtually identical, and no agency was examining whether the costs associated with these premiums were reasonable.  This is an environment which is conducive to price fixing,

92.     In California, there is a lack of regulatory authority and oversight over title insurance companies.  The rates in California are not set as part of a deliberate state intervention and the state does not and cannot meaningfully renew or approve these rates.  The rates at issue in this case went into effect without review.

**F.     Other Indicators of a Lack of Competition and Conditions Conducive to Collusive Rate Setting**

93.     In addition to the uniformity of rates, other facts suggest that it is more plausible than not that rates have been set based on an agreement to fix prices.

94.     In theory, the chain of title should be documented back to its historic grant of ownership centuries in the past.  Fear about a possible title defect in the distant past is widely used as a justification by title agencies when convincing property buyers to purchase an owner policy in addition to the lender policy, which is mandatory to secure a mortgage.  The title agency, however, saves much time and money when the search is limited to one or two transactions.  They rely on the insurance policy to cover the remote chance of missing an earlier but still-valid claim.  If such a claim is asserted and survives the scrutiny of the title insurance company's legal department, the expected costs of compensation is likely to be less than the sum of added overhead costs of routinely tracing back every chain of title to the earliest registered owner in the distant past.

95.     Title insurance industry officials tend to justify the large proportion of the premium retained by the title abstract and settlement agency (from 60 to more than 90 percent) by the alleged high costs of title searching back into the distant past.  If fact, a high proportion of noncommercial properties are searched only through the most recent transaction.  No information is available as to what proportions of claims originate in the distant past.  The industry has never

-20-

published pertinent statistics.  It would have a marketing incentive to publish these statistics if the risk were significant; that is has not published these statistics indicates that the risk probably is only slightly greater than zero.

96.    Many U.S. homes are being resold three or four times in twenty-five years.  At each of these occasions, an abstract of title will be prepared on the basis of a more or less than thorough review of the available title records, inheritance records, family records and records of past or current liens against a property.  It is reasonable, therefore, to suspect that the risk of a title defect will decrease every time a property is sold.

97.    Title searches have become less labor intensive, especially in large urban counties and cities.  More and more of the information is available online.  The statistical likelihood that a title default would be overlooked is a closely held industry secret, but it appears to be so small that many transactions that occurred during the last twenty-five to thirty-five years.  The evidence is strong that the title insurance industry has achieved a remarkable high level of loss minimization.

98.    Thus the costs of production have decreased as has the risk of loss yet none of these factors has resulted in price competition at the consumer level.

99.    There is a remarkable absence of rate changes by title insurers over the past five years, despite the declining costs of production, increased number of transactions and increased revenue per transaction.   During a period when costs per unit of production declined significantly, underwritten title companies and title insurers maintained excessive rates.  The prices charged by title insurers and underwritten title companies were not and are not responsive to the changing costs of production or increasing revenue per transaction at a given set of rates.  Again, this is indicia of an agreement not to compete based on price.

100.    As noted, the title companies engage in illegal rebates and kickbacks where the title insurer or the underwritten title company provides money, free services or other things of value to a real estate agent, a lender or homebuilder in exchange for business referrals.  These illegal rebates and kickbacks - a consequence of reverse competition - show that title insurance rates are supra competitive and that some portion of the overcharge is passed from the

-21-

1  underwritten title company or title insurer to the referrer of business.

2      101.    A lack of competition and the ability to control prices in enhanced by the fact that

3  there were few title insurer entrants over the period from 1995 through 2005 and the number of

4  title insurer groups declined as title insurers acquired other title insurers.  There were few

5  underwritten title company entrants over the 2000 to 2005 period and new entrants were

6  controlled business arrangements whose addition to the market did not result in greater price

7  competition.

8      102.    Access to title plants can be a barrier to entry, but the large barrier to entry exits

9  due to the established relationships between the entities that can steer the consumer's title and

10 escrow business and the entities who sell title insurance and escrow services.

11     103.    The title insurance market is highly concentrated - a few title insurers account for

12 the vast majority of title insurance sales - at both the statewide level and at the county level in

13 California.  For example, three title insurer groups account for 77.4% of the market at a statewide

14 level.  At the county level, each individual market was highly concentrated.  The GAO found that

15 First American and Fidelity had a market share of 66 percent.  Such a concentration enhances the

16 ability of companies to fix prices.

17     104.    The agreement not to compete based on price is also evidenced by the fact that no

18 company has marketed its services to consumers, the ultimate purchasers of the product.  This is

19 in marked contrast to real insurance, for example, car insurance, where companies compete

20 vigorously with well recognized slogans such as State Farm's "Like a Good Neighbor" or

21 Allstate's "good hands" or the cute (to some) GEICO gecko promising low prices.

### VIII.  CLAIMS FOR RELIEF

### COUNT I

### Violation of the Sherman Act

25     105.    Plaintiff incorporates by reference the preceding allegations.

26     106.    Beginning at least as early as February 2004, and continuing thereafter to the

27 present, the exact dates being unknown to plaintiff, defendants and their co-conspirators engaged

28 in a combination of conspiracy in unreasonable restraint of the aforesaid interstate trade and

-22-

1 | commerce in violation of Section 1 of the Sherman Act.

2 | 107. The aforesaid combination and conspiracy has consisted of a continuing

3 | agreement, understanding and concert of action among the defendants and their co-conspirators,

4 | the substantial terms of which have been:

5 | (a) to fix, raise, maintain and stabilize the price of title insurance throughout

6 | California;

7 | (b) to fix, raise, maintain and stabilize the terms and conditions of the sale of

8 | title insurance throughout California; and

9 | (c) to allocate and divide the market for title insurance in California.

10 | 108. In the absence of proper regulatory authority and oversight, defendants' conduct

11 | constitutes a horizontal agreement to fix the form, structure, and prices of title insurance and to

12 | allocated and divides the title insurance market in California and is *per se* violation of section I of

13 | the Sherman Act

14 | 109. Defendants' price-fixing, market allocation and division activity has been

15 | continuous throughout the relevant damages period and has been renewed and reinforced

16 | annually through submissions to the OIC of supposed costs and revenue information and its

17 | periodic submissions of rate changes.

18 | 110. Through their collective price-fixing, market allocation and division and

19 | manipulation of the regulatory process, defendants have harmed competition by charging

20 | consumers supra competitive prices for title insurance in California, evidenced in part by the fact

21 | that the prices are uniformly higher than compared with the cost of providing the insurance.

22 | 111. The aforesaid combination and conspiracy has had the following effects among

23 | others:

24 | (a) price competition in the sale of title insurance has been suppressed,

25 | restrained and eliminated;

26 | (b) prices for title insurance have been raised, fixed, maintained and stabilized

27 | at artificially high and non-competitive levels; and

28 | (c) purchasers of title insurance have been deprived of the benefit of free and

-23-

1    open competition.

2        112.    During the period of the antitrust violation by defendants and their co-

3    conspirators, plaintiff and each member of the class she represents, has purchased title insurance

4    and, by reason of the antitrust violations herein alleged, paid more for such that it would have

5    paid in the absence of said antitrust violations.  As a result, plaintiff and each member of the class

6    she represents, has been injured and damaged in an amount presently undetermined.

7                              **COUNT II**

8              **Violation of Cal. Bus. and Prof. Code §§ 16720, *et seq.***

9        113.    Plaintiff incorporates by reference the preceding allegations.

10       114.    Defendants conduct as set forth above is in violation of the Cartwright Act of

11   California (Cal. Bus. and Prof. Code §§ 16720, *et seq.)*

12       115.    As a direct result of defendants' unlawful acts plaintiffs have paid artificially

13   inflated prices for title insurance and have suffered injury to their business and property.

14                             **COUNT III**

15                **(Cal. Bus. and Prof. Code §§ 17200, *et seq.)***

16       116.    The preceding paragraphs of this Complaint are realigned and incorporated by

17   reference.  Plaintiff asserts this claim for violations of California's UCL, Bus. & Prof. Code §§

18   17200, *et seq.*, on behalf of herself and the members of the class.

19       117.    Defendants' statements and representations constitute unfair, unlawful and

20   deceptive trade practices in violation of the UCL.

21       118.    All of the wrongful conduct alleged herein occurs and continues to occur in the

22   conduct of defendants' business.  Defendants' wrongful conduct is part of a pattern or

23   generalized course of conduct that is repeated in the State of California on hundreds, if not

24   thousands, of occasions daily.

25       119.    Plaintiff has suffered injury in fact and has lost money or property as a result of

26   defendants' unfair, unlawful and/or deceptive practices by paying a higher price for title

27   insurance than she would or should have absent the conduct complained of.

28       120.    Plaintiff requests that this court enter such orders or judgment as may be necessary

-24-

1   to enjoin the defendants from continuing its unfair, unlawful, and/or deceptive practices, to

2   restore to any person in interest any money which may have been acquired by means of such

3   unfair competition and to disgorge any profits realized by defendants as a result of its unfair,

4   unlawful and/or deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ.

5   Code § 3345, and for such other relief as set forth in the Prayer for Relief.

**COUNT IV**

**UNJUST ENRICHMENT**

8       121.   Plaintiff incorporates by reference the preceding allegations.

9       122.   This Cause of action is pled in the alternative to all claims and/or causes of action

10   at law.

11       123.   Defendant has received a benefit from plaintiff and the class members in the form

12   of the prices plaintiff and the class members paid for defendants' title insurance.

13       124.   Defendants are aware of their receipt of the above-described benefit.

14       125.   Defendants received the above-described benefit to the detriment of plaintiff and

15   each of the other members of the class.

16       126.   Defendants continue to retain the above-described benefit to the detriment of

17   plaintiff and the class members.

18       127.   As a result of defendants' unjust enrichment, plaintiff and the class members have

19   sustained damages in an amount to be determined at trial and seek full disgorgement and

20   restitution of defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the

21   unlawful or wrongful conduct alleged above.

**PRAYER FOR RELIEF**

23   **WHEREFORE, plaintiff demands:**

24       A.   That the alleged combination and conspiracy among the defendants and their co-

25   conspirators be adjudged and decreed to be an unreasonable restraint of trade in violation of

26   Section 1 of the Sherman Act;

27       B.   That the court declares the premiums charged are excessive under state law and

28   order damages;

-25-

1      C.     That judgment be entered against defendants, jointly and severally, and in favor of

2  plaintiff, and each member of the class it represents, for threefold the damages determined to

3  have been sustained by plaintiff; and each member of the class it represents, together with the

4  cost of suit, including a reasonable attorneys' fee;

5      D.     Each of the defendants, successors, assignees, subsidiaries and transferees, and

6  their respective officers, directors, agents and employees, and all other persons acting or claiming

7  to act on behalf thereof or in concert therewith, be perpetually enjoined and restrained from in

8  any manner, directly or indirectly, continuing, maintaining or renewing the aforesaid

9  combination, conspiracy, agreement, understanding or concert of action, adopting or following

10  any practice, plan, program, or design having a similar purpose or effect in restraining

11  competition; and

12      E.     Such other and further relief as may appear necessary and appropriate.

13  **JURY TRIAL DEMANDED**

14      Pursuant to Rule 38, F.R.C.P., plaintiff demands a trial by jury of the claims alleged

15  herein.

16

17

18

19

20  Date: April 8, 2008               Respectfully submitted,

21

22

23  By: _____

24         DONALD AMAMGBO

25         REGINALD TERRELL
           Attorneys for Plaintiffs

26

27

28

-26-

COMPLAINT

# EXHIBIT 4

1   Daniel C. Girard (CA Bar No. 114826); dcg@girardgibbs.com
2   Elizabeth C. Pritzker (CA Bar No. 146267); ecp@girardgibbs.com
    Aaron M. Sheanin (CA Bar No. 214472) ams@girardgibbs.com
3   Alex C. Turan (CA Bar No. 227273); act@girardgibbs.com
    **GIRARD GIBBS LLP**
4   601 California Street, 14th Floor
    San Francisco, California 94104
5   Telephone: (415) 981-4800
6   Facsimile: (415) 981-4846

7   Attorneys for Plaintiffs

8                    UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11   RUBEN ROMERO and SARAH YAHN, on behalf of        Case No._____
     themselves and all others similarly situated,
12                                                     CLASS ACTION COMPLAINT
           Plaintiffs,
13         vs.                                         DEMAND FOR JURY TRIAL

14   FIDELITY NATIONAL FINANCIAL, INC.,
15   FIDELITY NATIONAL TITLE INSURANCE
     COMPANY, TICOR TITLE INSURANCE
16   COMPANY, TICOR TITLE INSURANCE
     COMPANY OF FLORIDA, CHICAGO TITLE
17   INSURANCE COMPANY, NATIONAL TITLE
     INSURANCE COMPANY OF NEW YORK, INC.,
18   SECURITY UNION TITLE INSURANCE
19   COMPANY, THE FIRST AMERICAN
     CORPORATION, FIRST AMERICAN TITLE
20   INSURANCE COMPANY, UNITED GENERAL
     TITLE INSURANCE COMPANY, LANDAMERICA
21   FINANCIAL GROUP, INC., COMMONWEALTH
22   LAND TITLE INSURANCE COMPANY,
     LAWYERS TITLE INSURANCE CORPORATION,
23   TRANSNATION TITLE INSURANCE COMPANY,
24   STEWART TITLE GUARANTY COMPANY,
     STEWART TITLE INSURANCE COMPANY, OLD
25   REPUBLIC NATIONAL TITLE INSURANCE
     COMPANY, and OLD REPUBLIC
26   INTERNATIONAL CORPORATION,

27         Defendants.

28

CLASS ACTION COMPLAINT

ORIGINAL FILED

'08 JUL 14 PM 4: 13

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

EMC

CV 08   3391

1    Plaintiffs Ruben Romero and Sarah Yahn, on behalf of themselves and all others similarly

2   situated, allege as follows:

### INTRODUCTION

4    1.    Plaintiffs bring this antitrust action on behalf of all persons and entities who purchased

5   title insurance in the State of California directly from the named defendants or any co-conspirator as

6   identified in this Complaint.

7    2.    Title insurance is one of the most costly items associated with a real estate purchase,

8   aside from the purchase price of the property.  In 2005, the price of title insurance for residential

9   properties ranged from approximately $1,010 (for a $250,000 property) to $1,490 (for a $500,000).

10   Title insurance premiums for more expensive homes and commercial properties are significantly

11   higher.

12    3.    Title insurance differs from other kinds of insurance in three respects.  First, unlike

13   automobile, life, homeowners or other forms of insurance, which protect consumers from loss

14   resulting from an event that may occur in the future, title insurance offers protection from events that

15   occurred in the past that may affect the title to the property.  Second, unlike other forms of insurance,

16   in which coverage may vary, most title insurance policies are based on a single set of form policies,

17   published by the American Land Title Association, and provide substantially the same protection.

18   Third, unlike other forms of insurance, title companies do not market their products directly to the

19   consumers who pay for them.  Instead, title insurers rely on "reverse competition" to market and sell

20   their products.  They pay commissions, kick-backs or referral fees, or provide other inducements to

21   real estate agents, banks, lenders, builders and others involved in real estate transactions to use their

22   insurance products as part of those transactions.

23    4.    In California, the title insurance market is dominated by five companies and their

24   affiliates or subsidiaries:  Fidelity National Financial, Inc., First American Corporation, LandAmerica

25   Financial Group, Inc., Stewart Title Guaranty Title Company, and Old Republic National Title

26   Insurance Company.  Combined, these five affiliate groups sell about 92 percent of the title insurance

27   policies sold in California – or roughly $2.85 billion of the $3.1 billion in title insurance premiums

28   collected from California consumers in 2004.

---

1

CLASS ACTION COMPLAINT

5.     In some of the major markets in the United States, such as New York, these same title insurers collectively meet, jointly set rates, and file these rates with the applicable state insurance authority. The rates are not subject to any meaningful review or regulation, however. Moreover, the companies agree to fix the price of title insurance at levels that include commissions, kick-backs and other inducements paid to middlemen to steer business referrals to these companies. These agreed-upon rates far exceed the risk and loss experience associated with title insurance. As a result of their joint rate setting agreement, no company competes on price to the consumer.

6.     Having agreed to fix prices in states where joint rate setting occurs, the five groups of affiliated companies agreed not to compete based on price to the consumer in other states, including California, where regulation of filed rates is non-existent. The result of this arrangement in California is that these companies have agreed to compete by offering inducements to middlemen for business referrals and thereby have fixed the rates of title insurance premiums at supra competitive levels.

7.     These agreements and activities by five affiliate groups of title insurers, combined with their market dominance in the State, have enabled these companies to maintain the price of title insurance in California at artificially high levels. California regulators have acknowledged the harm these agreements and this anti-competitive conduct have caused consumers during the Class Period.

8.     In 2005, for example, the California Office of the Insurance Commissioner found an "astonishing number" of kickbacks and similar inducements by title insurers to middlemen in violation of state law. A report to the California Insurance Commissioner prepared that same year by Birny Birnbaum, a consulting economist, also found "numerous examples in California of illegal rebates and kickbacks where the title insurer or the underwritten title company provides money, free services or other things of value to a real estate agent, a lender or homebuilder in exchange for business referrals." (*An Analysis of Competition in the California Title Insurance and Escrow Industry*, December 2005, p.3) Similar findings by California Insurance Commissioner, Steve Poizner, led to a February 2007 statement in which the Commissioner declared that "reasonable price competition does not exist for title and escrow services" in California. (*Insurance Commissioner Steve Poisner Issues Statement Following Decision by OAL in New Regulations, California Department of Insurance*, February 22, 2007.)

CLASS ACTION COMPLAINT

9.      The California Insurance Commissioner does not actively oversee or regulate rates, however, and does not have the power to do so. The absence of regulation by the California Insurance Commissioner has allowed collusive behavior among the five affiliate groups that dominate the market, as described herein, resulting in excessive rates for title insurance premiums in California.

10.     As a result of defendants' unlawful conduct, plaintiffs and members of the Class paid higher prices for title insurance than they would have paid in a competitive market.

## JURISDICTION AND VENUE

11.     Plaintiffs bring this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs also bring this action under the California Cartwright Act (Business and Professions Code § 16720 *et seq.*), and the California Unfair Competition Law (Business and Professions Code § 17200 *et seq.*).

12.     This Court has jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331, 1332(d) and 1337(a). This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

13.     Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c) and (d), because a substantial part of the events giving rise to the plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more  defendants transact business, maintain offices or are found in this District.

## PARTIES

**Plaintiffs**

14.     Plaintiffs Ruben Romero and Sarah Yahn, a married couple, are individuals residing in California. During the Class Period, plaintiffs Romero and Yahn purchased title insurance in California directly from one or more of the defendants and have been injured by reason of the antitrust violations alleged.

**Defendants**

A.      **Fidelity Family of Title Companies**

15.     Defendant Fidelity National Financial, Inc. ("Fidelity National") is a Delaware corporation headquartered at 601 Riverside Avenue, Jacksonville, Florida 32204. Fidelity National does business in California through one or more of its subsidiaries, including defendants Fidelity National Title Insurance Company, Ticor Title Insurance Company, Ticor Title Insurance Company of Florida, National Title Insurance of New York, Inc., Security Union Title Insurance Company, and Chicago Title insurance Company. Fidelity National is registered to do business in California.

16.     Defendant Fidelity National Title insurance Company ("Fidelity Title") is a California corporation with its principal place of business located at 601 Riverside Avenue, Jacksonville, Florida 32204. Fidelity Title does business in California, is a licensed title insurance company in California, and is registered to do business in California.

17.     Defendant Ticor Title Insurance Company ("Ticor") is a California corporation with its principal place of business located at 601 Riverside Avenue, Jacksonville, Florida 32204. Ticor does business in California, is a licensed title insurance company in California, and is registered to do business in California.

18.     Defendant Ticor Title Insurance Company of Florida ("Ticor Florida") is a Florida corporation with its principal place of business located at 601 Riverside Avenue, Jacksonville, Florida 32204. Ticor Florida does business in California, is a licensed title insurance company in California, and is registered to do business in California.

19.     Defendant Chicago Title insurance Company ("Chicago Title") is a Missouri corporation with its principal place of business located at 601 Riverside Avenue, Jacksonville, Florida 32204. Chicago Title does business in California, is a licensed title insurance company in California, and is registered to do business in California.

20.     Defendant National Title Insurance of New York, Inc. ("National Title") is a New York corporation with its principal place of business located at 601 Riverside Avenue, Jacksonville, Florida 32204. National Title does business in California, is a licensed title insurance company in California, and is registered to do business in California.

CLASS ACTION COMPLAINT

21.     Defendant Security Union Title Insurance Company ("Security Union") is a California corporation with its principal place of business located at 601 Riverside Avenue, Jacksonville, Florida 32204. Security Union does business in California, is a licensed title insurance company in California, and is registered to do business in California.

22.     The Fidelity family of title insurance companies (collectively "Fidelity") including Fidelity National, Fidelity Title, Ticor, Ticor Florida, Chicago Title, National Title, Security Union, and their affiliates, sells title insurance to purchasers of commercial and residential real estate throughout the United States, including California. Nationally, Fidelity accounts for approximately 27 percent of title premiums. These sales amounted to approximately $4.6 billion in 2006. Fidelity, Chicago Title, and Ticor also were founding members of the New York rate-setting organization known as TIRSA (discussed below), and have collectively fixed title insurance rates in the State of New York under that rate setting regime since TIRSA's inception in 1991.

23.     Fidelity and its affiliates are wholly-owned and controlled by Fidelity National. Through its subsidiaries, Fidelity National is a provider of title insurance, specialty insurance, and claims management services. During 2006, Fidelity National had revenues of approximately $9.4 billion. Fidelity engaged in the conduct challenged here with the approval of Fidelity National.

**B.      The First American Family of Title Companies**

24.     Defendant The First American Corporation ("First American Corp.") is a California corporation with its headquarters located at 1st American Way, Santa Ana, California 92707. First American does business in California through one or more of its subsidiaries, including First American Title Insurance Company.

25.     Defendant First American Title Insurance Company ("First American Title") is a California corporation with its headquarters at First American Way, Santa Ana, California 92707. First American Title does business in California, is a licensed title insurance company in California, and is registered to do business in California.

26.     Defendant United General Title Insurance Company ("United General") is a Colorado corporation located at 8310 S. Valley Highway, Suite 130, Englewood, Colorado 80112. United

1  General does business in California, is a licensed title insurance company in California, and is

2  registered to do business in California.

3       27.    The First American family of title insurance companies (collectively "First

4  American"), including defendants First American, First American Title, United General, and their

5  affiliates, sells title insurance to purchasers of commercial and residential real estate throughout the

6  United States, including California. Nationally, First American accounts for approximately 29 percent

7  of title premiums. These sales amounted to approximately $4.8 billion in 2006.

8       28.    The First American family of title insurance companies and their affiliates are wholly-

9  owned and controlled by First American Corp. Through its subsidiaries, First American is a provider

10  of title insurance, business information, and related products and services. During 2006, First

11  American had revenues of approximately $8.5 billion. The First American family of title insurance

12  companies and their affiliates engaged in the conduct challenged here with the approval of First

13  American Corp.

14  **C.    LandAmerica Family of Title Companies**

15       29.    Defendant LandAmerica Financial Group, Inc. ("LandAmerica") is a Virginia

16  corporation headquartered at 5600 Cox Road, Glen Allen, Virginia 23060. LandAmerica does

17  business in California through one or more of its subsidiaries, including Commonwealth Land Title

18  Insurance Company, Lawyers Title Insurance Corporation, and Transnation Title insurance Company.

19       30.    Defendant Commonwealth Land Title Insurance Company ("Commonwealth") is a

20  Pennsylvania corporation with its principal place of business located at 5600 Cox Road, Glen Allen,

21  Virginia 23060. Commonwealth does business in California, is a licensed title insurance company in

22  California, and is registered to do business in California.

23       31.    Defendant Lawyers Title Insurance Corporation ("Lawyers Title") is a Nebraska

24  corporation with its principal place of business located at 5600 Cox Road, Glen Allen, Virginia 23060.

25  Lawyers Title does business in California, is a licensed title insurance company in California, and is

26  registered to do business in California.

27       32.    Defendant Transnation Title Insurance Company ("Transnation") is a Nebraska

28  corporation with its principal place of business located at 5600 Cox Road, Glen Allen, Virginia 23060.

1   Transnation does business in California, is a licensed title insurance company in California, and is

2   registered to do business in California.

3          33.    The LandAmerica family of title insurance companies (collectively "LandAmerica"),

4   including defendants LandAmerica, Commonwealth, Lawyers Title, Transnation, and their affiliates,

5   is engaged in selling title insurance to purchasers of commercial and residential real estate throughout

6   the United States, including California.  Nationally, LandAmerica accounts for approximately 19

7   percent of title premiums.  These sales amounted to approximately $3.15 billion in 2006.

8          34.    The LandAmerica family of title insurance companies and their affiliates are wholly-

9   owned and controlled by defendant LandAmerica Financial Group, Inc.  Through its subsidiaries,

10  LandAmerica is a provider of title insurance and other products and services that facilitate the

11  purchase, sale, transfer, and financing of residential and commercial real estate.  During 2006,

12  LandAmerica had revenues of approximately $4 billion.  The LandAmerica family of title insurance

13  companies and their affiliates engaged in the conduct challenged here with the approval of

14  LandAmerica.

15  **D.    Stewart Family of Title Companies**

16         35.    Defendant Stewart Title Guaranty Company ("Stewart Guaranty") is a Texas

17  corporation headquartered at 1980 Post Oak Blvd., Suite 800, Houston, Texas 77056.  Stewart

18  Guaranty does business in California, is a licensed title insurance company in California, and is

19  registered to do business in California.

20         36.    Defendant Stewart Title insurance Company ("Stewart Title") is a New York

21  corporation with its principal place of business located at 300 E. 42nd Street, Floor 10, New York,

22  New York 10017.  Stewart Title does business in California, is a licensed title insurance company in

23  California, and is registered to do business in California.

24         37.    The Stewart family of title insurance companies (collectively "Stewart"), including

25  defendants Stewart Guaranty, Stewart Title, and their affiliates, sells title insurance to purchasers of

26  commercial and residential real estate throughout the United States and California.  Nationally,

27  Stewart accounts for approximately 12 percent of title premiums.  These sales amount to

28  approximately $2 billion in 2006.

CLASS ACTION COMPLAINT

**E.    Old Republic Family of Title Companies**

38.    Old Republic National Title Insurance Company ("Old Republic") is a Delaware corporation with its principle place of business located at 400 Second Avenue South, Minneapolis, Minnesota 55401. Old Republic sells title insurance to purchasers of commercial and residential real estate throughout the United States, including California, and is a licensed title insurance company in California and is registered to do business in California. Nationally, Old Republic accounts for approximately 6 percent of title premiums that, in 2006, amount to roughly $1 billion.

39.    Old Republic and its affiliates are wholly owned and/or controlled by defendant Old Republic International Corporation ("Old Republic International"), a Delaware corporation headquartered in Chicago, Illinois. Through its subsidiaries, Old Republic International is a provider of title insurance, general insurance, mortgage guaranty insurance, and life and health insurance. Old Republic international had 2006 revenues of approximately $3.8 billion. Old Republic engaged in the conduct alleged here with the approval of Old Republic International.

40.    Together, defendants account for more than 90 percent of the market for title insurance premiums consumers pay in California. Defendants account for more than 85 percent of the national market for title insurance premiums. In 2006, those sales amounted to approximately $14.5 billion.

## AGENTS AND CO-CONSPIRATORS

41.    The acts alleged against the defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees or representatives, while actively engaged in the management or operation of defendants' business or affairs.

42.    Various other persons, firms or corporations not named as defendants may have participated as co-conspirators with the named defendants in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

43.    Each defendant acted as the principal, agent or joint venturer of, or for, other defendants with respect to the acts, violations and common course of conduct alleged by plaintiffs.

## CLASS ACTION ALLEGATIONS

44.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of the following Class:

CLASS ACTION COMPLAINT

> **All persons or entities who purchased title insurance in California directly from the defendants, their subsidiaries, agents and/or affiliates, or any co-conspirator, from the earliest date allowable by law through the present (the "Class Period").**
>
> **Specifically excluded from this Class are the defendants; the officers, directors or employees of any defendant; any entity in which any defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any defendant. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.**

45.   This action has been brought and may properly be maintained on behalf of the Class proposed above under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

46.   **Numerosity.** Members of the Class are so numerous that their individual joinder is impracticable. It is estimated that the Class consists of thousands of members.

47.   **Existence and predominance of common questions.** Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members. These common questions include:

    a.   Whether defendants engaged in a contract, combination or conspiracy among themselves and/or their co-conspirators to raise, fix, and maintain the prices of title insurance sold in California;

    b.   The identities of the co-conspirators;

    c.   The duration of the conspiracy and nature and character of the acts done in furtherance of the conspiracy;

    d.   Whether the conspiracy violated Section 1 of the Sherman Act;

    e.   Whether defendants actively concealed the contract, combination or conspiracy from plaintiff and other Class members;

    f.   Whether the conduct of defendants and their co-conspirators caused prices of title insurance premiums to be artificially inflated to non-competitive levels; and

    g.   Whether plaintiffs and other members of the Class were injured by the conduct of defendants and their co-conspirators and, if so, the appropriate class-wide measure of damages and appropriate injunctive relief.

48.   **Typicality.**  Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs bought title insurance from one of the defendants and, like all Class members, were damaged by the wrongful conduct of defendants and their co-conspirators, and seek relief common to the Class.

49.   **Adequacy.**  Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class they seek to represent.  Plaintiffs have retained counsel competent and experienced in complex class action litigation, and intend to prosecute this action vigorously.  The interests of the members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

50.   **Superiority.**  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this case as a class action.

51.   In the alternative, the Class may be certified because:

a.   The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class members and would establish incompatible standards of conduct for defendants;

b.   The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede the ability of other Class members to protect their interests; and

c.   Defendants have acted or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief with respect to the members of the Class as a whole an appropriate form of relief.

52.     Plaintiffs reserve the right to expand, modify, or alter the class definition in response to information learned during discovery.

## TRADE AND COMMERCE

53.     During the Class Period, defendants were the major sellers of title insurance in the United States and California.  Defendants controlled in excess of 85 percent of the market for title insurance in the United States and approximately 92 percent of the statewide market in California.

54.     During the Class Period, defendants sold substantial quantities of title insurance in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district.

55.     During the Class Period, Class members located outside of and within California purchased commercial or residential property and title insurance within California.

56.     The activities of defendants and their co-conspirators, as described here substantially affected interstate trade and commerce in the United States, and in the State of California, and caused antitrust injury in the United States and in California.

## FACTUAL ALLEGATIONS

57.     Defendants are competitors in the sale of title insurance to consumers throughout the United States, including California.  They agreed and engaged in concerted efforts to (i) collectively set and charge supra-competitive rates for title insurance; (ii) include agency commission costs in their calculated rates; (iii) embed within these costs payoffs, kickbacks, and other charges that are unrelated to the issuance of title insurance; and (iv) hide these supposed "costs" from regulatory scrutiny by funneling them to and through title agents over which the government agencies have no ability or authority to regulate.

I.      **The Nature of Title Insurance**

58.     Title insurance differs from other, more familiar kinds of insurance.  Unlike automobile and homeowner insurance policies that protect consumers from events that may occur in the future, title insurance offers protection from events that might have occurred in the past and may affect the title to the real estate that a consumer is buying.

59. Title insurance, therefore, protects the purchaser of a property from unidentified defects in the title that would interfere with the full ownership and use of the property and the ultimate right to resell the property. Possible title defects include errors or omissions in deeds, mistakes in examining records, forgery, undisclosed heirs, missing heirs, liens for unpaid taxes, and liens by contractors.

60. There are two basic types of title insurance policies – the lender's policy and the owner's policy. The lender's policy is issued to the lender and will pay the lender the remaining principal on the loan if there is a title problem that cannot be resolved. The owner's policy is issued to the buyer of the property for the full purchase price of the property. Consequently, the maximum liability on a title insurance policy is the purchase price of the property.

61. In a typical home purchase, both a lender's policy and an owner's policy are issued. Lenders require a lender's policy whenever there is a loan associated with the real estate transaction. The lender's policy continues in force until the loan is extinguished, and the owner's policy continues until the property is sold.

62. With a refinancing transaction, the existing lender's policy is terminated and a new lender's policy is issued. The existing owner's policy remains in place. The lender does not pay for the lender's policy in a purchase or refinancing transaction. The premium may be paid by the buyer or seller in a purchase transaction, and by the owner in a refinancing transaction.

63. Title insurers do not compete on the basis of the policies or coverage that they provide. In fact, almost all title policies are based on a single set of form policies published and maintained by the American Land Title Association, the title insurance industry's national trade association. Moreover, the end goal of an exhaustive title search by a title insurer is not to provide coverage for title defects that the search uncovers, but rather to exclude coverage for any such defects and, therefore, further reduce the real value of the title policy that is written to cover only unknown defects in the title at the time of issuance. As a result, title insurance is a homogenous, commodity product. There is no substantive, if any, difference between a policy offered by one company in comparison to a policy offered by another company for the same property transaction.

64. Title insurance is one of the most costly items associated with the closing of a real estate transaction, aside from the purchase price of the property. In California, rates for title insurance

CLASS ACTION COMPLAINT

are based on a percentage of the total value of the property being insured.  For residential properties, this price ranged in 2005 from about $1,010 (for a $250,000 property) to about $1,490 (for a $500,000 property).  For more expensive homes and commercial properties, these prices are significantly higher.  The amount consumers spent on title insurance in California rose dramatically from approximately $700 million in 1995 to about $3.1 billion in 2004.

65.    Title insurance companies recognize that consumers generally lack the means to make independent decisions regarding the scope, terms and price of title insurance.  Title insurance referrals are typically made by lawyers, mortgage brokers, lenders, realtors or other professionals who take part in the transaction, and the cost of title insurance premium is presented to the consumer in the closing statement at the time of closing.  Typically, consumers do not shop around or negotiate the price for title insurance.  As a result of these dynamics, the supply and demand principles that would apply in a competitive market are not implicated, and the title insurance industry is not subject to any meaningful competitive constraints.

66.    The title insurance market in California is dominated by five groups of affiliated companies, that when combined, sell approximately 92 percent of the title insurance policies sold in California, and that own and control the "title plants" in many California counties that every title insurer must rely on to issue title policies.  "Title plants" contain information regarding property transfers and liens reaching back many years.

67.    Title companies, in marked contrast to property, casualty, life, and other traditional insurance carriers, choose not to market their products directly to consumers who pay for them. Instead, the title insurance industry operates on what is termed a "reverse competition" model. Reverse competition means that title companies solicit business referrals from the other major players in the home purchase scenario – real estate agents and agencies, banks, lenders, builders, developers, and others such as middlemen or go-betweens.  The title companies pay middlemen for these referrals in the form of direct payments, advertising expenses, junkets, parties, and other kickbacks and inducements.  In addition, middlemen such as Windermere, John L. Scott, and Coldwell Banker-Bain, who themselves control a substantial portion of the real estate brokerage market, take significant ownership stakes in local title agencies and affiliates of the major title insurers.  These middlemen

13
CLASS ACTION COMPLAINT

1   then profit be receiving a direct monetary return from the referral of title business to the title agent in

2   which they maintain an ownership interest.

3         68.    Reverse competition does not benefit consumers through market-driven forces.

4   Instead, companies spend much of their marketing budgets entertaining real estate agents, banks,

5   lenders, builders, developers, and others in an effort to convince these middlemen to steer the home-

6   buying clients to their companies for the clients' title insurance needs.

7         69.    Rather than seek to capture business by offering lower prices, title insurers offer

8   kickbacks in the form of finder's fees, gifts, meals, business services, and other financial enticements.

9   As a result, title insurers compete and increase their business through higher pricing (that allows for

10   generous inducements and kickbacks) not lower pricing to consumers.

11         70.    In some of the major markets in the United States, these same title insurers collectively

12   meet, jointly set rates, and file these rates with the applicable state insurance authority.  The rates are

13   not subject to any meaningful review or regulation.  The companies agree to fix the price of title

14   insurance far in excess of the risk and loss experience associated with such insurance.  As a result of

15   the joint agreement as to rates, competition is relegated to the middleman, and therefore, no title

16   company competes on price to the consumer.

17         71.    In addition to paying inducements and kickbacks, the title insurance companies and

18   their agents divide the market of real-estate middlemen through the use of Affiliated Business

19   Arrangements ("ABAs"), where the dominant real estate brokers purchase significant ownership

20   stakes in favored title insurance affiliates.  The real estate brokers then reward their associates for

21   using the preferred title insurance providers and lock out independent title insurers.

22         72.    Having agreed to fix prices in states where joint rate-setting occurs, the companies

23   agreed not to compete based on price to the consumer in other states, including California, where

24   regulation of filed rates is lax or non-existent.  Thus, title insurance companies agree to set prices at

25   supra-competitive levels and to compete based on offering inducements to middlemen.

26         73.    One example of competing based on illegal kickbacks to middlemen came to light in

27   July 2005, when nine major title companies reached an agreement with the California Department of

28   Insurance to pay $37.8 million in refunds and penalties for illegal rebating where national

CLASS ACTION COMPLAINT

1 | homebuilders, lenders, and realtors were encouraged to steer business to particular title insurers. The
2 | nine companies were members of three insurance groups, all three of which are defendants here –
3 | LandAmerica Financial Corporation, The First American Title Insurance Company, and Fidelity
4 | National Financial, Inc.

5 |       74.     Under the arrangement, the homebuilder formed a reinsurance company affiliate – a
6 | captive reinsurer. Then, under an agreement with the title insurer, the homebuilder would steer the
7 | consumer to the title insurer and the title insurer would cede a portion of the premium – typically 50%
8 | after the first $200 to $300 – to the captive reinsurer with no substantive risk of loss associated with
9 | the reinsurance transaction. In effect, the arrangement allowed for the title insurer to rebate 50% of
10 | the premium to the homebuilder.

11 |       75.     As a result of this scheme, the companies were accused of paying $25.4 million in
12 | illegal kickbacks to various lenders, builders, and realtors in exchange for the referral of title insurance
13 | business. Their actions involved more than 82,000 California households that purchased or refinanced
14 | a home between 1997 and 2004.

15 |       76.     In March 2005, the U.S. Department of Housing and Urban Development ("HUD")
16 | determined that 80% or more of the premium paid by a consumer for title insurance frequently goes to
17 | the local title agent or lawyer who ordered the policy and may be running the closing.

18 | **II.     Lack of Regulatory Supervision in California**

19 |       77.     In California, there is a lack of regulatory authority and oversight over title insurance
20 | companies. The rates in California are not set as part of deliberate state intervention, and the state
21 | does not meaningfully renew or approve these rates. The rates at issue in this case went into effect
22 | without review.

23 |       78.     Although the California Office of the Insurance Commissioner ("OIC") found an
24 | "astonishing number" of kickbacks and similar inducements in violation of state law, it does not
25 | actively oversee or regulate rates, and, does not, by its own admission, have the power to do so. The
26 | absence of regulation in California has allowed and continues to allow collusive behavior and
27 | excessive rates to flourish at the expense of the consumers.

28 |

79. In February 2007, Steve Poizner, the Insurance Commissioner of California, issued a statement concluding that "reasonable price competition does not exist for title and escrow services." (*Insurance Commissioner Steve Poizner Issues Statement Following Decision by OAL on New Regulations,* California Department of Insurance, February 22, 2007.)

80. Poizner's press release goes on to state that the costs of the illegal inducements that title companies lavish on intermediaries to obtain the homeowner's business are passed on to the homeowner. Indeed, Poizner's press release states: "As a result, over the past 10 years, even though technology has lowered the costs of title searches and document production, title and escrow charges have not come down. In fact, title insurance on the average home in California costs roughly double what it cost 10 years ago, despite the fact that [title insurance] companies' production costs have plummeted."

81. A report to the California Insurance Commissioner prepared during December 2005 by Birny Birnbaum, Consulting Economist, found abuses of the lack of regulatory supervision in this state. For instance, his report states: "We found numerous examples in California of illegal rebates and kickbacks where the title insurer or the underwritten title company provides money, free services or other things of value to a real estate agent, a lender or homebuilder in exchange for business referrals." (*An Analysis of Competition in the California Title Insurance and Escrow Industry,* December 2005, p.3.)

82. The excess money paid to title agents not only works to steer business to defendants, but also serves to boost defendants' profits through the inflated revenues they obtain to cover the agency payments, and through their ownership or management stake in many of these agencies.

III. **Indicators of a Lack of Competition and Conditions Conducive to Collusive Rate Setting**

A. **Low or Declining Title Search Costs**

83. The bulk of the title insurance premium goes to expenses as opposed to claim payments. Title insurers paid an average of 4.6 percent of premiums for claims and claim settlement expenses from 1995 to 2004, compared to around 80 percent of the total premium collected for property and casualty insurance. Title searches have become less labor intensive, especially in large urban counties and cities, as more of the pertinent information regarding claim of title is available

1  online. As a result, the costs of production and the risk of loss have decreased. None of these factors
2  resulted in price competition at the consumer level, however.

3  84. Despite declining costs of production, increased number of transactions and increased
4  revenue per transaction, there have been few rate changes by title insurers over the past five years.
5  During a period when costs per unit of production declined, underwritten title companies and title
6  insurers maintained excessive rates. That prices charged by title insurers and underwritten title
7  companies were not and are not responsive to the changing costs of production or increasing revenue
8  per transaction at a given set of rates is evidence of an agreement not to compete based on price.

9  **B.    Title Premiums Include Improper Payments, Commissions and Inducements**

10  85. The defendant title companies provide illegal rebates and kickbacks where the title
11  insurer or the underwritten title company provides money, free services, or other things of value to a
12  real estate agent, a lender, or homebuilder in exchange for business referrals. These illegal rebates and
13  kickbacks – a consequence of reverse competition – show that title insurance rates are supra-
14  competitive.

15  **C.    Market Dominance and Lack of Competition Based on Price to Consumer**

16  86. The volume of the California title insurance transactions is substantial. The number of
17  residential title transactions exceeded 3 million during 2004 alone. Commercial property transactions
18  are in addition to this volume.

19  87. The title insurance market is highly concentrated – few title insurers account for the
20  vast majority of title insurance sales – at both the statewide level and at the county level in California.
21  For example, the five defendant families controlled approximately 92 percent of the California title
22  insurance market in 2005.

23  88. Defendants have maintained their market dominance and ability to control prices for
24  title insurance in part because of the substantial barriers to entry in the market. Between 1995 and
25  2005, the number of title insurer groups declined as title insurers acquired other title insurers. Few
26  companies entered the title insurance business during the period from 2000 through 2005.

27  89. Access to title plants is a barrier to entry. Established relationships between entities
28  that steer consumers to title insurance sellers is an additional barrier to entry.

---

17

CLASS ACTION COMPLAINT

90.     As a result of their market dominance and anti-competitive practices, defendants enjoy excessive profits at the expense of the consumers.  For example, title insurance underwriters earned after-tax profits of 49.0 percent in 2003 and 32.3 percent in 2004.

**IV.     Price Fixing in Other Large Markets that Affect California**

91.     New York is one of several states in which the leading title insurers collectively fix their prices through a rate-setting organization known as the Title Insurance Rate Service Association, Inc., or TIRSA.  TIRSA collects from defendants and TIRSA's other members revenue and cost information and annually submits it in aggregate form along with collectively set title rates to the New York Insurance Department.  Under this rate setting regime, defendants have charged identical and collectively fixed rates to consumers since TIRSA's inception in 1991.

92.     The New York Insurance Department is charged with reviewing the title rates that defendants (through TIRSA) collectively fix.  Defendants have made this impossible, however, by manipulating the rates so that they are principally based on costs over which the Insurance Department has neither the authority nor the ability to assess.

93.     Under TIRSA's collective rate setting regime, roughly 85 percent of the total title insurance premiums are based on the so-called "costs" associated with the payment of agency commissions.  These costs are referred to as so-called "agency commissions."  As in California, these commissions chiefly include kickbacks and other costs unrelated to the issuance of title insurance.  Instead, as in California, these supposed costs are funned to and through title agents to increase defendants' overall business and get them more business.

94.     New York Insurance Law does not authorize TIRSA to include kickbacks and other agency commission payments that are unrelated to the issuance of title insurance in its collectively fixed rates.  The New York Insurance Department has acknowledged, however, that it lacks the authority to review any agency commission payments and, therefore, cannot properly evaluate TIRSA's calculated rates.

# VIOLATIONS ALLEGED

## First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

95.     Plaintiffs incorporate and reallege each and every allegation in the preceding paragraphs of this complaint.

96.     Beginning at a time presently unknown to Plaintiffs, but at least as early as May 2004, defendants and their co-conspirators engaged in a combination and conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

97.     The combination and conspiracy consisted of a continuing agreement, understanding and concert of action among defendants and their co-conspirators, the substantial terms of which were:

      a.     To fix, raise, maintain and stabilize the price of title insurance throughout California;

      b.     To fix, raise, maintain and stabilize the terms and conditions of sale of title insurance in California; and

      c.     To allocate and divide the market for title insurance in California.

98.     In the absence of proper regulatory authority and oversight, defendants' conduct constitutes a horizontal agreement to fix the form, structure, and prices of title insurance and to allocate and divide the title insurance market in California which is a *per se* violation of Section 1 of the Sherman Act.

99.     Defendants' price fixing, market allocation, and division activity has been continuous throughout the relevant damages period and has been renewed and reinforced annually through submissions to the OIC of supposed cost and revenue information and its periodic submissions of rate changes.

100.    Through their collective price-fixing, market allocation and division, as well as manipulation of the regulatory process, defendants harmed competition by charging consumers supra-competitive prices for title insurance in California, evidenced by the uniformly higher prices as compared to the cost of providing the title insurance.

CLASS ACTION COMPLAINT

101.    The combination and conspiracy alleged here had, among other things, the following effects:

a.      Price competition in the sale of title insurance has been restrained, suppressed, and/or eliminated;

b.      Prices for title insurance sold by defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels; and

c.      Purchasers of title insurance have been deprived of the benefits of free and open competition.

102.    During the period of the antitrust violations by defendants and their co-conspirators, Plaintiffs and each member of the Class they represent purchased title insurance and, by reason of the antitrust violations alleged here, paid more for such than they would have paid in the absence of the antitrust violations.  As a result, Plaintiffs and members of the Class have been injured in an amount presently undetermined.

## Second Claim for Relief

## (Violation of the California Cartwright Act)

103.    Plaintiffs incorporate and reallege each and every allegation in the preceding paragraphs of this complaint.

104.    Defendants' contract, combination, trust or conspiracy was centered in, carried out, effectuated and perfected mainly within California, and defendants' conduct within California injured all members of the Class throughout the United States.  Therefore, this claim for relief under California law is brought on behalf of all members of the Class, whether or not they are California residents.

105.    Beginning at a time presently unknown to Plaintiffs, but at least as early as May 2004, defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Sections 16720, *et seq.* of the California Business and Professional Code.  Defendants acted in violation of Sections 16720, *et seq.* to fix, raise, stabilize and maintain prices of, and allocate markets for title insurance at supra-competitive levels.

106.    The violations of Sections 16720, *et seq.* of the California Business and Professions Code consisted of a continuing unlawful trust and concert of action among the defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for title insurance in the state of California.

107.    For the purpose of forming and effectuating the unlawful agreement, defendants and their co-conspirators did those things which they combined and conspired to do, including the acts, practices and course of conduct alleged above and the following:

     a.    To fix, raise, maintain and stabilize the price of title insurance;

     b.    To allocate markets for title insurance amongst themselves; and

     c.    To allocate and divide the market for title insurance in California.

108.    The combination and conspiracy alleged here had the following effects:

     a.    Price competition in the sale of title insurance has been restrained, suppressed and/or eliminated in California and throughout the United States;

     b.    Price for title insurance sold by defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in California and throughout the United States; and

     c.    Those who purchased title insurance from defendants and their co-conspirators have been deprived of the benefit of free and open competition.

109.    Plaintiffs and the other members of the Class paid supra-competitive, artificially inflated prices for title insurance.

110.    As a direct and proximate result of defendants' unlawful conduct, Plaintiff and the members of the Class have been injured in their business and property because they paid more for title insurance than they otherwise would have paid in the absence of defendants' unlawful conduct.

111. As a result of defendants' violation of Sections 16720, *et seq.* of the California Business and Professions Code, Plaintiffs seek treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief

### (Violation of the California Unfair Competition Law)

112. Plaintiffs incorporate and reallege each and every allegation in the preceding paragraphs of this complaint.

113. Defendants' business acts and practices were centered in, carried out, effectuated and perfected mainly within California, and defendant's conduct within California injured all members of the Class throughout the United States. Therefore, this claim for relief under California law is brought on behalf of all members of the Class, whether or not they are California residents.

114. During the Class Period, and continuing to the present, defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

115. This Claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from defendants for acts that violated Sections 17200, *et seq.* of the California Business and Professions Code, commonly known as the Unfair Competition Law.

116. Defendants' conduct violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures by defendants constituted a common continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Sections 17200, *et seq.*, including the following:

    a. Defendants' acts and practices violate Section 1 of the Sherman Act and Section 16720, *et seq.*, of the California Business and Professions Code, set forth above;

    b. Defendants' acts and practices are unfair to consumers of title insurance in California and throughout the United States within the

meaning of Section 17200 of the California Business and
Professions Code; and

c.     Defendants' acts and practices are fraudulent or deceptive within
the meaning of Section 17200 of the California Business and
Professions Code.

117.    Plaintiffs and each of the Class members are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of their illegal business acts or practices as alleged here.

118.    The illegal conduct alleged here is continuing and there is no indication that defendants will not continue such activity into the future.

119.    The unlawful and unfair business practices of defendants, as described above, caused Plaintiffs and the members of the Class to pay supra-competitive and artificially-inflated prices for title insurance. Plaintiffs and the members of the Class suffered injury in fact and lost money or property as a result.

120.    Plaintiffs request that this Court enter such order or judgment as may be necessary to enjoin defendants from continuing their unfair, unlawful, and/or deceptive practices, to restore to them and the Class members any money that may have been unjustly acquired by defendants by means of defendants' unfair competition.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the members of the Class pray for relief as follows:

A.     That this action be certified and maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.     That the unlawful conduct, contract, conspiracy or combination alleged here be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

C.     That Plaintiffs and the Class recover damages, including treble damages, and restitution, as provided by federal and state antitrust and unfair competition laws, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against the defendants;

D.     That defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, employees, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner: (1) continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged here; (2) entering into any other conspiracy similar to the ones alleged here; (3) entering into any other contract, conspiracy or combination having similar purpose or effect; and (4) adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.     That Plaintiffs and the Class be awarded pre-and post-judgment interest, and that the interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.     That Plaintiffs and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.     That Plaintiffs and the Class have such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

//
//
//
//
//
//
//
//
//
//
//
//
//

1                    **JURY DEMAND**

2      Plaintiffs demand a trial by jury on all claims so triable.

3

4  DATED: July 14, 2008                 Respectfully submitted,

5                       **GIRARD GIBBS LLP**

6

7              By: _____

8                      Daniel C. Girard

                         Elizabeth C. Pritzker

9                      Aaron M. Sheanin

                         Alex C. Turan

10                    601 California Street, 14th Floor

                         San Francisco, California 94108

11                    Telephone: (415) 981-4800

                         Facsimile: (415) 981-4846

12

13                    *Attorneys for Plaintiffs Ruben Romero and*

                     *Sarah Yahn*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

# EXHIBIT 5

1   BARRACK, RODOS & BACINE
    STEPHEN R. BASSER (121590)
2   sbasser@barrack.com
    JOHN L. HAEUSSLER (215044)
3   jhaeussler@barrack.com
    402 West Broadway, Suite 850
4   San Diego, CA 92101
    Telephone: (619) 230-0800
5   Facsimile: (619) 230-1874

6   [Additional counsel listed on signature page]

7   Attorneys for Plaintiffs

8

9                        UNITED STATES DISTRICT COURT

10                      SOUTHERN DISTRICT OF CALIFORNIA

11

12
    LOUIS AND SILVIA MARTINEZ, on          ) Case '08: CV 0499 L WMc
13  behalf of themselves and all other similarly )
    situated,                              ) CLASS ACTION COMPLAINT FOR:
14                                         )
                   Plaintiffs,             ) 1. VIOLATION OF SECTION 1 OF THE
15                                         )    SHERMAN ACT;
           vs.                             )
16                                         ) 2. VIOLATION OF CAL. BUS. AND
    FIDELITY NATIONAL FINANCIAL,           )    PROF. CODE § 16720, et. seq.;
17  INC., FIDELITY NATIONAL TITLE          )
    INSURANCE COMPANY, TICOR TITLE         ) 3. VIOLATION OF CAL. BUS. AND
18  INSURANCE COMPANY, TICOR TITLE         )    PROF. CODE § 17200, et seq.; and
    INSURANCE COMPANY OF FLORIDA,          )
19  CHICAGO TITLE INSURANCE                ) 4. UNJUST ENRICHMENT
    COMPANY, NATIONAL TITLE                )
20  INSURANCE OF NEW YORK, INC.,           )
    SECURITY UNION TITLE INSURANCE         )
21  COMPANY, THE FIRST AMEICAN             )
    CORPORATION, FIRST AMERICAN            )
22  TITLE INSURANCE COMPANY,               )
    UNITED GENERAL TITLE INSURANCE         )
23  COMPANY, LANDAMERICA                   )
    FINANCIAL GROUP, INC.,                 )
24  COMMONWEALTH LAND TITLE                )
    INSURANCE COMPANY, LAWYERS             )
25  TITLE INSURANCE CORPORATION,           )
    TRANSNATION TITLE INSURANCE            )
26  COMPANY, STEWART TITLE                 )
    GUARANTY COMPANY and STEWART           )
27  TITLE INSURANCE COMPANY                ) JURY TRIAL DEMANDED
                                           )
28                 Defendants.             )

FILED
08 MAR 18 AM 11: 24
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: CP          DEPUTY

CLASS ACTION COMPLAINT
59893

1    Plaintiffs, Louis and Silvia Martinez, by their attorneys, on behalf of themselves and all

2    others similarly situated, brings this action for treble damages and injunctive relief under the

3    antitrust laws of the United States and based on statutes of the State of California against the

4    above named defendants, demand a trial by jury, and complaining and alleging as follows:

5    **I.    INTRODUCTION**

6        1.    From the consumer's point of view, title insurance differs greatly from other,

7    more familiar kinds of insurance.  For one thing, while automobile and homeowner insurance

8    policies protect consumers from an event that may occur in the future, title insurance offers

9    protection from events that might have occurred in the past.

10       2.    Most simply, title insurance is protection purchased against a loss arising from

11   problems that occurred in the past and may affect the title to the real estate that a consumer is

12   buying.  Title insurers do not compete on the basis of the policies or coverage that they provide.

13   In fact, almost all title policies are based on a single set of form policies published and

14   maintained by the national trade association, the American Land Title Association.

15   Furthermore, the end goal of an exhaustive title search by a title insurer is not to provide

16   coverage for title defects that the search uncovers, but rather to exclude coverage for any such

17   defects and therefore, reduce the real value of the title policy which is written to cover only

18   unknown defects in title at the time of issuance.  As a result, title insurance is a commodity

19   product.

20       3.    Even for the savviest of insurance consumers, the purchase of a title insurance

21   policy is just one more expensive step in the dizzying, convoluted and often confusing flurry of

22   paperwork and signings that culminate in the closing of a home purchase.  Consumers who

23   normally shop around for their insurance and carefully compare prices, typically emerge from

24   the closing on their new home holding an insurance policy that they know virtually nothing

25   about and that in all likelihood, they will never need.

26       4.    The title insurance market in California consists of a dozen carriers, ranging in

27   size from regional companies to national affiliates.  However, the market is dominated by four

28   groups of affiliated companies which, combined, sell over 90 percent of the title insurance

1    policies sold in California and which own and control the title plants in many California

2    counties that every title insurer must rely on in order issue title policies.

3        5.    Title companies, in marked contrast to property, casualty, life and other

4    traditional insurance carriers, choose not to market their products directly to the consumers who

5    pay for them.  Instead, the title insurance industry operates on what is termed a "reverse

6    competition" model.  Reverse competition means that title companies solicit business referrals

7    from the other major players in the home purchase scenario — real estate agents and agencies,

8    banks, lenders, builders, developers and others: middlemen or go-betweens.  The title

9    companies pay middlemen for these referrals in the form of direct payments, advertising

10    expenses, junkets, parties and other kick-backs and inducements.  In addition, middlemen such

11    as Windermere, John L. Scott and Caldwell Banker-Bain, who themselves control a significant

12    portion of the real estate brokerage market, take significant ownership stakes in local title agents

13    and affiliates of the major title insurers and thereby get a direct return in profit from the referral

14    of title business to the title agent whom they partly or wholly own.

15        6.    Reverse competition, as the term suggests, isn't a model that benefits consumers

16    through market-driven forces.  In fact, consumers are bypassed completely as title companies

17    spend nearly all of their marketing budgets "wining and dining" real estate agents, banks,

18    lenders, builders, developers and others in an effort to convince these middlemen to steer their

19    home-buying clients to their companies for their title insurance needs.

20        7.    In some of the major markets in the United States, these same title insurers

21    collectively meet, and jointly set rates and file these rates with the applicable state insurance

22    authority.  The rates are not subject to any meaningful review or regulation.  The companies

23    agree to fix the price of title insurance far in excess of the risk and loss experience associated

24    with such insurance.  As a result of the joint agreement as to rates, competition is relegated to

25    the middleman.  As a result of their joint rate setting and agreement, no company competes on

26    price to the consumer.

27        8.    Having agreed to fix prices in states where joint rate setting occurs, the

28    companies agreed to not compete based on price to the consumer in other states, including

1   California, where regulation of filed rates is lax or non-existent. Thus, they agreed to set rates

2   at supra competitive prices and to compete based on offering inducements to middlemen. In

3   California, in three successive reports, the Office of the Insurance Commissioner ("OIC") has

4   found an "astonishing number" of such inducements that are in violation of state law. However,

5   the OIC does not actively oversee rates, and, in fact, does not by its own admission have the

6   power to do so. The absence of regulation has allowed collusive behavior and excessive rates.

7         9.     In addition to paying inducements and kick-backs, the title companies and their

8   agents divide the market of real-estate middlemen through the use of Affiliated Business

9   Arrangements ("ABAs"), wherein the dominant real estate brokers purchase significant

10   ownership stakes in favored title insurance affiliates. The real estate brokers then reward their

11   associates for using the preferred insurance providers and lock-out independent title insurers.

12         10.    In this action, plaintiffs, on behalf of a Class of those purchasing title insurance

13   in California, seek damages arising from defendants' violation of the Sherman Act as well as

14   California statutory law.

15   **II.    JURISDICTION AND VENUE**

16         11.    This Complaint is filed and these proceedings are instituted under Sections 4 and

17   16 of the Act of Congress of October 15, 1914, C. 323, Stats. 731, 737 (15 U.S.C. §§ 15, 26) to

18   obtain injunctive relief and to recover treble damages and the costs of suit, including a

19   reasonable attorneys' fee, against defendants for the injuries sustained by plaintiffs and the

20   members of the Class which they represent by reason of defendants' and their co-conspirators'

21   violations, as hereinafter alleged, of Section I of the Sherman Act (15 U.S.C. § 1). As such, this

22   Court has jurisdiction pursuant to 28 U.S.C. §1331. This Court also has supplemental

23   jurisdiction pursuant to 28 U.S.C. §1367(a).

24         12.    Defendants transact business, maintain offices or are found within the Southern

25   District of California. The interstate commerce described hereinafter is carried on, in part,

26   within the Southern District of California, the conspiratorial acts herein alleged were carried on,

27   in part, in the Southern District of California, and plaintiffs purchased title insurance in the

28   Southern District of California.

1  **III.    PARTIES**

2      **A.      Plaintiffs**

3      13.    Plaintiffs, Louis and Silvia Martinez, are individuals residing in Chula Vista,

4  California.  During the Class Period, plaintiffs purchased title insurance directly from one or

5  more of the defendants herein and have been injured by reason of the antitrust violations

6  alleged.

7      **B.      Defendants**

8      14.    Defendant Fidelity National Financial, Inc. ("Fidelity National") is a Delaware

9  corporation headquarted at 601 Riverside Avenue, Jacksonville, Florida 32204.   Fidelity

10 National does business in California through one or more of its subsidiaries, including but not

11 limited to, defendants Fidelity National Title Insurance Company, Ticor Title Insurance

12 Company, Ticor Title Insurance Company of Florida, National Title Insurance of New York,

13 Inc., Security Union Title Insurance Company, and Chicago Title Insurance Company. Fidelity

14 National is registered to do business in California.

15     15.    Defendant Fidelity National Title Insurance Company ("FNTIC") is a California

16 Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida

17 32204.  FNTIC does business in California, is a licensed title insurance company in California

18 and is registered to do business in California.

19     16.    Defendant Ticor Title Insurance Company ("Ticor") is a California Corporation

20 with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.  Ticor

21 does business in California, is a licensed title insurance company in California and is registered

22 to do business in California.

23     17.    Defendant Ticor Title Insurance Company of Florida ("TTICF") is a Florida

24 corporation with its principle place of business at 601 Riverside Ave., Jacksonville Florida

25 32204.  TTICF does business in California, is a licensed title insurance company in California

26 and is registered to do business in California.

27     18.    Defendant Chicago Title Insurance Company ("Chicago Title") is a Missouri

28 Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida

1    32204. Chicago Title does business in California, is a licensed title insurance company in

2    California and is registered to do business in California.

3        19.    Defendant National Title Insurance of New York, Inc. ("NTINY") is a New York

4    corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida

5    32204. NTINY does business in California, is a licensed title insurance company in California

6    and is registered to do business in California.

7        20.    Defendant Security Union Title Insurance Company ("SUTIC") is a California

8    corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida

9    32204. SUTIC does business in California, is a licensed title insurance company in California

10    and is registered to do business in California.

11        21.    The Fidelity family of title insurance companies (collectively, "Fidelity") —

12    which includes defendants Fidelity National, FNTIC, Ticor, TTICF, Chicago Title, NTINY and

13    SUTIC, and their affiliates — is engaged in selling title insurance to purchasers of commercial

14    and residential real estate throughout the United States, including California. Nationally,

15    Fidelity accounts for approximately 27 percent of title premiums, which in 2006 amounted to

16    roughly $4.6 billion. Fidelity, Chicago Title and Ticor were founding members of TIRSA

17    (defined below) and since TIRSA's inception have charged title insurance rates in New York

18    that TIRSA collectively sets.

19        22.    The Fidelity family of title insurance companies and their affiliates are wholly-

20    owned and controlled by defendant Fidelity National Financial, Inc. Through its subsidiaries,

21    Fidelity National is a provider of title insurance, specialty insurance, and claims management

22    services. Fidelity National had 2006 revenues of roughly $9.4 billion. The Fidelity family of

23    title insurance companies engaged in the conduct challenged herein with the approval and assent

24    of defendant Fidelity National

25        23.    Defendant the First American Corporation ("First American") is a California

26    corporation with its headquarters at 1st American Way, Santa Ana, California 92707. First

27    American does business in California through one or more of its subsidiaries, including but not

28

1  limited to, defendants First American Title Insurance Company and United General Title

2  Insurance Company.

3      24.    Defendant First American Title Insurance Company ("FATIC") is a California

4  corporation with its headquarters at 1st American Way, Santa Ana, California 92707.  FATIC

5  does business in California, is a licensed title insurance company in California and is registered

6  to do business in California.

7      25.    Defendant United General Title Insurance Company ("UGTIC") is a Colorado

8  corporation located at 8310 S. Valley Highway, Suite 130, Englewood, CO 80112.  UGTIC

9  does business in California, is a licensed title insurance company in California and is registered

10  to do business in California.

11      26.    The First American family of title insurance companies (collectively, "First

12  American") — which included defendants First American, FATIC and UGTIC, and their

13  affiliates — is engaged in selling title insurance to purchasers of commercial and residential real

14  estate throughout the United States, including California.  Nationally, First American accounts

15  for approximately 29 percent of title premiums, which in 2006 amounted to roughly $4.8

16  billion.  First American Title was a founding member of TIRSA and since TIRSA's inception

17  has charged title insurance rates in New York that TIRSA collectively sets.

18      27.    The First American family of title insurance companies and their affiliates are

19  wholly-owned and controlled by defendant The First American Corporation.   Through its

20  subsidiaries, First American is a provider of title insurance, business information, and related

21  products and services.  First American had 2006 revenues of roughly $8.5 billion.  The First

22  American family of title insurance companies and their affiliates engaged in the conduct

23  challenged herein with the approval and assent of defendant First American.

24      28.    Defendant LandAmerica Financial Group, Inc. ("LandAmerica") is a Virginia

25  corporation headquartered at 5600 Cox Road, Glen Allen, Virginia 23060.  LandAmerica does

26  business in California through one or more of its subsidiaries, including but not limited to,

27  defendants Commonwealth Land Title Insurance Company, Lawyers Title Insurance

28  Corporation and Transnation Title Insurance Company.

29.    Defendant Commonwealth Land Title Insurance Company ("CLTIC") is a Pennsylvania corporation with its principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060.  CLTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

30.    Defendant Lawyers Title Insurance Corporation ("LTIC") is a Nebraska corporation with its principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060. LTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

31.    Defendant Transnation Title Insurance Company ("TNTIC") is a Nebraska corporation with its principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060. TNTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

32.    The LandAmerica family of title insurance companies (collectively "LandAmerica") — which included defendants LandAmerica, CLTIC, LTIC and TNTIC, and their affiliates — is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including California.    Nationally, LandAmerica accounts for approximately 19 percent of title premiums, which in 2006 amounted to roughly $3.15 billion.  Commonwealth and Lawyers Title were founding members of TIRSA and since TIRSA's inception have charged title insurance rates in New York that TIRS collectively sets.

33.    The LandAmerica family of title insurance companies and their affiliates are wholly-owned and controlled by defendant LandAmerica Financial Group, Inc. Through its subsidiaries, LandAmerica is a provider of title insurance and other products and services that facilitate the purchase, sale, transfer, and financing of residential and commercial real estate. LandAmerica had 2006 revenues of roughly $4 billion.  The Land America family of title insurance companies and their affiliates engaged in the conduct challenged herein with the approval of defendant LandAmerica.

1    34.    Defendant Stewart Title Guaranty Company ("STGC") is a Texas corporation

2  headquartered at 1980 Post Oak Blvd., Suite 800, Houston, Texas 77069. STGC does business

3  in California, is a licensed title insurance company in California and is registered to do business

4  in California.

5    35.    Defendant Stewart Title Insurance Company ("STIC") is a New York

6  corporation with its principle place of business at 300 E. 42nd St., Floor 10, New York, NY

7  10017. STIC does business in California, is a licensed title insurance company in California

8  and is registered to do business in California.

9    36.    The Stewart family of title insurance companies (collectively, "Stewart") —

10  which includes defendants STGC and STIC, and its affiliates — is engaged in selling title

11  insurance to purchasers of commercial and residential real estate throughout the United States

12  and California. Nationally, Stewart accounts for approximately 12 percent of title premiums,

13  which in 2006 amounted to roughly $2 billion. Stewart was a founding member of TIRSA and

14  since TIRSA's inception has charged title insurance rates in New York that TIRSA collectively

15  sets.

16    37.    Together, defendants account for more than 85 percent of the title premiums

17  consumers pay in California. Nationally, they account for more than 85 percent of title

18  premiums, which in 2006 amounted to roughly $14.5 billion. Throughout the relevant damages

19  period, defendants charged California consumers in California virtually identical title insurance

20  rates.

21  **IV.    OTHER ENTITIES**

22    38.    TIRSA is a voluntary association of title insurers licensed as a rate service

23  organization pursuant to Article 23 of the State of New York Insurance Law. TIRSA maintains

24  its offices in New York City, which until recently were located at the same New York address

25  of Fidelity Title.

26    39.    TIRSA annually compiles from its members statistical data relating to their title

27  insurance premiums, losses and expenses and submits this information in aggregate form to the

28  New York Insurance Department. TIRSA also prepares and submits the New York Title

1 | Insurance Rate Manual which sets forth title rates to be charged and rules to be followed by

2 | TIRSA's members. The Insurance Department has never objected to any of the rates TIRSA has

3 | collectively set. Similarly, the California OIC has not actually held a public hearing or

4 | conducted any other review or regulation of the title insurance rates in California for thirty

5 | years.

6 | 40. TIRSA's membership is comprised of defendant insurers and all other title

7 | insurers that are licensed to issue policies in New York. Currently, Fidelity, First American,

8 | LandAmerica, and Stewart collectively represent 14 of TIRSA's 22 members. As such, they

9 | comprise a majority voting block which, according to TIRSA's by-laws, allows them to control

10 | the operations of TIRSA and, in particular, TIRSA's collective rate setting activity.

11 | 41. Various other persons, firms and corporations not made defendants herein have

12 | participated as co-conspirators with the defendants in the violations alleged herein and have

13 | performed acts and made statements in furtherance thereof.

14 | **V.    CLASS ACTION ALLEGATIONS**

15 | 42. Plaintiffs bring this action under Rule 23, and particularly subsection (b)(3), of

16 | the Federal Rules of Civil Procedure, on behalf of themselves and a Class consisting of all

17 | persons excluding governmental entities, defendants, subsidiaries and affiliates of defendants,

18 | who purchased directly, from one or more of the defendants and/or their co-conspirators title

19 | insurance for residential and commercial property in California during the four year period

20 | preceding this lawsuit and who have sustained damages as a result of the conspiracy herein

21 | alleged. The number of potential Class members is so numerous that joinder is impracticable.

22 | 43. Plaintiffs, as representatives of the Class, will fairly and adequately protect the

23 | interest of the Class members. The interests of plaintiffs are coincident with, and not

24 | antagonistic to, those of the Class members.

25 | 44. Except as to amount of damages each member of the Class has by itself

26 | sustained, all other questions of fact and law are common to the class, including but not limited

27 | to, the combination and conspiracy hereinafter alleged, the violation of Section I of the Sherman

28 | Act (15 U.S.C. § 1) and the effects of such violation.

1    45.    Plaintiffs, along with all other members of the Rule (b)(3) Class, were injured as

2  a result of paying supracompetitive prices for title insurance in California.    These

3  supracompetitive prices were achieved as a result of defendants' illegal price-fixing activities

4  and market allocation and division.

5    46.    Members of the Class include hundreds of thousands, if not millions, of

6  consumers.  They are so numerous that their joinder would be impracticable.

7    47.    Plaintiffs also bring this action as a class action under Rule 23(b)(2) of the

8  Federal Rules of Civil Procedure, for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

9  The Rule (b)(2) Class included all members of the (b)(3) Class, and all consumers who are

10  threatened with injury by the anticompetitive conduct detailed herein.

11    48.    Defendants have acted, continued to act, refused to act and continued to refuse to

12  act on ground generally applicable to the Rule (b)(2) Class, thereby making appropriate final

13  injunctive relief with respect to the Rule (b)(2) Class as a whole.

14    49.    Members of the Rule (b)(2) Class include hundreds of thousands, if not millions,

15  of consumers.  They are so numerous that their joinder would be impracticable.

16    50.    Common questions of law and fact exist with respect to all Class members and

17  predominate over any questions solely affecting individual Class members.    Among the

18  questions of law or fact common to the class are the following:

19    • Whether defendants have engaged in the alleged illegal price-fixing
       activity and market allocation and division.

20

21    • The duration and scope of defendants' allege illegal price-fixing and
       market allocation and division activity.

22    • Whether defendants' alleged illegal price-fixing and market allocation
       and division has caused higher prices to plaintiffs and other purchasers of

23    title insurance in California.

24    • Whether the Insurance Commissioner has actively supervised defendants'
       price fixing and market allocation and division.

25

26    51.    Plaintiffs do not have any conflict of interest with other Class members.

    Plaintiffs' claims are typical of the claims of the Class and they will fairly and adequately

27  reflect the interests of the Class.  Counsel competent and experience in federal class action and

28  federal antitrust litigation has been retained to represent the class.

52. This action is superior to any other method for the fair and efficient adjudication of this legal dispute since joinder of all members is not only impracticable, but impossible. The damages suffered by certain members of the Class are small in relation to the expense and burden of individual litigation and therefore it is highly impractical for such Class members to seek redress for damages resulting from defendants' anticompetitive conduct.

53. There will be no extraordinary difficulty in the management of the Class action.

## VI.  TRADE AND COMMERCE

54. During all or part of the period in suit, defendants and their co-conspirators were sellers of title insurance in California.

55. During the period in suit, the defendants sold substantial quantities of title insurance in a continuous and uninterrupted flow of interstate commerce. In 2005, consumers in the United States paid $17 billion for residential title insurance policies.

56. During the period in suit, Class members from locations outside California purchased commercial or residential property and title insurance within California.

57. During the period in suit, the defendants were the major sellers of title insurance in the United States and California. Defendants controlled in excess of 85 percent of the market for title insurance in the United States and California.

58. The activities of the defendants and their co-conspirators, as described herein, were within the flow of interstate commerce and substantially affected interstate commerce.

## VII.  FACTUAL ALLEGATIONS

### A.  The Nature of Title Insurance

59. Title insurance is one of the most costly items associated with the closing of a real estate transaction. In California, rates for title insurance are based on a percentage of the total value of the property being insured. For residential properties, this price ranged in 2005 from about $1,010 (for $250,000) property to $1,490 (for a $500,000 property). For more expensive homes and commercial properties, these prices are significantly higher. The amount spent on title insurance has risen dramatically over the past decade.

60.    Title insurance serves an important purpose.  It protects the purchaser of a property from any unidentified defects in the title that would in any way interfere with the full and complete ownership and use of the property with the ultimate right to resell the property. Title insurance is required by lenders in most residential and commercial real estate transactions.

61.    Consumers exercise little discretion in choosing the title insurer from which they purchase the insurance.  That decision is typically made for them by their lawyer, mortgage brokers, lender, or realtor.  Consequently, for most purchasers, the cost of title insurance is not challenged.  Most consumers do not even become aware of the price they will pay and to which insurer they will pay it until the actual closing of the real estate transaction.  By then it's too late, consumers can't attempt to negotiate a better title insurance price or alternate provider for fear of delaying or derailing the entire transaction.  There is no shopping around.  There is no negotiation of price.

62.    This dynamic basically removes the sale of title insurance from the normal competitive process and any real competitive constraints,unlike the regular forces of supply and demand.  The purchasers of the insurance, in most instances, are not the ones making the purchasing decisions.  And, they are certainly in no position to question the price.

63.    The most effective but illegal way for a particular title insurer to get business is to encourage those making the purchasing decisions — the real-estate middlemen — to steer business to that insurer.  The best way to so motivate the middlemen is not through lower prices (that they are not even paying).  Rather is it through kickbacks in the form of finder's fees, gifts, meals, business serviced and other financial enticements.  Therefore, it is through higher pricing (which allows for generous inducements and kick-backs), not lower pricing, that provides the best way for title insurers to compete and increase their business.

**B.    Price-Fixing in the Large Markets**

64.    New York is one of the several states in which the leading title insurers collectively fix their prices through a rate-setting organization like TIRSA.  There are two

1   principal cost components that go into TIRSA's calculation.  One comprises the risk associated

2   with issuing the title policy.  The other comprises the "agency commission" paid to title agents.

3        65.    The risk component covers the risk the title insurer bears for any undiscovered

4   defects in the title.  Unlike property insurance, title insurance carries with it a very limited risk

5   of loss to the insurer.  That is because title insurance protects against unknown *prior* events that

6   cause defects in title.  With a proper search and examination of prior ownership records, any

7   such defects can and almost always are readily identified and excluded from the policy's

8   coverage.  Consequently, the average claim payout on a title insurance policy in the United

9   States amounts to only about 5 percent of the total premium collected.  This is very different

10  from property coverage (such as auto and home insurance) — which protects against *future*

11  occurrences over which the insurer has little to no control — where the average claim payout

12  amounts to about 80 percent of the total premium.

13       66.    The "agency commissions" component of the title insurance rate covers

14  payments made to title agents.  Defendants have an ownership or management stake in many of

15  the title agencies to which these payments are made.  A small portion of the payments is for the

16  search and exam of prior ownership records of the property being purchased to identify any

17  liens, encumbrances, burdens, exclusions, or other defects in the title.  The search and exam

18  function does not involve the spreading or underwriting of risk, and title insurers typically

19  outsource this task to title agents.

20       67.    The remainder, and by far the bulk, of the agency commissions are comprised of

21  costs unrelated to the issuance of title insurance.  These costs include kickbacks and other

22  financial inducements title insurers provide to title agents and indirectly (through title agents) to

23  the lawyers, brokers, and lenders who, in reality, are the ones deciding which title insurer to use.

24  These payments have nothing to do with the issuance of title insurance and are made by the title

25  insurers merely to inflate their revenues and steer business their way.

26       68.    Under TIRSA's collective rate setting regime, roughly 85 percent of the total title

27  insurance premium is based on the so-called "costs" associated with the payment of agency

28  commission.  Only 15 percent is based on costs associated with the risk of loss.

1    69.    TIRSA publishes its final calculated title rates in the New York Title Insurance

2  Rate Manual. These rates are tied to the value of the property being insured. This is so despite

3  the fact that the costs associated with agency commissions are entirely unrelated to the value of

4  the property. Indeed, agency kickbacks and enticements have little to do with producing a

5  particular title policy and provide no value — proportional to property value or otherwise — to

6  the consumer. Even search and exam costs are unrelated to property value. They instead

7  depend on the age of the property, the complexity of the ownership history, and the accessibility

8  of prior ownership records.

9    70.    There are other states in which the defendants overtly met and agreed to fix the

10  rates for title insurance as part of a formal collective rate setting process.

11    **C.    TIRSA's Formation**

12    71.    Prior to TIRSA, the New York Board of Title Underwriters ("NYBTU") served

13  as the title insurance rate-setting body in New York. NYBTU, along with the title insurance

14  rate setting bureaus in many other states, was disbanded in the mid-1980s in the wake of a

15  Federal Trade Commission ("FTC") challenge to the collective rate setting activity of many of

16  these associations. The FTC's challenge culminated in *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621

17  (1992), where the Supereme Court held that to avoid *per se* illegal price fixing liability, the rate

18  setting activity of these rating bureaus must be actively supervised by the state.

19    72.    In *Ticor*, the FTC focused its challenge on agency commissions. The FTC

20  contended that the respective state insurance departments merely rubber-stamped this portion of

21  the collectively fixed rates without any independent review or analysis of their reasonableness

22  or cost justification. The Supreme Court agreed with the FTC that this kind of limited state

23  oversight was not sufficient. Rather, to avoid illegal price-fixing liability, the state insurance

24  department has to "exercise[]sufficient independent judgment and control so that the details of

25  the rates or prices have been established as a product of deliberate state intervention, not simply

26  by agreement among private parties." *Ticor*, 504 U.S. at 634-35.

27    73.    Following the Supreme Court's instruction in *Ticor*, the Third Circuit on remand

28  in *Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129 (3d Cir. 1992), upheld the FTC's finding that the

1    collective rate-setting of certain state rating bureaus was improper because it was not actively

2    supervised by the state.  According to the circuit court, "[t]he Supreme Court plainly instructed

3    us that a state's rubber stamp is not enough.  Active supervision requires the state regulatory

4    authorities' independent review and approval." *Id.* at 1139.

5        74.     Defendants formulated TIRSA's first rate manual and procedure soon after the

6    Supreme Court's *Ticor* decision.  Through TIRSA, defendants have set up a rate-setting scheme

7    to get around the rigors of state oversight required by *Ticor*.  They have done so by calculating a

8    single rate that comprises both risk and agency commission costs and by outsourcing to title

9    agents the agency commission costs.  In this way, defendants avoid providing the Insurance

10   Department with any detailed breakout or backup for the bulk of the costs that make up their

11   collectively fixed rates.

12       75.     TIRSA merely submits an aggregated figure that is supposed to represent the

13   total agency commission costs.  Embedded with this figure is the vast quantity of dollars that are

14   funneled to and through the title agencies as kickbacks, financial inducements and other costs

15   unrelated to the issuance of title insurance.  Defendants' design in all of this has been to

16   effectively "hide" the cost basis for their artificially high and collectively fixed title insurance

17   premiums from the regulatory scrutiny that *Ticor* demands.

18   **D.     Lack of Regulatory Supervision and Authority in New York and
            Other States Including California**

19

20       76.     There is no provision under the New York Insurance Law for TIRSA to include

21   in its collectively fixed rates kickbacks and other agency commission payments unrelated to the

22   issuance of title insurance.   Indeed, the New York Insurance Department has openly

23   acknowledged that it lacks the authority to review any agency commission payments.  It has

24   likewise recognized that defendants' outsourcing of agency commission costs has prevented it

25   from performing a meaningful review of TIRSA's calculated rates.  This was made clear at a

26   November 2006 public hearing the New York Insurance Department held — the first in 15

27   years — where it questioned TIRSA and its members on TIRSA's failure to provide the

28   Insurance Department with any backup or detail for agency commissions.

77.    At the hearing, the Insurance Department conceded that it could not properly evaluate TIRSA's calculated rates, and that it could only do so if it obtained the detailed cost information on agency commissions that TIRSA does not provide.

78.    The Insurance Department's recognition that it is not properly supervising TIRSA's rate-setting activity is consistent with the April 2007 findings of the U.S. Government Accountability Office ("GAO") that the title insurance industry is in need of greater state regulation.  The GAO studied the industry conditions of several states, including New York, and concluded that "state regulators have not collected the type of data, *primarily on title agents' costs and operations*, needed to analyze premium prices and underlying costs."  (Emphasis added.)

79.    Unchecked by regulatory review and insulated from competition, defendants have thus been able to collectively fix title insurance rates at supracompetitive levels and earn profits that vastly exceed those contemplated by the Insurance Department or that would have resulted in a free and open competitive market.

80.    At the time of TIRSA's formation, the Insurance Department established 5 percent (of the total premium) as the level of profit to which title insurers are entitled.  The Insurance Department is supposed to carefully analyze TIRSA's rate calculations, and, in particular, its revenue and cost information, to ensure that this 5 percent profit level is maintained and based on a reasonable premium.  However, without the authority or ability to scrutinize agency commission costs, the Insurance Department has been unable to perform this function.  As a result, defendants (through TIRSA) have been able to set artificially high title premiums and secure title profits far in excess of the 5 percent threshold.

81.    Through an independent investigation conducted over the past several years, the New York State Attorney General found that for every dollar of insurance premium defendants collected, of the roughly 15 cents that supposedly accounts for the risk of loss, only 3 cents is paid out in claims.  And, of the roughly 85 cents that supposedly covers agency commissions, only between 8 and 11 cents goes to costs actually incurred by title agents in producing the title

1  policy.  These numbers show that title insurers' collectively fixed rates have resulted in profits

2  that are untethered to and vastly exceed the costs of producing such policies.

3      82.    The New York Attorney General's investigation further revealed that what was

4  largely driving these numbers were the kickbacks and other financial inducements defendants

5  were funneling to and through title agents to secure more business.  As reported at the New

6  York Insurance Department's 2006 hearing, one title agency's financial statements revealed that

7  it spent more than $1 million of these so-called "agency commissions" on items identified as

8  "Christmas", "automobile expenses", "political contributions", "promotional expenses", and

9  "travel and entertainment".  These expenses are not even remotely related to the issuance of title

10  insurance.

11      83.    The Washington State Insurance Commissioner's October 2006 report found

12  strikingly similar abuses in Washington.  Violations were pervasive and the Commissioner

13  concluded that consumers were paying too much as a result.

14      84.    All of this "excess money" paid to title agents not only works to steer business to

15  defendants.  It also serves to boost defendants' own profits through the inflated revenues they

16  obtain to cover these agency payments and through their ownership or management stake in

17  many of these agencies.

18      85.    Defendants are competitors in the sale of title insurance to consumers throughout

19  the United States.  These title insurers have agreed and engaged in concerted efforts to (i)

20  collectively set and charge uniform and supracompetitive rates for title insurance, (ii) include in

21  their calculated rates agency commission costs, (iii) embed within these costs payoffs,

22  kickbacks, and other charges that are unrelated to the issuance of title insurance, and (iv) hide

23  these supposed "costs" from regulatory scrutiny by funneling them to and through title agents

24  over which the government agencies have no ability or authority to regulate.

25      86.    The GAO in its 2007 report entitled "Actions Needed to Improve Oversight of

26  the Title Insurance Industry and Better Protect Consumers" found several indicia of a lack of

27  competition and questions about the reasonableness of prices including:

28

- Consumers find it difficult to shop for title insurance, therefore, they put little pressure on insurers and agents to compete based on price;

- Title agents do not market to consumers, who pay for title insurance, but to those in the position to refer consumers to particular title agents, thus creating potential conflicts of interest;

- A number of recent investigations by HUD and state regulatory officials have indentified instances of alleged illegal activities with the title industry that appear to reduce price competition and could indicate excessive prices;

- As property values or loan amounts increase, prices paid for title insurance by consumers appear to increase faster than insurers' and agents' costs; and

- In states where agents' search and examination services are not included in the premium paid by consumers, it is not clear that additional amounts paid to title agents are fully supported by underlying costs.

87.    The GAO visited several states, including California, and found a lack of regulatory oversight:

> In the states we visited, we found that regulators did not assess title agents' costs to determine whether they were in line with premium rates; had made only limited efforts to verse title agents (including ABAs involving insurers and agents); and, until recently, had taken few actions against alleged violations of antikickback laws. In part, this situation has resulted from a lack of resources and limited coordination among different regulators within states. On the federal level, authority for alleged violations of section 8 of RESPA, including those involving increasingly complex ABAs, is limited to seeking injunctive relief. Some state regulators expressed frustration with HUD's level of responsiveness to their requests for help with enforcement, and some industry officials said that RESPA rules regarding ABAs and referral fees need to be clarified. Industry and government stakeholders have proposed several regulatory changes, including RESPA reform, strengthened regulation of agents, a competitor right of action with no monetary penalty, and alternative title insurance models. [*Id.* at 41, footnotes omitted.]

**E.    Competition Based on Kickbacks and Inducements But Not Rates**

88.    Having agreed to fix or stabilize prices in New York and other states where they overtly meet to promulgate rates, these same defendants then set out to do the same in other states.

89.    In other words, as a direct result of these meetings where rates were agreed to, these same defendants agree, either expressly or tacitly, to not compete on rates in other states

1 as well. To compete on rates in other states could and would imperil their ability to maintain

2 the agreed rate in states like New York.

3    90.    As in the case in New York, a lack of regulatory authority over rates created an

4 environment in which a conspiracy can and did succeed. No agency was examining why all the

5 rates were virtually identical, and no agency was examining whether the costs associated with

6 these premiums were reasonable. This is an environment which is conducive to price fixing.

7    91.    In California, there is a lack of regulatory authority and oversight over title

8 insurance companies. The rates in California are not set as part of a deliberate state intervention

9 and the state does not and cannot meaningfully renew or approve these rates. The rates at issue

10 in this case went into effect without review.

11 **F.    Other Indicators of a Lack of Competition and Conditions Conducive to Collusive Rate Setting**

12

13    92.    In addition to the uniformity of rates, other facts suggest that is it more plausible

than not that rates have been set based on an agreement to fix prices.

14

15    93.    In theory, the chain of title should be documented back to its historic grant of

ownership centuries in the past. Fear about a possible title defect in the distant past is widely

16

17 used as a justification by title agencies when convincing property buyers to purchase an owner

policy in addition to the lender policy, which is mandatory to secure a mortgage. The title

18

19 agency, however, saves much time and money when the search is limited to one or two

transactions. They rely on the insurance policy to cover the remote chance of missing an earlier

20

21 but still-valid claim. If such a claim is asserted and survives the scrutiny of the title insurance

company's legal department, the expected cost of compensation is likely to be less than the sum

22

23 of added overhead costs of routinely tracing back every chain of title to the earliest registered

owner in the distant past.

24

25    94.    Title insurance industry officials tend to justify the large proportion of the

premium retained by the title abstract and settlement agency (from 60 to more than 90 percent)

26

27 by the alleged high cost of title searching back into the distant past. In fact, a high proportion of

noncommercial properties are searched only through the most recent transaction. No

28 information is available as to what proportion of claims originate in the distant past. The

1    industry has never published pertinent statistics. It would have a marketing incentive to publish

2    these statistics if the risk were significant; that it has not published these statistics indicates that

3    the risk probably is only slightly greater than zero.

4        95.    Many U.S. homes have been resold three or four times in twenty-five years. At

5    each of these occasions, an abstract of title will be prepared on the basis of a more or less

6    thorough review of the available title records, inheritance records, family records and records of

7    past or current liens against a property. It is reasonable, therefore, to suspect that the risk of a

8    title defect will decrease every time a property is sold.

9        96.    Title searches have become less labor intensive, especially in large urban

10    counties and cities. More and more of the information is available online. The statistical

11    likelihood that a title default would be overlooked is a closely held industry secret, but it

12    appears to be so small that many transactions are not insured on the basis of a search of the last

13    owner's title history or a search into transactions that occurred during the last twenty-five to

14    thirty-five years. The evidence is strong that the title insurance industry has achieved a

15    remarkably high level of loss minimization.

16        97.    Thus the costs of production have decreased as has the risk of loss yet none of

17    these factors has resulted in price competition at the consumer level.

18        98.    There is remarkable absence of rate changes by title insurers over the past five

19    years, despite declining costs of production, increased number of transactions and increased

20    revenue per transaction. During a period when costs per unit of production declined

21    significantly, underwritten title companies and title insurers maintained excessive rates. The

22    prices charged by title insurers and underwritten title companies were not and are not responsive

23    to the changing costs of production or increasing revenue per transaction at a given set of rates.

24    Again, this is indicia of an agreement not to compete based on price.

25        99.    As noted, the title companies engage in illegal rebates and kickbacks where the

26    title insurer or the underwritten title company provides money, free services or other things of

27    value to a real estate agent, a lender or homebuilder in exchange for business referrals. These

28    illegal rebates and kickbacks — a consequence of reverse competition — show that title

1  insurance rates are supra competitive and that some portion of the overcharge is passed from the

2  underwritten title company or title insurer to the referrer of business.

3      100.  A lack of competition and the ability to control prices is enhanced by the fact that

4  there were few title insurer entrants over the period from 1995 through 2005 and the number of

5  title insurer groups declined as title insurers acquired other title insurers.  There were few

6  underwritten title company entrants over the 2000 to 2005 period and new entrants were

7  controlled business arrangements whose addition to the market did not result in greater price

8  competition.

9      101.  Access to title plants can be a barrier to entry, but a larger barrier to entry exists

10 due to the established relationships between the entities that can steer the consumer's title and

11 escrow business and the entities who sell title insurance and escrow services.

12     102.  The title insurance market is highly concentrated — a few title insurers account

13 for the vast majority of title insurance sales — at both the statewide level and at the county level

14 in California.  For example, three title insurer groups account for 77.4% of the market at a

15 statewide level.  At the county level, each individual market was highly concentrated.  The

16 GAO found that First American and Fidelity had a market share of 66 percent.  Such a

17 concentration enhances the ability of companies to fix prices.

18     103.  The agreement not to compete based on price is also evidenced by the fact that

19 no company has marketed its services to consumers, the ultimate purchasers of the product.

20 This is in marked contrast to real insurance, for example, car insurance, where the companies

21 compete vigorously with well recognized slogans such as State Farm's "Like a Good Neighbor,"

22 or Allstate's "good hands,' or the cute (to some) GEICO gecko promising low prices.

23 **VIII.  CLAIMS FOR RELIEF**

24                          **COUNT I**

25                 **Violation of the Sherman Act**

26     104.  Plaintiffs incorporate by reference the preceding allegations.

27     105.  Beginning at least as early as March 2004, and continuing thereafter to the

28 present, the exact dates being unknown to plaintiffs, defendants and their co-conspirators

1  engaged in a combination and conspiracy in unreasonable restraint of the aforesaid interstate

2  trade and commerce in violation of Section 1 of the Sherman Act.

3      106.    The aforesaid combination and conspiracy has consisted of a continuing

4  agreement, understanding and concert of action among the defendants and their co-conspirators,

5  the substantial terms of which have been:

6            (a)    to fix, raise, maintain and stabilize the price of title insurance throughout

7  California;

8            (b)    to fix, raise, maintain and stabilize the terms and conditions of sale of title

9  insurance in California; and

10            (c)    to allocate and divide the market for title insurance in California.

11      107.    In the absence of proper regulatory authority and oversight, defendants' conduct

12  constitutes a horizontal agreement to fix the form, structure, and prices of title insurance and to

13  allocate and divide the title insurance market in California and is a *per se* violation of Section I

14  of the Sherman Act.

15      108.    Defendants' price-fixing, market allocation and division activity has been

16  continuous throughout the relevant damages period and has been renewed and reinforced

17  annually through submissions to the OIC of supposed cost and revenue information and its

18  periodic submissions of rate changes.

19      109.    Through their collective price-fixing, market allocation and division and

20  manipulation of the regulatory process, defendants have harmed competition by charging

21  consumers supra competitive prices for title insurance in California, evidenced in part by the

22  fact that the prices are uniformly higher than compared with the cost of providing the insurance.

23      110.    The aforesaid combination and conspiracy has had the following effects among

24  others:

25            (a)    price competition in the sale of title insurance has been suppressed,

26  restrained and eliminated;

27            (b)    prices for title insurance have been raised, fixed, maintained and

28  stabilized at artificially high and non-competitive levels; and

1          (c)     purchasers of title insurance have been deprived of the benefit of free and

2   open competition.

3          111.    During the period of the antitrust violations by defendants and their co-

4   conspirators, plaintiffs and each member of the Class they represent, have purchased title

5   insurance and, by reason of the antitrust violations herein alleged, paid more for such than they

6   would have paid in the absence of said antitrust violations.  As a result, plaintiffs and each

7   member of the Class they represent, have been injured and damaged in an amount presently

8   undetermined.

9                                    **COUNT II**

10                **Violation of Cal. Bus. and Prof. Code § 16720, *et seq.***

11          112.    Plaintiffs incorporate by reference the preceding allegations.

12          113.    Defendants' conduct as set forth above is in violation of the Cartwright Act of

13   California (Cal. Bus. & Prof. Code § 16720, *et seq.*).

14          114.    As a direct result of defendants' unlawful acts plaintiffs have paid artificially

15   inflated prices for title insurance and have suffered injury to their business and property.

16                                   **COUNT III**

17                **Violation of Cal. Bus. And Prof. Code § 17200, *et seq.***

18          115.    The preceding paragraphs of this Complaint are realleged and incorporated by

19   reference.  Plaintiffs assert this claim for violations of California's UCL, Bus. & Prof. Cod §

20   17200, *et seq.*, on behalf of themselves and the members of the Class.

21          116.    Defendants' statements and representations constitute unfair, unlawful and

22   deceptive trade practices in violation of the UCL.

23          117.    All of the wrongful conduct alleged herein occurs and continues to occur in the

24   conduct of defendants' business. Defendants' wrongful conduct is part of a pattern or

25   generalized course of conduct that is repeated in the State of California on hundreds, if not

26   thousands, of occasions daily.

27

28

118.    Plaintiffs have suffered injury in fact and have lost money or property as a result of defendants' unfair, unlawful and/or deceptive practices by paying a higher price for title insurance than they would or should have absent the conduct complained of.

119.    Plaintiffs request that this Court enter such orders or judgment as may be necessary to enjoin the defendants from continuing their unfair, unlawful, and/or deceptive practices, to restore to any person in interest any money which may have been acquired by means of such unfair competition and to disgorge any profits realized by defendants as a result of its unfair, unlawful and/or deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code § 3345, and for such other relief as set forth in the Prayer for Relief.

### COUNT IV

### Unjust Enrichment

120.    Plaintiffs incorporate by reference the preceding allegations.

121.    This Cause of Action is pled in the alternative to all claims and/or causes of action at law.

122.    Defendants have received a benefit from plaintiffs and the Class members in the form of the prices plaintiffs and the Class members paid for defendants' title insurance.

123.    Defendants are aware of their receipt of the above-described benefit.

124.    Defendants received the above-described benefit to the detriment of plaintiffs and each of the other members of the Class.

125.    Defendants continue to retain the above-described benefit to the detriment of plaintiffs and the Class members.

126.    As a result of defendants' unjust enrichment, plaintiffs and the Class members have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand:

1    A.    That the alleged combination and conspiracy among the defendants and their co-

2    conspirators be adjudged and decreed to be an unreasonable restraint of trade in violation of

3    Section 1 of the Sherman Act;

4    B.    That the Court declare that the premiums charged are excessive under state law

5    and order damages;

6    C.    That judgment be entered against defendants, jointly and severally, and in favor

7    of plaintiffs, and each member of the Class they represent, for threefold the damages determined

8    to have been sustained by plaintiffs, and each member of the Class they represent, together with

9    the cost of suit, including a reasonable attorneys' fee;

10    D.    Each of the defendants, successors, assignees, subsidiaries and transferees, and

11    their respective officers, directors, agents and employees, and all other persons acting or

12    claiming to act on behalf thereof or in concert therewith, be perpetually enjoined and restrained

13    from, in any matter, directly or indirectly, continuing, maintaining or renewing the aforesaid

14    combination, conspiracy, agreement, understanding or concert of action, adopting or following

15    any practice, plan, program, or design having a similar purpose or effect in restraining

16    competition; and

17    E.    Such other and further relief as may appear necessary and appropriate.

## JURY TRIAL DEMAND

19    Pursuant to Rule 38, F.R.C.P., plaintiffs demand a trial by jury of the claims alleged herein.

20    DATED:  March 18, 2008            BARRACK, RODOS & BACINE
                                        STEPHEN R. BASSER
21                                      JOHN L. HAEUSSLER

22

23                                      _____
                                            STEPHEN R. BASSER
24
                                        402 West Broadway, Suite 850
25                                      San Diego, CA  92101
                                        Telephone:  (619) 230-0800
26                                      Facsimile:   (619) 230-1874

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BARRACK, RODOS & BACINE
GERALD J. RODOS
JEFFREY GITTLEMAN
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

Attorneys for Plaintiffs Louis and Silvia
Martinez

**UNITED STATES
DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**# 148885    — SH
* * C O P Y * *
March 18, 2008**
**11:33:34**

**Civ Fil Non-Pris**
USAO #.: 08CV0499
Judge..: M. JAMES LORENZ
Amount.:                    $350.00 CK
Check#.: BC5842

**Total—>   $350.00**

FROM: MARTINEZ V. FIDELTIY NAT'L
       FINANCIAL INC

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS
Louis Martinez
Silvia Martinez

**(b)** County of Residence of First Listed Plaintiff   **San Diego**
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Stephen R. Basser, John L. Haeussler, Barrack, Rodos & Bacine,
402 West Broadway, Suite 850, San Diego, CA 92101 (619)230-0800

## DEFENDANTS
Fidelity National Financial, Inc., Fidelity National Title Insurance Company, (list continues on Attachment A to Civil Cover Sheet)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

CLERK, U.S. DISTRICT COURT
DISTRICT OF CALIFORNIA
BY:                              DEPUTY

Attorneys (If Known)

**08 CV 0499 L WMc**

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☒ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity)
Brief description of cause: Class action for violation of the antitrust laws pursuant to Section 1 of the Sherman Act; violation of California Bus. and Prof. Code and Unjust Enrichment  15 U.S.C. § 1526

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):   JUDGE                DOCKET NUMBER

DATE   03/18/2008
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**
RECEIPT #  148885   AMOUNT  $ 350   APPLYING IFP          JUDGE          MAG. JUDGE

Sei 3/18/08

CR

# EXHIBIT 6

FILED

2008 MAR 20 PH 4: 11

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

Christopher Kim (SBN 082080)
Lisa J. Yang (SBN 208971)
**LIM RUGER & KIM, LLP**
1055 West Seventh Street, Suite 2800
Los Angeles, California 90017
Telephone: (213) 955-9500
email: christopher.kim@lrklawyers.com
        lisa.yang@lrklawyers.com

Joseph H. Meltzer
Edward W. Ciolko
Katherine B. Bornstein (SBN 249926)
Terence S. Ziegler
Casandra A. Murphy
**SCHIFFRIN BARROWAY
    TOPAZ & KESSLER, LLP**
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706

Alan R. Plutzik (SBN. 077785)
Robert M. Bramson (SBN 102006)
**SCHIFFRIN BARROWAY TOPAZ
& KESSLER, LLP**
2125 Oak Grove Road, Suite 120
Walnut Creek, CA 94598
Telephone: (925) 945-0770

Counsel for Plaintiffs,

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| VINCENT LEON DAVIS, individually and on behalf of all others similarly situated, | Case No. **CV08-01897 DSF JWx** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| FIDELITY NATIONAL FINANCIAL, INC., FIDELITY NATIONAL TITLE INSURANCE COMPANY, TICOR TITLE INSURANCE COMPANY, TICOR TITLE INSURANCE COMPANY OF FLORIDA, CHICAGO TITLE INSURANCE COMPANY, | |

LIM, RUGER & KIM, LLP

NATIONAL TITLE INSURANCE OF NEW YORK, INC., SECURITY UNION TITLE INSURANCE COMPANY, THE FIRST AMERICAN CORPORATION, FIRST AMERICANTITLE INSURANCE COMPANY, UNITED GENERALTITLE INSURANCE COMPANY, LANDAMERICA FINANCIAL GROUP, INC., COMMONWEALTH LAND TITLE INSURANCE COMPANY, LAWYERS TITLE INSURANCE CORPORATION, TRANSNATION TITLE INSURANCE COMPANY, STEWART TITLE GUARANTY COMPANY and STEWART TITLE INSURANCE COMPANY

Defendants.

Plaintiff, ("Plaintiff") by his attorneys, on behalf of himself and all others similarly situated, hereby seek treble damages, other monetary relief and injunctive relief for defendants' violations of United States and California antitrust laws alleging as follows:

## I.     INTRODUCTION

1.     The purpose of title insurance is to protect the buyer against previously undiscovered title defects which may encumber the use, enjoyment or transfer of the property.  Title insurers do not guarantee a clean title but rather safeguard the policyholder against title defects found after the property has been transferred.  Therefore, the only protection afforded to the insured concerns the highly unlikely event that an undetected title deficiency existed prior to the time the policy was issued.

2.     Consumers often find themselves in unfamiliar territory when it comes to title insurance.  The majority of homebuyers are overwhelmed by the

LIM, RUGER & KIM, LLP

1    tremendous amount of paperwork that is flashed before their eyes during the

2    closing process of a home purchase. They generally walk away from the closing

3    without any understanding of their title insurance policy. There is a marked

4    contrast between title insurance and traditional life, automotive and homeowner

5    insurance policies that are marketed to consumers.

6        3.    Title companies do not engage in direct to consumer marketing.

7    Instead, the title insurance industry operates on what is termed a "reverse

8    competition" model. Reverse competition means that title insurers solicit business

9    referrals from the other major players in the home purchase scenario – real estate

10   agents and agencies, banks, lenders, builders, developers and other middlemen or

11   go-betweens who are in the best position to influence buyers. Indeed, buyers

12   typically defer, often unknowingly, to their lender, builder, real estate agent or

13   representative to select a title company. These middlemen act on behalf of the title

14   insurance companies in return for receiving kickbacks and other financial

15   incentives. Insurance consumers, in most cases, are effectively removed from the

16   decision-making process and assigned a policy. The title insurance industry

17   operates on an inherently corrupt system that eliminates competition based on the

18   services and policies rendered. In fact, their rates and policy structures are

19   primarily dictated through publications created by their national trade association,

20   the American Land Title Association.

21       4.    Reverse competition, as the term suggests, isn't a model that benefits

22   consumers through market-driven forces. In fact, consumers are bypassed

23   completely as title companies spend nearly all of their marketing budgets "wining

24   and dining" real estate agents, lenders, builders, developers and others in an effort

25   to convince these middlemen to steer their home-buying clients to their companies

26   for their title insurance needs.

27       5.    The California title insurance market is dominated by four groups of

28

LIM, RUGER & KIM, LLP

3

CLASS ACTION COMPLAINT

affiliated companies which control over 90 percent of the policies sold in the state. In addition, these powerful groups own and control a majority of California title plants that virtually every title insurer uses to issue title policies.

6.    Title insurers have industry meetings where they set rates that are ultimately filed and frequently rubberstamped by the applicable state insurance agency. The title insurance companies, in their respective markets, collectively come to an agreement on a set price that in no manner accounts for their miniscule risk exposure or the nature of the property being insured. They are able to essentially regulate themselves and eliminate any competition in the consumer market. As a result of the joint agreement as to rates, the courting of middlemen through financial rewards is the only aspect of title insurance business that is competitive.

7.    Having agreed to fix prices in states where joint rate setting occurs, the companies agreed to not compete based on price to the consumer in other states, including California., where regulation of filed rates is lax or non-existent. Thus, they agreed to set rates at supracompetitive prices and to compete based on offering inducements to middlemen. In California, in three successive reports, the Office of the Insurance Commissioner ("OIC") has found an "astonishing number" of such inducements that are in violation of state law. However, the OIC does not actively oversee or regulate rates, and, in fact, does not by its own admission have the power to do so. The absence of regulation has allowed collusive behavior and excessive rates.

8.    In addition to paying inducements and kickbacks, the title companies and their agents divide the market of real-estate middlemen through the use of Affiliated Business Arrangements ("ABAs"), wherein the dominant real estate brokers purchase significant ownership stakes in favored title insurance affiliates. The real estate brokers then reward their associates for using the preferred title

LIM, RUGER & KIM, LLP

4
CLASS ACTION COMPLAINT

1  insurance providers and lock out independent title insurers.

2      9.    In this action, plaintiff, on behalf of a Class of those purchasing title

3  insurance in California, seek damages arising from defendants' violations of the

4  Sherman Act as well as California statutory law.

5             **II.    JURISDICTION AND VENUE**

6      10.    Plaintiff and class members bring this action to recover monetary

7  damages, including treble damages, and to obtain injunctive relief, costs of suit,

8  and reasonable attorneys' fees arising from the defendants' violations of Section 1

9  of the Sherman Act (15 U.S.C. § 1).

10      11.    This Court has jurisdiction over this action pursuant 28 U.S.C. §§

11  1331, 1337(a) and 1367.

12      12.    Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15

13  and 22, and 28 U.S.C. § 1391 (b) and (c), in that defendants maintain offices,

14  conduct business or are found within this judicial district.

15               **III.    PARTIES**

16  **A.    Plaintiff**

17      13.    Plaintiff, Vincent Leon Davis, is an individual residing in Los Angeles

18  County, California.  During the class period, plaintiff purchased title insurance

19  directly from one or more defendants herein and was injured by the unlawful

20  conduct alleged in this complaint.

21  **B.    Defendants**

22      14.    Defendant Fidelity National Financial, Inc. ("Fidelity National") is a

23  Delaware corporation headquartered at 601 Riverside Avenue, Jacksonville,

24  Florida 32204.  Fidelity National does business in California through one or more

25  of its subsidiaries, including but not limited to, defendants Fidelity National Title

26  Insurance Company, Ticor Title Insurance Company, Ticor Title Insurance

27  Company of Florida, National Title Insurance of New York, Inc., Security Union

28

LIM, RUGER & KIM, LLP

1    Title Insurance Company, and Chicago Title Insurance Company.  Fidelity

2    National is registered to do business in California.

3         15.    Defendant Fidelity National Title Insurance Company ("FNTIC") is a

4    California Corporation with its principal place of business at 601 Riverside Ave.,

5    Jacksonville, Florida 32204. FNTIC does business in California, is a licensed title

6    insurance company in California and is registered to do business in California.

7         16.    Defendant Ticor Title Insurance Company ("Ticor") is a California

8    Corporation with its principal place of business at 601 Riverside Ave.,

9    Jacksonville, Florida 32204. Ticor does business in California, is a licensed title

10   insurance company in California and is registered to do business in California.

11        17.    Defendant Ticor Title Insurance Company of Florida ("TTICF") is a

12   Florida corporation with its principal place of business at 601 Riverside Ave.,

13   Jacksonville, Florida 32204.  TTICF does business in California, is a licensed title

14   insurance company in California and is registered to do business in California.

15        18.    Defendant Chicago Title Insurance Company ("Chicago Title") is a

16   Missouri Corporation with its principal place of business at 601 Riverside Ave.,

17   Jacksonville, Florida 32204.  Chicago Title does business in California, is a

18   licensed title insurance company in California and is registered to do business in

19   California.

20        19.    Defendant National Title Insurance of New York, Inc. ("NTINY") is a

21   New York corporation with its principal place of business at 601 Riverside Ave.,

22   Jacksonville, Florida 32204.  NTINY does business in California, is a licensed title

23   insurance company in California and is registered to do business in California.

24        20.    Defendant Security Union Title Insurance Company ("SUTIC") is a

25   California corporation with its principal place of business at 601 Riverside Ave.,

26   Jacksonville, Florida 32204.  SUTIC does business in California, is a licensed title

27   insurance company in California and is registered to do business in California.

28

LIM, RUGER & KIM, LLP

CLASS ACTION COMPLAINT

1    21.    The Fidelity family of title insurance companies (collectively,

2    "Fidelity") – which includes defendants Fidelity National, FNTIC, Ticor, TTICF,

3    Chicago Title, NTINY and SUTIC, and their affiliates – is engaged in selling title

4    insurance to purchasers of commercial and residential real estate throughout the

5    United States, including California.  Nationally, Fidelity accounts for

6    approximately 27 percent of title premiums, which in 2006 amounted to roughly

7    $4.6 billion.  Fidelity, Chicago Title and Ticor were founding members of TIRSA

8    (defined below) and since TIRSA's inception have charged title insurance rates in

9    New York that TIRSA collectively sets.

10    22.    The Fidelity family of title insurance companies and their affiliates are

11    wholly-owned and controlled by defendant Fidelity National Financial, Inc.

12    Through its subsidiaries, Fidelity National is a provider of title insurance, specialty

13    insurance, and claims management services.  Fidelity National had 2006 revenues

14    of roughly $9.4 billion.  The Fidelity family of title insurance companies engaged

15    in the conduct challenged herein with the approval and assent of defendant Fidelity

16    National.

17    23.    Defendant The First American Corporation ("First American") is a

18    California corporation with its headquarters at 1ST American Way, Santa Ana,

19    California 92707.  First American does business in California through one or more

20    of its subsidiaries, including but not limited to, defendants First American Title

21    Insurance Company and United General Title Insurance Company.

22    24.    Defendant First American Title Insurance Company ("FATIC") is a

23    California corporation with its headquarters at 1st American Way, Santa Ana,

24    California 92707.  FATIC does business in California, is a licensed title insurance

25    company in California and is registered to do business in California.

26    25.    Defendant United General Title Insurance Company ("UGTIC") is a

27    Colorado corporation located at 8310 S. Valley Highway, Suite 130, Englewood,

28

LIM, RUGER & KIM, LLP

1  CO 80112. UGTIC does business in California, is a licensed title insurance
2  company in California and is registered to do business in California.

3      26.   The First American family of title insurance companies (collectively,
4  "First American") – which includes defendants First American, FATIC and
5  UGTIC, and their affiliates – is engaged in selling title insurance to purchasers of
6  commercial and residential real estate throughout the United States, including
7  California. Nationally, First American accounts for approximately 29 percent of
8  title premiums, which in 2006 amounted to roughly $4.8 billion. First American
9  Title was a founding member of TIRSA and since TIRSA's inception has charged
10 title insurance rates in New York that TIRSA collectively sets.

11     27.   The First American family of title insurance companies and their
12 affiliates are wholly-owned and controlled by defendant The First American
13 Corporation. Through its subsidiaries, First American is a provider of title
14 insurance, business information, and related products and services. First American
15 had 2006 revenues of roughly $8.5 billion. The First American family of title
16 insurance companies and their affiliates engaged in the conduct challenged herein
17 with the approval and assent of defendant First American.

18     28.   Defendant LandAmerica Financial Group, Inc. ("LandAmerica") is a
19 Virginia corporation headquartered at 5600 Cox Road, Glen Allen, Virginia 23060.
20 Land America does business in California through one or more of its subsidiaries,
21 including but not limited to, defendants Commonwealth Land Title Insurance
22 Company, Lawyers Title Insurance Corporation and Transnation Title Insurance
23 Company.

24     29.   Defendant Commonwealth Land Title Insurance Company ("CLTIC")
25 is a Pennsylvania corporation with is principal place of business at 5600 Cox Road,
26 Glen Allen, Virginia 23060. CLTIC does business in California, is a licensed title
27 insurance company in California and is registered to do business in California.

28

LIM, RÜGER & KIM, LLP

30.     Defendant Lawyers Title Insurance Corporation ("LTIC") is a Nebraska corporation with is principal place of business at 5600 Cox Road, Glen Allen, Virginia 23060. LTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

31.     Defendant Transnation Title Insurance Company ("TNTIC") is a Nebraska corporation with is principal place of business at 5600 Cox Road, Glen Allen, Virginia 23060. TNTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

32.     The LandAmerica family of title insurance companies (collectively, "LandAmerica") -- which includes defendants LandAmerica, CLTIC, LTIC and TNTIC, and their affiliates -- is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including California. Nationally, LandAmerica accounts for approximately 19 percent of title premiums, which in 2006 amounted to roughly $3.15 billion. Commonwealth and Lawyers Title were founding members of TIRSA and since TIRSA's inception have charged title insurance rates in New York that TIRSA collectively sets.

33.     The LandAmerica family of title insurance companies and their affiliates are wholly-owed and controlled by defendant Land America Financial Group, Inc.  Through its subsidiaries, LandAmerica is a provider of title insurance and other products and services that facilitate the purchase, sale, transfer, and financing of residential and commercial real estate.  LandAmerica had 2006 revenues of roughly $4 billion.  The LandAmerica family of title insurance companies and their affiliates engaged in the conduct challenged herein with the approval of defendant LandAmerica.

34.     Defendant Stewart Title Guaranty Company ("STGC") is a Texas corporation headquartered at 1980 Post Oak Blvd., Suite 800, Houston, Texas 77056. STGC does business in California, is a licensed title insurance company in

CLASS ACTION COMPLAINT

1   California and is registered to do business in California.

2      35.   Defendant Stewart Title Insurance Company ("STIC") is a New York

3   corporation with its principal place of business at 300 E. 42nd St., Floor 10, New

4   York, NY 10017. STIC does business in California, is a licensed title insurance

5   company in California and is registered to do business in California.

6      36.   The Stewart family of title insurance companies (collectively,

7   "Stewart") – which includes defendants STGC and STIC, and its affiliates – is

8   engaged in selling title insurance to purchasers of commercial and residential real

9   estate throughout the United States and California. Nationally, Stewart accounts

10   for approximately 12 percent of title premiums, which in 2006 amounted to

11   roughly $2 billion. Stewart was a founding member of TIRSA and since TIRSA's

12   inception has charged title insurance rates in New York that TIRSA collectively

13   sets.

14      37.   Together, defendants account for more than 85 percent of the title

15   premiums consumers pay in California. Nationally, they account for more than 85

16   percent of title premiums, which in 2006 amounted to roughly $14.5 billion.

17   Throughout the relevant damages period, defendants charged California consumers

18   in California virtually identical title insurance rates.

19             **IV.   OTHER ENTITIES**

20      38.   TIRSA is a voluntary association of title insurers licensed as a rate

21   service organization pursuant to Article 23 of the State of New York Insurance

22   Law. TIRSA maintains its offices in New York City, which until recently were

23   located at the same New York address of Fidelity Title.

24      39.   TIRSA annually compiles from its members statistical data relating to

25   their title insurance premiums, losses and expenses and submits this information in

26   aggregate form to the New York Insurance Department. TIRSA also prepares and

27   submits the New York Title Insurance Rate Manual which sets forth title rates to

28

LIM, RUGER & KIM, LLP

1  be charged and rules to be followed by TIRSA's members.  The Insurance

2  Department has never objected to any of the rates TIRSA has collectively set.

3  Similarly, the California OIC has not actually held a public hearing or conducted

4  any other review or regulation of the title insurance rates in California for thirty

5  years.

6      40.    TIRSA's membership is comprised of defendant insurers and all other

7  title insurers that are licensed to issue policies in New York.  Currently, Fidelity,

8  First American, LandAmerica, and Stewart collectively represent 14 of TIRSA's 22

9  members.  As such, they comprise a majority voting block which, according to

10  TIRSA's by-laws, allows them to control the operations of TIRSA and, in

11  particular, TIRSA's collective rate setting activity.

12      41.    Various other persons, firms and corporations not made defendants

13  herein have participated as co-conspirators with the defendants in the violations

14  alleged herein and have performed acts and made statements in furtherance

15  thereof.

16      **V.    CLASS ACTION ALLEGATIONS**

17      42.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of

18  Civil Procedure, particularly Rule 23(b)(3), on behalf of himself and the following

19  class (the "Class"):

20          All persons who purchased title insurance directly from

21          one or more of the defendants and/or their co-

22          conspirators for residential and commercial property in

23          California during the four year period preceding this

24          lawsuit.  Excluded from the Class are defendants, their

25          parent companies, subsidiaries and affiliates, government

26          entities and judges or justices assigned to hear any aspect

27          of this case.

28

LIM, RUGER & KIM, LLP

1    43.    Plaintiff does not currently know the exact number and identities of

2    class members but such information is known by defendants and is ascertainable

3    through appropriate discovery.  Plaintiff believes that the number of potential class

4    members is so numerous that joinder is impracticable.

5    44.    Plaintiff's claims are typical of the Class because all members of the

6    Class are direct purchasers of title insurance, injured in the same manner by the

7    same wrongful conduct of defendants, and seek relief that is common to the Class.

8    The questions of law and fact common to the Class members predominate over any

9    questions which may affect only individual members.

10    45.    Plaintiff will fairly and adequately represent the interests of the Class

11    in that plaintiff is a direct purchaser of title insurance during the relevant damage

12    period and has no conflict with any other members of the Class.  Furthermore,

13    plaintiff has retained competent counsel experienced in antitrust class action

14    litigation.

15    46.    Plaintiff, along with other members of the Rule 23(b)(3) Class, was

16    injured as a result of paying supracompetitive prices for title insurance in

17    California.  These supracompetitive prices were achieved as a result of defendants'

18    illegal price-fixing activities and market allocation and division.

19    47.    Members of the (b)(3) Class include hundreds of thousands, if not

20    millions, of consumers.  They are so numerous that their joinder would be

21    impracticable.

22    48.    Plaintiff also brings this action as a class action under Rule 23(b)(2) of

23    the Federal Rule of Civil Procedure, which includes all members of the 23(b)(3)

24    Class, and all consumers who are threatened with injury by the anticompetitive

25    conduct detailed herein.

26    49.    Defendants have acted, continued to act, refused to act and continued

27    to refuse to act on grounds generally applicable to the Rule 23(b)(2) Class, thereby

28

LIM, RUGER & KIM, LLP

1  making appropriate final injunctive relief with respect to the Rule 23(b)(2) Class as
2  a whole.

3      50.   Members of the Rule 23(b)(2) Class include hundreds of thousands, if
4  not millions, of consumers. They are so numerous that their joinder would be
5  impracticable.

6      51.   Among the questions of law and fact common to the Class are:

7          (a) Whether defendants have engaged in the alleged illegal price-
8              fixing activity and market allocation and division;

9          (b) The duration and scope of defendants' alleged illegal price-
10             fixing and market allocation and division activity;

11         (c) Whether defendants' alleged illegal price-fixing and market
12             allocation and division has caused higher prices to plaintiff and
13             other purchasers of title insurance in California; and

14         (d) Whether plaintiff and the other class members are entitled to,
15             among other things, injunctive relief, and if so, the nature and
16             extent of such injunctive relief.

17     52.   A class action is superior to other available methods for the fair and
18 efficient adjudication of this controversy. The prosecution of duplicative litigation
19 by individual Class members would create an unnecessary risk of inconsistent or
20 varying adjudications potentially leading to the establishment of incompatible
21 standards of conduct for defendants. The Class is readily definable and the
22 prosecution as a class action provides the only adequate means of redress for
23 otherwise diminutive claims that could not reasonably support the expense of an
24 individual litigation.

25                 **VI.   TRADE AND COMMERCE**

26     53.   During the Class period, each defendant and their co-conspirators sold
27 title insurance in California and in a continuous and uninterrupted flow of
28

LIM, RUGER & KIM, LLP

1  interstate commerce

2      54.   During the Class period, defendants collectively dominated the title

3  insurance market.  Title insurance consumers in the United States paid an

4  estimated $17 billion for residential title insurance in 2005.

5      55.   During the Class period, defendants dominated over 85% of the title

6  insurance market in California and the United States.

7      56.   During the Class period, Class members outside of California

8  purchased residential or commercial title insurance within the State of California.

9      57.   The business activities of the defendants and their co-conspirators

10  were within the flow of interstate commerce and substantially affected interstate

11  commerce in the United States.

## VII.   FACTUAL ALLEGATIONS

### A.   The Nature of Title Insurance

14      58.   In California, title insurance rates are based on a percentage of the

15  total value of the property being insured.  For example, a California residential

16  property that was sold for $500,000 would have cost the buyer approximately

17  $1,500 for title insurance in 2005.

18      59.   Consumers are required to purchase title insurance when they take

19  possession of property.  Mortgage loans will not be approved without the security

20  of a title insurance policy.  Title companies perform extensive research to identify

21  any defects that may encumber a property before it is transferred to an owner.

22  Title insurance is a necessary commodity that protects an owner from defects that

23  existed, but were not identified by the title company, prior to their settlement.

24      60.   Title insurance companies operate their business on the premise that

25  consumers are generally uninformed or unaware of all matters concerning title

26  insurance.  Buyers are generally not presented, at any time, with an opportunity to

27  make an independent decision regarding any aspect of their property title.  In most

28

LIM, RUGER & KIM, LLP

1    cases, the buyer is not aware that they have a choice when it comes to selecting a

2    title company. Even a sophisticated buyer, however, is powerless at the bargaining

3    table because title companies have eliminated competition from the market. The

4    unregulated, fixed rate charged for title insurance is not, by any reasonable

5    evaluation, commensurate with the associated risks assumed and the services

6    rendered.

7         61.    The title insurer bears a statistically minimal risk for undetected title

8    defects that existed prior to the transfer of property. A competent review of the

9    previous ownership history should reveal any encumbrances, liens, exclusions, or

10   other defects in the title which are excluded from the insured's policy. The

11   information necessary to identify title deficiencies is readily available and highly

12   dependable. The extent of the search itself is dependant on a number of factors

13   including the earliest recorded age of the property, the number of transfers, and the

14   integrity and accessibility of ownership records. The complexity of the title

15   company's research and review process is unrelated to the value of the property or

16   rate charged to the insured. Indeed, the national average recovery for a claim on a

17   title insurance policy is approximately 5% of the total premium. On the other

18   hand, the national average for property insurance is approximately 80% of the total

19   premium collected.

20        62.    The most effective, but illegal, way for a particular title insurer to get

21   business is to encourage those making the purchasing decisions – the real-estate

22   middlemen – to steer business to that insurer. The best way to so motivate the

23   middlemen is not through lower prices (that they are not even paying). Rather, it is

24   through kickbacks in the form of finder's fees, gifts, meals, business services and

25   other financial enticements. Therefore, it is through higher pricing (which allows

26   for generous inducements and kickbacks), not lower pricing that provides the best

27   way for title insurers to compete and increase their business.

28

LIM, RUGER & KIM, LLP

63. New York is one of several states in which the leading title insurers collectively fix their prices through a rate-setting organization like TER.SA. There are two principal cost components that go into TIRSA's calculation. One comprises the risk associated with issuing the title policy. The other comprises the "agency commissions" paid to title agents.

64. The risk component covers the risk the title insurer bears for any undiscovered defects in the title. Unlike property insurance, title insurance carries with it a very limited risk of loss to the insurer. That is because title insurance protects against unknown prior events that cause defects in title. With a proper search and examination of prior ownership records, any such defects can and almost always are readily identified and excluded from the policy's coverage. Consequently, the average claim payout on a title insurance policy in the United States amounts to only about 5 percent of the total premium collected. This is very different from property coverage (such as auto and home insurance) — which protects against future occurrences over which the insurer has little to no control — where the average claim payout amounts to about 80 percent of the total premium.

65. The "agency commissions" component of the title insurance rate covers payments made to title agents. Defendants have an ownership or management stake in many of the title agencies to which these payments are made. A small portion of these payments is for the search and exam of prior ownership records of the property being purchased to identify any liens, encumbrances, burdens, exclusions, or other defects in the title. The search and exam function does not involve the spreading or underwriting of risk, and title insurers typically outsource this task to title agents.

66. The remainder, and by far the bulk, of the agency commissions are comprised of costs unrelated to the issuance of title insurance. These costs include kickbacks and other financial inducements title insurers provide to title agents and

CLASS ACTION COMPLAINT

LIM, RUGER & KIM, LLP

1   indirectly (through title agents) to the lawyers, brokers, and lenders who, in reality,

2   are the ones deciding which title insurer to use. These payments have nothing to do

3   with the issuance of title insurance and are made by title insurers merely to inflate

4   their revenues and steer business their way.

5        67.   Under TIRSA's collective rate setting regime, roughly 85 percent of

6   the total title insurance premium is based on the so-called "costs" associated with

7   the payment of agency commissions. Only 15 percent is based on costs associated

8   with the risk of loss.

9        68.   TIRSA publishes its final calculated title rates in the New York Title

10   Insurance Rate Manual. These rates are tied to the value of the property being

11   insured. This is so despite the fact that the costs associated with agency

12   commissions are entirely unrelated to the value of the property. Indeed, agency

13   kickbacks and enticements have little to do with producing a particular title policy

14   and provide no value – proportional to property value or otherwise – to the

15   consumer. Even search and exam costs are unrelated to property value. They

16   instead depend on the age of the property, the complexity of the ownership history,

17   and the accessibility of prior ownership records.

18        69.   There are other states in which the defendants overly meet and agree

19   to fix the rates for title insurance as part of a formal collective rate setting process.

20   **B.   TIRSA's Formation**

21        70.   Prior ot TIRSA, the New York Board of Title Underwriters

22   ("NYBTU") served as the title insurance rate-setting body in New York. NYBTU,

23   along with the title insurance rate setting bureaus in many other states, was

24   disbanded in the mid-1980s in the wake of a Federal Trade Commission ("FTC")

25   challenge to the collective rate setting activity of many of these associations. The

26   FTC's challenge culminated in *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621 (1992),

27   where the Supreme Court held that to avoid per se illegal price-fixing liability, the

28

LIM, RUGER & KIM, LLP

1 rate setting activity of these rating bureaus must be actively supervised by the state.

2     71.    In Ticor, the Supreme Court ruled that the rate establishing entities

3 within the individual states must be overseen and regulated by the state to avoid

4 per se price-fixing in violation of the Sherman Act. The Court found that the

5 respective state insurance departments failed to perform an independent review of

6 the title insurance industry's self-proclaimed fixed rates to determine their

7 reasonableness. It was held that the state insurance department must "exercise

8 sufficient independent judgment and control so that the details of the rates or prices

9 have been established as a product of deliberate state intervention, not simply by

10 agreement among private parties." Ticor, 504 U.S. at 634-35.

11     72.    The Third Circuit, reviewing Ticor on remand, concurred with the

12 FTC's finding that the collective rate-setting of certain state rating bureaus was

13 improper because it was not actively supervised by the state. The court wrote,

14 "[t]he Supreme Court plainly instructed us that a state's rubber stamp is not

15 enough. Active supervision requires the state regulatory authorities' independent

16 review and approval." Ticor Title Ins. Co. v. FTC, 998 F.2d 1129, 1139 (3d Cir.

17 1992).

18     73.    Defendants implemented a counter maneuver designed to circumvent

19 the Supreme Court's ruling in Ticor. Through TIRSA, defendants have set up a

20 rate-setting scheme to get around the rigors of state oversight required by Ticor.

21 They have done so by calculating a single rate that comprises both risk and agency

22 commission costs and by outsourcing to title agents the agency commission costs.

23 In this way, defendants avoid providing the Insurance Department with any

24 detailed breakout or backup for the bulk of the costs that make up their collectively

25 fixed rates.

26     74.    TIRSA merely submits an aggregated figure that is supposed to

27 represent the total agency commission costs. Embedded within this figure is the

28

LIM, RUGER & KIM, LLP

CLASS ACTION COMPLAINT

1 vast quantity of dollars that are funneled to and through the title agencies as

2 kickbacks, financial inducements and other costs unrelated to the issuance of title

3 insurance. Defendants' design in all of this has been to effectively "hide" the cost

4 basis for their artificially high and collectively fixed title insurance premiums from

5 the regulatory scrutiny that Ticor demands.

6 **C.      Lack of Regulatory Supervision and Authority in New York**

7 **and Other States Including California**

8       75.     There is no provision under the New York Insurance Law for TIRSA

9 to include in its collectively fixed rates kickbacks and other agency commission

10 payments unrelated to the issuance of title insurance. Indeed, the New York

11 Insurance Department has openly acknowledged that it lacks the authority to

12 review any agency commission payments. It has likewise recognized that

13 defendants' outsourcing of agency commission costs has prevented it from

14 performing a meaningful review of TIRSA's calculated rates. This was made clear

15 at a November 2006 public hearing the New York Insurance Department held -- the

16 first in 15 years -- where it questioned TIRSA and its members on TIRSA's failure

17 to provide the Insurance Department with any backup or detail for agency

18 commissions.

19       76.     At the hearing, the Insurance Department conceded that it could not

20 properly evaluate TIRSA's calculated rates, and that it could only do so if it

21 obtained the detailed cost information on agency commissions that TIRSA does

22 not provide.

23       77.     The Insurance Department's recognition that it is not properly

24 supervising TIRSA's rate-setting activity is consistent with the April 2007 findings

25 of the U.S. Government Accountability Office ("GAO") that the title insurance

26 industry is in need of greater state regulation. The GAO studied the industry

27 conditions of several states, including New York, and concluded that "state

28

LIM, RUGER & KIM, LLP

1  regulators have not collected the type of data, primarily on title agents' costs and

2  operations, needed to analyze premium prices and underlying costs."

3    78.    Unchecked by regulatory review and insulated from competition,

4  defendants have thus been able to collectively fix title insurance rates at

5  supracompetitive levels and earn profits that vastly exceed those contemplated by

6  the Insurance Department or that would have resulted in a free and open

7  competitive market.

8    79.    At the time of TIRSA's formation, the Insurance Department

9  established 5 percent (of the total premium) as the level of profit to which title

10  insurers are entitled.  The Insurance Department is supposed to carefully analyze

11  TIRSA's rate calculations, and, in particular, its revenue and cost information, to

12  ensure that this 5 percent profit level is maintained and based on a reasonable

13  premium.  However, without the authority or ability to scrutinize agency

14  commission costs, the Insurance Department has been unable to perform this

15  function.  As a result, defendants (through TIRSA) have been able to set artificially

16  high title premiums and secure title profits far in excess of the 5 percent threshold.

17    80.    Through an independent investigation conducted over the past several

18  years, the New York State Attorney General found that for every dollar of

19  insurance premium defendants collected, of the roughly 15 cents that supposedly

20  accounts for the risk of loss, only 3 cents is paid out in claims.  And, of the roughly

21  85 cents that supposedly covers agency commissions, only between 8 and 11 cents

22  goes to costs actually incurred by title agents in producing the title policy.  These

23  numbers show that title insurers' collectively fixed rates have resulted in profits

24  that untethered to and vastly exceeded the costs of producing such policies.

25    81.    The New York Attorney General's investigation further revealed that

26  what was largely driving these numbers were the kickbacks and other financial

27  inducements defendants were funneling to and through title agents to secure more

28

LIM, RUGER & KIM, LLP

20
CLASS ACTION COMPLAINT

business.  As reported in the New York Insurance Department's 2006 hearing, one title agency's financial statements revealed that it spent more than $1 million of these so-called "agency commissions" on items identified as "Christmas", "automobile expenses", "political contributions", "promotional expenses", and "travel and entertainment".  These expenses are not even remotely related to the issuance of title insurance.

82.  The Washington State Insurance Commissioner's October 2006 report found strikingly similar abuses in Washington.  Violations were pervasive and the Commissioner concluded that consumers were paying too much as a result.

83.  All of this "excess money" paid to title agents not only works to steer business to defendants.  It also serves to boost defendants' own profits through the inflated revenues they obtain to cover these agency payments and through their ownership or management stake in many of these agencies.

84.  Defendants are competitors in the sale of title insurance to consumers throughout the United States.  These title insurers have agreed and engaged in concerted efforts to (i) collectively set and charge uniform and supracompetitive rates for title insurance, (ii) include in their calculated rate agency commission costs, (iii) embed within these costs payoffs, kickbacks, and other charges that are unrelated to the issuance of title insurance, and (iv) hide these supposed "costs" from regulatory scrutiny by funneling them to and through title agents over which the government agencies have no ability or authority to regulate.

85.  The United States Government Accountability Office ("GAO") in its 2007 report entitled "Actions Needed to Improve Oversight of the Title Insurance Industry and Better Protect Consumers" found several indicia of a lack of competition and questions about the reasonableness of prices including:

LIM, RUGER & KIM, LLP

1    • Consumers find it difficult to shop for title insurance, therefore,

2    they put little pressure on insurers and agents to compete based on

3    price;

4    • Title agents do not market to consumers, who pay for title

5    insurance, but to those in the position to refer consumers to

6    particular title agents, thus creating potential conflicts of interest;

7    • A number of recent investigations by HUD and state regulatory

8    officials have identified instances of alleged illegal activities with

9    the title industry that appear to reduce price competition and could

10   indicate excessive prices;

11   • As property values or loan amounts increase, prices paid for title

12   insurance by consumers appear to increase faster than insurers' and

13   agents' costs; and

14   • In states where agents' search and examination services are not

15   included in the premium paid by consumers, it is not clear that

16   additional amounts paid to title agents are fully supported by

17   underlying costs.

18   86.    The GAO visited several states, including California, and found a lack

19   of regulatory oversight:

20   In the states we visited, we found that regulators did not

21   assess title agents' costs to determine whether they were

22   in line with premium rates; had made only limited efforts

23   to oversee title agents (including ABAs involving

24   insurers and agents); and, until recently, had taken few

25   actions against alleged violations of antikickback laws.

26   In part, this situation has resulted from a lack of

27   resources and limited coordination among different

28

LIM, RUGER & KIM, LLP

1      regulators within states.  On the federal level, authority

2      for alleged violations of section 8 of RESPA, including

3      those involving increasingly complex ABAs, is limited to

4      seeking injunctive relief.  Some state regulators

5      expressed frustration with HUD's level of responsiveness

6      to their requests for help with enforcement, and some

7      industry officials said that RESPA rules regarding ABAs

8      and referral fees need to be clarified.  Industry and

9      government stakeholders have proposed several

10     regulatory changes, including RESPA reform,

11     strengthened regulation of agents, a competitor right of

12     action with no monetary penalty, and alternative title

13     insurance models.  [Id. at 41, footnotes omitted.]

**D.  Competition Based on Kickbacks and Inducements but not Rates**

87.   Having agreed to fix or stabilize prices in New York and other states where they overtly meet to promulgate rates, these same defendants then set out to do the same in other states.

88.   In other words, as a direct result of these meetings where rates were agreed to, these same defendants agreed, either expressly or tacitly, to not compete on rates in other states as well.  To compete on rates in other states could and would imperil their ability to maintain the agreed rate in states like New York.

89.   As is the case in New York, a lack of regulatory authority over rates created an environment in which a conspiracy can and did succeed.  No agency was examining why all the rates were virtually identical, and no agency was examining whether the costs associated with these premiums were reasonable.  This is an environment which is conducive to price-fixing.

LIM, RUGER & KIM, LLP

1  90. In California, there is a lack of regulatory authority and oversight over

2 title insurance companies. The rates in California are not set as part of a deliberate

3 state intervention and the state does not and cannot meaningfully renew or approve

4 these rates. The rates at issue in this case went into effect without review.

5 **E. Other Indicators of a Lack of Competition and Conditions**

6   **Conducive to Collusive Rate Setting**

7   91. In addition to the uniformity of rates, other facts suggest that it is more

8 plausible than not that rates have been set based on an agreement to fix prices.

9   92. In theory, the chain of title should be documented back to its historic

10 grant of ownership centuries past. Fear about a possible title defect in the distant

11 past is widely used as a justification by title agencies when convincing property

12 buyers to purchase an owner policy in addition to the lender policy, which is

13 mandatory to secure a mortgage. The title agency, however, saves much time and

14 money when the search is limited to one or two transactions. They rely on the

15 insurance policy to cover the remote chance of missing an earlier but still valid

16 claim. If such a claim is asserted and survives the scrutiny of the title insurance

17 company's legal department, the expected cost of compensation is likely to be less

18 than the sum of added overhead costs of routinely tracing back every chain of title

19 to the earliest registered owner in the distant past.

20   93. Title insurance Industry officials tend to justify the large proportion of

21 the premium retained by the title abstract and settlement agency (from 60 to more

22 than 90 percent) by the alleged high cost of title searching back into the distant

23 past. In fact, a high proportion of non-commercial properties are searched only

24 through the most recent transaction. No information is available as to what

25 proportion of claims originate in the distant past. The industry has never published

26 pertinent statistics. It would have a marketing incentive to publish these statistics

27 if the risk were significant; that it has not published these statistics indicates that

28

LIM, RUGER & KIM, LLP

1    the risk probably is only slightly greater than zero.

2        94.    Many U.S. homes are being resold three or four times in twenty-five

3    years. At each of these occasions, an abstract of tile will be prepared on the basis

4    of a more or less thorough review of the available title records, inheritance records,

5    family records and records of past or current liens against a property. It is

6    reasonable, therefore, to suspect that the risk of a title defect will decrease every

7    time a property is sold.

8        95.    Title searches have become less labor intensive, especially in large

9    urban counties and cities. More and more of the information is available online.

10   The statistical likelihood that a title default would be overlooked is a closely held

11   industry secret, but it appears to be so small that many transactions are now insured

12   on the basis of a search of the last owner's title history or a search into transactions

13   that occurred during the last twenty-five to thirty-five years. The evidence is

14   strong that the title insurance industry has achieved a remarkably high level of loss

15   minimization.

16       96.    Thus, the costs of production have decreased as has the risk of loss yet

17   none of these factors has resulted in price competition at the consumer level.

18       97.    There is a remarkable absence of rate changes by title insurers over the

19   past five years, despite declining costs of production, increased number of

20   transactions and increased revenue per transaction. During a period when costs per

21   unit of production declined significantly, underwritten title companies and title

22   insurers maintained excessive rates. The prices charged by title insurers and

23   underwritten title companies were not and are not responsive to the changing costs

24   of production or increasing revenue per transaction at a given set of rates. Again,

25   this is indicia of an agreement not to compete based on price.

26       98.    As noted, the title companies engage in illegal rebates and kickbacks

27   where the title insurer or the underwritten title company provides money, free

28

LIM, RUGER & KIM, LLP

LIM, RUGER & KIM, LLP

1   services or other things of value to a real estate agent, a lender or homebuilder in

2   exchange for business referrals.  These illegal rebates and kickbacks — a

3   consequence of reverse competition — show that title insurance rates are

4   supracompetitive and that some portion of the overcharge is passed from the

5   underwritten title company or title insurer to the referrer of business.

6        99.    A lack of competition and the ability to control prices is enhanced by

7   the fact that there were few title insurer entrants over the period from 1995 through

8   2005 and the number of title insurer groups declined as title insurers acquired other

9   title insurers.  There were few underwritten title company entrants over the 2000 to

10  2005 period and new entrants were controlled business arrangements whose

11  addition to the market did not result in greater price competition.

12       100.   Access to title plants can be a barrier to entry, but a large barrier to

13  entry exists due to the established relationships between the entities that can steer

14  the consumer's title and escrow business and the entities who sell title insurance

15  and escrow services.

16       101.   The title insurance market is highly concentrated — a few title

17  insurers account for insurance the vast majority of title insurance sales — at both

18  the statewide level and at the county level in California. For example, three title

19  insurer groups account for 77.4% of the market at a statewide level. At the county

20  level, each individual market was highly concentrated.  The GAO found that First

21  American and Fidelity had a market share of 66 percent.  Such a concentration

22  enhances the ability of companies to fix prices.

23       102.   The agreement not to compete based on price is also evidenced by the

24  fact that no company has marketed its services to consumers, the ultimate

25  purchasers of the product.

26  //

27  //

28  //

LIM, RUGER & KIM, LLP

# VIII. CLAIMS FOR RELIEF

## COUNT I

## VIOLATION OF THE SHERMAN ACT

103. Plaintiff incorporates by reference the preceding allegations as if fully set forth herein.

104. Although the exact dates are unknown to plaintiff, it is herein alleged upon information and belief that beginning at least as early as March, 2004, and continuing thereafter to the present, defendants and their co-conspirators engaged in a contract, combination or conspiracy to unlawfully restrain trade and commerce in violation of Section 1 of the Sherman Act.

105. The aforesaid combination and conspiracy has consisted of a continuing agreement, understanding and concert of action among the defendants and their co-conspirators, the substantial terms of which have been:

        (a)    to fix, raise, maintain and stabilize the price of title insurance throughout the State of California;

        (b)    to fix, raise, maintain and stabilize the terms and conditions of sale of title insurance in the State of California; and

        (c)    to allocate and divide the market for title insurance throughout the State of California.

106. In the absence of proper regulatory authority and oversight, defendants' conduct constitutes a horizontal agreement to fix the form, structure, and prices of title insurance and to allocate and divide the title insurance market in California and is a per se violation of Section I of the Sherman Act.

107. Defendants' price-fixing, market allocation and division activity has been continuous throughout the relevant damages period and has been renewed and reinforced annually through submissions to the OIC of supposed cost and revenue information and its periodic submissions of rate changes.

1    108.    Through their collective price-fixing, market allocation and division

2    and manipulation of the regulatory process, defendants have harmed competition

3    by charging consumers supracompetitive prices for title insurance in California,

4    evidenced in part by the fact that the prices are uniformly higher than compared

5    with the cost of providing the insurance.

6    109.    The aforesaid combination and conspiracy has had the following

7    effects among others:

8        (a)    price competition in the sale of title insurance has been

9        suppressed, restrained and eliminated;

10       (b)    prices for title insurance have been raised, fixed, maintained

11       and stabilized at artificially high and non-competitive levels; and

12       (c)    purchasers of title insurance have been deprived of the benefit

13       of free and open competition.

14   110.    Plaintiff and Class members, as a proximate result of defendants'

15   unlawful conduct in the California title insurance market, have suffered injury in

16   that they paid supracompetitive rates for title insurance.  Defendants' horizontal

17   price fixing scheme, unimpeded by meaningful regulatory oversight, constitutes a

18   per se violation of Section 1 of the Sherman Act.  As a result, plaintiff and each

19   member of the Class he represents, has been injured and damaged in an amount

20   presently undetermined.

21   ## COUNT II

22   ## VIOLATION OF CALIFORNIA BUSINESS

23   ## AND PROFESSIONS CODE §§ 16720, *ET SEQ.*

24   111.    Plaintiff incorporates by reference all the preceding allegations as if

25   fully set forth herein.

26   112.    Defendants' acts, as alleged herein, are in violation of Federal and

27   State antitrust laws and were carried out and effectuated within the State of

28

LIM, RUGER & KIM, LLP

1 | California.

2 | 113. Defendants, beginning no later than March, 2004 and continuing to the
3 | present, violated the Cartwright Act of California (Cal. Bus. & Prof. Code §§
4 | 16720, et seq.).

5 | 114. As a direct result of defendants' unlawful conduct, plaintiff and Class
6 | members, have suffered injury in that they paid more for title insurance than they
7 | would have paid in the absence of the alleged antitrust violations and have suffered
8 | injury to their business and property.

9 | ## COUNT III

10 | ## CALIFORNIA'S BUSINESS & PROFESSIONS CODE §§ 17200, *ET SEQ.*

11 | 115. Plaintiff incorporates by reference all of the preceding allegations as if
12 | fully set forth herein.

13 | 116. Plaintiff and Class members allege that defendants' statements and
14 | misrepresentations constitute unfair, unlawful and deceptive trade practices in
15 | violation California's UCL, Bus. & Prof. Code §§ 17200, et seq.

16 | 117. Defendants' illegal conduct, alleged herein, is ongoing and part of a
17 | larger pattern of conduct that permeates the title insurance industry. Plaintiff and
18 | Class members sustained injuries in the form of lost money or property, paying an
19 | inflated price for title insurance, as a direct result of defendants' conduct in
20 | violation of § 17200 of the California Business and Professions Code.

21 | 118. Plaintiff requests that this Court enjoin the defendants from continuing
22 | its unfair, unlawful, and deceptive practices. Plaintiff and Class members are
23 | entitled to full restitution and/or disgorgement of all revenue, earnings, profits,
24 | compensation, and benefits resulting from defendants' unlawful business acts, as
25 | provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code § 3345, and for
26 | such other relief as set forth in the Prayer for Relief.

27 |
28 |

LIM, RUGER & KIM, LLP

# COUNT IV

## UNJUST ENRICHMENT

119.  Plaintiff incorporates by reference all of the preceding allegations as if fully set forth herein.

120.  This Cause of Action is pled in the alternative to all claims and/or causes of action at law.

121.  Defendants have received a benefit from plaintiff and the Class members in the form of the prices plaintiff and the Class members paid for defendants' title insurance.

122.  Defendants are aware of their receipt of the above-described benefit.

123.  Defendants received the above-described benefit to the detriment of plaintiff and each of the other members of the Class.

124.  Defendants continue to retain the above-described benefit to the detriment of plaintiff and the Class members.

125.  As a result of defendants' unjust enrichment, plaintiff and the Class members have sustained damages in an amount to be determined at trial, and seek full disgorgement and restitution of defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands:

A.  That the alleged combination and conspiracy among the defendants and their co-conspirators be adjudged and decreed an unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

B.  That the Court declare that the premiums charged are excessive under state law and order damages;

C.  That judgment be entered against defendants, jointly and severally, and in favor of plaintiff, and each member of the Class it represents, for threefold

LIM, RUGER & KIM, LLP

CLASS ACTION COMPLAINT

the damages determined to have been sustained by plaintiff, and each member of

the Class it represents, together with the cost of suit, including a reasonable

attorneys' fee;

D.     Each of the defendants, successors, assignees, subsidiaries and

transferees, and their respective officers, directors, agents and employees, and all

other persons acting or claiming to act on behalf thereof or in concert therewith, be

perpetually enjoined and restrained from, in any manner, directly or indirectly,

continuing, maintaining or renewing the aforesaid combination, conspiracy,

agreement, understanding or concert of action, adopting or following any practice,

plan, program, or design having a similar purpose or effect in restraining

competition; and

E.     Other and further relief as may appear necessary and appropriate.

## JURY TRIAL DEMANDED

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff

demands a trial by jury for all claims alleged herein.

Dated: March 20, 2008          **LIM, RUGER & KIM, LLP**

By:     _____

Christopher Kim
Lisa J. Yang

**SCHIFFRIN BARROWAY TOPAZ &
KESSLER, LLP**
Alan R. Plutzik, Of Counsel
Robert M. Bramson, Of Counsel
2125 Oak Grove Road, Suite 120
Walnut Creek, CA  94598
Telephone:  (925) 945-0770
Fax:  (925) 945-8792

LIM, RUGER & KIM, LLP

CLASS ACTION COMPLAINT

1    **SCHIFFRIN BARROWAY TOPAZ &**
2    **KESSLER, LLP**
     Joseph H. Meltzer
3    Edward W. Ciolko
     Katherine B. Bornstein
4    Terence S. Ziegler
5    Casandra A. Murphy
     280 King of Prussia Road
6    Radnor, PA 19087
7    Telephone: (610) 667-7706
     Facsimile: (610) 667-7056
8

9    Attorneys for Plaintiff and the Proposed Class

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LIM, RUGER & KIM, LLP

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge Dale S. Fischer and the assigned discovery Magistrate Judge is Andrew J. Wistrich.

The case number on all documents filed with the Court should read as follows:

## CV08- 1897 DSF (AJWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| **[X] Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | **[ ] Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | **[ ] Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

Christopher Kim (Bar No. 082080)
Lisa J. Yang (Bar No. 208971)
LIM RUGER & KIM, LLP
1055 West Seventh Street, Suite 2800
Los Angeles, California 90017
Telephone: (213) 955-9500

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

VINCENT LEON DAVIS, individually
and on behalf of all others
similarly situated.

PLAINTIFF(S)

CASE NUMBER

**CV08-01897** DSF AJWx

v.

(COMPLETE DEFENDANTS' LIST ATTACHED)

DEFENDANT(S).

**SUMMONS**

TO:     DEFENDANT(S):  (Please see the list attached)

A lawsuit has been filed against you.

Within   20   days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney,  Christopher Kim or Lisa J. Yang , whose address is  Lim, Ruger & Kim, LLP, 1055 West Seventh Street, Suite 2800, Los Angeles, CA 90017 . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated:   **MAR 2 0 2008**

By: _Natalie Hongoria_
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                          SUMMONS

**ATTACHMENT TO SUMMONS**

Defendants,

FIDELITY NATIONAL FINANCIAL, INC., FIDELITY NATIONAL
TITLE INSURANCE COMPANY, TICOR TITLE INSURANCE
COMPANY, TICOR TITLE INSURANCE COMPANY OF FLORIDA,
CHICAGO TITLE INSURANCE COMPANY, NATIONAL TITLE
INSURANCE OF NEW YORK, INC., SECURITY UNION TITLE
INSURANCE COMPANY, THE FIRST AMERICAN CORPORATION,
FIRST AMERICANTITLE INSURANCE COMPANY, UNITED
GENERALTITLE INSURANCE COMPANY, LANDAMERICA
FINANCIAL GROUP, INC., COMMONWEALTH LAND TITLE
INSURANCE COMPANY, LAWYERS TITLE INSURANCE
CORPORATION, TRANSNATION TITLE INSURANCE COMPANY,
STEWART TITLE GUARANTY COMPANY and STEWART TITLE
INSURANCE COMPANY

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)

Vincent Leon Davis

**DEFENDANTS**

Fidelity National Finance, Inc., et al.

**(b)** County of Residence of First Listed Plaintiff (Except in U.S. Plaintiff Cases):

County of Residence of First Listed Defendant (In U.S. Plaintiff Cases Only):

**(c)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Christopher Kim/Lisa J. Yang          Tel: (213) 955-9500
LIM RUGER & KIM, LLP
1055 West Seventh Street, Suite 2800
Los Angeles, CA 90017

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff          ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant          ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes   ☐ No          ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. §§ 1331, 1337(a) and 1367

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☑ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities /Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | | | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**VIII(a). IDENTICAL CASES:** Has this action been previously filed and dismissed, remanded or closed? ☑ No   ☐ Yes

If yes, list case number(s):

**FOR OFFICE USE ONLY:**   Case Number: _____          CV08 - 01897

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

### AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**VIII(b). RELATED CASES:** Have any cases been previously filed that are related to the present case? ☑ No ☐ Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or

             ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

             ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

             ☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** List the California County, or State if other than California, in which **EACH** named plaintiff resides (Use an additional sheet if necessary)
☐ Check here if the U.S. government, its agencies or employees is a named plaintiff.

    VINCENT LEON DAVIS - Los Angeles

List the California County, or State if other than California, in which **EACH** named defendant resides. (Use an additional sheet if necessary).
☐ Check here if the U.S. government, its agencies or employees is a named defendant.
    FIDELITY NATIONAL FINANCIAL, INC. - Florida
    FIDELITY NATIONAL TITLE INSURANCE COMPANY - Florida
    TICOR TITLE INSURANCE COMPANY - Florida
    TICOR TITLE INSURANCE COMPANY OF FLORIDA - Florida
    (See the attached for continuation of this list)

List the California County, or State if other than California, in which **EACH** claim arose. (Use an additional sheet if necessary)
**Note:** In land condemnation cases, use the location of the tract of land involved.

    Los Angeles

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _____ Date ____3-20-2008____

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# ATTACHMENT TO CIVIL COVER SHEET (CV-71 (07/05))

- CHICAGO TITLE INSURANCE COMPANY - Chicago
- NATIONAL TITLE INSURANCE OF NEW YORK, INC. - New York
- SECURITY UNION TITLE INSURANCE COMPANY - Florida
- THE FIRST AMERICAN CORPORATION - Orange County, California
- FIRST AMERICAN TITLE INSURANCE COMPANY – Orange County, California
- UNITED GENERAL TITLE INSURANCE COMPANY – Los Angeles County, California
- LANDAMERICA FINANCIAL GROUP, INC. - Virginia
- COMMONWEALTH LAND TITLE INSURANCE COMPANY - Virginia
- LAWYERS TITLE INSURANCE CORPORATION – Connecticut
- TRANSNATION TITLE INSURANCE COMPANY - Virginia
- STEWART TITLE GUARANTY COMPANY - Texas
- STEWART TITLE INSURANCE COMPANY – New York

# EXHIBIT 7

COPY

1  Michael D. Braun (167416)
2  BRAUN LAW GROUP, P.C.
   12304 Santa Monica Blvd., Suite 109
   Los Angeles, CA 90025
3  Tel:   (310) 442-7755
   Fax:   (310) 442-7756
4  E-mail:  service@braunlawgroup.com
5  **Liaison Counsel for Plaintiff**
6  Loren Kieve (56280)
   KIEVE LAW OFFICES
7  50 California Street, Suite 1500
   San Francisco, CA 94111
8  Tel:   (415) 364-0060
   E-mail:  lk@kievelaw.com
9

Christopher J. Gray
LAW OFFICE OF CHRISTOPHER J.
GRAY, P.C.
460 Park Avenue, 21ST Floor
New York, NY 10022
Tel:   (212) 838-3221
E-mail:  gray@cjgraylaw.com

10  **Counsel for Plaintiff**
    **[Additional counsel listed on signature page]**
11
12            **UNITED STATES DISTRICT COURT**
13            **CENTRAL DISTRICT OF CALIFORNIA**
14  DR. RAJNIKANT KOTHARI, on
    Behalf of Himself,            **CASE NO.:  SACV08-00440 DOC (RNBx)**
15
                  Plaintiff,      **CLASS ACTION**
16
       vs.                        **CLASS ACTION COMPLAINT**
17
18  FIRST AMERICAN TITLE          **JURY TRIAL DEMANDED**
    INSURANCE COMPANY,
19  FIDELITY NATIONAL TITLE
    INSURANCE COMPANY,
20  CHICAGO TITLE INSURANCE
    COMPANY, TICOR TITLE          **BY FAX**
21  INSURANCE COMPANY,
    FIDELITY NATIONAL FINANCE,
22  INC., UNITED GENERAL TITLE
    INSURANCE COMPANY, FIRST
23  AMERICAN CORPORATION,
    COMMONWEALTH LAND TITLE
24  INSURANCE COMPANY,
    LAWYERS TITLE INSURANCE
25  CORPORATION, LANDAMERICA
    FINANCIAL GROUP, INC.,
26  STEWART TITLE GUARANTY
    COMPANY, and STEWART TITLE
27  INSURANCE COMPANY,
28                Defendants.

1    Plaintiff Dr. Rajnikant Kothari ("plaintiff"), on behalf of himself and all others

2    similarly situated, upon knowledge with respect to his own acts and upon

3    information and belief with respect to all other matters, alleges as follows:

4    1.    Plaintiff brings this action under Section 1 of the Sherman Act and the

5    statutes of the State of California to enjoin defendants' illegal price-fixing activity

6    and recover damages for the illegal overcharges the Class has paid in connection

7    with the unlawful activity by defendants alleged herein.

8                          **JURISDICTION AND VENUE**

9    2.    Plaintiff brings this action under Section 16 of the Clayton Act, 15

10   U.S.C. § 26, to prevent and restrain violations of Section 1 of the Sherman Act, 15

11   U.S.C. § 1, and for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.

12   This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337.

13   3.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and

14   15 U.S.C. § 22 because each defendant is a corporation that is found or transacts

15   business in this district, and because a substantial portion of the affected trade and

16   commerce described herein has been carried out in this district.

17   4.    The violations of antitrust law alleged herein have substantially affected

18   interstate commerce.  Defendants sell title insurance throughout the United States

19   collecting billions of dollars in premiums annually.

20                              **THE PARTIES**

21   5.    Plaintiff is a resident of Canton, Ohio.  During the Class Period as

22   hereinafter defined plaintiff purchased title insurance at a price that was artificially

23   high because of defendants' unlawful price-fixing agreement.

24   6.    The Fidelity family of title insurance companies (collectively,

25   "Fidelity")-- which includes defendant Fidelity National Title Insurance Co.

26   ("Fidelity Title"), defendant Chicago Title Insurance Company ("Chicago Title"),

27   defendant Ticor Title Insurance Company ("Ticor Title"), and their affiliates – is

28   engaged in selling title insurance to purchasers of commercial and residential real

1

estate throughout the United States, including California. Nationally, Fidelity accounts for approximately 27 percent of title premiums, which in 2006 amounted to roughly $4.6 billion. Fidelity Title, Chicago Title, and Ticor Title were founding members of TIRSA (as discussed below).

7. Fidelity Title, Chicago Title, Ticor Title, and their affiliates are wholly-owned and controlled by defendant Fidelity National Finance, Inc. ("Fidelity National"), a Delaware corporation headquartered in Jacksonville, Florida. Through its subsidiaries, Fidelity National is a provider of title insurance, specialty insurance, and claims management services. Fidelity engaged in the conduct challenged herein with the approval and assent of Fidelity National.

8. The First American family of title insurance companies (collectively, "First American") – which includes defendant First American Title Insurance Company ("First American Title") and defendant United General Title Insurance Company ("United General Title"), and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including California. Nationally, First American accounts for approximately 29 percent of title premiums, which in 2006 amounted to roughly $4.8 billion. First American Title and United General Title were founding members of TIRSA.

9. First American Title, United General Title, and their affiliates are wholly-owned and controlled by defendant First American Corporation ("FAC"), a California corporation headquartered in Santa Ana, California. Through its subsidiaries, FAC is a provider of title insurance, business information, and related products and services. FAC had 2006 revenues of roughly $8.5 billion. First American engaged in the conduct challenged herein with the approval and assent of FAC.

2

10. The LandAmerica family of title insurance companies (collectively, "LandAmerica") – which includes defendant Commonwealth Land Title Insurance Company ("Commonwealth"), defendant Lawyers Title Insurance Corporation ("Lawyers Title"), and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including California. Nationally, LandAmerica accounts for approximately 19 percent of title premiums, which in 2006 amounted to roughly $3.15 billion. Commonwealth and Lawyers Title were founding members of TIRSA.

11. Commonwealth and Lawyers Title are wholly-owned and controlled by defendant LandAmerica Financial Group, Inc. ("LAFG"), a Virginia corporation headquartered in Glen Allen, Virginia. Through its subsidiaries, LAFG is a provider of title insurance and other products and services that facilitate the purchase, sale, transfer, and financing of residential and commercial real estate. LAFG had 2006 revenues of roughly $4 billion. LandAmerica engaged in the conduct challenged herein with the approval and assent of LAFG.

12. The Stewart family of title insurance companies (collectively, "Stewart") – which includes defendant Stewart Title Guaranty Company and, defendant Stewart Title Insurance Company, and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including California. Nationally, Stewart accounts for approximately 12 percent of title premiums, which in 2006 amounted to roughly $2 billion. Stewart was a founding member of TIRSA.

13. Together, Fidelity, First American, LandAmerica and Stewart account for more than 85 percent of title premiums in the United States, which in 2006 amounted to roughly $14.5 billion.

///

///

///

14. Significant nonparty TIRSA is a voluntary association of title insurers licensed as a rate service organization pursuant to Article 23 of the Insurance Law of the State of New York. TIRSA maintains its offices in New York City, which until recently were located at the same New York address of defendant Fidelity Title.

15. TIRSA annually compiles from its members statistical data relating to their title insurance premiums, losses and expenses and submits this information in aggregate form to the New York Insurance Department. TIRSA also prepares and submits the New York Title Insurance Rate Manual which sets forth title rates to be charged and rules to be followed by TIRSA's members. The Insurance Department has never objected to any of the rates TIRSA has collectively set.

16. TIRSA's membership is comprised of defendant insurers and all other title insurers that are licensed to issue policies in New York. Currently, Fidelity, First American, LandAmerica, and Stewart collectively represent 14 of TIRSA's 22 members. As such, they comprise a majority voting block which, according to TIRSA's by-laws, allows them to control the operations of TIRSA and, in particular, TIRSA's collective rate setting activity.

## DETAILED FACTUAL ALLEGATIONS

A. The Business of Title Insurance

17. Title insurance serves an important purpose. It protects the purchaser of a property from any unidentified defects in the title that would in any way interfere with the full and complete ownership and use of the property and with the ultimate right to resell the property. Title insurance is required by lenders in most residential and commercial real estate transactions.

18. Despite the importance and high cost of title insurance, consumers have little understanding of the product, the purpose it serves, and the reasonableness of the price they pay for it. They also exercise little discretion in choosing the title insurer from which they purchase the insurance. That decision is typically made for them by their lawyer, mortgage broker, lender, or realtor. Consequently, for most

4

1     purchasers, the cost of title insurance is largely overlooked and seldom, if ever,

2     challenged. Most consumers do not even become aware of the price they will pay

3     and to which insurer they will pay it until the actual closing of the real estate

4     transaction. Usually the consumer does not "shop around" or negotiate with respect

5     to the price of the insurance coverage.

6         19.     Due to this lack of a competitive environment, title insurers have little

7     or no incentive to compete with respect to price.

8         20.     The most effective way for a particular title insurer to get business is to

9     encourage those making the purchasing decisions – typically lawyers, brokers or

10     lenders servicing a customer – to steer business to that insurer. One way to so

11     motivate these third-party representatives is through kickbacks in the form of

12     finder's fees, gifts, and other financial enticements. Therefore, it is higher pricing

13     (which allows for payments to referring parties), not lower pricing or competing on

14     the basis of price, that provides the best way for title insurers to compete and

15     increase their business.

16         21.     Premiums for title insurance cover both the risk of loss to the

17     underwriter and "agency commissions." Unlike property insurance, title insurance

18     carries with it a very limited risk of loss to the insurer. That is because the title

19     insurance protects against *prior* events that cause defects in title. With a proper

20     search and examination of prior ownership records, any such defects can and almost

21     always are readily identified and excluded from the policy's coverage.

22     Consequently, the average claim payout on a title insurance policy amounts to only

23     about 5 percent of the total premium collected. This is very different from property

24     coverage (such as auto and home insurance) – which protects against *future*

25     occurrences over which the insurer has little to no control – where the average claim

26     payout amounts to about 80 percent of the total premium.

27

28

22. The "agency commissions" component of the title insurance rate covers payments made to title agents. Defendants have an ownership or management stake in many of the title agencies to which these payments are made. A small portion of these payments is for the search and exam of prior ownership records of the property being purchased to identify any liens, encumbrances, burdens, exclusions, or other defects in the title. The search and exam function does not involve the spreading or underwriting of risk and title insurers typically outsource this task to title agents.

23. The remainder, and by far the bulk, of the agency commissions are comprised of costs unrelated to the issuance of title insurance. These costs include kickbacks and other financial inducements title insurers provide to title agents and indirectly (through title agents) to the lawyers, brokers, and lenders who, in reality, are the ones deciding which title insurer to use. These payments have nothing to do with the issuance of title insurance and are made by title insurers merely to inflate their revenues and steer business their way.

24. Under TIRSA's collective rate setting regime, roughly 85 percent of the total title insurance premium is based on the so-called "costs" associated with the payment of agency commissions. Only 15 percent is based on costs associated with the risk of loss. TIRSA publishes its final calculated title rates in the New York Title Insurance Rate Manual. These rates are tied to the value of the property being insured. This is so despite the fact that the costs associated with agency commissions are entirely unrelated to the value of the property. Indeed, agency kickbacks and enticements have little to do with producing a particular title policy and provide no value – proportional to property value or otherwise – to the consumer. Even search and exam costs are unrelated to property value. They instead depend on the age of the property, the complexity of the ownership history, and the accessibility of prior ownership records.

6

**B.** **TIRSA**

25. Prior to TIRSA, the New York Board of Title Underwriters ("NYBTU") served as the title insurance rate-setting body in New York. NYBTU, along with the title insurance rate setting bureaus in many other states, was disbanded in the mid-1980's in the wake of a Federal Trade Commission ("FTC") challenge to the collective rate setting activity of many of these associations. The FTC's challenge culminated in *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621 (1992), where the Supreme Court held that to avoid *per se* illegal price fixing liability, the rate setting activity of these rating bureaus must be actively supervised by the state.

26. In *Ticor*, like here, the FTC focused its challenge on agency commissions. The FTC contended that the respective state insurance departments merely rubber-stamped this portion of the collectively fixed rates without any independent review or analysis of their reasonableness or cost justification. The Supreme Court agreed with the FTC that this kind of limited state oversight was not sufficient. Rather, to avoid illegal price-fixing liability, the state insurance department has to "exercise[] sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties." *Ticor*, 504 U.S. at 634-35.

27. Following the Supreme Court's instruction in *Ticor*, the Third Circuit on remand in *Ticor Title Ins. Co. v. FTC*, 998 F. 2d 1129 (3d Cir. 1993), upheld the FTC's finding that the collective rate-setting of certain state rating bureaus was improper because it was not actively supervised by the state. According to the circuit court, "[t]he Supreme Court plainly instructed us that a state's rubber stamp is not enough. Active supervision requires the state regulatory authorities' independent review and approval." *Id.* at 1139.

7

1    28.    Defendants formulated TIRSA's first rate manual and procedure soon
2    after the Supreme Court's *Ticor* decision. Through TIRSA, defendants have set up a
3    rate-setting scheme to get around the rigors of state oversight required by *Ticor*.
4    They have done so by calculating a single rate that comprises both risk and agency
5    commission costs and by outsourcing to title agents the agency commission costs. In
6    this way, defendants avoid providing the Insurance Department with any detailed
7    breakout or backup for the bulk of the costs that make up their collectively fixed
8    rates.

9    29.    TIRSA merely submits an aggregated figure that is supposed to
10   represent the total agency commission costs. Embedded within this figure is the vast
11   quantity of dollars that are funneled to and through the title agencies as kickbacks,
12   financial inducements and other costs unrelated to the issuance of title insurance.
13   Defendants' design in all of this has been to effectively "hide" the cost basis for their
14   artificially high and collectively fixed title insurance premiums from the regulatory
15   scrutiny that *Ticor* demands.

16   30.    There is no provision under the Insurance Law for TIRSA to include in
17   its collectively fixed rates kickbacks and other agency commission payments
18   unrelated to the issuance of title insurance. Indeed, the Insurance Department has
19   publicly stated that it lacks the authority to review any agency commission payments.
20   It has likewise recognized that defendants' outsourcing of agency commission costs
21   has prevented it from performing a meaningful review of TIRSA's calculated rates.
22   This was made clear at a November 2006 public hearing the Insurance Department
23   held – the first in 15 years – where it questioned TIRSA and its members on
24   TIRSA's failure to provide the Insurance Department with any backup or detail for
25   agency commissions. Further, at the hearing the Insurance Department conceded
26   that it could not properly evaluate TIRSA's rates without access to detailed
27   information concerning agency commissions that TIRSA does not provide.

28

31.     The Insurance Department's recognition that it is not properly supervising TIRSA's rate-setting activity is consistent with the April 2007 findings of the U.S. Government Accountability Office ("GAO") that the title insurance industry is in dire need of greater state regulation.  The GAO studied the industry conditions of several states, including New York, and concluded that "state regulators have not collected the type of data, *primarily on title agents' costs and operations*, needed to analyze premium prices and underlying costs." (emphasis added)

32.     To remedy this failing, GAO has proposed, among other things: 1) strengthening the regulation of title agents through means such as establishing meaningful requirements of capitalization, licensing, and continuing education; and 2) improving the oversight of title agents through more detailed audits and the collection of data that would allow in-depth analyses of agents' costs and revenues.

33.     Unchecked by regulatory review and insulated from competition, defendants have thus been able to collectively fix title insurance rates at supracompetitive levels and earn profits in New York that vastly exceed those contemplated by the Insurance Department or that would have resulted in a free and lawfully operating competitive market.

C.     Defendants' Agreement Not to Compete
       on The Price of Title Insurance in California

34.     The title insurance market in California consists of a dozen carriers, ranging in size from regional companies to national affiliates.  However, the market is dominated by four groups of affiliated companies which, combined, sell over 90 percent of the title insurance policies sold in California and which own and control the title plants in many California counties that every title insurer must rely on in order to issue title policies.

35.     Title companies, in marked contrast to property, casualty, life and other traditional insurance carriers, choose not to market their products directly to the consumers who pay for them. Instead, the title insurance industry operates on what is termed a "reverse competition" mode. Reverse competition means that title companies solicit business referrals from the other major players in the home purchase scenario - real estate agents and agencies, banks, lenders, builders, developers and others: middlemen or go-betweens. The title companies pay middlemen for these referrals in the form of direct payments, advertising expenses, junkets, parties and other kick-backs and inducements.

36.     Reverse competition, as the term suggests, isn't a model that benefits consumers through market-driven forces. In fact, consumers are bypassed completely as title companies spend nearly all of their marketing budgets "wining and dining" real estate agents, banks, lenders, builders, developers and others in an effort to convince these middlemen to steer their home-buying clients to their companies for their title insurance needs.

37.     In some of the major markets in the United States, these same title insurers collectively meet, and jointly set rates and file these rates with the applicable state insurance authority. The rates are not subject to any meaningful review or regulation. The companies agree to fix the price of title insurance far in excess of the risk and loss experience associated with such insurance. As a result of the joint agreement as to rates, competition is relegated to the middleman.

38.     As a result of their joint rate setting and agreement, no company competes on price to the consumer.

39.     Having agreed to fix prices in states where joint rate setting occurs, the companies agreed to not compete based on price to the consumer in other states, including California, where regulation of filed rates is lax or non-existent. Thus, they agreed to set rates at supracompetitive prices and to compete based on offering inducements to middlemen.

10

40.     In California, in three successive reports, the Office of the Insurance Commissioner ("OIC") has found an "astonishing number" of such inducements that are in violation of state law. However, the OIC does not actively oversee or regulate rates, and, in fact, does not by its own admission have the power to do so. The absence of regulation has allowed collusive behavior and excessive rates.

41.     In addition to paying inducements and kick-backs, the title companies and their agents divide the market of real-estate middlemen through the use of Affiliated Business Arrangements ("ABAs"), wherein the dominant real estate brokers purchase significant ownership stakes in favored title insurance affiliates. The real estate brokers then reward their associates for using the preferred title insurance providers and lock-out independent title insurers.

42.     The GAO visited several states, including California, and found a lack of regulatory oversight, as stated in a report:

> In the states we visited, we found that regulators did not assess title agents' costs to determine whether they were in line with premium rates; had made only limited efforts to oversee title agents (including ABAs involving insurers and agents); and, until recently, had taken few actions against alleged violations of antikickback laws. In part, this situation has resulted from a lack of resources and limited coordination among different regulators within states. On the federal level, authority for alleged violations of section 8 of RESPA, including those involving increasingly complex ABAs, is limited to seeking injunctive relief. Some state regulators expressed frustration with HUD's level of responsiveness to their requests for help with enforcement, and some industry officials said that RESPA rules regarding ABAs and referral fees need to be clarified. Industry and government stakeholders have proposed several regulatory changes, including RESPA reform, strengthened regulation of agents, a

1          competitor right of action with no monetary penalty, and alternative

2          title insurance models.

3

4      43.    Having agreed to fix or stabilize prices in New York and other states

5 where they covertly meet to promulgate rates, these same defendants then set out to

6 do the same in other states.  In other words, as a direct result of these meetings

7 where rates were agreed to, these same defendants agreed, either expressly or tacitly,

8 not to compete on rates in other states as well.  To compete on rates in other states

9 could and would imperil their ability to maintain the agreed rate in states like New

10 York.

11      44.    As is the case in New York, a lack of regulatory authority over rates

12 created an environment in which a conspiracy can and did succeed.  No agency was

13 examining why all the rates were virtually identical, and no agency was examining

14 whether the costs associated with these premiums were reasonable. This is an

15 environment that  is conducive to price fixing.

16      45.    In addition to the uniformity of rates, other facts suggest that it is more

17 plausible than not that rates have been set based on an agreement to fix prices.  In

18 theory, the chain of title should be documented back to its historic grant of

19 ownership centuries in the past.  Fear about a possible title defect in the distant past

20 is widely used as a justification by title agencies when convincing property buyers to

21 purchase an owner policy in addition to the lender policy, which is mandatory to

22 secure a mortgage.  The title agency, however, saves much time and money when the

23 search is limited to one or two transactions.  They rely on the insurance policy to

24 cover the remote chance of missing an earlier but still-valid claim.  On balance, the

25 expected cost of compensation in the cases in which a title defect materializes is

26 likely to be less than the sum of added overhead costs of routinely tracing back every

27 chain of title to the earliest registered owner in the distant past.

28

46.     Title insurance industry officials tend to justify the large proportion of the premium retained by the title abstract and settlement agency (from 60 to more than 90 percent) by the alleged high cost of title searching back into the distant past. In fact, a high proportion of noncommercial properties are searched only through the most recent transaction. No information is available as to what proportion of claims originate in the distant past.

47.     Many U.S. homes are being resold three or four times in twenty-five years. At each of these occasions, an abstract of title will be prepared on the basis of a more or less thorough review of the available title records, inheritance records, family records and records of past or current liens against a property.  It is reasonable, therefore, to suspect that the risk of a title defect will decrease every time a property is sold.

48.     Title searches have become less labor intensive, especially in large urban counties and cities.  More and more of the information is available online. The statistical likelihood that a title default would be overlooked is a closely held industry secret, but it appears to be so small that many transactions are now insured on the basis of a search of the last owner's title history or a search into transactions that occurred during the last twenty-five to thirty-five years.

49.     The available  evidence strongly suggests that the title insurance industry has achieved a remarkably low level of loss.  Yet, despite lowered risks of loss and transaction costs, the defendants have not engaged in price competition at the consumer level.

50.     There is a remarkable absence of rate changes by title insurers over the past five years, despite declining costs of production, increased number of transactions and increased revenue per transaction, during a period when costs per unit of production declined significantly.  This failure to compete on price and absence of material rate changes are indicia of an agreement not to compete based on price.

1    51.    The title insurance market is highly concentrated - a few title insurers

2    account for the vast majority of title insurance sales - at both the statewide level and

3    at the county level in California. For example, three title insurer groups account for

4    77.4% of the market at a statewide level.  At the county level, each individual market

5    was highly concentrated.   Such a concentration enhances the ability of defendants to

6    fix prices

7                          **CLASS ACTION ALLEGATIONS**

8    52.    Plaintiff brings this action as a class action under rule 23(b)(3) of the

9    Federal Rules of Civil Procedure for violations of Section 1 of the Sherman Act, 15

10   U.S.C. § 1.  The Rule (b)(3) Class is comprised of all consumers who purchased title

11   insurance in California from defendants during the fullest period permitted by the

12   applicable statue of limitations.

13   53.    Plaintiff, along with all other members of the Rule (b)(3) Class, was

14   injured as a result of paying supracompetitive prices for title insurance in California.

15   These supracompetitive prices were achieved as a result of defendants' illegal price-

16   fixing activities.  Defendants are jointly and severally liable for the illegal price-

17   fixing activities alleged herein.

18   54.    Members of the (b)(3) Class include hundreds of thousands, if not

19   millions, of consumers.  Class members are so numerous that their joinder would be

20   impracticable.

21   55.    Plaintiff also brings this action as a class action under Rule 23(b)(2) of

22   the Federal  Rules of Civil Procedure, for violations of Section 1 of the Sherman Act,

23   15 U.S.C. § 1 and the California statutes.  The Rule (b)(2) Class includes all

24   members of the (b)(3) Class, and all consumers who are threatened with injury by the

25   anticompetitive conduct detailed herein.

26   56.    Defendants have acted, continued to act, refused to act and continued to

27   refuse to act on grounds applicable to the Rule (b)(2) Class, thereby making

28   appropriate final injunctive relief with respect to the Rule (b)(2) Class as a whole.

14

57.     Members of the Rule (b)(2) Class include hundreds of thousands, if not millions, of consumers.  They are so numerous that their joinder would be impracticable.

58.     Common questions of law and fact exist with respect to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of law or fact common to the class are the following:

        a.    Whether defendants have engaged in the alleged illegal price-fixing activity;

        b.    The duration and scope of defendants' alleged illegal price-fixing activity;

        c.    Whether defendants' alleged illegal price-fixing has caused higher prices to plaintiff and other purchasers of title insurance in California; and

        d.    The extent to which defendants' unlawful activities artificially inflated title insurance rates.

59.     Plaintiff does not have any conflict of interest with other Class members.  Plaintiff's claims are typical of the claims of the Class and plaintiff will fairly and adequately represent the interests of the Class.  Plaintiff has retained counsel competent and experienced in class action and other complex litigation to represent the Class.

60.     This action is superior to any other method for the fair and efficient adjudication of this legal dispute since joinder of all members is not only impracticable, but impossible.  The damages suffered by certain members of the Class are small in relation to the expense and burden of individual litigation and therefore it is highly impractical for such Class members to seek redress for damages resulting from defendants' anticompetitive conduct.

61.     There will be no extraordinary difficulty in the management of the Class action.

**CAUSES OF ACTION**

**AS AND FOR A FIRST CAUSE OF ACTION**

**AGAINST ALL DEFENDANTS FOR PER SE PRICE FIXING**

(Sherman Act Section I – *Per Se* Unlawful Horizontal Price-Fixing)

62.     Plaintiff repeats and realleges each and every allegation of this complaint as if fully set forth herein.

63.     Defendants have entered into a continuing illegal contract, combination, or conspiracy in restraint of trade, the purpose and effect of which is to fix and maintain supracompetitive prices to consumers for title insurance in California and elsewhere.  This contract, combination, and conspiracy is illegal *per se* under Section 1 of the Sherman Act, 15 U.S.C. § 1.

64.     Defendants' contract, combination, or conspiracy is comprised of defendants' efforts and agreement to (i) collectively fix uniform and supracompetitive rates for title insurance in California and other states; (ii) include in their calculated rates agency commission costs; (iii) embed within these costs payoffs, kickbacks, and other charges to title agents that are unrelated to the issuance of title insurance; (iv) hide these supposed costs from regulatory scrutiny by funneling them to and through title agents; and (v) agree, either expressly or tacitly, not to compete on premium rates for title insurance in the State of California.

65.     Defendants' contract, combination, or conspiracy has caused substantial anticompetitive effects in the title insurance market.  It has done so by causing plaintiff, and other purchasers of title insurance in California, to pay significantly more for title insurance than they would have in the absence of defendants' illegal activity.

16

66.     As a result of these violations of Section 1 of the Sherman Act, plaintiff and the purported Class have been injured in their business and property in an amount not presently known, but which is, at a minimum, millions dollars, prior to trebling.

67.     Such violations and the effects thereof are continuing and will continue unless injunctive relief is granted.  Plaintiff has no adequate remedy at law.

## AS AND FOR A SECOND CAUSE OF ACTION

### AGAINST ALL DEFENDANTS FOR VIOLATION OF CAL. BUS. AND PROF. CODE §§ 16720 *ET SEQ.*

68.     Plaintiff repeats and realleges each of his allegations as though fully set forth herein.

69.     Defendants' conduct  as set forth above is in violation of the Cartwright Act of California (Cal. Bus. & Prof. Code §§ 16720, *et seq.*).

70.     As a direct result of defendants' unlawful acts plaintiff and members of the Class have paid artificially inflated prices for title insurance and have suffered injury to their business and property.

## AS AND FOR A THIRD CAUSE OF ACTION

### AGAINST ALL DEFENDANTS FOR VIOLATION OF CAL. BUS. AND PROF. CODE §§ 17200 *ET SEQ.*

71.     Plaintiff repeats and realleges each of his previous allegations as though fully set forth herein.

72.     Defendants' statements and representations constitute unfair, unlawful and deceptive trade practices in violation of the UCL, Bus. & Prof. Code §§ 17200, *et seq.*

73.     All of the wrongful conduct alleged herein occurred and continues to occur in the conduct of defendants' business.   Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is repeated in the State of California on hundreds, if not thousands, of occasions daily.

17

74. Plaintiff has suffered injury in fact and has lost money or property as a result of defendants' unfair, unlawful and/or deceptive practices by paying a higher price for title insurance then he would or should have absent the conduct complained of.

75. Plaintiff requests that this Court enter such orders or judgment as may be necessary to enjoin the defendants from continuing its unfair, unlawful, and/or deceptive practices, to restore to any person in interest any money which may have been acquired by means of such unfair competition and to disgorge any profits realized by defendants as a result of their unfair, unlawful and/or deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code § 3345, and for such other relief as set forth in the Prayer for Relief.

## AS AND FOR A FOURTH CAUSE OF ACTION
## FOR UNJUST ENRICHMENT

76. Plaintiff incorporates by reference the preceding allegations.

77. This Cause of Action is pled in the alternative to all claims and/or causes of action at law.

78. Defendants have received a benefit from plaintiff and the Class members in the form of the prices plaintiff and the Class members paid for defendants' title insurance.

79. Defendants are aware of their receipt of the above-described benefit.

80. Defendants received the above-described benefit to the detriment of plaintiff and other members of the Class.

81. Defendants continue to retain the above-described benefit to the detriment of plaintiff and the Class members.

82. As a result of defendants' unjust enrichment, plaintiff and the Class members have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution

18

# DEMAND FOR JURY TRIAL

83.  Plaintiff demands a trial by jury of all issues so triable.

# PRAYER FOR RELIEF

WHEREFORE, plaintiff and the Class request the following relief:

A.  That the Court determine that this action is a proper class action, certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as class counsel;

B.  That the Court declare, adjudge, and decree that defendants have committed the violations of federal law alleged herein;

C.  That defendants, their directors, officers, employees, agents, successors, and assigns be permanently enjoined and restrained from, in any manner, directly or indirectly, unlawfully fixing or maintaining their title insurance rates at supracompetitive levels, and committing any other violations of Section 1 of the Sherman Act, the California Statutes, and/or of other laws having a similar purpose and effect;

D.  That the Court award damages sustained by Class members from defendants' violations of Section 1 of the Sherman Act in an amount to be proven at trial, to be trebled according to law, plus interest (including prejudgment interest), to compensate them for the overcharges they incurred;

///
///
///

19

E.   That the Court award the Class attorneys' fees and costs of suit , and grant such other and further relief as the Court may deem just and proper.

Dated: April 23, 2008

Michael D. Braun
BRAUN LAW GROUP, P.C.

By: _____

Michael D. Braun
12304 Santa Monica Blvd., Suite 109
Los Angeles, CA 90025
Tel:   (310) 442-7755
Fax:   (310) 442-7756
E-mail:  service@braunlawgroup.com

**Liaison Counsel for Plaintiff**

Loren Kieve
KIEVE LAW OFFICES
50 California Street, Suite 1500
San Francisco, CA 94111
Tel:   (415) 364-0060
Fax:   (415) 439-5377
E-mail:  lk@kievelaw.com

Christopher J. Gray
LAW OFFICE OF CHRISTOPHER J. GRAY, P.C.
460 Park Avenue, 21ST Floor
New York, NY 10022
Tel:   (212) 838-3221
Fax:   (212) 508-3695
E-mail:  gray@cjgraylaw.com

Krishna B. Narine
LAW OFFICE OF KRISHNA B. NARINE
2600 Philmont Avenue
Huntingdon Valley, PA 19006
Tel:   (215) 914-2460
Fax:   (215) 914-2462
E-mail: knarine@kbnlaw.com

Louis F. Burke
E-mail: lburke@lfblaw.com
Leslie Wybiral
E-mail: ewybiral@lfblaw.com
LOUIS F. BURKE, P.C.
460 Park Avenue, 21ST Floor
New York, NY 10022
Tel:   (212) 682-1700
Fax:   (212) 808-4280

20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Samuel D. Edwards
E-mail: sedwards@sselaw.com
Kirk G. Smith
E-mail: ksmith@sselaw.com
SHEPHERD SMITH & EDWARDS LLP
1010 Lamar Street, Suite 900
Houston, TX 77002
Tel: (713) 227-2400
Fax: (713) 227-7215

**Counsel for Plaintiff**

# EXHIBIT 8

FILED

2008 MAY 28 PM 2: 52

CLERK U S DISTRICT COURT
CENTRAL DIST OF CALIF
LOS ANGELES

B f _____

1   GUIDO SAVERI (22349) *guido@saveri.com*
    R. ALEXANDER SAVERI (173102) *rick@saveri.com*
2   CADIO ZIRPOLI (179108) *cadio@saveri.com*
    SAVERI & SAVERI, INC.
3   111 Pine Street, Suite 1700
    San Francisco, CA 94111-5619
4   Telephone: (415) 217-6810
    Facsimile: (415) 217-6813

5

6   JULIO J. RAMOS (189944) *ramosfortrustee@yahoo.com*
    LAW FIRM OF JULIO J. RAMOS
7   35 Grove Street, Suite 107
    San Francisco, CA 94102
8   Telephone: (415) 948-3015

9   *Attorneys for Plaintiff*

10

11            **UNITED STATES DISTRICT COURT**

           **CENTRAL DISTRICT OF CALIFORNIA**
12

13   Emilse Magana, on behalf of herself and all others
    similarly situated,       )   Case No.
                         )
14                      )
          Plaintiff,       )   **SACV08-0591 CJC**
15                      )
      v.               )   **CLASS ACTION COMPLAINT** (FFMx)
16                      )
    FIDELITY NATIONAL FINANCIAL, INC.,  )   **JURY TRIAL DEMANDED**
17   FIDELITY NATIONAL TITLE INSURANCE  )
    COMPANY, TICOR TITLE INSURANCE     )
18   COMPANY, TICOR TITLE INSURANCE    )
    COMPANY OF FLORIDA, CHICAGO TITLE  )
19   INSURANCE COMPANY, NATIONAL TITLE  )
    INSURANCE OF NEW YORK, INC., SECURITY  )
20   UNION TITLE INSURANCE COMPANY, THE  )
    FIRST AMERICAN CORPORATION, FIRST   )
21   AMERICAN TITLE INSURANCE COMPANY,  )
    UNITED GENERAL TITLE INSURANCE     )
22   COMPANY, LANDAMERICA FINANCIAL    )
    GROUP, INC., COMMONWEALTH LAND TITLE )
23   INSURANCE COMPANY, LAWYERS TITLE   )
    INSURANCE CORPORATION, TRANSNATION  )
24   TITLE INSURANCE COMPANY, STEWART   )
    TITLE GUARANTY COMPANY and STEWART  )
25   TITLE INSURANCE COMPANY         )
                     )
26          Defendants.     )

27

28

    CLASS ACTION COMPLAINT

GUIDO SAVERI (22349) *guido@saveri.com*
R. ALEXANDER SAVERI (173102) *rick@saveri.com*
CADIO ZIRPOLI (179108) *cadio@saveri.com*
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA 94111-5619
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

JULIO J. RAMOS (189944) *ramosfortrustee@yahoo.com*
LAW FIRM OF JULIO J. RAMOS
35 Grove Street, Suite 107
San Francisco, CA 94102
Telephone: (415) 948-3015

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Emilse Magana, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FIDELITY NATIONAL FINANCIAL, INC., FIDELITY NATIONAL TITLE INSURANCE COMPANY, TICOR TITLE INSURANCE COMPANY, TICOR TITLE INSURANCE COMPANY OF FLORIDA, CHICAGO TITLE INSURANCE COMPANY, NATIONAL TITLE INSURANCE OF NEW YORK, INC., SECURITY UNION TITLE INSURANCE COMPANY, THE FIRST AMERICAN CORPORATION, FIRST AMERICAN TITLE INSURANCE COMPANY, UNITED GENERAL TITLE INSURANCE COMPANY, LANDAMERICA FINANCIAL GROUP, INC., COMMONWEALTH LAND TITLE INSURANCE COMPANY, LAWYERS TITLE INSURANCE CORPORATION, TRANSNATION TITLE INSURANCE COMPANY, STEWART TITLE GUARANTY COMPANY and STEWART TITLE INSURANCE COMPANY<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

**PAGE**

I.      INTRODUCTION .................................................................................................... 1

II.     JURISDICTION AND VENUE ............................................................................. 3

III.    PARTIES ................................................................................................................ 4

        A.      Plaintiff ...................................................................................................... 4

        B.      Defendants .................................................................................................. 4

IV.     OTHER ENTITIES ................................................................................................ 8

V.      CLASS ACTION ALLEGATIONS ....................................................................... 9

VI.     TRADE AND COMMERCE ................................................................................ 11

VII.    FACTUAL ALLEGATIONS ............................................................................... 11

        A.      The Nature of Title Insurance .................................................................. 11

        B.      Price-Fixing in the Large Markets ........................................................... 13

        C.      TIRSA's Formation .................................................................................. 14

        D.      Lack of Regulatory Supervision and Authority in New York and
                Other States Including California .............................................................. 15

        E.      Competition Based on Kickbacks and Inducements But Not Rates .......... 19

        F.      Other Indicators of a Lack of Competition and Conditions Conducive
                to Collusive Rate Setting ......................................................................... 19

VIII.   CLAIMS FOR RELIEF ........................................................................................ 22

        COUNT I  Violation of the Sherman Act .............................................................. 22

        COUNT II  Violation of Cal. Bus. and Prof. Code §§ 16720, *et seq.* ................... 24

        COUNT III  (California's Business & Professions Code §§ 17200, *et seq.*) .......... 24

        COUNT IV  Unjust Enrichment ............................................................................ 25

PRAYER FOR RELIEF ................................................................................................... 25

JURY TRIAL DEMANDED ............................................................................................ 26

Plaintiff, Emilse Magana, by her attorneys, on behalf of herself and all others similarly situated, brings this action for treble damages and injunctive relief under the antitrust laws of the United States and based on statutes of the State of California against the above named defendants, demand a trial by jury, and complaining and alleging as follows:

**I.    INTRODUCTION**

1.    From the consumer's point of view, title insurance differs greatly from other, more familiar kinds of insurance. For one thing, while automobile and homeowner insurance policies protect consumers from an event that may occur in the future, title insurance offers protection from events that might have occurred in the past.

2.    Most simply, title insurance is protection purchased against a loss arising from problems that occurred in the past and may affect the title to the real estate that a consumer is buying. Title insurers do not compete on the basis of the policies or coverage that they provide. In fact, almost all title policies are based on a single set of form policies published and maintained by the national trade association, the American Land Title Association. Furthermore, the end goal of an exhaustive title search by a title insurer is not to provide coverage for title defects that the search uncovers, but rather to exclude coverage for any such defects and therefore, further reduce the real value of the title policy which is written to cover only unknown defects in title at the time of issuance. As a result, title insurance is a commodity product.

3.    Even for the savviest of insurance consumers, the purchase of a title insurance policy is just one more expensive step in the dizzying, convoluted and often confusing flurry of paperwork and signings that culminate in the closing of a home purchase. Consumers who normally shop around for their insurance and carefully compare prices, typically emerge from the closing on their new home holding an insurance policy that they know virtually nothing about and that in all likelihood, they will never need.

4.    The title insurance market in California consists of a dozen carriers, ranging in size from regional companies to national affiliates. However, the market is dominated by four groups of affiliated companies which, combined, sell over 85 percent of the title insurance policies sold in

California and which own and control the title plants in many California counties that every title insurer must rely on in order issue title policies.

5. Title companies, in marked contrast to property, casualty, life and other traditional insurance carriers, choose not to market their products directly to the consumers who pay for them. Instead, the title insurance industry operates on what is termed a "reverse competition" model. Reverse competition means that title companies solicit business referrals from the other major players in the home purchase scenario – real estate agents and agencies, banks, lenders, builders, developers and others: middlemen or go-betweens. The title companies pay middlemen for these referrals in the form of direct payments, advertising expenses, junkets, parties and other kick-backs and inducements. In addition, middlemen such as Windermere, John L. Scott and Caldwell Banker-Bain, who themselves control a significant portion of the real estate brokerage market, take significant ownership stakes in local title agents and affiliates of the major title insurers and thereby get a direct return in profit from the referral of title business to the title agent whom they partly or wholly own.

6. Reverse competition, as the term suggests, isn't a model that benefits consumers through market-driven forces. In fact, consumers are bypassed completely as title companies spend nearly all of their marketing budgets "wining and dining" real estate agents, banks, lenders, builders, developers and others in an effort to convince these middlemen to steer their home-buying clients to their companies for their title insurance needs.

7. In some of the major markets in the United States, these same title insurers collectively meet, and jointly set rates and file these rates with the applicable state insurance authority. The rates are not subject to any meaningful review or regulation. The companies agree to fix the price of title insurance far in excess of the risk and loss experience associated with such insurance. As a result of the joint agreement as to rates, competition is relegated to the middleman. As a result of their joint rate setting and agreement, no company competes on price to the consumer.

8. Having agreed to fix prices in states where joint rate setting occurs, the companies agreed to not compete based on price to the consumer in other states, including California, where

CLASS ACTION COMPLAINT

1  regulation of filed rates is lax or non-existent. Thus, they agreed to set rates at supra competitive

2  prices and to compete based on offering inducements to middlemen. In California, in three

3  successive reports, the Office of the Insurance Commissioner ("OIC") has found an "astonishing

4  number" of such inducements that are in violation of state law. However, the OIC does not

5  actively oversee or regulate rates, and, in fact, does not by its own admission have the power to do

6  so. The absence of regulation has allowed collusive behavior and excessive rates.

7        9.     In addition to paying inducements and kick-backs, the title companies and their

8  agents divide the market of real-estate middlemen through the use of Affiliated Business

9  Arrangements ("ABAs"), wherein the dominant real estate brokers purchase significant ownership

10  stakes in favored title insurance affiliates. The real estate brokers then reward their associates for

11  using the preferred title insurance providers and lock-out independent title insurers.

12        10.    In this action, plaintiff, on behalf of a Class of those purchasing title insurance in

13  California, seek damages arising from defendants' violations of the Sherman Act as well as

14  California statutory law.

15  **II.    JURISDICTION AND VENUE**

16        11.    This Complaint is filed and these proceedings are instituted under Sections 4 and 16

17  of the Act of Congress of October 15, 1914, C. 323, Stats. 731, 737 (15 U.S.C. §§ 15, 26) to obtain

18  injunctive relief and to recover treble damages and the costs of suit, including a reasonable

19  attorneys' fee, against defendants for the injuries sustained by plaintiff and the members of the

20  Class which she represents by reason of defendants' and their co-conspirators' violations, as

21  hereinafter alleged, of Section I of the Sherman Act (15 U.S.C. § 1).

22        12.    Defendants transact business, maintain offices or are found within the Central

23  District of California. The interstate commerce described hereinafter is carried on, in part, within

24  the Central District of California and the conspiratorial acts herein alleged were carried on, in part,

25  in the Central District of California.

26

27

28

CLASS ACTION COMPLAINT

- 3 -

**III. PARTIES**

**A. Plaintiff**

13. Emilse Magana is an individual residing in the State of California. During the Class Period, plaintiff purchased title insurance directly from one or more of the defendants herein and has been injured by reason of the antitrust violations alleged.

**B. Defendants**

14. Defendant Fidelity National Financial, Inc. ("Fidelity National") is a Delaware corporation headquartered at 601 Riverside Avenue, Jacksonville, Florida 32204. Fidelity National does business in California through one or more of its subsidiaries, including but not limited to, defendants Fidelity National Title Insurance Company, Ticor Title Insurance Company, Ticor Title Insurance Company of Florida, National Title Insurance of New York, Inc., Security Union Title Insurance Company, and Chicago Title Insurance Company. Fidelity National is registered to do business in California.

15. Defendant Fidelity National Title Insurance Company ("FNTIC") is a California Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204. FNTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

16. Defendant Ticor Title Insurance Company ("Ticor") is a California Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204. Ticor does business in California, is a licensed title insurance company in California and is registered to do business in California.

17. Defendant Ticor Title Insurance Company of Florida ("TTICF") is a Florida corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204. TTICF does business in California, is a licensed title insurance company in California and is registered to do business in California.

18. Defendant Chicago Title Insurance Company ("Chicago Title") is a Missouri Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.

CLASS ACTION COMPLAINT

- 4 -

Chicago Title does business in California, is a licensed title insurance company in California and is
registered to do business in California.

19.     Defendant National Title Insurance of New York, Inc. ("NTINY") is a New York
corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.
NTINY does business in California, is a licensed title insurance company in California and is
registered to do business in California.

20.     Defendant Security Union Title Insurance Company ("SUTIC") is a California
corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.
SUTIC does business in California, is a licensed title insurance company in California and is
registered to do business in California.

21.     The Fidelity family of title insurance companies (collectively, "Fidelity") – which
includes defendants Fidelity National, FNTIC, Ticor, TTICF, Chicago Title, NTINY and SUTIC,
and their affiliates – is engaged in selling title insurance to purchasers of commercial and
residential real estate throughout the United States, including California.  Nationally, Fidelity
accounts for approximately 27 percent of title premiums, which in 2006 amounted to roughly
$4.6 billion.  Fidelity, Chicago Title and Ticor were founding members of TIRSA (defined below)
and since TIRSA's inception have charged title insurance rates in New York that TIRSA
collectively sets.

22.     The Fidelity family of title insurance companies and their affiliates are wholly-
owned and controlled by defendant Fidelity National Financial, Inc.  Through its subsidiaries,
Fidelity National is a provider of title insurance, specialty insurance, and claims management
services.  Fidelity National had 2006 revenues of roughly $9.4 billion.  The Fidelity family of title
insurance companies engaged in the conduct challenged herein with the approval and assent of
defendant Fidelity National.

23.     Defendant The First American Corporation ("First American") is a California
corporation with its headquarters at 1st American Way, Santa Ana, California 92707.  First
American does business in California through one or more of its subsidiaries, including but not

1   limited to, defendants First American Title Insurance Company and United General Title Insurance

2   Company.

3       24.     Defendant First American Title Insurance Company ("FATIC") is a California

4   corporation with its headquarters at 1st American Way, Santa Ana, California 92707. FATIC does

5   business in California, is a licensed title insurance company in California and is registered to do

6

7   business in California.

8       25.     Defendant United General Title Insurance Company ("UGTIC") is a Colorado

9   corporation located at 8310 S. Valley Highway, Suite 130, Englewood, CO 80112. UGTIC does

10  business in California, is a licensed title insurance company in California and is registered to do

11  business in California.

12      26.     The First American family of title insurance companies (collectively, "First

13  American") – which includes defendants First American, FATIC and UGTIC, and their affiliates –

14  is engaged in selling title insurance to purchasers of commercial and residential real estate

15  throughout the United States, including California. Nationally, First American accounts for

16  approximately 29 percent of title premiums, which in 2006 amounted to roughly $4.8 billion. First

17  American Title was a founding member of TIRSA and since TIRSA's inception has charged title

18

19  insurance rates in New York that TIRSA collectively sets.

20      27.     The First American family of title insurance companies and their affiliates are

21  wholly-owned and controlled by defendant The First American Corporation. Through its

22  subsidiaries, First American is a provider of title insurance, business information, and related

23  products and services. First American had 2006 revenues of roughly $8.5 billion. The First

24  American family of title insurance companies and their affiliates engaged in the conduct

25  challenged herein with the approval and assent of defendant First American.

26      28.     Defendant LandAmerica Financial Group, Inc. ("LandAmerica") is a Virginia

27  corporation headquartered at 5600 Cox Road, Glen Allen, Virginia 23060. LandAmerica does

28  business in California through one or more of its subsidiaries, including but not limited to,

CLASS ACTION COMPLAINT

- 6 -

1     defendants Commonwealth Land Title Insurance Company, Lawyers Title Insurance Corporation

2     and Transnation Title Insurance Company.

3          29.      Defendant Commonwealth Land Title Insurance Company ("CLTIC") is a

4     Pennsylvania corporation with is principle place of business at 5600 Cox Road, Glen Allen,

5     Virginia 23060. CLTIC does business in California, is a licensed title insurance company in

6     California and is registered to do business in California.

7          30.      Defendant Lawyers Title Insurance Corporation ("LTIC") is a Nebraska corporation

8     with is principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060. LTIC does

9     business in California, is a licensed title insurance company in California and is registered to do

10     business in California.

11          31.      Defendant Transnation Title Insurance Company ("TNTIC") is a Nebraska

12     corporation with is principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060.

13     TNTIC does business in California, is a licensed title insurance company in California and is

14     registered to do business in California.

15          32.      The LandAmerica family of title insurance companies (collectively,

16     "LandAmerica") – which includes defendants LandAmerica, CLTIC, LTIC and TNTIC, and their

17     affiliates – is engaged in selling title insurance to purchasers of commercial and residential real

18     estate throughout the United States, including California. Nationally, LandAmerica accounts for

19     approximately 19 percent of title premiums, which in 2006 amounted to roughly $3.15 billion.

20     Commonwealth and Lawyers Title were founding members of TIRSA and since TIRSA's

21     inception have charged title insurance rates in New York that TIRSA collectively sets.

22          33.      The LandAmerica family of title insurance companies and their affiliates are

23     wholly-owed and controlled by defendant Land America Financial Group, Inc. Through its

24     subsidiaries, LandAmerica is a provider of title insurance and other products and services that

25     facilitate the purchase, sale, transfer, and financing of residential and commercial real estate.

26     LandAmerica had 2006 revenues of roughly $4 billion. The LandAmerica family of title insurance

27     companies and their affiliates engaged in the conduct challenged herein with the approval of

28     defendant LandAmerica.

CLASS ACTION COMPLAINT

- 7 -

1    34.    Defendant Stewart Title Guaranty Company ("STGC") is a Texas corporation

2    headquartered at 1980 Post Oak Blvd., Suite 800, Houston, Texas 77056. STGC does business in

3    California, is a licensed title insurance company in California and is registered to do business in

4    California.

5    35.    Defendant Stewart Title Insurance Company ("STIC") is a New York corporation

6    with its principle place of business at 300 E. 42nd St., Floor 10, New York, NY 10017. STIC does

7    business in California, is a licensed title insurance company in California and is registered to do

8    business in California.

9    36.    The Stewart family of title insurance companies (collectively, "Stewart") – which

10   includes defendants STGC and STIC, and its affiliates – is engaged in selling title insurance to

11   purchasers of commercial and residential real estate throughout the United States and California.

12   Nationally, Stewart accounts for approximately 12 percent of title premiums, which in 2006

13   amounted to roughly $2 billion. Stewart was a founding member of TIRSA and since TIRSA's

14   inception has charged title insurance rates in New York that TIRSA collectively sets.

15   37.    Together, defendants account for more than 85 percent of the title premiums

16   consumers pay in California. Nationally, they account for more than 85 percent of title premiums,

17   which in 2006 amounted to roughly $14.5 billion. Throughout the relevant damages period,

18   defendants charged California consumers in California virtually identical title insurance rates.

19   **IV.    OTHER ENTITIES**

20   38.    TIRSA is a voluntary association of title insurers licensed as a rate service

21   organization pursuant to Article 23 of the State of New York Insurance Law. TIRSA maintains its

22   offices in New York City, which until recently were located at the same New York address of

23   Fidelity Title.

24   39.    TIRSA annually compiles from its members statistical data relating to their title

25   insurance premiums, losses and expenses and submits this information in aggregate form to the

26   New York Insurance Department. TIRSA also prepares and submits the New York Title Insurance

27   Rate Manual which sets forth title rates to be charged and rules to be followed by TIRSA's

28   members. The Insurance Department has never objected to any of the rates TIRSA has collectively

CLASS ACTION COMPLAINT

- 8 -

1    set. Similarly, the California OIC has not actually held a public hearing or conducted any other

2    review or regulation of the title insurance rates in California for thirty years.

3         40.      TIRSA's membership is comprised of defendant insurers and all other title insurers

4    that are licensed to issue policies in New York. Currently, Fidelity, First American, LandAmerica,

5    and Stewart collectively represent 14 of TIRSA's 22 members. As such, they comprise a majority

6    voting block which, according to TIRSA's by-laws, allows them to control the operations of

7    TIRSA and, in particular, TIRSA's collective rate setting activity.

8         41.      Various other persons, firms and corporations not made defendants herein have

9    participated as co-conspirators with the defendants in the violations alleged herein and have

10    performed acts and made statements in furtherance thereof.

11    **V.     CLASS ACTION ALLEGATIONS**

12         42.      Plaintiff brings this action under Rule 23, and particularly subsection (b)(3), of the

13    Federal Rules of Civil Procedure, on behalf of herself and a Class consisting of all persons

14    excluding governmental entities, defendants, subsidiaries and affiliates of defendants, who

15    purchased directly, from one or more of the defendants and/or their co-conspirators title insurance

16    for residential and commercial property in California during the four year period preceding this

17    lawsuit and who have sustained damages as a result of the conspiracy herein alleged. The number

18    of potential Class members is so numerous that joinder is impracticable.

19         43.      Plaintiff, as representative of the Class, will fairly and adequately protect the interest

20    of the Class members. The interests of plaintiff are coincident with, and not antagonistic to, those

21    of the Class members.

22         44.      Except as to the amount of damages each member of the Class has by itself

23    sustained, all other questions of fact and law are common to the Class, including but not limited to,

24    the combination and conspiracy hereinafter alleged, the violation of Section 1 of the Sherman Act

25    (15 U.S.C. § 1) and the effects of such violation.

26         45.      Plaintiff, along with all other members of the Rule (b)(3) Class, were injured as a

27    result of paying supracompetitive prices for title insurance in California. These supracompetitive

28

CLASS ACTION COMPLAINT

prices were achieved as a result of defendants' illegal price-fixing activities and market allocation and division.

46. Members of the Class include hundreds of thousands, if not millions, of consumers. They are so numerous that their joinder would be impracticable.

47. Plaintiff also brings this action as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure, for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Rule (b)(2) Class includes all members of the (b)(3) Class, and all consumers who are threatened with injury by the anticompetitive conduct detailed herein.

48. Defendants have acted, continued to act, refused to act and continued to refuse to act on grounds generally applicable to the Rule (b)(2) Class, thereby making appropriate final injunctive relief with respect to the Rule (b)(2) Class as a whole.

49. Members of the Rule (b)(2) Class include hundreds of thousands, if not millions, of consumers. They are so numerous that their joinder would be impracticable.

50. Common questions of law and fact exist with respect to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law or fact common to the class are the following:

- Whether defendants have engaged in the alleged illegal price-fixing activity and market allocation and division.

- The duration and scope of defendants' alleged illegal price-fixing and market allocation and division activity.

- Whether defendants' alleged illegal price-fixing and market allocation and division has caused higher prices to plaintiffs and other purchasers of title insurance in California.

- Whether the Insurance Commissioner has actively supervised defendants' price fixing and market allocation and division.

51. Plaintiff does not have any conflict of interest with other Class members. Plaintiff's claims are typical of the claims of the Class and they will fairly and adequately reflect the interests of the Class. Counsel is competent and experienced in federal class action and federal antitrust litigation and has been retained to represent the Class.

CLASS ACTION COMPLAINT

- 10 -

1        52.    This action is superior to any other method for the fair and efficient adjudication of

2 this legal dispute since joinder of all members is not only impracticable, but impossible. The

3 damages suffered by certain members of the Class are small in relation to the expense and burden

4 of individual litigation and therefore it is highly impractical for such Class members to seek redress

5 for damages resulting from defendants' anticompetitive conduct.

6        53.    There will be no extraordinary difficulty in the management of the Class action.

7 **VI.    TRADE AND COMMERCE**

8        54.    During all or part of the period in suit, defendants and their co-conspirators were

9 sellers of title insurance in California.

10        55.    During the period in suit, the defendants sold substantial quantities of title insurance

11 in a continuous and uninterrupted flow in interstate commerce. In 2005, consumers in the United

12 States paid $17 billion for residential title insurance policies.

13        56.    During the period in suit, Class members from locations outside California

14 purchased commercial or residential property and title insurance within California.

15        57.    During the period in suit, the defendants were the major sellers of title insurance in

16 the United States and California. Defendants controlled in excess of 85 percent of the market for

17 title insurance in the United States and California.

18        58.    The activities of the defendants and their co-conspirators, as described herein, were

19 within the flow of interstate commerce and substantially affected interstate commerce.

20 **VII.    FACTUAL ALLEGATIONS**

21 **A.    The Nature of Title Insurance**

22        59.    Title insurance is one of most costly items associated with the closing of a real

23 estate transaction. In California, rates for title insurance are based on a percentage of the total

24 value of the property being insured. For residential properties, this price ranged in 2005 from

25 about $1,010 (for a $250,000.00) property to $1,490 (for a $500,000 property). For more

26 expensive homes and commercial properties, these prices are significantly higher. This amount

27 spent on title insurance has risen dramatically over the past decade.

28

CLASS ACTION COMPLAINT

60. Title insurance serves an important purpose. It protects the purchaser of a property from any unidentified defects in the title that would in any way interfere with the full and complete ownership and use of the property with the ultimate right to resell the property. Title insurance is required by lenders in most residential and commercial real estate transactions.

61. Title insurance companies operate their business on the premise that consumers are generally uninformed or unaware of all matters concerning title insurance. Consumers are generally not presented, at any time, with an opportunity to make an independent decision regarding any aspect of their propery title. That decision is typically made for them by their lawyer, mortgage broker, lender, or realtor. Consequently, for most purchasers, the cost of title insurance is not challenged. Most consumers do not even become aware of the price they will pay and to which insurer they will pay it until the actual closing of the real estate transaction. By then it's too late, consumers can't attempt to negotiate a better title insurance price or alternate provider for fear of delaying or derailing the entire transaction. There is no shopping around. There is no negotiation of price.

62. This dynamic basically removes the sale of title insurance from the normal competitive process. Unlike the regular forces of supply and demand that keep most industries and their pricing in check, the title insurance industry is not subject to any real competitive constraints. The purchasers of the insurance, in most instances, are not the ones making the purchasing decisions. And, they are certainly in no position to question the price.

63. The most effective, but illegal, way for a particular title insurer to get business is to encourage those making the purchasing decisions – the real-estate middlemen – to steer business to that insurer. The best way to so motivate the middlemen is not through lower prices (that they are not even paying). Rather, it is through kickbacks in the form of finder's fees, gifts, meals, business services and other financial enticements. Therefore, it is through higher pricing (which allows for generous inducements and kick-backs), not lower pricing, that provides the best way for title insurers to compete and increase their business.

**B.    Price-Fixing in the Large Markets**

64.    New York is one of several states in which the leading title insurers collectively fix their prices through a rate-setting organization like TIRSA. There are two principal cost components that go into TIRSA's calculation. One comprises the risk associated with issuing the title policy. The other comprises the "agency commissions" paid to title agents.

65.    The risk component covers the risk the title insurer bears for any undiscovered defects in the title. Unlike property insurance, title insurance carries with it a very limited risk of loss to the insurer. That is because title insurance protects against unknown *prior* events that cause defects in title. With a proper search and examination of prior ownership records, any such defects can and almost always are readily identified and excluded from the policy's coverage. Consequently, the average claim payout on a title insurance policy in the United States amounts to only about 5 percent of the total premium collected. This is very different from property coverage (such as auto and home insurance) – which protects against *future* occurrences over which the insurer has little to no control – where the average claim payout amounts to about 80 percent of the total premium.

66.    The "agency commissions" component of the title insurance rate covers payments made to title agents. Defendants have an ownership or management stake in many of the title agencies to which these payments are made. A small portion of these payments is for the search and exam of prior ownership records of the property being purchased to identify any liens, encumbrances, burdens, exclusions, or other defects in the title. The search and exam function does not involve the spreading or underwriting of risk, and title insurers typically outsource this task to title agents.

67.    The remainder, and by far the bulk, of the agency commissions are comprised of costs unrelated to the issuance of title insurance. These costs include kickbacks and other financial inducements title insurers provide to title agents and indirectly (through title agents) to the lawyers, brokers, and lenders who, in reality, are the ones deciding which title insurer to use. These payments have nothing to do with the issuance of title insurance and are made by title insurers merely to inflate their revenues and steer business their way.

CLASS ACTION COMPLAINT

- 13 -

1    68. Under TIRSA's collective rate setting regime, roughly 85 percent of the total title

2 insurance premium is based on the so-called "costs" associated with the payment of agency

3 commissions. Only 15 percent is based on costs associated with the risk of loss.

4    69. TIRSA publishes its final calculated title rates in the New York Title Insurance Rate

5 Manual. These rates are tied to the value of the property being insured. This is so despite the fact

6 that the costs associated with agency commissions are entirely unrelated to the value of the

7 property. Indeed, agency kickbacks and enticements have little to do with producing a particular

8 title policy and provide no value – proportional to property value or otherwise – to the consumer.

9 Even search and exam costs are unrelated to property value. They instead depend on the age of the

10 property, the complexity of the ownership history, and the accessibility of prior ownership records.

11    70. There are other states in which the defendants overtly meet and agree to fix the rates

12 for title insurance as part of a formal collective rate setting process.

13 **C. TIRSA's Formation**

14    71. Prior to TIRSA, the New York Board of Title Underwriters ("NYBTU") served as

15 the title insurance rate-setting body in New York. NYBTU, along with the title insurance rate

16 setting bureaus in many other states, was disbanded in the mid-1980s in the wake of a Federal

17 Trade Commission ("FTC") challenge to the collective rate setting activity of many of these

18 associations. The FTC's challenge culminated in *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621 (1992),

19 where the Supreme Court held that to avoid *per se* illegal price fixing liability, the rate setting

20 activity of these rating bureaus must be actively supervised by the state.

21    72. In *Ticor*, the FTC focused its challenge on agency commissions. The FTC

22 contended that the respective state insurance departments merely rubber-stamped this portion of the

23 collectively fixed rates without any independent review or analysis of their reasonableness or cost

24 justification. The Supreme Court agreed with the FTC that this kind of limited state oversight was

25 not sufficient. Rather, to avoid illegal price-fixing liability, the state insurance department has to

26 "exercise[]sufficient independent judgment and control so that the details of the rates or prices have

27 been established as a product of deliberate state intervention, not simply by agreement among

28 private parties." *Ticor*, 504 U.S. at 634-35.

CLASS ACTION COMPLAINT

- 14 -

73.     Following the Supreme Court's instruction in *Ticor*, the Third Circuit on remand in *Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129 (3d Cir. 1992), upheld the FTC's finding that the collective rate-setting of certain state rating bureaus was improper because it was not actively supervised by the state. According to the circuit court, "[t]he Supreme Court plainly instructed us that a state's rubber stamp is not enough. Active supervision requires the state regulatory authorities' independent review and approval." *Id.* at 1139.

74.     Defendants formulated TIRSA's first rate manual and procedure soon after the Supreme Court's *Ticor* decision. Through TIRSA, defendants have set up a rate-setting scheme to get around the rigors of state oversight required by *Ticor*. They have done so by calculating a single rate that comprises both risk and agency commission costs and by outsourcing to title agents the agency commission costs. In this way, defendants avoid providing the Insurance Department with any detailed breakout or backup for the bulk of the costs that make up their collectively fixed rates.

75.     TIRSA merely submits an aggregated figure that is supposed to represent the total agency commission costs. Embedded within this figure is the vast quantity of dollars that are funneled to and through the title agencies as kickbacks, financial inducements and other costs unrelated to the issuance of title insurance. Defendants' design in all of this has been to effective "hide" the cost basis for their artificially high and collectively fixed title insurance premiums from the regulatory scrutiny that *Ticor* demands.

**D.   Lack of Regulatory Supervision and Authority in New York and Other States Including California**

76.     There is no provision under the New York Insurance Law for TIRSA to include in its collectively fixed rates kickbacks and other agency commission payments unrelated to the issuance of title insurance. Indeed, the New York Insurance Department has openly acknowledged that it lacks the authority to review any agency commission payments. It has likewise recognized that defendants' outsourcing of agency commission costs has prevented it from performing a meaningful review of TIRSA's calculated rates. This was made clear at a November 2006 public hearing the New York Insurance Department held – the first in 15 years – where it questioned

1  TIRSA and its members on TIRSA's failure to provide the Insurance Department with any backup

2  or detail for agency commissions.

3      77.    At the hearing, the Insurance Department conceded that it could not properly

4  evaluate TIRSA's calculated rates, and that it could only do so if it obtained the detailed cost

5  information on agency commissions that TIRSA does not provide.

6      78.    The Insurance Department's recognition that it is not properly supervising TIRSA's

7  rate-setting activity is consistent with the April 2007 findings of the U.S. Government

8  Accountability Office ("GAO") that the title insurance industry is in need of greater state

9  regulation.  The GAO studied the industry conditions of several states, including New York, and

10  concluded that "state regulators have not collected the type of data, *primarily on title agents' costs*

11  *and operations,* needed to analyze premium prices and underlying costs."  (Emphasis added.)

12      79.    Unchecked by regulatory review and insulated from competition, defendants have

13  thus been able to collectively fix title insurance rates at supra competitive levels and earn profits

14  that vastly exceed those contemplated by the Insurance Department or that would have resulted in a

15  free and open competitive market.

16      80.    At the time of TIRSA's formation, the Insurance Department established 5 percent

17  (of the total premium) as the level of profit to which title insurers are entitled.  The Insurance

18  Department is supposed to carefully analyze TIRSA's rate calculations, and, in particular, its

19  revenue and cost information, to ensure that this 5 percent profit level is maintained and based on a

20  reasonable premium.  However, without the authority or ability to scrutinize agency commission

21  costs, the Insurance Department has been unable to perform this function.  As a result, defendants

22  (through TIRSA) have been able to set artificially high title premiums and secure title profits far in

23  excess of the 5 percent threshold.

24      81.    Through an independent investigation conducted over the past several years, the

25  New York State Attorney General found that for every dollar of insurance premium defendants

26  collected, of the roughly 15 cents that supposedly accounts for the risk of loss, only 3 cents is paid

27  out in claims.  And, of the roughly 85 cents that supposedly covers agency commissions, only

28  between 8 and 11 cents goes to costs actually incurred by title agents in producing the title policy.

CLASS ACTION COMPLAINT

1    These numbers show that title insurers' collectively fixed rates have resulted in profits that

2    untethered to and vastly exceed the costs of producing such policies.

3          82.    The New York Attorney General's investigation further revealed that what was

4    largely driving these numbers were the kickbacks and other financial inducements defendants were

5    funneling to and through title agents to secure more business.  As reported at the New York

6    Insurance Department's 2006 hearing, one title agency's financial statements revealed that it spent

7    more than $1 million of these so-called "agency commissions" on items identified as "Christmas",

8    "automobile expenses", "political contributions", "promotional expenses", and "travel and

9    entertainment".  These expenses are not even remotely related to the issuance of title insurance.

10         83.    A report to the California Inurance Comissioner prepared by Barry Birnbaum,

11   Consulting Economist, in December 2005, found strikingly similar abuses, "We found numerous

12   examples in California of illegal rebates and kickbacks where the title insurer or the underwritten

13   title company provides money, free services or other things of value to a real estate agent, a lender

14   or homebuilder in exchange for business referrals."(*An Analysis of Competition in the California*

15   *Title Insurance and Escrow Industry,* December 2005, p. 3)

16         84.    All of this "excess money" paid to title agents not only works to steer business to

17   defendants.  It also serves to boost defendants' own profits through the inflated revenues they

18   obtain to cover these agency payments and through their ownership or management stake in many

19   of these agencies.

20         85.    Defendants are competitors in the sale of title insurance to consumers throughout

21   the United States.  These title insurers have agreed and engaged in concerted efforts to

22   (i) collectively set and charge uniform and supracompetitive rates for title insurance, (ii) include in

23   their calculated rates agency commission costs, (iii) embed within these costs payoffs, kickbacks,

24   and other charges that are unrelated to the issuance of title insurance, and (iv) hide these supposed

25   "costs" from regulatory scrutiny by funneling them to and through title agents over which the

26   government agencies have no ability or authority to regulate.

27

28

CLASS ACTION COMPLAINT

- 17 -

86.     The GAO in its 2007 report entitled "Actions Needed to Improve Oversight of the Title Insurance Industry and Better Protect Consumers" found several indicia of a lack of competition and questions about the reasonableness of prices including:

- Consumers find it difficult to shop for title insurance, therefore, they put little pressure on insurers and agents to compete based on price;

- Title agents do not market to consumers, who pay for title insurance, but to those in the position to refer consumers to particular title agents, thus creating potential conflicts of interest;

- A number of recent investigations by HUD and state regulatory officials have identified instances of alleged illegal activities with the title industry that appear to reduce price competition and could indicate excessive prices;

- As property values or loan amounts increase, prices paid for title insurance by consumers appear to increase faster than insurers' and agents' costs; and

- In states where agents' search and examination services are not included in the premium paid by consumers, it is not clear that additional amounts paid to title agents are fully supported by underlying costs.

87.     The GAO visited several states, including California, and found a lack of regulatory oversight:

In the states we visited, we found that regulators did not assess title agents' costs to determine whether they were in line with premium rates; had made only limited efforts to oversee title agents (including ABAs involving insurers and agents); and, until recently, had taken few actions against alleged violations of antikickback laws. In part, this situation has resulted from a lack of resources and limited coordination among different regulators within states. On the federal level, authority for alleged violations of section 8 of RESPA, including those involving increasingly complex ABAs, is limited to seeking injunctive relief. Some state regulators expressed frustration with HUD's level of responsiveness to their requests for help with enforcement, and some industry officials said that RESPA rules regarding ABAs and referral fees need to be clarified. Industry and government stakeholders have proposed several regulatory changes, including RESPA reform, strengthened regulation of agents, a

CLASS ACTION COMPLAINT

- 18 -

competitor right of action with no monetary penalty, and alternative title insurance models. [*Id.* at 41, footnotes omitted.]

**E.    Competition Based on Kickbacks and Inducements But Not Rates**

88.    Having agreed to fix or stabilize prices in New York and other states where they overtly meet to promulgate rates, these same defendants then set out to do the same in other states.

89.    In other words, as a direct result of these meetings where rates were agreed to, these same defendants agreed, either expressly or tacitly, to not compete on rates in other states as well. To compete on rates in other states could and would imperil their ability to maintain the agreed rate in states like New York.

90.    As is the case in New York, a lack of regulatory authority over rates created an environment in which a conspiracy can and did succeed. No agency was examining why all the rates were virtually identical, and no agency was examining whether the costs associated with these premiums were reasonable. This is an environment which is conducive to price fixing.

91.    In California, there is a lack of regulatory authority and oversight over title insurance companies. The rates in California are not set as part of a deliberate state intervention and the state does not and cannot meaningfully renew or approve these rates. The rates at issue in this case went into effect without review.

92.    In fact, in February of 2007, the Insurance Comissioner of California, Steve Poizner issued a statement concluding "that reasonable price competition does not exist for title and escrow services." (*Inurance Commisssioner Steve Poizner Issues Statement Following Decision by OAL on New Regulations*, California Department of Insurance, February 22, 2007)

**F.    Other Indicators of a Lack of Competition and Conditions Conducive to Collusive Rate Setting**

93.    In addition to the uniformity of rates, other facts suggest that it is more plausible than not that rates have been set based on an agreement to fix prices.

94.    In theory, the chain of title should be documented back to its historic grant of ownership centuries in the past. Fear about a possible title defect in the distant past is widely used as a justification by title agencies when convincing property buyers to purchase an owner policy in

1  addition to the lender policy, which is mandatory to secure a mortgage. The title agency, however,
2  saves much time and money when the search is limited to one or two transactions. They rely on
3  the insurance policy to cover the remote chance of missing an earlier but still-valid claim. If such a
4  claim is asserted and survives the scrutiny of the title insurance company's legal department, the
5  expected cost of compensation is likely to be less than the sum of added overhead costs of
6  routinely tracing back every chain of title to the earliest registered owner in the distant past.

7      95.    Title insurance industry officials tend to justify the large proportion of the premium
8  retained by the title abstract and settlement agency (from 60 to more than 90 percent) by the
9  alleged high cost of title searching back into the distant past. In fact, a high proportion of
10  noncommercial properties are searched only through the most recent transaction. No information
11  is available as to what proportion of claims originate in the distant past. The industry has never
12  published pertinent statistics. It would have a marketing incentive to publish these statistics if the
13  risk were significant; that it has not published these statistics indicates that the risk probably is only
14  slightly greater than zero.

15      96.    Many U.S. homes are being resold three or four times in twenty-five years. At each
16  of these occasions, an abstract of title will be prepared on the basis of a more or less thorough
17  review of the available title records, inheritance records, family records and records of past or
18  current liens against a property. It is reasonable, therefore, to suspect that the risk of a title defect
19  will decrease every time a property is sold.

20      97.    Title searches have become less labor intensive, especially in large urban counties
21  and cities. More and more of the information is available online. The statistical likelihood that a
22  title default would be overlooked is a closely held industry secret, but it appears to be so small that
23  many transactions are now insured on the basis of a search of the last owner's title history or a
24  search into transactions that occurred during the last twenty-five to thirty-five years. The evidence
25  is strong that the title insurance industry has achieved a remarkably high level of loss minimization.
26  Indeed, the national everage recovery for a claim on a title insurance policy is appoximately 5% of
27  the total premium. On the other hand, the national average for property insurance is approximately
28  80% of the total premium collected.

CLASS ACTION COMPLAINT

- 20 -

1    98.    Thus the costs of production have decreased as has the risk of loss yet none of these

2    factors has resulted in price competition at the consumer level.

3    99.    There is a remarkable absence of rate changes by title insurers over the past five

4    years, despite declining costs of production, increased number of transactions and increased

5    revenue per transaction. During a period when costs per unit of production declined significantly,

6    underwritten title companies and title insurers maintained excessive rates. The prices charged by

7    title insurers and underwritten title companies were not and are not responsive to the changing

8    costs of production or increasing revenue per transaction at a given set of rates. Again, this is

9    indicia of an agreement not to compete based on price.

10   100.   As noted, the title companies engage in illegal rebates and kickbacks where the title

11   insurer or the underwritten title company provides money, free services or other things of value to

12   a real estate agent, a lender or homebuilder in exchange for business referrals. These illegal rebates

13   and kickbacks – a consequence of reverse competition – show that title insurance rates are supra

14   competitive and that some portion of the overcharge is passed from the underwritten title company

15   or title insurer to the referrer of business.

16   101.   A lack of competition and the ability to control prices is enhanced by the fact that

17   there were few title insurer entrants over the period from 1995 through 2005 and the number of

18   title insurer groups declined as title insurers acquired other title insurers. There were few

19   underwritten title company entrants over the 2000 to 2005 period and new entrants were controlled

20   business arrangements whose addition to the market did not result in greater price competition.

21   102.   Access to title plants can be a barrier to entry, but a large barrier to entry exists due

22   to the established relationships between the entities that can steer the consumer's title and escrow

23   business and the entities who sell title insurance and escrow services.

24   103.   The title insurance market is highly concentrated – a few title insurers account for

25   the vast majority of title insurance sales – at both the statewide level and at the county level in

26   California. For example, three title insurer groups account for 77.4% of the market at a statewide

27   level. At the county level, each individual market was highly concentrated. The GAO found that

28

CLASS ACTION COMPLAINT

- 21 -

First American and Fidelity had a market share of 66 percent. Such a concentration enhances the ability of companies to fix prices

104. The agreement not to compete based on price is also evidenced by the fact that no company has marketed its services to consumers, the ultimate purchasers of the product. This is in marked contrast to real insurance, for example, car insurance, where the companies compete vigorously with well recognized slogans such as State Farm's "Like a Good Neighbor," or Allstate's "good hands," or the cute (to some) GEICO gecko promising low prices.

105. As a result of this lack of competition, California title inturance and escrow services markets have enjoyed excessive profits, "In a competitive market, sellers earn a reasonable profit. In the California title insurance and escrow services markets, bot the title insurers and the underwritten title companies realized excessive profits over an extended period of time. In 2003 and 2004, underwritten title companies in California earned after-tax profits of 49.0% and 32.3% respectively – excessive by any reasonable measure." (*An Analysis of Competition in the California Title Insurance and Escrow Industry,* December 2005, p. 2)

**VIII. CLAIMS FOR RELIEF**

**COUNT I**

**Violation of the Sherman Act**

106. Plaintiff incorporates by reference the preceding allegations.

107. Beginning at least as early as May 2004, and continuing thereafter to the present, the exact dates being unknown to plaintiff, defendants and their co-conspirators engaged in a combination and conspiracy in unreasonable restraint of the aforesaid interstate trade and commerce in violation of Section 1 of the Sherman Act.

108. The aforesaid combination and conspiracy has consisted of a continuing agreement, understanding and concert of action among the defendants and their co-conspirators, the substantial terms of which have been:

    (a) to fix, raise, maintain and stabilize the price of title insurance throughout California;

CLASS ACTION COMPLAINT

(b) to fix, raise, maintain and stabilize the terms and conditions of sale of title insurance in Californi; and

(c) to allocate and divide the market for title insurance in California.

109. In the absence of proper regulatory authority and oversight, defendants' conduct constitutes a horizontal agreement to fix the form, structure, and prices of title insurance and to allocate and divide the title insurance market in California and is a *per se* violation of Section I of the Sherman Act.

110. Defendants' price-fixing, market allocation and division activity has been continuous throughout the relevant damages period and has been renewed and reinforced annually through submissions to the OIC of supposed cost and revenue information and its periodic submissions of rate changes.

111. Through their collective price-fixing, market allocation and division and manipulation of the regulatory process, defendants have harmed competition by charging consumers supra competitive prices for title insurance in California, evidenced in part by the fact that the prices are uniformly higher than compared with the cost of providing the insurance.

112. The aforesaid combination and conspiracy has had the following effects among others:

(a) price competition in the sale of title insurance has been suppressed, restrained and eliminated;

(b) prices for title insurance have been raised, fixed, maintained and stabilized at artificially high and non-competitive levels; and

(c) purchasers of title insurance have been deprived of the benefit of free and open competition.

113. During the period of the antitrust violations by defendants and their co-conspirators, plaintiff and each member of the Class she represents, has purchased title insurance and, by reason of the antitrust violations herein alleged, paid more for such that it would have paid in the absence of said antitrust violations. As a result, plaintiff and each member of the Class she represents, has been injured and damaged in an amount presently undetermined.

CLASS ACTION COMPLAINT

- 23 -

1

2

| 1 | **COUNT II** |

**COUNT II**

**Violation of Cal. Bus. and Prof. Code §§ 16720, *et seq.***

114.  Plaintiff incorporates by reference the preceding allegations.

115.  Defendants conduct as set forth above is in violation of the Cartwright Act of California (Cal. Bus. & Prof. Code §§ 16720, *et seq.*).

116.  As a direct result of defendants' unlawful acts plaintiffs have paid artificially inflated prices for title insurance and have suffered injury to their business and property.

**COUNT III**

**(California's Business & Professions Code §§ 17200, *et seq.*)**

117.  The preceding paragraphs of this Complaint are realleged and incorporated by reference.  Plaintiff asserts this claim for violations of California's UCL, Bus. & Prof. Code §§ 17200, *et seq.*, on behalf of herself and the members of the Class.

118.  Defendants' statements and representations constitute unfair, unlawful and deceptive trade practices in violation of the UCL.

119.  All of the wrongful conduct alleged herein occurs and continues to occur in the conduct of defendants' business.  Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is repeated in the State of California on hundreds, if not thousands, of occasions daily.

120.  Plaintiff has suffered injury in fact and has lost money or property as a result of defendants' unfair, unlawful and/or deceptive practices by paying a higher price for title insurance then she would or should have absent the conduct complained of.

121.  Plaintiff requests that this Court enter such orders or judgment as may be necessary to enjoin the defendants from continuing its unfair, unlawful, and/or deceptive practices, to restore to any person in interest any money which may have been acquired by means of such unfair competition and to disgorge any profits realized by defendants as a result of its unfair, unlawful and/or deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code § 3345, and for such other relief as set forth in the Prayer for Relief.

CLASS ACTION COMPLAINT

- 24 -

**COUNT IV**

**UNJUST ENRICHMENT**

122.    Plaintiff incorporates by reference the preceding allegations.

123.    This Cause of Action is pled in the alternative to all claims and/or causes of action at law.

124.    Defendant has received a benefit from plaintiff and the Class members in the form of the prices plaintiff and the Class members paid for defendants' title insurance.

125.    Defendants are aware of their receipt of the above-described benefit.

126.    Defendants received the above-described benefit to the detriment of plaintiff and each of the other members of the Class.

127.    Defendants continue to retain the above-described benefit to the detriment of plaintiff and the Class members.

128.    As a result of defendants' unjust enrichment, plaintiff and the Class members have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands:

A.    That the alleged combination and conspiracy among the defendants and their co-conspirators be adjudged and decreed to be an unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

B.    That the Court declare that the premiums charged are excessive under state law and order damages;

C.    That judgment be entered against defendants, jointly and severally, and in favor of plaintiff, and each member of the Class it represents, for threefold the damages determined to have been sustained by plaintiff, and each member of the Class it represents, together with the cost of suit, including a reasonable attorneys' fee;

CLASS ACTION COMPLAINT

1        D.     Each of the defendants, successors, assignees, subsidiaries and transferees, and their

2 respective officers, directors, agents and employees, and all other persons acting or claiming to act

3 on behalf thereof or in concert therewith, be perpetually enjoined and restrained from, in any

4 manner, directly or indirectly, continuing, maintaining or renewing the aforesaid combination,

5 conspiracy, agreement, understanding or concert of action, adopting or following any practice,

6 plan, program, or design having a similar purpose or effect in restraining competition; and

7        E.     Such other and further relief as may appear necessary and appropriate.

8 **JURY TRIAL DEMANDED**

9 Pursuant to Rule 38, F.R.C.P., plaintiff demands a trial by jury of the claims alleged herein.

11 DATED: May 21, 2007.

Randy Renick (179652)
Dan Stormer (101967)
HADSELL, STORMER, KEENY,
RICHARDSON & RENICK, LLP
128 N. Fair Oaks Ave.
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079

GUIDO SAVERI (22349)
R. ALEXANDER SAVERI (173102)
CADIO ZIRPOLI (179108)
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA 94111-5619
Telephone: (415) 217-6810

JULIO J. RAMOS (189944)
LAW FIRM OF JULIO J. RAMOS
35 Grove Street, Suite 107
San Francisco, CA 94102
Telephone: (415) 948-3015

*Attorneys for Plaintiff*

*ti.001*

CLASS ACTION COMPLAINT

- 26 -

# EXHIBIT 9

FILED

2008 JUN -4 PM 3: 18

CLERK U.S. DISTRICT COURT
CENTRAL DIST. O. CALIF.
LOS ANGELES

BY _____

Brian Barry (135631: bribarry1@yahoo.com)
LAW OFFICES OF BRIAN BARRY
1801 Avenue of the Stars, Suite 307
Los Angeles, California 90067
Telephone: (310) 788-0831
Facsimile: (310) 788-0841

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Mark Moynahan, on behalf of himself and all others similarly situated, | Case No. **AHS** |
| Plaintiff, | **SACV08-0620** (ANx) |
| v. | **CLASS ACTION COMPLAINT** |
| FIDELITY NATIONAL FINANCIAL, INC., FIDELITY NATIONAL TITLE INSURANCE COMPANY, TICOR TITLE INSURANCE COMPANY, TICOR TITLE INSURANCE COMPANY OF FLORIDA, CHICAGO TITLE INSURANCE COMPANY, NATIONAL TITLE INSURANCE OF NEW YORK, INC., SECURITY UNION TITLE INSURANCE COMPANY, THE FIRST AMERICAN CORPORATION, FIRST AMERICAN TITLE INSURANCE COMPANY, UNITED GENERAL TITLE INSURANCE COMPANY, LANDAMERICA FINANCIAL GROUP, INC., COMMONWEALTH LAND TITLE INSURANCE COMPANY, LAWYERS TITLE INSURANCE CORPORATION, TRANSNATION TITLE INSURANCE COMPANY, STEWART TITLE GUARANTY COMPANY and STEWART TITLE INSURANCE COMPANY | **JURY TRIAL DEMANDED** |
| Defendants. | |

COPY

CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION .................................................................................. 1

II. JURISDICTION AND VENUE ........................................................... 5

III. PARTIES ............................................................................................. 5

    A. Plaintiff ...................................................................................... 5

    B. Defendants ................................................................................. 6

IV. OTHER ENTITIES ............................................................................. 12

V. CLASS ACTION ALLEGATIONS .................................................... 13

VI. TRADE AND COMMERCE ............................................................... 16

VII. FACTUAL ALLEGATIONS .............................................................. 17

    A. The Nature of Title Insurance .................................................. 17

    B. Price-Fixing in the Large Markets ............................................ 19

    C. TIRSA's Formation ................................................................... 21

    D. Lack of Regulatory Supervision and Authority in New York and Other States Including California ........................................... 23

    E. Competition Based on Kickbacks and Inducements But Not Rates ........ 29

    F. Other Indicators of a Lack of Competition and Conditions Conducive to Collusive Rate Setting .................................................................. 30

VIII. CLAIMS FOR RELIEF ...................................................................... 34

    COUNT I Violation of the Sherman Act ............................................. 34

    COUNT II Violation of Cal. Bus. and Prof. Code §§ 16720, *et seq.* ............... 36

    COUNT III (California's Business & Professions Code §§ 17200, *et seq.*) ..... 37

    COUNT IV Unjust Enrichment ........................................................... 38

PRAYER FOR RELIEF ................................................................................ 39

JURY TRIAL DEMANDED ........................................................................ 40

Plaintiff, Mark Moynahan, by his attorneys, on behalf of himself and all others similarly situated, brings this action for treble damages and injunctive relief under the antitrust laws of the United States and based on statutes of the State of California against the above named defendants, demand a trial by jury, and complaining and alleging as follows:

## I.   INTRODUCTION

1.      From the consumer's point of view, title insurance differs greatly from other, more familiar kinds of insurance.  For one thing, while automobile and homeowner insurance policies protect consumers from an event that may occur in the future, title insurance offers protection from events that might have occurred in the past.

2.      Most simply, title insurance is protection purchased against a loss arising from problems that occurred in the past and may affect the title to the real estate that a consumer is buying.  Title insurers do not compete on the basis of the policies or coverage that they provide.  In fact, almost all title policies are based on a single set of form policies published and maintained by the national trade association, the American Land Title Association.  Furthermore, the end goal of an exhaustive title search by a title insurer is not to provide coverage for title defects that the search uncovers, but rather to exclude coverage for any such defects and therefore, further reduce the real value of the title policy which is written to cover

only unknown defects in title at the time of issuance.  As a result, title insurance is a

commodity product.

3.      Even for the savviest of insurance consumers, the purchase of a title

insurance policy is just one more expensive step in the dizzying, convoluted and

often confusing flurry of paperwork and signings that culminate in the closing of a

home purchase.  Consumers who normally shop around for their insurance and

carefully compare prices, typically emerge from the closing on their new home

holding an insurance policy that they know virtually nothing about and that in all

likelihood, they will never need.

4.      The title insurance market in California consists of a dozen carriers,

ranging in size from regional companies to national affiliates.  However, the market

is dominated by four groups of affiliated companies which, combined, sell over 85

percent of the title insurance policies sold in California and which own and control

the title plants in many California counties that every title insurer must rely on in

order issue title policies.

5.      Title companies, in marked contrast to property, casualty, life and other

traditional insurance carriers, choose not to market their products directly to the

consumers who pay for them. Instead, the title insurance industry operates on what is

termed a "reverse competition" model. Reverse competition means that title

companies solicit business referrals from the other major players in the home

purchase scenario – real estate agents and agencies, banks, lenders, builders,

developers and others:  middlemen or go-betweens.  The title companies pay

middlemen for these referrals in the form of direct payments, advertising expenses,

junkets, parties and other kick-backs and inducements.  In addition, middlemen such

as Windermere, John L. Scott and Caldwell Banker-Bain, who themselves control a

significant portion of the real estate brokerage market, take significant ownership

stakes in local title agents and affiliates of the major title insurers and thereby get a

direct return in profit from the referral of title business to the title agent whom they

partly or wholly own.

6.    Reverse competition, as the term suggests, isn't a model that benefits

consumers through market-driven forces.  In fact, consumers are bypassed

completely as title companies spend nearly all of their marketing budgets "wining

and dining" real estate agents, banks, lenders, builders, developers and others in an

effort to convince these middlemen to steer their home-buying clients to their

companies for their title insurance needs.

7.    In some of the major markets in the United States, these same title

insurers collectively meet, and jointly set rates and file these rates with the applicable

state insurance authority.  The rates are not subject to any meaningful review or

regulation.  The companies agree to fix the price of title insurance far in excess of the

risk and loss experience associated with such insurance.  As a result of the joint

agreement as to rates, competition is relegated to the middleman.  As a result of their

joint rate setting and agreement, no company competes on price to the consumer.

8. Having agreed to fix prices in states where joint rate setting occurs, the companies agreed to not compete based on price to the consumer in other states, including California, where regulation of filed rates is lax or non-existent. Thus, they agreed to set rates at supra competitive prices and to compete based on offering inducements to middlemen. In California, in three successive reports, the Office of the Insurance Commissioner ("OIC") has found an "astonishing number" of such inducements that are in violation of state law. However, the OIC does not actively oversee or regulate rates, and, in fact, does not by its own admission have the power to do so. The absence of regulation has allowed collusive behavior and excessive rates.

9. In addition to paying inducements and kick-backs, the title companies and their agents divide the market of real-estate middlemen through the use of Affiliated Business Arrangements ("ABAs"), wherein the dominant real estate brokers purchase significant ownership stakes in favored title insurance affiliates. The real estate brokers then reward their associates for using the preferred title insurance providers and lock-out independent title insurers.

10. In this action, plaintiff, on behalf of a Class of those purchasing title insurance in California, seek damages arising from defendants' violations of the Sherman Act as well as California statutory law.

## II. JURISDICTION AND VENUE

11.    This Complaint is filed and these proceedings are instituted under Sections 4 and 16 of the Act of Congress of October 15, 1914, C. 323, Stats. 731, 737 (15 U.S.C. §§ 15, 26) to obtain injunctive relief and to recover treble damages and the costs of suit, including a reasonable attorneys' fee, against defendants for the injuries sustained by plaintiff and the members of the Class which she represents by reason of defendants' and their co-conspirators' violations, as hereinafter alleged, of Section I of the Sherman Act (15 U.S.C. § 1).

12.    Defendants transact business, maintain offices or are found within the Central District of California.  The interstate commerce described hereinafter is carried on, in part, within the Central District of California and the conspiratorial acts herein alleged were carried on, in part, in the Central District of California.

## III. PARTIES

### A.    Plaintiff

13.    Mark Moynahan, during the Class Period, purchased title insurance directly from Chicago Title, one of the defendants herein and has been injured by reason of the antitrust violations alleged.

**B.    Defendants**

14.    Defendant Fidelity National Financial, Inc. ("Fidelity National") is a Delaware corporation headquartered at 601 Riverside Avenue, Jacksonville, Florida 32204.  Fidelity National does business in California through one or more of its subsidiaries, including but not limited to, defendants Fidelity National Title Insurance Company, Ticor Title Insurance Company, Ticor Title Insurance Company of Florida,  National Title Insurance of New York, Inc., Security Union Title Insurance Company, and Chicago Title Insurance Company.  Fidelity National is registered to do business in California.

15.    Defendant Fidelity National Title Insurance Company ("FNTIC") is a California Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.  FNTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

16.    Defendant Ticor Title Insurance Company ("Ticor") is a California Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.  Ticor does business in California, is a licensed title insurance company in California and is registered to do business in California.

17.    Defendant Ticor Title Insurance Company of Florida ("TTICF") is a Florida corporation with its principle place of business at 601 Riverside Ave.,

Jacksonville, Florida 32204. TTICF does business in California, is a licensed title insurance company in California and is registered to do business in California.

18. Defendant Chicago Title Insurance Company ("Chicago Title") is a Missouri Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204. Chicago Title does business in California, is a licensed title insurance company in California and is registered to do business in California.

19. Defendant National Title Insurance of New York, Inc. ("NTINY") is a New York corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204. NTINY does business in California, is a licensed title insurance company in California and is registered to do business in California.

20. Defendant Security Union Title Insurance Company ("SUTIC") is a California corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204. SUTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

21. The Fidelity family of title insurance companies (collectively, "Fidelity") – which includes defendants Fidelity National, FNTIC, Ticor, TTICF, Chicago Title, NTINY and SUTIC, and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including California. Nationally, Fidelity accounts for approximately 27 percent of title premiums, which in 2006 amounted to roughly $4.6 billion. Fidelity, Chicago Title and Ticor were founding members of TIRSA (defined below)

and since TIRSA's inception have charged title insurance rates in New York that TIRSA collectively sets.

22.     The Fidelity family of title insurance companies and their affiliates are wholly-owned and controlled by defendant Fidelity National Financial, Inc. Through its subsidiaries, Fidelity National is a provider of title insurance, specialty insurance, and claims management services. Fidelity National had 2006 revenues of roughly $9.4 billion. The Fidelity family of title insurance companies engaged in the conduct challenged herein with the approval and assent of defendant Fidelity National.

23.     Defendant The First American Corporation ("First American") is a California corporation with its headquarters at 1st American Way, Santa Ana, California 92707. First American does business in California through one or more of its subsidiaries, including but not limited to, defendants First American Title Insurance Company and United General Title Insurance Company.

24.     Defendant First American Title Insurance Company ("FATIC") is a California corporation with its headquarters at 1st American Way, Santa Ana, California 92707. FATIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

25.     Defendant United General Title Insurance Company ("UGTIC") is a Colorado corporation located at 8310 S. Valley Highway, Suite 130, Englewood, CO

80112. UGTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

26. The First American family of title insurance companies (collectively, "First American") – which includes defendants First American, FATIC and UGTIC, and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including California. Nationally, First American accounts for approximately 29 percent of title premiums, which in 2006 amounted to roughly $4.8 billion. First American Title was a founding member of TIRSA and since TIRSA's inception has charged title insurance rates in New York that TIRSA collectively sets.

27. The First American family of title insurance companies and their affiliates are wholly-owned and controlled by defendant The First American Corporation. Through its subsidiaries, First American is a provider of title insurance, business information, and related products and services. First American had 2006 revenues of roughly $8.5 billion. The First American family of title insurance companies and their affiliates engaged in the conduct challenged herein with the approval and assent of defendant First American.

28. Defendant LandAmerica Financial Group, Inc. ("LandAmerica") is a Virginia corporation headquartered at 5600 Cox Road, Glen Allen, Virginia 23060. LandAmerica does business in California through one or more of its subsidiaries, including but not limited to, defendants Commonwealth Land Title Insurance

Company, Lawyers Title Insurance Corporation and Transnation Title Insurance Company.

29.     Defendant Commonwealth Land Title Insurance Company ("CLTIC") is a Pennsylvania corporation with is principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060.  CLTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

30.     Defendant Lawyers Title Insurance Corporation ("LTIC") is a Nebraska corporation with is principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060.  LTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

31.     Defendant Transnation Title Insurance Company ("TNTIC") is a Nebraska corporation with is principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060.  TNTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

32.     The LandAmerica family of title insurance companies (collectively, "LandAmerica") – which includes defendants LandAmerica, CLTIC, LTIC and TNTIC, and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including California.  Nationally, LandAmerica accounts for approximately 19 percent of title premiums, which in 2006 amounted to roughly $3.15 billion.  Commonwealth and

Lawyers Title were founding members of TIRSA and since TIRSA's inception have charged title insurance rates in New York that TIRSA collectively sets.

33.   The LandAmerica family of title insurance companies and their affiliates are wholly-owed and controlled by defendant Land America Financial Group, Inc.   Through its subsidiaries, LandAmerica is a provider of title insurance and other products and services that facilitate the purchase, sale, transfer, and financing of residential and commercial real estate.   LandAmerica had 2006 revenues of roughly $4 billion.   The LandAmerica family of title insurance companies and their affiliates engaged in the conduct challenged herein with the approval of defendant LandAmerica.

34.   Defendant Stewart Title Guaranty Company ("STGC") is a Texas corporation headquartered at 1980 Post Oak Blvd., Suite 800, Houston, Texas 77056. STGC does business in California, is a licensed title insurance company in California and is registered to do business in California.

35.   Defendant Stewart Title Insurance Company ("STIC") is a New York corporation with its principle place of business at 300 E. 42nd St., Floor 10, New York, NY 10017.   STIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

36.   The Stewart family of title insurance companies (collectively, "Stewart") – which includes defendants STGC and STIC, and its affiliates – is engaged in selling title insurance to purchasers of commercial and residential real

estate throughout the United States and California. Nationally, Stewart accounts for approximately 12 percent of title premiums, which in 2006 amounted to roughly $2 billion. Stewart was a founding member of TIRSA and since TIRSA's inception has charged title insurance rates in New York that TIRSA collectively sets.

37. Together, defendants account for more than 85 percent of the title premiums consumers pay in California. Nationally, they account for more than 85 percent of title premiums, which in 2006 amounted to roughly $14.5 billion. Throughout the relevant damages period, defendants charged California consumers in California virtually identical title insurance rates.

## IV. OTHER ENTITIES

38. TIRSA is a voluntary association of title insurers licensed as a rate service organization pursuant to Article 23 of the State of New York Insurance Law. TIRSA maintains its offices in New York City, which until recently were located at the same New York address of Fidelity Title.

39. TIRSA annually compiles from its members statistical data relating to their title insurance premiums, losses and expenses and submits this information in aggregate form to the New York Insurance Department. TIRSA also prepares and submits the New York Title Insurance Rate Manual which sets forth title rates to be charged and rules to be followed by TIRSA's members. The Insurance Department has never objected to any of the rates TIRSA has collectively set. Similarly, the

California OIC has not actually held a public hearing or conducted any other review or regulation of the title insurance rates in California for thirty years.

40. TIRSA's membership is comprised of defendant insurers and all other title insurers that are licensed to issue policies in New York. Currently, Fidelity, First American, LandAmerica, and Stewart collectively represent 14 of TIRSA's 22 members. As such, they comprise a majority voting block which, according to TIRSA's by-laws, allows them to control the operations of TIRSA and, in particular, TIRSA's collective rate setting activity.

41. Various other persons, firms and corporations not made defendants herein have participated as co-conspirators with the defendants in the violations alleged herein and have performed acts and made statements in furtherance thereof.

## V. CLASS ACTION ALLEGATIONS

42. Plaintiff brings this action under Rule 23, and particularly subsection (b)(3), of the Federal Rules of Civil Procedure, on behalf of herself and a Class consisting of all persons excluding governmental entities, defendants, subsidiaries and affiliates of defendants, who purchased directly, from one or more of the defendants and/or their co-conspirators title insurance for residential and commercial property in California beginning in March 2004 and who have sustained damages as a result of the conspiracy herein alleged. The number of potential Class members is so numerous that joinder is impracticable.

43. Plaintiff, as representative of the Class, will fairly and adequately protect the interest of the Class members. The interests of plaintiff are coincident with, and not antagonistic to, those of the Class members.

44. Except as to the amount of damages each member of the Class has by itself sustained, all other questions of fact and law are common to the Class, including but not limited to, the combination and conspiracy hereinafter alleged, the violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and the effects of such violation.

45. Plaintiff, along with all other members of the Rule (b)(3) Class, were injured as a result of paying supracompetitive prices for title insurance in California. These supracompetitive prices were achieved as a result of defendants' illegal price-fixing activities and market allocation and division.

46. Members of the Class include hundreds of thousands, if not millions, of consumers. They are so numerous that their joinder would be impracticable.

47. Plaintiff also brings this action as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure, for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Rule (b)(2) Class includes all members of the (b)(3) Class, and all consumers who are threatened with injury by the anticompetitive conduct detailed herein.

48. Defendants have acted, continued to act, refused to act and continued to refuse to act on grounds generally applicable to the Rule (b)(2) Class, thereby

making appropriate final injunctive relief with respect to the Rule (b)(2) Class as a whole.

49.     Members of the Rule (b)(2) Class include hundreds of thousands, if not millions, of consumers.  They are so numerous that their joinder would be impracticable.

50.     Common questions of law and fact exist with respect to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of law or fact common to the class are the following:

- Whether defendants have engaged in the alleged illegal price-fixing activity and market allocation and division.

- The duration and scope of defendants' alleged illegal price-fixing and market allocation and division activity.

- Whether defendants' alleged illegal price-fixing and market allocation and division has caused higher prices to plaintiffs and other purchasers of title insurance in California.

- Whether the Insurance Commissioner has actively supervised defendants' price fixing and market allocation and division.

51. Plaintiff does not have any conflict of interest with other Class members. Plaintiff's claims are typical of the claims of the Class and they will fairly and adequately reflect the interests of the Class. Counsel is competent and experienced in federal class action and federal antitrust litigation and has been retained to represent the Class.

52. This action is superior to any other method for the fair and efficient adjudication of this legal dispute since joinder of all members is not only impracticable, but impossible. The damages suffered by certain members of the Class are small in relation to the expense and burden of individual litigation and therefore it is highly impractical for such Class members to seek redress for damages resulting from defendants' anticompetitive conduct.

53. There will be no extraordinary difficulty in the management of the Class action.

## VI. TRADE AND COMMERCE

54. During all or part of the period in suit, defendants and their co-conspirators were sellers of title insurance in California.

55. During the period in suit, the defendants sold substantial quantities of title insurance in a continuous and uninterrupted flow in interstate commerce. In 2005, consumers in the United States paid $17 billion for residential title insurance policies.

56. During the period in suit, Class members from locations outside California purchased commercial or residential property and title insurance within California.

57. During the period in suit, the defendants were the major sellers of title insurance in the United States and California. Defendants controlled in excess of 85 percent of the market for title insurance in the United States and California.

58. The activities of the defendants and their co-conspirators, as described herein, were within the flow of interstate commerce and substantially affected interstate commerce.

## VII. FACTUAL ALLEGATIONS

### A. The Nature of Title Insurance

59. Title insurance is one of most costly items associated with the closing of a real estate transaction. In California, rates for title insurance are based on a percentage of the total value of the property being insured. For residential properties, this price ranged in 2005 from about $1,010 (for a $250,000.00) property to $1,490 (for a $500,000 property). For more expensive homes and commercial properties, these prices are significantly higher. This amount spent on title insurance has risen dramatically over the past decade.

60. Title insurance serves an important purpose. It protects the purchaser of a property from any unidentified defects in the title that would in any way interfere

with the full and complete ownership and use of the property with the ultimate right to resell the property. Title insurance is required by lenders in most residential and commercial real estate transactions.

61.     Title insurance companies operate their business on the premise that consumers are generally uninformed or unaware of all matters concerning title insurance. Consumers are generally not presented, at any time, with an opportunity to make an independent decision regarding any aspect of their propery title. That decision is typically made for them by their lawyer, mortgage broker, lender, or realtor. Consequently, for most purchasers, the cost of title insurance is not challenged. Most consumers do not even become aware of the price they will pay and to which insurer they will pay it until the actual closing of the real estate transaction. By then it's too late, consumers can't attempt to negotiate a better title insurance price or alternate provider for fear of delaying or derailing the entire transaction. There is no shopping around. There is no negotiation of price.

62.     This dynamic basically removes the sale of title insurance from the normal competitive process. Unlike the regular forces of supply and demand that keep most industries and their pricing in check, the title insurance industry is not subject to any real competitive constraints. The purchasers of the insurance, in most instances, are not the ones making the purchasing decisions. And, they are certainly in no position to question the price.

63.     The most effective, but illegal, way for a particular title insurer to get business is to encourage those making the purchasing decisions – the real-estate middlemen – to steer business to that insurer.  The best way to so motivate the middlemen is not through lower prices (that they are not even paying).  Rather, it is through kickbacks in the form of finder's fees, gifts, meals, business services and other financial enticements.  Therefore, it is through higher pricing (which allows for generous inducements and kick-backs), not lower pricing, that provides the best way for title insurers to compete and increase their business.

**B.     Price-Fixing in the Large Markets**

64.     New York is one of several states in which the leading title insurers collectively fix their prices through a rate-setting organization like TIRSA.  There are two principal cost components that go into TIRSA's calculation.  One comprises the risk associated with issuing the title policy.  The other comprises the "agency commissions" paid to title agents.

65.     The risk component covers the risk the title insurer bears for any undiscovered defects in the title.  Unlike property insurance, title insurance carries with it a very limited risk of loss to the insurer.  That is because title insurance protects against unknown *prior* events that cause defects in title.  With a proper search and examination of prior ownership records, any such defects can and almost always are readily identified and excluded from the policy's coverage.

Consequently, the average claim payout on a title insurance policy in the United States amounts to only about 5 percent of the total premium collected. This is very different from property coverage (such as auto and home insurance) – which protects against *future* occurrences over which the insurer has little to no control – where the average claim payout amounts to about 80 percent of the total premium.

66. The "agency commissions" component of the title insurance rate covers payments made to title agents. Defendants have an ownership or management stake in many of the title agencies to which these payments are made. A small portion of these payments is for the search and exam of prior ownership records of the property being purchased to identify any liens, encumbrances, burdens, exclusions, or other defects in the title. The search and exam function does not involve the spreading or underwriting of risk, and title insurers typically outsource this task to title agents.

67. The remainder, and by far the bulk, of the agency commissions are comprised of costs unrelated to the issuance of title insurance. These costs include kickbacks and other financial inducements title insurers provide to title agents and indirectly (through title agents) to the lawyers, brokers, and lenders who, in reality, are the ones deciding which title insurer to use. These payments have nothing to do with the issuance of title insurance and are made by title insurers merely to inflate their revenues and steer business their way.

68. Under TIRSA's collective rate setting regime, roughly 85 percent of the total title insurance premium is based on the so-called "costs" associated with the

payment of agency commissions. Only 15 percent is based on costs associated with the risk of loss.

69. TIRSA publishes its final calculated title rates in the New York Title Insurance Rate Manual. These rates are tied to the value of the property being insured. This is so despite the fact that the costs associated with agency commissions are entirely unrelated to the value of the property. Indeed, agency kickbacks and enticements have little to do with producing a particular title policy and provide no value -- proportional to property value or otherwise -- to the consumer. Even search and exam costs are unrelated to property value. They instead depend on the age of the property, the complexity of the ownership history, and the accessibility of prior ownership records.

70. There are other states in which the defendants overtly meet and agree to fix the rates for title insurance as part of a formal collective rate setting process.

**C.    TIRSA's Formation**

71. Prior to TIRSA, the New York Board of Title Underwriters ("NYBTU") served as the title insurance rate-setting body in New York. NYBTU, along with the title insurance rate setting bureaus in many other states, was disbanded in the mid-1980s in the wake of a Federal Trade Commission ("FTC") challenge to the collective rate setting activity of many of these associations. The FTC's challenge culminated in *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621 (1992), where the Supreme

Court held that to avoid *per se* illegal price fixing liability, the rate setting activity of these rating bureaus must be actively supervised by the state.

72. In *Ticor*, the FTC focused its challenge on agency commissions. The FTC contended that the respective state insurance departments merely rubber-stamped this portion of the collectively fixed rates without any independent review or analysis of their reasonableness or cost justification. The Supreme Court agreed with the FTC that this kind of limited state oversight was not sufficient. Rather, to avoid illegal price-fixing liability, the state insurance department has to "exercise[]sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties." *Ticor*, 504 U.S. at 634-35.

73. Following the Supreme Court's instruction in *Ticor*, the Third Circuit on remand in *Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129 (3d Cir. 1992), upheld the FTC's finding that the collective rate-setting of certain state rating bureaus was improper because it was not actively supervised by the state. According to the circuit court, "[t]he Supreme Court plainly instructed us that a state's rubber stamp is not enough. Active supervision requires the state regulatory authorities' independent review and approval." *Id.* at 1139.

74. Defendants formulated TIRSA's first rate manual and procedure soon after the Supreme Court's *Ticor* decision. Through TIRSA, defendants have set up a rate-setting scheme to get around the rigors of state oversight required by *Ticor*.

They have done so by calculating a single rate that comprises both risk and agency commission costs and by outsourcing to title agents the agency commission costs. In this way, defendants avoid providing the Insurance Department with any detailed breakout or backup for the bulk of the costs that make up their collectively fixed rates.

75. TIRSA merely submits an aggregated figure that is supposed to represent the total agency commission costs. Embedded within this figure is the vast quantity of dollars that are funneled to and through the title agencies as kickbacks, financial inducements and other costs unrelated to the issuance of title insurance. Defendants' design in all of this has been to effective "hide" the cost basis for their artificially high and collectively fixed title insurance premiums from the regulatory scrutiny that *Ticor* demands.

**D. Lack of Regulatory Supervision and Authority in New York and Other States Including California**

76. There is no provision under the New York Insurance Law for TIRSA to include in its collectively fixed rates kickbacks and other agency commission payments unrelated to the issuance of title insurance. Indeed, the New York Insurance Department has openly acknowledged that it lacks the authority to review any agency commission payments. It has likewise recognized that defendants' outsourcing of agency commission costs has prevented it from performing a

meaningful review of TIRSA's calculated rates. This was made clear at a November 2006 public hearing the New York Insurance Department held – the first in 15 years – where it questioned TIRSA and its members on TIRSA's failure to provide the Insurance Department with any backup or detail for agency commissions.

77. At the hearing, the Insurance Department conceded that it could not properly evaluate TIRSA's calculated rates, and that it could only do so if it obtained the detailed cost information on agency commissions that TIRSA does not provide.

78. The Insurance Department's recognition that it is not properly supervising TIRSA's rate-setting activity is consistent with the April 2007 findings of the U.S. Government Accountability Office ("GAO") that the title insurance industry is in need of greater state regulation. The GAO studied the industry conditions of several states, including New York, and concluded that "state regulators have not collected the type of data, *primarily on title agents' costs and operations,* needed to analyze premium prices and underlying costs." (Emphasis added.)

79. Unchecked by regulatory review and insulated from competition, defendants have thus been able to collectively fix title insurance rates at supra competitive levels and earn profits that vastly exceed those contemplated by the Insurance Department or that would have resulted in a free and open competitive market.

80.     At the time of TIRSA's formation, the Insurance Department established 5 percent (of the total premium) as the level of profit to which title insurers are entitled.  The Insurance Department is supposed to carefully analyze TIRSA's rate calculations, and, in particular, its revenue and cost information, to ensure that this 5 percent profit level is maintained and based on a reasonable premium.  However, without the authority or ability to scrutinize agency commission costs, the Insurance Department has been unable to perform this function.  As a result, defendants (through TIRSA) have been able to set artificially high title premiums and secure title profits far in excess of the 5 percent threshold.

81.     Through an independent investigation conducted over the past several years, the New York State Attorney General found that for every dollar of insurance premium defendants collected, of the roughly 15 cents that supposedly accounts for the risk of loss, only 3 cents is paid out in claims.  And, of the roughly 85 cents that supposedly covers agency commissions, only between 8 and 11 cents goes to costs actually incurred by title agents in producing the title policy.  These numbers show that title insurers' collectively fixed rates have resulted in profits that untethered to and vastly exceed the costs of producing such policies.

82.     The New York Attorney General's investigation further revealed that what was largely driving these numbers were the kickbacks and other financial inducements defendants were funneling to and through title agents to secure more business.  As reported at the New York Insurance Department's 2006 hearing, one

CLASS ACTION COMPLAINT

- 25 -

title agency's financial statements revealed that it spent more than $1 million of these so-called "agency commissions" on items identified as "Christmas", "automobile expenses", "political contributions", "promotional expenses", and "travel and entertainment". These expenses are not even remotely related to the issuance of title insurance.

83.     A report to the California Inurance Comissioner prepared by Barry Birnbaum, Consulting Economist, in December 2005, found strikingly similar abuses, "We found numerous examples in California of illegal rebates and kickbacks where the title insurer or the underwritten title company provides money, free services or other things of value to a real estate agent, a lender or homebuilder in exchange for business referrals."(*An Analysis of Competition in the California Title Insurance and Escrow Industry,* December 2005, p. 3)

84.     All of this "excess money" paid to title agents not only works to steer business to defendants. It also serves to boost defendants' own profits through the inflated revenues they obtain to cover these agency payments and through their ownership or management stake in many of these agencies.

85.     Defendants are competitors in the sale of title insurance to consumers throughout the United States. These title insurers have agreed and engaged in concerted efforts to (i) collectively set and charge uniform and supracompetitive rates for title insurance, (ii) include in their calculated rates agency commission costs, (iii) embed within these costs payoffs, kickbacks, and other charges that are

CLASS ACTION COMPLAINT

unrelated to the issuance of title insurance, and (iv) hide these supposed "costs" from regulatory scrutiny by funneling them to and through title agents over which the government agencies have no ability or authority to regulate.

86.     The GAO in its 2007 report entitled "Actions Needed to Improve Oversight of the Title Insurance Industry and Better Protect Consumers" found several indicia of a lack of competition and questions about the reasonableness of prices including:

- Consumers find it difficult to shop for title insurance, therefore, they put little pressure on insurers and agents to compete based on price;

- Title agents do not market to consumers, who pay for title insurance, but to those in the position to refer consumers to particular title agents, thus creating potential conflicts of interest;

- A number of recent investigations by HUD and state regulatory officials have identified instances of alleged illegal activities with the title industry that appear to reduce price competition and could indicate excessive prices;

CLASS ACTION COMPLAINT

- 27 -

- As property values or loan amounts increase, prices paid for title insurance by consumers appear to increase faster than insurers' and agents' costs; and

- In states where agents' search and examination services are not included in the premium paid by consumers, it is not clear that additional amounts paid to title agents are fully supported by underlying costs.

87. The GAO visited several states, including California, and found a lack of regulatory oversight:

> In the states we visited, we found that regulators did not assess title agents' costs to determine whether they were in line with premium rates; had made only limited efforts to oversee title agents (including ABAs involving insurers and agents); and, until recently, had taken few actions against alleged violations of antikickback laws. In part, this situation has resulted from a lack of resources and limited coordination among different regulators within states. On the federal level, authority for alleged violations of section 8 of RESPA, including those involving increasingly complex ABAs, is limited to seeking injunctive relief. Some state regulators expressed frustration with HUD's level of responsiveness to their requests for help with enforcement, and some industry officials said that RESPA rules regarding ABAs and referral fees need to be clarified. Industry and government stakeholders have proposed several regulatory changes, including RESPA reform, strengthened regulation of agents, a competitor right of action with no monetary

penalty, and alternative title insurance models. [*Id.* at 41, footnotes omitted.]

## E.  Competition Based on Kickbacks and Inducements But Not Rates

88.  Having agreed to fix or stabilize prices in New York and other states where they overtly meet to promulgate rates, these same defendants then set out to do the same in other states.

89.  In other words, as a direct result of these meetings where rates were agreed to, these same defendants agreed, either expressly or tacitly, to not compete on rates in other states as well. To compete on rates in other states could and would imperil their ability to maintain the agreed rate in states like New York.

90.  As is the case in New York, a lack of regulatory authority over rates created an environment in which a conspiracy can and did succeed. No agency was examining why all the rates were virtually identical, and no agency was examining whether the costs associated with these premiums were reasonable. This is an environment which is conducive to price fixing.

91.  In California, there is a lack of regulatory authority and oversight over title insurance companies. The rates in California are not set as part of a deliberate state intervention and the state does not and cannot meaningfully renew or approve these rates. The rates at issue in this case went into effect without review.

92.  In fact, in February of 2007, the Insurance Comissioner of California, Steve Poizner issued a statement concluding "that reasonable price competition does

not exist for title and escrow services." (*Inurance Commisssioner Steve Poizner Issues Statement Following Decision by OAL on New Regulations*, California Department of Insurance, February 22, 2007)

**F.  Other Indicators of a Lack of Competition and Conditions Conducive to Collusive Rate Setting**

93.  In addition to the uniformity of rates, other facts suggest that it is more plausible than not that rates have been set based on an agreement to fix prices.

94.  In theory, the chain of title should be documented back to its historic grant of ownership centuries in the past.  Fear about a possible title defect in the distant past is widely used as a justification by title agencies when convincing property buyers to purchase an owner policy in addition to the lender policy, which is mandatory to secure a mortgage.  The title agency, however, saves much time and money when the search is limited to one or two transactions.  They rely on the insurance policy to cover the remote chance of missing an earlier but still-valid claim.  If such a claim is asserted and survives the scrutiny of the title insurance company's legal department, the expected cost of compensation is likely to be less than the sum of added overhead costs of routinely tracing back every chain of title to the earliest registered owner in the distant past.

95.  Title insurance industry officials tend to justify the large proportion of the premium retained by the title abstract and settlement agency (from 60 to more

than 90 percent) by the alleged high cost of title searching back into the distant past. In fact, a high proportion of noncommercial properties are searched only through the most recent transaction. No information is available as to what proportion of claims originate in the distant past. The industry has never published pertinent statistics. It would have a marketing incentive to publish these statistics if the risk were significant; that it has not published these statistics indicates that the risk probably is only slightly greater than zero.

96.     Many U.S. homes are being resold three or four times in twenty-five years. At each of these occasions, an abstract of title will be prepared on the basis of a more or less thorough review of the available title records, inheritance records, family records and records of past or current liens against a property. It is reasonable, therefore, to suspect that the risk of a title defect will decrease every time a property is sold.

97.     Title searches have become less labor intensive, especially in large urban counties and cities. More and more of the information is available online. The statistical likelihood that a title default would be overlooked is a closely held industry secret, but it appears to be so small that many transactions are now insured on the basis of a search of the last owner's title history or a search into transactions that occurred during the last twenty-five to thirty-five years. The evidence is strong that the title insurance industry has achieved a remarkably high level of loss minimization. Indeed, the national everage recovery for a claim on a title insurance

policy is appoximately 5% of the total premium. On the other hand, the national average for property insurance is approximately 80% of the total premium collected.

98. Thus the costs of production have decreased as has the risk of loss yet none of these factors has resulted in price competition at the consumer level.

99. There is a remarkable absence of rate changes by title insurers over the past five years, despite declining costs of production, increased number of transactions and increased revenue per transaction. During a period when costs per unit of production declined significantly, underwritten title companies and title insurers maintained excessive rates. The prices charged by title insurers and underwritten title companies were not and are not responsive to the changing costs of production or increasing revenue per transaction at a given set of rates. Again, this is indicia of an agreement not to compete based on price.

100. As noted, the title companies engage in illegal rebates and kickbacks where the title insurer or the underwritten title company provides money, free services or other things of value to a real estate agent, a lender or homebuilder in exchange for business referrals. These illegal rebates and kickbacks – a consequence of reverse competition – show that title insurance rates are supra competitive and that some portion of the overcharge is passed from the underwritten title company or title insurer to the referrer of business.

101. A lack of competition and the ability to control prices is enhanced by the fact that there were few title insurer entrants over the period from 1995 through

2005 and the number of title insurer groups declined as title insurers acquired other title insurers. There were few underwritten title company entrants over the 2000 to 2005 period and new entrants were controlled business arrangements whose addition to the market did not result in greater price competition.

102. Access to title plants can be a barrier to entry, but a large barrier to entry exists due to the established relationships between the entities that can steer the consumer's title and escrow business and the entities who sell title insurance and escrow services.

103. The title insurance market is highly concentrated – a few title insurers account for the vast majority of title insurance sales – at both the statewide level and at the county level in California. For example, three title insurer groups account for 77.4% of the market at a statewide level. At the county level, each individual market was highly concentrated. The GAO found that First American and Fidelity had a market share of 66 percent. Such a concentration enhances the ability of companies to fix prices

104. The agreement not to compete based on price is also evidenced by the fact that no company has marketed its services to consumers, the ultimate purchasers of the product. This is in marked contrast to real insurance, for example, car insurance, where the companies compete vigorously with well recognized slogans such as State Farm's "Like a Good Neighbor," or Allstate's "good hands," or the cute (to some) GEICO gecko promising low prices.

CLASS ACTION COMPLAINT

105.   As a result of this lack of competition, California title insurance and escrow services markets have enjoyed excessive profits, "In a competitive market, sellers earn a reasonable profit.  In the California title insurance and escrown services markets, bot the title insurers and the underwritten title companies realized excessive profits over an extended period of time.  In 2003 and 2004, underwritten title companies in California earned after-tax profits of 49.0% and 32.3% respectively – excessive by any reasonable measure." (*An Analysis of Competition in the California Title Insurance and Escrow Industry,* December 2005, p. 2)

## VIII.  CLAIMS FOR RELIEF

### COUNT I

### Violation of the Sherman Act

106.   Plaintiff incorporates by reference the preceding allegations.

107.   Beginning at least as early as May 2004, and continuing thereafter to the present, the exact dates being unknown to plaintiff, defendants and their co-conspirators engaged in a combination and conspiracy in unreasonable restraint of the aforesaid interstate trade and commerce in violation of Section 1 of the Sherman Act.

108.   The aforesaid combination and conspiracy has consisted of a continuing agreement, understanding and concert of action among the defendants and their co-conspirators, the substantial terms of which have been:

(a)     to fix, raise, maintain and stabilize the price of title insurance throughout California;

(b)     to fix, raise, maintain and stabilize the terms and conditions of sale of title insurance in Californi; and

(c)     to allocate and divide the market for title insurance in California.

109.   In the absence of proper regulatory authority and oversight, defendants' conduct constitutes a horizontal agreement to fix the form, structure, and prices of title insurance and to allocate and divide the title insurance market in California and is a *per se* violation of Section I of the Sherman Act.

110.   Defendants' price-fixing, market allocation and division activity has been continuous throughout the relevant damages period and has been renewed and reinforced annually through submissions to the OIC of supposed cost and revenue information and its periodic submissions of rate changes.

111.   Through their collective price-fixing, market allocation and division and manipulation of the regulatory process, defendants have harmed competition by charging consumers supra competitive prices for title insurance in California, evidenced in part by the fact that the prices are uniformly higher than compared with the cost of providing the insurance.

112.   The aforesaid combination and conspiracy has had the following effects among others:

(a)     price competition in the sale of title insurance has been suppressed, restrained and eliminated;

(b)     prices for title insurance have been raised, fixed, maintained and stabilized at artificially high and non-competitive levels; and

(c)     purchasers of title insurance have been deprived of the benefit of free and open competition.

113.    During the period of the antitrust violations by defendants and their co-conspirators, plaintiff and each member of the Class she represents, has purchased title insurance and, by reason of the antitrust violations herein alleged, paid more for such that it would have paid in the absence of said antitrust violations.  As a result, plaintiff and each member of the Class she represents, has been injured and damaged in an amount presently undetermined.

## COUNT II

### Violation of Cal. Bus. and Prof. Code §§ 16720, *et seq.*

114.    Plaintiff incorporates by reference the preceding allegations.

115.    Defendants conduct as set forth above is in violation of the Cartwright Act of California (Cal. Bus. & Prof. Code §§ 16720, *et seq.*).

116.    As a direct result of defendants' unlawful acts plaintiffs have paid artificially inflated prices for title insurance and have suffered injury to their business and property.

## COUNT III

### (California's Business & Professions Code §§ 17200, *et seq.*)

117. The preceding paragraphs of this Complaint are realleged and incorporated by reference. Plaintiff asserts this claim for violations of California's UCL, Bus. & Prof. Code §§ 17200, *et seq.*, on behalf of herself and the members of the Class.

118. Defendants' statements and representations constitute unfair, unlawful and deceptive trade practices in violation of the UCL.

119. All of the wrongful conduct alleged herein occurs and continues to occur in the conduct of defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is repeated in the State of California on hundreds, if not thousands, of occasions daily.

120. Plaintiff has suffered injury in fact and has lost money or property as a result of defendants' unfair, unlawful and/or deceptive practices by paying a higher price for title insurance then she would or should have absent the conduct complained of.

121. Plaintiff requests that this Court enter such orders or judgment as may be necessary to enjoin the defendants from continuing its unfair, unlawful, and/or deceptive practices, to restore to any person in interest any money which may have been acquired by means of such unfair competition and to disgorge any profits

realized by defendants as a result of its unfair, unlawful and/or deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code § 3345, and for such other relief as set forth in the Prayer for Relief.

## COUNT IV

## UNJUST ENRICHMENT

122. Plaintiff incorporates by reference the preceding allegations.

123. This Cause of Action is pled in the alternative to all claims and/or causes of action at law.

124. Defendant has received a benefit from plaintiff and the Class members in the form of the prices plaintiff and the Class members paid for defendants' title insurance.

125. Defendants are aware of their receipt of the above-described benefit.

126. Defendants received the above-described benefit to the detriment of plaintiff and each of the other members of the Class.

127. Defendants continue to retain the above-described benefit to the detriment of plaintiff and the Class members.

128. As a result of defendants' unjust enrichment, plaintiff and the Class members have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

# PRAYER FOR RELIEF

WHEREFORE, plaintiff demands:

A.     That the alleged combination and conspiracy among the defendants and their co-conspirators be adjudged and decreed to be an unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

B.     That the Court declare that the premiums charged are excessive under state law and order damages;

C.     That judgment be entered against defendants, jointly and severally, and in favor of plaintiff, and each member of the Class it represents, for threefold the damages determined to have been sustained by plaintiff, and each member of the Class it represents, together with the cost of suit, including a reasonable attorneys' fee;

D.     Each of the defendants, successors, assignees, subsidiaries and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf thereof or in concert therewith, be perpetually enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the aforesaid combination, conspiracy, agreement, understanding or concert of action, adopting or following any practice, plan, program, or design having a similar purpose or effect in restraining competition; and

E.     Such other and further relief as may appear necessary and appropriate.

## JURY TRIAL DEMANDED

Pursuant to Rule 38, F.R.C.P., plaintiff demands a trial by jury of the claims alleged herein.

DATED:  June 3 , 2008

Brian Barry
LAW OFFICES OF BRIAN BARRY
1801 Avenue of the Stars, Suite 307
Los Angeles, California 90067
Telephone:  (310) 788-0831
Facsimile:   (310) 788-0841

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Alicemarie H. Stotler and the assigned discovery Magistrate Judge is Arthur Nakazato.

The case number on all documents filed with the Court should read as follows:

## SACV08- 620 AHS (ANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| [ ] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [X] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Mark Moynahan, on behalf of himself and all others similarly situated, <br><br> PLAINTIFF(S) <br><br> v. <br><br> FIDELITY NATIONAL FINANCIAL, INC., et. al. (see attachment) <br><br><br> DEFENDANT(S). | CASE NUMBER <br><br> SACV08-0620 AHS (AMx) <br><br><br><br> SUMMONS |

TO:      DEFENDANT(S):

     A lawsuit has been filed against you.

     Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Brian Barry_____, whose address is _1801 Avneue of the Stars, Suite 307_____.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.


                                                      Clerk, U.S. District Court

Dated: _____JUN - 4 2008_____        By: _Natalie Songeric_____
                                                       Deputy Clerk

                                                 *(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

1   Brian Barry (135631: bribarry1@yahoo.com)
    LAW OFFICES OF BRIAN BARRY
2   1801 Avenue of the Stars, Suite 307
    Los Angeles, California 90067
3   Telephone:  (310) 788-0831
    Facsimile:  (310) 788-0841
4

5   *Attorneys for Plaintiff*

6               **UNITED STATES DISTRICT COURT**

7               **CENTRAL DISTRICT OF CALIFORNIA**

8   Mark Moynahan, on behalf of himself and all      )
9   others similarly situated,                       )   Case No.
                                                     )
10                          Plaintiff,                )
                                                     )
11          v.                                        )   **CLASS ACTION**
                                                     )   **COMPLAINT**
12   FIDELITY NATIONAL FINANCIAL, INC.,              )
     FIDELITY NATIONAL TITLE                          )   **JURY TRIAL DEMANDED**
13   INSURANCE COMPANY, TICOR TITLE                  )
     INSURANCE COMPANY, TICOR TITLE                  )
14   INSURANCE COMPANY OF FLORIDA,                   )
     CHICAGO TITLE INSURANCE                          )
15   COMPANY, NATIONAL TITLE                          )
     INSURANCE OF NEW YORK, INC.,                    )
16   SECURITY UNION TITLE INSURANCE                  )
     COMPANY, THE FIRST AMERICAN                     )
17   CORPORATION, FIRST AMERICAN                     )
     TITLE INSURANCE COMPANY, UNITED                 )
18   GENERAL TITLE INSURANCE                          )
     COMPANY, LANDAMERICA FINANCIAL                  )
19   GROUP, INC., COMMONWEALTH LAND                  )
     TITLE INSURANCE COMPANY,                         )
20   LAWYERS TITLE INSURANCE                          )
     CORPORATION, TRANSNATION TITLE                  )
21   INSURANCE COMPANY, STEWART                      )
     TITLE GUARANTY COMPANY and                      )
22   STEWART TITLE INSURANCE                          )
     COMPANY                                          )
23                                                   )
                                                     )
24                          Defendants.               )
                                                     )
25

26

27

28



CLASS ACTION COMPLAINT

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Mark Moynahan, on behalf of himself and all others similarly situated, PLAINTIFF(S) <br><br> v. <br><br> FIDELITY NATIONAL FINANCIAL, INC., et. al. (see attachment) <br><br> DEFENDANT(S). | **CASE NUMBER** <br><br> SACV08-0620 AHS (ANx) <br><br> **SUMMONS** |

TO:     DEFENDANT(S):

          A lawsuit has been filed against you.

          Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, Brian Barry _____, whose address is 1801 Avneue of the Stars, Suite 307 _____.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

                                                        Clerk, U.S. District Court

          Dated:  ___JUN - 4 2008___          By: __NATALIE LONGORIA__
                                                              Deputy Clerk

          *[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

1198

Brian Barry (135631: bribarry1@yahoo.com)
LAW OFFICES OF BRIAN BARRY
1801 Avenue of the Stars, Suite 307
Los Angeles, California 90067
Telephone: (310) 788-0831
Facsimile: (310) 788-0841

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Mark Moynahan, on behalf of himself and all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| FIDELITY NATIONAL FINANCIAL, INC., FIDELITY NATIONAL TITLE INSURANCE COMPANY, TICOR TITLE INSURANCE COMPANY, TICOR TITLE INSURANCE COMPANY OF FLORIDA, CHICAGO TITLE INSURANCE COMPANY, NATIONAL TITLE INSURANCE OF NEW YORK, INC., SECURITY UNION TITLE INSURANCE COMPANY, THE FIRST AMERICAN CORPORATION, FIRST AMERICAN TITLE INSURANCE COMPANY, UNITED GENERAL TITLE INSURANCE COMPANY, LANDAMERICA FINANCIAL GROUP, INC., COMMONWEALTH LAND TITLE INSURANCE COMPANY, LAWYERS TITLE INSURANCE CORPORATION, TRANSNATION TITLE INSURANCE COMPANY, STEWART TITLE GUARANTY COMPANY and STEWART TITLE INSURANCE COMPANY | **JURY TRIAL DEMANDED** |
| Defendants. | |

COPY

CLASS ACTION COMPLAINT

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
Mark Moynaham

**DEFENDANTS**
Fidelity National Financial, Inc., et. al.

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Law Offices of Brian Barry
1801 Avenue of the Stars, Suite 307, Los Angeles, CA 90067
Phone: (310) 788-0831

Attorneys (If Known)

---

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff    ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant    ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

---

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify):    ☐ 6 Multi-District Litigation    ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes ☐ No    ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Sherman Act reuqetst for antitrust injunctive releif

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☒ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE/ PENALTY** | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **REAL PROPERTY** | | ☐ 640 R.R. & Truck | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | **IMMIGRATION** | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 462 Naturalization Application | | ☐ 690 Other | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 240 Torts to Land | ☐ 463 Habeas Corpus- Alien Detainee | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

# SACV08-0620

**FOR OFFICE USE ONLY:**    Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

